1          A      I think I was in Ukraine.

2          Q      And when you received the first copy of

3    your statement, did you read it?

4          A      Of course I did.

5          Q      Did you make any suggested changes?

6          A      Yes, of course.

7          Q      And were those changes then incorporated

8    into the declaration that you eventually signed?

9          A      Yeah, of course.

10         Q      Did you discuss your statement with

11   anybody other than Mr. Chalos or Mr. Seward or their

12   employees?  Such as discussing it with Mr. Ivanov or

13   your father or your mother?

14         A      No, it was -- I think I discussed it with

15   Michael Ivanov.

16         Q      And did Mr. Ivanov help you with this

17   statement?

18         A      I wouldn't say helped.  I'm just -- just

19   asked him if everything is okay, and that's it.  I

20   wouldn't say he helped me.

21         Q      The assets that you have identified,

22   being the ten capes, two tankers, seven coastal

23   vessels, 14 tugs, barges, seven fleet cranes, and a

24   couple of transhippers, are any of them -- are all of

25   those unencumbered?



1        A        Yeah.

2        Q        When was the last time that Deloitte did

3    an audit of your companies?

4        A        I think half a year we did, I think, as

5    far as I recall.

6        Q        Do you do quarterly or every half year,

7    every six months, audits?

8        A        It depends.  Usually annually.  This year

9    we might semi-annually.

10       Q        Was Price Waters Coopers ever your

11   accountants?

12       A        That's a good question.  I think at some

13   period of time, yes.

14       Q        Did they provide -- did Price Waters

15   Coopers provide you with an audit or unaudited

16   statement in 2009?

17       A        Yes.

18       Q        Have you met with Mr. Cherepanov

19   recently?

20       A        Recently, no -- by coincidence I saw him

21   in restaurant in Odessa and I said hello.  That's it.

22       Q        What about Mr. Tarasov?

23       A        I haven't seen him in a long time.

24       Q        What about Mr. Kozminkikh?

25       A        Kozminkikh?  Kozminkikh I met half year,



1   but we are living in the same city so it's natural that

2   we meet somewhere, apart from Cherepanov.  Cherepanov

3   lives in Greece and visits Odessa, not frequently, to

4   the best of my knowledge.

5                    (Specially Appearing Defendant Freight

6                    Bulk PTE, Ltd.'s Responses and Objections

7                    to Plaintiff's Revised Supplemental

8                    Requests for Production of Documents

9                    marked as Baransky Exhibit Number 6)

10   BY MR. BENNETT:

11        Q     Have you ever seen that document before?

12        A     I think I -- I don't recall.  Maybe.

13   There are so many documents, you know, I don't recall.

14        Q     When did you first come to learn that

15   Vista, Freight Bulk and ICI were required to respond to

16   a document request made by Flame in this action?

17                    MR. CHALOS:  Objection.  That misstates

18   the law, Bill, and it's misleading.

19                    Vista and ICI are not obliged to respond

20   to anything.  There is an appearance in this case by

21   specially-appearing Defendant FBP as the owner of the

22   vessel that your client wrongfully attached.

23                    You can ask the witness whatever you want

24   to ask him, but it's improper to ask him questions that

25   call for legal conclusions or set forth a misleading



1    predicate.

2                MR. BENNETT:  Anything else you would

3    like to say?

4                MR. CHALOS:  Probably, but not at this

5    time.

6                MR. BENNETT:  Okay.

7    BY MR. BENNETT:

8        Q    When did you first come to know that you

9    would have to produce documents?

10       A    Last week or previous week.

11       Q    And how did you come to know that?

12       A    I don't recall.  I think through MSB

13   probably.

14       Q    Were you given a document to read or were

15   you told to obtain documents?

16       A    Of course I was given document to read,

17   yeah.

18       Q    And after reading that document, did you

19   speak to any employees of yours to obtain

20   documentation?

21       A    Yeah.

22       Q    And did you tell them to locate documents

23   that were responsive to the request?

24       A    I consulted with my counsel and I was

25   told what is not -- what is not required to be



```
 1  produced.
 2       Q     Were you instructed not to bring certain
 3  documents?
 4       A     No.
 5       Q     When -- did you review documents that
 6  were e-mailed from your office?
 7       A     Yeah.
 8       Q     And were any of the documents that were
 9  given to you by your office via e-mail not included in
10  the package of documents we reviewed earlier today?
11       A     No.
12       Q     But there are certain documents that were
13  taken out of that e-mail --
14       A     No.
15       Q     -- and not provided --
16       A     No.  To the best of my knowledge, no.
17       Q     And how do you know that?
18       A     I believe so.
19       Q     Were you present when the documents were
20  being printed out?
21       A     No.
22       Q     Did you review all of the documents that
23  were given to me, which is part of Exhibit --
24             MR. CHALOS:  Maybe 4.
25
```



1   BY MR. BENNETT:

2        Q     -- Exhibit 4?

3        A     How to say -- not deeply.  I reviewed.

4        Q     Do you know whether there are any

5   documents that were part of the e-mails that are not

6   contained in 4?

7        A     I -- I don't know.

8        Q     Were you aware that I was agreeable to

9   come to London to take your deposition?

10       A     Yeah.

11       Q     And did you want to go to London for your

12   deposition or did you prefer to come here?

13       A     I don't really care.  I can go --

14       Q     So are you here voluntarily?

15       A     Yup, of course voluntary.  How -- nobody

16   can force me.

17       Q     Sir, I'm going to serve you with a

18   Complaint on behalf of Vista and as a shareholder of

19   ICI.  You've been personally served.

20             MR. CHALOS:  First off, this is improper,

21   Mr. Bennett.

22             Second off, you know the rules about

23   serving a litigant that's come in in connection with a

24   lawsuit.

25             And second off --



1              MR. BENNETT:  We can fight that in court.
2   That's just --
3              MR. CHALOS:  I don't see -- you're
4   serving what?
5              MR. BENNETT:  Summons and Complaint.
6              MR. CHALOS:  In connection with what?
7              MR. BENNETT:  In connection with the
8   lawsuit against ICI and Flame and Freight Bulk.
9              MR. CHALOS:  You are serving him in his
10  capacity as what?
11             MR. BENNETT:  Capacity as the single
12  shareholder of Vista and the director of Vista and the
13  controller of Vista and as a 20 percent shareholder of
14  ICI.
15             But we're going to move on the
16  deposition.  If you have a motion to make about it, you
17  can make the motion later on.
18  BY MR. BENNETT:
19         Q    Sir --
20             MR. CHALOS:  Sorry, I'm --
21             (Discussion off the record)
22             MR. CHALOS:  Let me make sure I
23  understand if I get this right.
24             MR. BENNETT:  It's my deposition.  I'm
25  going to continue with my questioning.



1            MR. CHALOS:  No, you're not.

2            MR. BENNETT:  Yes, I am.

3            MR. CHALOS:  No, no, you have interrupted

4   your deposition to try and serve process which is,

5   first off, an amateur intimidation tactic; but second

6   off, it's improper; third off, we'd like to understand

7   what the purpose of what you signed here is.

8            MR. BENNETT:  I am not going to debate it

9   right now during my deposition.

10            MR. CHALOS:  Okay.

11   BY MR. BENNETT:

12        Q    Are you ready for the next question?

13            MR. CHALOS:  Then you can take it back.

14            MR. BENNETT:  Okay.

15            THE WITNESS:  Can we take a break?

16            MR. CHALOS:  You can take a break, but I

17   don't understand what we're talking about.

18   BY MR. BENNETT:

19        Q    Sir, sir, can you look at the exhibit

20   with the responses.

21        A    Yup.

22            MR. CHALOS:  Just a second.  Are you

23   saying that this witness, as a representative of Vista,

24   is found here?  Because if that's the case, then why

25   are we fooling with a Rule B?  And I don't understand



1  what you're doing here, so I'd like to understand while

2  we're here, because that may make your whole Rule B

3  moot and the ship should be able to sail immediately if

4  that's what your game is.

5           I mean, so let's -- can we talk about

6  what we have going?

7           MR. BENNETT:  No, I'm going to take my

8  deposition.

9  BY MR. BENNETT:

10       Q     Sir, can you grab your document

11  responses.

12       A     Can I take a break, please.

13       Q     Do you need a break?

14       A     Yeah.

15       Q     Okay.  We'll take a break.

16           (Recess)

17           MR. CHALOS:  Put in request that we're

18  adjourning the deposition --

19           MR. BENNETT:  No way.

20           MR. CHALOS:  -- and requesting that a

21  call be made, placed to chambers, and we're not going

22  to continue until we have resolution of the issue.

23           MR. BENNETT:  What's the issue?

24           MR. CHALOS:  You didn't want to hear it

25  before.  I told you what it was, but, you know, we'll



1    talk about it --

2              MR. BENNETT:  That's not an issue that

3    should stop the deposition.  We can discuss it tomorrow

4    with the judge.

5              MR. CHALOS:  No, we'll do it now.  If the

6    judge isn't available, I will reconsider, but I would

7    like to get this resolved.

8              MR. BENNETT:  What's the resolution?  I

9    don't understand what you are trying to get resolved.

10   He is either served or not served.  And you can do that

11   in 10 days, 20 days, 30 days.

12             MR. CHALOS:  No.  Because this is an

13   improper tactic.  You know, the man's come here, you

14   attach property that he unofficially owns --

15             MR. BENNETT:  Which you claim is

16   wrongful, which is fine, you know, I mean, that's the

17   dispute, George.

18             MR. CHALOS:  You asked me to explain to

19   you and you are going to cut me off.

20             MR. BENNETT:  Okay.  So go ahead.

21             MR. CHALOS:  It's okay.

22             MR. BENNETT:  I won't cut you off.

23             MR. CHALOS:  It's okay.

24             Viktor --

25             (Recess)



1          MR. BENNETT:  Just to put a statement on

2    the record, prior to taking an adjournment, I had

3    provided Mr. Baransky with a copy of the Summons and

4    Complaint that was filed in this action with the

5    purpose of serving him in his capacity as an ICI

6    shareholder and a Vista director.

7          I'm withdrawing that service without

8    prejudice so we can move on.

9          Good enough?

10         MR. CHALOS:  Agreed, yeah.

11         MR. BENNETT:  Okay, great.

12   BY MR. BENNETT:

13    Q    Sir, if you can take the last exhibit

14   that we marked, which was the --

15    A    6.

16    Q    -- 6.

17    A    Yes.

18    Q    If you go to page 4.

19    A    All right.

20    Q    Let's go through some of the requests

21   that were made and the responses; okay?

22    A    Um-hum.

23    Q    In the first request we had asked for any

24   and all documents concerning monthly bank statements

25   for all three defendants and their subsidiaries for the



1    period January 1, 2008 to January 31, 2011.

2           A       To December 31?

3           Q       Yes, December 31, 2011.

4                   Do you see that?

5           A       Yup.

6           Q       Was Vista -- strike that.

7                   You'll agree with me that Vista was an

8    active company from November of 2008 up until

9    December 31 of 2011; correct?

10          A       I agree with you.

11          Q       And you as the controller of Vista do

12   have access to monthly bank account statements for

13   Vista; correct?

14          A       Correct.

15          Q       But you did not produce those in -- for

16   me to review; correct?

17          A       Yeah, because I'm not -- I'm acting on

18   behalf of FBP presently.

19          Q       And is that the sole reason why you have

20   not produced them, is because you're here only as FBP?

21          A       Yes.

22                  MR. CHALOS:  Can I just -- I'm assuming

23   the question is his understanding and not asking for

24   legal conclusions?

25                  MR. BENNETT:  Yes.



```
 1  BY MR. BENNETT:
 2        Q      Your understanding.
 3        A      Yes.
 4        Q      You will agree with me though that the
 5  CAPE VIEWER was purchased using monies that belonged to
 6  Vista; correct?
 7        A      CAPE VIEWER was purchased by money which
 8  belonged from Sea Traffic to be quite accurate.
 9        Q      Which you controlled?
10        A      Yes.
11        Q      Which was money that was earned by Vista?
12        A      Yeah.
13        Q      And HACHI, for all intents and purposes?
14        A      HACHI is not making money.
15        Q      It's just a holding company?
16        A      Yeah.
17        Q      Okay.  Is it your testimony as you sit
18  here today that you have no access to any documents
19  that belong to ICI?
20        A      Yeah, yeah, that's my testimony.
21        Q      Do you know where those documents are
22  located?
23        A      Well, I can only guess.  Well, before, as
24  far as I know, they were located in Greek office, which
25  is center -- which is financial, was financial center
```



1  of industry locaters.

2          Before, as per my understanding, they

3  were there, my belief, but now, I don't know, when I

4  was working for IC Ukraine.

5      Q      After receiving this document request,

6  did you ever have a conversation with your father about

7  whether he can provide you with documents responsive to

8  this request?

9      A      No, I didn't ask him.

10     Q      With respect to document request number

11  2, we were seeking FFA contract settlements for the

12  year 2008.

13          FBP doesn't have those documents in hand;

14  right?

15     A      Um-hum.

16     Q      Correct?

17     A      Correct.

18     Q      And if we wanted those documents, you

19  would have had to have had that conversation with your

20  father to ask him if those exist; correct?

21     A      Yeah.

22     Q      But you didn't have that conversation?

23     A      No.  No.  I didn't ask him for anything.

24     Q      With respect to item number 3, we had

25  asked for any and all documents concerning the minutes



1  of board minutes of each named defendant and its

2  respective subsidiaries for the period January 2008 and

3  December 31, 2013.

4          A     Yeah.

5          Q     Do you see that?

6          A     Yes.

7          Q     And if you can take a look at the

8  documents Bates-stamped 00109 to 115, which is part of

9  Exhibit 4.

10         A     Yeah.  109, yeah.

11         Q     Yes.  It would be 109 to 115.

12         A     Yeah, yeah.  Yeah, I have that.

13         Q     Is that the -- to the best of your

14 recollection, is it fair to say that those documents

15 are the only documents responsive to that request?

16         A     We're talking about FBP now; right?

17         Q     Yes, Freight Bulk.

18         A     Yeah, yeah, I think -- I believe so,

19 yeah.

20         Q     In that same time period, January 1,

21 2008, to December 31st, 2013, notwithstanding that

22 Vista start in the November of 2008, during that time

23 period, did Vista have board meetings?

24         A     So did Vista have board meetings for --

25 which time to which time?



```
 1          Q       From its inception until today.

 2          A       Probably there were.  There were.  Not so

 3   many, but there were.

 4          Q       And were there minutes of board meetings?

 5          A       I think so, yeah.

 6          Q       And with respect to ICI, in the year 2008

 7   are you aware of board meetings that took place?

 8          A       No, I'm not aware.

 9          Q       Did you, after receiving this document

10   request, did you speak to your dad to see if he could

11   provide you with minutes?

12          A       I didn't speak with him about this at

13   all.  I -- he didn't -- he didn't see even this

14   request.

15          Q       With respect to request number 4, we

16   asked for any and all documents concerning records

17   relating to the identity of all the shareholders for

18   each named defendant and its respective subsidiaries

19   for the time period January 1, 2008, to December 1,

20   2013.

21                  Do you see that request?

22          A       Yeah, yeah.

23          Q       And the response identifies certain

24   documents; correct?

25          A       The response -- point number 4; right?
```



```
 1                 Yeah, yeah.  Do you want me to see
 2   this --
 3         Q       Well, my question is did you produce
 4   anything on behalf of Vista?
 5         A       To the best of my recollection, no.
 6         Q       Did you provide anything on behalf of
 7   ICI?
 8         A       No, surely.
 9         Q       So the only documents that you provided
10   were documents relating to Freight Bulk?
11         A       Absolutely; correct.
12         Q       And the documents that you provided to
13   Freight Bulk show the shareholders as being Marshall
14   Island companies; correct?
15         A       Yeah, yeah.
16         Q       In document request number 5, we asked
17   for any and all documents concerning contracts relating
18   to the ownership and registration of the MOTOR VESSEL
19   CAPE VIEWER for the period from January 2008 through
20   the present, including but not limited to any documents
21   reflecting registration in the Republic of the Marshall
22   Islands, Singapore, and any of the ports.
23                 Do you see that?
24         A       Yup.
25         Q       And you produced those documents and we
```



1  discussed those; right?

2         A    Yes.

3         Q    And within those documents there -- you

4  had signed certain documents on behalf of Freight Bulk;

5  correct?

6         A    Yeah.

7         Q    And there were certain people who signed

8  on behalf of Vista and Sea Traffic?

9         A    Yeah, yeah, yeah.

10        Q    And they all work in the same office

11  space; correct?

12        A    Yeah.

13        Q    That's Zorin, Batola (sic) and yourself?

14        A    Bakalo.   Yeah.

15        Q    Bakalo.   But you control Vista and you

16  control Sea Traffic and you control Freight Bulk?

17        A    I told you I have a power of attorney for

18  those companies, yeah.

19        Q    There was no charter party between

20  Freight Bulk and any other entity that you're aware of;

21  correct?

22        A    No.

23        Q    When you say you have general power of

24  attorney, what does that mean?

25        A    It means I can act on behalf of the



1    company without restriction.

2         Q    And who gave you that power of attorney?

3    Yourself; right?

4         A    No, it -- the director.  Director who is

5    there.

6         Q    And you're the director?

7         A    No.  I am the holder of power of

8    attorney.

9         Q    Well, who are the directors of HACHI?

10        A    I do not recall.  They are special

11   proposed people, directors.

12        Q    But you're the controlling party of

13   HACHI?

14        A    I have general power of attorney from

15   director to --

16        Q    Is HACHI a Marshall Islands company?

17        A    Yeah.

18        Q    And do you know the names of the

19   nominated Board of Directors?

20        A    I do not recall.  I think there is a

21   director and there is a secretary probably, as far as I

22   remember.  But I do not recall the names.

23        Q    And yourself?

24        A    No, I'm not a member of the board.

25        Q    And is that established under Marshall



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1  Islands law?

2      A     Yeah, of course.

3      Q     And the nominee directors are required

4  under Marshall Islands law?

5      A     No, you can be director yourself; I can

6  be director myself.

7      Q     And who set up HACHI?

8      A     Myself.

9      Q     And who set up Vista?

10     A     Myself.

11     Q     And who set up Freight Bulk?

12     A     Freight Bulk -- I think Freight Bulk was

13 set up by Freight Bulk Marshall Islands, it was

14 probably, or Sea Traffic --

15     Q     And freight Bulk Marshall Islands you set

16 up?

17     A     HACHI Holding was probably set up.

18     Q     Okay.  And Sea Traffic, who set that up?

19     A     Either HACHI Holding or myself.

20     Q     Okay.

21     A     Because I don't remember exactly.

22     Q     Number 7 we had asked for all contracts

23 by and between Vista, Freight Bulk and any third-party

24 manager relating to the operation of the CAPE VIEWER.

25           Do you see that?



1          A     Yup.

2          Q     And is it your testimony that all of the

3    documents that Freight Bulk has relating or responding

4    to that question is contained within the documents that

5    were produced?

6          A     Let me make sure.

7                Looks fine, yeah.  That's correct.

8          Q     In paragraph 7, the documents that were

9    produced, were they produced by Vista or were they

10   produced by Freight Bulk?

11         A     By Freight Bulk.

12         Q     And who was the employee at Freight Bulk

13   that you had asked to compile these documents?

14               Freight Bulk doesn't have any employees;

15   correct?

16         A     I produce them personally as the

17   director.

18         Q     And who did you ask to produce them on

19   your behalf?  Because you testified earlier that you

20   did not come with documents and they were sent to us by

21   e-mail.

22               So my question to you is who, what

23   person, went to look at these documents.

24               Was it Mr. Ivanov; Michael?

25         A     No.



1          Q      Mr. Yudaev?

2          A      No.  He's not -- he's not aware about

3   this.  I -- I don't recall who exactly was doing this

4   physically.

5          Q      And the person that did this physically,

6   that was a Vista employee; correct?  Or a Columbus

7   employee?

8          A      I cannot find out what -- who was this

9   person, so we can't really --

10         Q      Well, it couldn't have been someone from

11  Freight Bulk because Freight Bulk does haven't any

12  employees; correct?

13         A      Yeah, right, but I produced them on

14  behalf of Freight Bulk; I'm their director.

15         Q      I know, but what I'm wondering is who

16  opened up the files and picked out the documents?  And

17  it sounds like it was someone who was a Vista employee,

18  someone who is in the Vista offices, and so it was

19  either a Vista employee, a Columbus employee --

20         A      I don't know.  It can be it was Vista

21  employee.  It could have been a Vista employee because

22  I cannot identify the person.

23         Q      And were all these documents located

24  within the office where Vista, Columbus and Tech

25  Projects and MKTM have their office?



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1          A      I'm not sure.  Maybe -- maybe they were

2    located at home of somebody who was producing them.  I

3    am not sure.  I cannot -- I don't know.

4          Q      In paragraph 8 we asked for all

5    correspondence and records relating --

6          A      Sorry, excuse me.  8?

7          Q      Yes, 8.

8                 All correspondence and records relating

9    to the CAPE VIEWER sent to or from Vista and/or Freight

10   Bulk and/or their agents in the classification society

11   for the CAPE VIEWER.

12         A      Yeah, yeah.

13         Q      Did you find that request to be vague?

14                Did you understand that request?

15         A      Yes, of course, it's clear.  Very clear.

16         Q      And did you produce all of those

17   documents, to the best of your knowledge?

18         A      On behalf of Freight Bulk, yes, of

19   course, yes.

20         Q      Has Freight Bulk ever had the vessel

21   surveyed?

22         A      I don't recall it.  I don't --

23         Q      You don't know if the class has ever

24   surveyed the vessel since you --

25         A      I would assume that on delivery probably



1    the class would have surveyed but I'm not sure.

2        Q    And you would have gotten that through

3    e-mail of some sort; they would have sent that survey

4    report to Vista or Columbus or MKTM or Sea Traffic?

5        A    No, but the survey is a technical matter,

6    so it most probably should be addressed to a technical

7    manager, which is Sea Traffic, most probably.

8        Q    And you would receive that through what,

9    e-mail?

10        A    I don't know.

11        Q    Some sort of correspondence would give

12    you that?

13        A    Through Ukrainian technical manager

14    probably, MKTM or -- I don't know.  I'm guessing

15    though.

16        Q    And MKTM is you; you're MKTM; you control

17    MKTM?

18        A    I don't control it directly.

19        Q    But --

20        A    I have --

21        Q    You have people who work for you?

22        A    Yes.  There are people whom I trust who

23    are the director -- directors of MKTM.  But I wouldn't

24    say controlled.

25        Q    Is your mom a director of MKTM?



```
 1         A     No.

 2         Q     Is your father?

 3         A     No.

 4         Q     With respect to request number 9, we had

 5   asked that CAPE VIEWER's proof of entry with the mutual

 6   P & I Club, including all correspondence to and from

 7   the club relating to defendants.

 8               Do you see that?

 9         A     Yeah, sure.

10         Q     Did -- in 2009, did you obtain defense

11   cover as a charterer?

12         A     I believe so.

13         Q     Did you obtain defense cover or P & I

14   cover in 2010?

15         A     Yeah.

16         Q     Or both?

17         A     We were constantly renewing our P & I

18   cover.

19         Q     And in 2011?

20         A     Yes.

21         Q     And did you meet with underwriters or did

22   underwriters come to Odessa to meet with you?

23         A     Me personally didn't meet.  I think some

24   of my people met them.

25         Q     And is it your testimony as you sit here
```



1    today that all of the correspondence to and from the

2    mutual P & I Club for the years -- for 2008 to the

3    present are contained within documents 66 and 108?

4         A    No, but -- not since 2008.  We were

5    talking about Freight Bulk; right?  Freight Bulk was

6    inquired 2012, so won't be correct to say from 2008.

7         Q    So the request talks about relating to

8    defendants.  So you didn't produce any of the P & I

9    cover that relates to Vista; is that correct?

10        A    No.  To the best of my recollection, no.

11        Q    And --

12             MR. CHALOS:  Just a second.  You're

13   talking about other Vista assets, other assets that may

14   be belonging to Vista?  Hold on a second.  I'm

15   inarticulate.

16             Okay, never mind, I'll withdraw the

17   objection.  Go ahead and ask -- my point is maybe the

18   question should be refined to articulate --

19   BY MR. BENNETT:

20        Q    Sir, did you provide any documents

21   responsive to that request relating to Vista,

22   correspondence between Vista and the P & I Club, or

23   did -- is it simply Freight Bulk and the P & I Club?

24        A    No, it's -- here, it's not only Vista.

25   It's all correspondence.  All correspondence connected

