IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

FLAME S.A.,

      **Plaintiff,**

GLORY WEALTH SHIPPING PTE LTD.,         CIVIL NO. 2:13-cv-658

      **Consolidated Plaintiff,**

VITOL S.A.,

      **Intervening Plaintiff,**

NOBLE CHARTERING, INC.,

      **Intervening Plaintiff,**

      **v.**

INDUSTRIAL CARRIERS, INC., VISTA
SHIPPING, INC., and FREIGHT BULK
PTE. LTD.,

      **Defendants.**

## OPINION & ORDER

These matters come before the Court on two of Freight Bulk PTE, Ltd.'s ("Defendant" or "FBP") Motions. The first is its Motion to Vacate, Motion to Dismiss Flame S.A.'s ("Plaintiff" or "Flame") Amended Complaint, ECF No. 103, the second, FBP's Motion to Vacate, Motion to Dismiss Glory Wealth Shipping Pte. Ltd.'s ("Glory Wealth") Amended Complaint. ECF No. 105. Flame responded on March 27, 2014, ECF No. 123, and FBP replied to Flame on April 3, 2014. ECF No. 134. Glory Wealth responded March 24, 2014, and FBP replied on March 31,

1

2014. ECF No. 126.[1] Both matters are ripe, a hearing was held on May 12, 2014,[2] and the Court has considered all of the parties' arguments. To the extent not specifically addressed they are either moot or without merit. For the reasons herein, the Court **DENIES** the Motions. ECF Nos. 103 & 105.

## I.     PROCEDURAL AND FACTUAL HISTORY

Although the parties and Court are very familiar with this case's procedural history, the Court will discuss the pertinent portions of that history as well as the factual foundation of the case in addressing the instant motions.

### A.     FLAME'S ATTACHMENT

In 2008 Flame entered into four Forward Freight (Swap) Agreements ("FFA's") with Defendant International Carriers, Inc. ("ICI"). The FFA's concerned certain shipping routes defined by the Baltic Exchange. ICI breached those agreements and Flame subsequently brought a successful suit in the High Court of England, obtaining a judgment for $19,907,118.36 against ICI.

On December 23, 2010, Flame filed a complaint in the Southern District of New York to enforce the English judgment. The district court entered a default judgment on October 4, 2011, in favor of Flame. Flame registered that judgment in the Eastern District of Virginia on October 11, 2013, becoming effective October 17, 2013.

On November 22, 2013, Flame brought the instant suit against ICI and co-Defendants Vista Shipping, Inc. ("Vista") and FBP. Flame alleges that Vista and FBP are alter egos of ICI and are therefore jointly liable with ICI. Flame moved this Court to issue an order for the attachment of the M/V CAPE VIEWER ("CAPE VIEWER" or "Vessel") pursuant to its verified

---

[1] FBP mislabeled a filing such that it appears that it replied twice to Flame's Response.
[2] The Court held hearings on FBP's earlier motions to vacate Flame's attachment on December 6, 2013, December 13, 2013, and January 7, 2014.

complaint. The Court granted the attachment in its November 22, 2013 order. FBP subsequently moved to vacate that order and to have the entire matter dismissed on two grounds: first, that the Court did not have subject matter jurisdiction over Flame's claim and second, that Flame had failed to plead a *prima facie* claim that FBP was the alter ego of ICI. The Court permitted limited discovery for jurisdictional purposes, including the depositions of Viktor Baranskiy ("Mr. Baranskiy" or "Baranskiy") and Alessandro Ballerini ("Mr Ballerini" or "Ballerini"). After three hearings, Flame filed an Amended Complaint on January 9, 2014. The Court entered an Opinion and Order on January 10, 2014, determining that admiralty jurisdiction did exist, certifying that question for expedited appeal to the Fourth Circuit, and reserving judgment on the alter ego question until the appeals process completed. ECF No. 57. The circuit court accelerated its briefing schedule and heard oral argument on May 14, 2014. FBP filed this Motion to Vacate Flame's Amended Complaint in mid-March. ECF No. 103.

### B.    GLORY WEALTH'S ATTACHMENT

On October 29, 2009, Plaintiff Glory Wealth received an arbitration award in England against ICI for $38,528,753.18 plus interest for breach of a charter party agreement. It attempted to intervene in this matter in order to enforce that award on December 17, 2013. After initially denying Glory Wealth's motion to intervene, the Court, entered an order of attachment on December 19, and consolidated Glory Wealth's claim with Flame's on December 20, 2013. FBP filed its motion to vacate that order on the ground that Glory Wealth had failed to adequately plead that FBP was the alter ego of ICI. After hearing argument on all motions before the Court in this case on January 7, 2014, Glory Wealth was directed to file an Amended Complaint by January 9 incorporating elements of the Baranskiy deposition, which it did. Finally, after much prodding, Glory Wealth attached the CAPE VIEWER just before the February 27, 2014

3

teleconference hearing.

### C.   FACTUAL HISTORY

At the May 12, 2014 hearing, where the parties were abundantly represented, the Court ruled that the factual allegations of Flame and Glory Wealth would be combined by each so that the Amended Complaints of each would be the factual allegations of both as to the facts concerning the alleged alter ego question leading to the piercing of company veils.[3] The Baranskiy deposition is considered for both plaintiffs Flame and Glory Wealth.

While only Defendant FBP has made an appearance at this point in the proceedings, it is necessary to discuss the connections between FBP and co-defendants ICI and Vista. The following facts are not in dispute, unless noted, and are drawn largely from the declaration or deposition testimony of FBP's own Viktor Baranskiy. The deposition is filed in this case. ECF No. 51.

ICI was a shipping company based in and largely operated from Ukraine.[4] It operated profitably and successfully until 2008 when, along with the rest of the shipping industry, it was struck by the global recession. ICI subsequently defaulted on many of its obligations, including obligations to Plaintiffs Flame and Glory Wealth. ICI filed for bankruptcy in October 2008. At the time of its filing for bankruptcy Victor Baranskiy had an 18% ownership interest in ICI that had been awarded to him in January or February of that year as a bonus for his good work. Mr. Baranskiy disputes that he ever saw the shares or received them. If Viktor Baranskiy received the shares as alleged, he and his father, who owned 33% of ICI, would have a controlling 51% ownership interest during the relevant time period, control which Mr. Baranskiy admitted having in his deposition. Dep. of Viktor Baranskiy Tr. at 34.

---

[3] Flame and Glory Wealth consented to this combination
[4] Technically ICI is still in existence, although it appears that it is no more than a paper company at this point.

Vista was incorporated on June 24, 2008. However, it did not begin operations until sometime around October 2008. It was during that period, at the end of 2008, that Baranskiy, along with several ICI-affiliated employees, left ICI and began working for Vista. Mr. Baranskiy subsequently relinquished his 18% holding in ICI sometime between September and November, 2008, Decl. of Viktor Baranskiy at 2, ¶ 11, while still retaining control of Vista. Vista soon began to operate many of the same routes with many of the same clients as ICI formerly had. Vista also formed several subsidiary companies, creating a highly interconnected web of entities. Some of these companies, such as FBP, were formed for the purpose of purchasing one or two vessels. It was ICI's practice to form such entities to shield itself from significant exposure to Rule B attachments.[5]

To demonstrate the interconnectedness of the companies, it is useful to set forth how FBP obtained the funds to purchase the CAPE VIEWER, which is the object of the attachment order in question. FBP owns the CAPE VIEWER. FBP is 100% owned by Freight Bulk Ltd., which is in turn owned by HACHI. It appears HACHI is a holding company, and Mr. Baranskiy is the ultimate beneficial owner of it. FBP was established in September 2012 solely to purchase and be the registered owner of the CAPE VIEWER and another vessel, the M/V CAPE CLIMBER. FBP received the approximately $9 million for the purchase of the Vessel[6] from Sea Traffic (which is controlled by Baranskiy), which in turn received funds from Vista (which is also controlled by Baranskiy). Vista and FBP have a "commercial management agreement" whereby

---

[5] Rule B attachments were quite common at the time under the Winter Storm regime created by the Second Circuit, Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002), which permitted maritime attachments of wire transfers. The Second Circuit later overruled itself. Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., 585 F.3d 58 (2d Cir. 2009). Nevertheless, Baranskiy made it clear that the entities were formed for the purpose of avoiding Rule B attachments. Dep. Tr. of Victor Baranskiy at 71 ("My understanding is that not only Weaver [an ICI-subsidiary], but other companies, I would guess, were set up in order to avoid Ruby [sic] attachment . . . .").
[6] The CAPE VIEWER was, like the other vessels purchased by Vista's subsidiaries, paid for in cash and unencumbered by a mortgage.

Vista essentially acts as (and on certain charter documents is listed as) the owner of the CAPE VIEWER. Therefore, FBP is ultimately controlled by Baranskiy via HACHI; Vista ultimately provided the capital funding for FBP; Vista ultimately controls and manages the CAPE VIEWER (which is one-half of FBP's entire portfolio);[7] and Vista is ultimately controlled by Baranskiy.

Baranskiy testified at his deposition that the funds to start up Vista were derived from a loan of "a couple of hundred thousand dollars" from a friend's company, a loan of approximately $1,000,000 from his mother that was delivered in cash in a briefcase, and his own personal savings of an indeterminate amount.[8] From this initial position Vista was able to, over the course of approximately four years, amass a fleet of ships worth over $100,000,000. The ships were purchased with cash and unencumbered by mortgages. Vista accomplished this feat despite the worst economic downturn in recent memory.

## II.   THE INSTANT MOTIONS

As the Court turns to the instant motions, it makes an observation. The personal and overblown attacks the parties have leveled at one another throughout this matter are unnecessary. Having observed counsel behave with civility before and after hearings but lambaste one another during oral argument and in their written submissions, the Court expresses its disappointment at the lack of courtesy counsel for all parties (even after the substitution of Defendant's counsel) show one another. The Court also notes that hyperbole is not legal argument and asks the parties to refrain from hyperbolic rhetoric.

---

[7] It is unknown, from what has been presented to the Court, who the manager of the CAPE CLIMBER is.

[8] Considering Baranskiy's relatively young age of 28 years and his self-reported modest salaries ($4,000 per month after his promotion to the chartering department and later between $5,000 and $10,000 per month in 2008), it seems unlikely that those savings would be significant relative to the other two amounts that he received. However, Mr. Baranskiy did state he "had other incomes, other sources of incomes," which he described as 4% of ICI's net profits at first and then 10% of the yearly net profits, amounting to as much as $500,000. Baranskiy Dep. Tr. at 33-34. Mr. Baranskiy also said he had more than $100 million cash available in November 2008, none of which came from ICI. Id. at 144. He may also have had $1 million in "locked up" funds from a brokerage business. Id. at 137-38.

The Court summarizes the parties' arguments immediately below and addresses them in more detail in its analysis.

### A.   FBP'S MOTION TO VACATE FLAME'S ATTACHMENT

FBP argues that laches and relevant statutes of limitations bar Flame's Attachment. FBP also contends that Flame cannot meet the pleading standard regarding its alter ego claim. FBP puts forth many factual representations, which FBP contends do not permit the inference of an alter ego claim against itself vis-à-vis ICI.

Flame's Response would have this Court consider FBP's Motion as a Motion for Reconsideration under Federal Rule of Civil Procedure 54(b) or an untimely Rule 12 Motion to Dismiss. Under these standards, Flame argues FBP's Motion should be denied and its representations ignored by the Court as improperly before it at the pleading stage. Flame also argues that it has met its Rule B burden and that its claim is not time barred. Flame asks for attorney's fees for having to respond.

In its Reply, FBP disputes Flame's Rule 54 and Rule 12 contentions and argues for: a probable cause standard to apply in its challenge to the attachment. It also contends that its evidence is properly before the Court.

### B.   FBP'S MOTION TO VACATE GLORY WEALTH'S ATTACHMENT

In addition to the arguments made to vacate Flame's attachment, which FBP repeats in its Motion to Vacate Glory Wealth's attachment, FBP also argues that the doctrine of equitable vacatur compels this Court to vacate Glory Wealth's attachment, as FBP is subject to *in personam* jurisdiction in Singapore, where Glory Wealth is also incorporated.

Glory Wealth responds by asking for sanctions regarding FBP's time bar claims; that the doctrine of equitable vacatur should not be invoked here because FBP is no more than a paper

company in Singapore and equitable vacatur would thus effectively end its claim; and that their earlier brief comprehensively covered the alter ego pleading question.

FBP replies that Glory Wealth's alter ego pleadings are insufficient and reasserts its time bar claim against Glory Wealth's attachment. Finally, FBP argues that if its Motions are granted, the matter must be dismissed, as the attached vessel is the sole method by which this Court has jurisdiction of the Vessel and thus the parties.

## III.    ANALYSIS

### A.    JURISDICTION

The Court previously determined that it has jurisdiction over Flame's Complaint. That question is now on appeal. See Flame, S.A. v. Fright Bulk PTE, Ltd., No. 14-1189, (4th Cir. 2014).

Jurisdiction as to Glory Wealth's claim has not been challenged, but the Court must address it before proceeding to the merits. Vitol, S.A. v. Primerose Shipping Co. Ltd., 708 F.3d 527, 533 (4th Cir. 2013) (citing Sucampo Pharms., Inc. v. Astellas Pharma, Inc., 471 F.3d 544, 548 (4th Cir. 2006)). Glory Wealth's underlying arbitration award covers a breach of charter party between it and ICI. Am. Compl. ¶ 9. This Court has jurisdiction over admiralty claims pursuant to 28 U.S.C. § 1333, and charter party contracts sound in admiralty. The Volunteer, 28 F. Cas. 1260 (C.C.D. Mass. 1834) (Story, J.). Therefore Glory Wealth's claim is properly before this Court sitting in admiralty.

### B.    PROCEDURAL POSTURE

Flame argues that FBP's Motion is either nothing more than a Rule 54(b) Motion to Reconsider or an untimely Rule 12 Motion to Dismiss, not a proper motion to vacate pursuant to Supplemental Rule E(4)(f).

## 1. RULE 54(B)

Under Rule 54(b) of the Federal Rules of Civil Procedure, "[A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities." Fed.R.Civ.P. 54(b). But this language is irrelevant. FBP is not asking the Court to reconsider an earlier ruling. In its January 10, 2014 Order, the Court withheld ruling on the additional question of Flame's pleading—that FBP is the alter ego of ICI—until the jurisdiction question is resolved on appeal. Op. & Order, Jan. 10, 2014, ECF No. 57. Although FBP filed this Motion before that resolution, the Court has not decided the issue before it. Thus there is nothing to reconsider.

## 2. RULE 12(B)(6)

Flame argues that by asking for the dismissal of the complaint after the attachment is vacated, FBP must be asking for a Rule 12(b)(6) dismissal. FBP first claimed only that without an attached vessel it follows that the Amended Complaint must be dismissed because the Court lacks jurisdiction. Flame argues that vacating an attachment and dismissing a case for lack of jurisdiction are separate remedies.

Even when jurisdiction is based solely on maritime attachment and that attachment is vacated under Supplemental Rule E, dismissal does not automatically follow. Vitol, S.A. v. Primerose Shipping Co. Ltd., 708 F.3d 527, 540 (4th Cir. 2013). As the Fourth Circuit puts it: "This argument fails as a matter of law." Id. Instead, "the primary remedy afforded for failure to comply with Rule E(2)(a) is vacatur of the attachment. Dismissal of the complaint is not a Rule E remedy." Id. at 539.

For these reasons the Court considers the instant Motions seeking the Court to vacate the

9

attachment under Supplemental Rule E.

However, FBP also moved to dismiss under statutes of limitations and laches.[9] While these defenses ordinarily cannot be used in the context of a Rule 12(b)(6) motion to dismiss, courts in our circuit have held that laches and statutes of limitations may be asserted in a Rule 12(b)(6) motion. Marshall v. Meadows, 921 F. Supp. 1490, 1494 (E.D. Va. 1996) ("The defendant is ultimately required to prove laches as an affirmative defense pursuant to Fed.R.Civ.P. 8(c), but as explained above, the Fourth Circuit disdains a hypertechnical reading of the rules; laches is an appropriate issue for a motion to dismiss in this case."); see Knickman v. Prince George's Cnty., 187 F. Supp. 2d 559, 565 n.4 (D. Md. 2002) (citing Marshall and noting that statutes of limitations may be brought under Rule 12(b)(6) too); see also E.E.O.C. v. Propak Logistics, Inc., 13-1687, 2014 WL 1199493 (4th Cir. Mar. 25, 2014) ("Propak filed a motion to dismiss arguing, among other things, that the action should be barred under the doctrine of laches."); Rivers v. Black & White Cars, Inc., 1990 WL 303324 (E.D. Va. June 7, 1990) (considering as procedurally proper before refusing to dismiss a case on a 12(b)(6) motion based on statute of limitations and laches).

## C.   TIME BAR

An action brought after its applicable statute of limitations is time barred. A cause of action without an applicable statute of limitations may too be time barred in equity by the doctrine of laches. The parties dispute which time bars apply. FBP asks the Court to apply a two-year statute of limitations for fraud and/or laches. Plaintiffs seek a twenty-year statute of limitations for judgment enforcement.

---

[9] FBP explained the effects of its arguments in response to Flame's Motion to Dismiss FBP's Counterclaims. The Court considers this argument for clarity's sake and because the Court had to confront the issue regardless. Although FBP was in default for not answering, the Court granted FBP leave to answer Plaintiffs' Amended Complaints. The court therefore addresses these contentions.

As a preliminary matter, the statute of limitations for common-law fraud does not apply. Neither Plaintiff has alleged common-law fraud but fraudulent conveyance, a statutory cause of action for which no statute of limitations exists. See 55 Va. Code § 55-80. Instead laches applies to fraudulent conveyance claims. In re Massey, 225 B.R. 887, 890 (Bankr. E.D. Va. 1998) (citing Virginia Supreme Court cases).

FBP also contends that laches applies to Flame and Glory Wealth's alter ego claims, arguing that piercing the corporate veil is an equitable remedy and therefore subject to laches. Both Plainitffs contend that they are seeking to enforce judgments against ICI through its alleged alter ego FBP. Actions enforcing judgments are subject to a twenty-year statute of limitations. See Va. Code. § 8.01-251(A) (imposing a twenty-year statute of limitations to enforce a judgment). FBP contends that no judgment exists against it, so the statute does not apply.

The Court need not determine whether the twenty-year statute of limitation applies.[10] If it did, both Plaintiffs would easily fall within its timeframe. The Court does not pursue this analysis because it finds that neither Plaintiff is guilty of laches regarding their respective claims.

"Laches imposes on the defendant the ultimate burden of proving '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" White v. Daniel, 909 F.2d 99, 102 (4th Cir. 1990) (citing Costello v. United States, 365 U.S. 265, 282 (1961)); Giddens v. Isbrandtsen Co., 355 F.2d 125, 127 (4th Cir. 1966). Lack of diligence "exists where 'the plaintiff delayed inexcusably or unreasonably in filing suit.'" White, 909 F.2d at 102 (citing cases). A defendant must prove prejudice, id., and may do so "by proving some disadvantage on the part of the defendant in asserting or establishing a claimed right or some other harm caused by detrimental reliance on the plaintiff's conduct." United States

---

[10] At the May 12, 2014 hearing, the Court discussed the statute of limitations question, indicating that "[T]he statute of limitations is to enforce a judgment. It's a 20-year statute of limitations. I'm not worried about it . . . ."

v. Smithfield Foods, Inc., 969 F. Supp. 975, 986 (E.D. Va. 1997) (citing White, F.2d at 102). "Thus the presence of laches is ascertained by a balancing of the claimant's delay with the proferred [sic] excuse, if any, against the defendant's consequent detriment. The determination demands a weighing of equities. These in turn depend upon an assay of the circumstances." Giddens, 355 F.2d at 127.

### 1. FLAME'S CLAIMS

Flame and ICI entered into FFA's in the spring and summer of 2008. In the fall, ICI defaulted and breached those FFA's. In December 2010, Flame won a judgment against ICI for nearly $20 million. Flame then domesticated that foreign judgment in New York district court in September 2011, receiving an order to that effect in October 2011. Flame registered that judgment in this Court on October 17, 2013 and attached the CAPE VIEWER in November.

FBP maintains that Flame had ample opportunity to bring forward these claims against FBP in its action against ICI in England and in the Southern District of New York, or in ICI's abortive Greek bankruptcy filing. FBP contends that Flame should have brought the fraudulent transfer and alter ego claims forward at those opportunities, pointing to Flame director Mr. Ballerini's deposition as proof that Flame "followed the movement of the Industrial Carrier people for years, and we have watched what they have done for, like, since 2008." Ballerini Dep. Tr. at 54.

But just because Flame knew of ICI's alleged behavior and did not file suit against FBP until now does not mean it is guilty of laches. First, Flame diligently pursued its FFA claims against ICI in England. It then domesticated its judgment in New York and Virginia. It has followed ICI's activities since 2008. But the mix of entities alone would require diligent study and analysis before determining which entities are related and the extent of those relations in

12

order to bring the claims alleged here. In fact, FBP was not formed until September 21, 2012 in Singapore, so a delay in alleging alter ego against this entity is to be expected, as is any delay in tracing the allegedly fraudulently transferred funds to the CAPE VIEWER's purchase through FBP. And it was not until the CAPE VIEWER entered this district that Flame was able to determine that property allegedly obtained through fraudulent transfers from ICI entered the United States. Flame's delay in bringing this action therefore is neither inexcusable nor unreasonable.

FBP also alleged no concrete prejudice in its original motion. Instead it argued that it was "being prejudicially asked to defend allegations of conduct occurring years before its existence" and that its vessel's attachment is costing it significant losses. ECF No. 104. FBP elaborates in its Reply, and avers that the time passage has impacted its defense because neither it nor Mr. Baranskiy has access to the relevant financial materials of ICI. ECF No. 134. Secondly, FBP contends that Flame's delay has caused undue financial prejudice to FBP, because the claims would have been worthless against ICI but are now potentially valuable against the financially successful FBP.

This latter contention is meritless. If the allegations are proved true in the Amended Complaint, then the money owed to Flame by ICI and its alleged alter ego FBP is precisely the money that has enabled FBP's success. The former contention has more merit but still falls short of the prejudice required, given that the allegations here are of alter ego and, if true, lead to the inference that Mr. Baranskiy has knowledge and documents pertaining to the issue, as the alleged director of the web of companies here and an alleged part-owner of ICI.

Thus, neither prong of laches is met with respect to Flame's claims, and the doctrine is unavailable to FBP as a defense here.

## 2. GLORY WEALTH'S CLAIMS

Glory Wealth's claim arose when ICI allegedly breached their charter party in August 2008. Glory Wealth received an arbitration award in England at the end of October 2009.

FBP contends that Glory Wealth should have brought any claims it had against ICI forward at ICI's October 2008 Greek bankruptcy before that proceeding was dismissed. FBP cites Lyerly v. IRS, for the proposition that a claimant's failure to file a claim or objection to a bankruptcy plan of reorganization triggers laches and may amount to unreasonable delay if the creditor was aware of the bankruptcy from its inception. 235 B.R. 401, 405 (Bankr. W.D. N.C. 1998). FBP also notes that Glory Wealth could have brought forward these allegations against ICI in its 2009 case in New York, Glory Wealth Shipping PTE Ltd. v. Industrial Carriers Inc., No 08-cv-8425 (S.D.N.Y. dismissed Dec. 3, 2009), or at Glory Wealth's own liquidation proceeding in Singapore, where it wrote off the debt owed it by ICI, per FBP's attorney's declaration.

As with Flame, the maze of entities formed in the aftermath of ICI's bankruptcy makes pursuing claims against ICI's alleged alter egos and fraudulent transferees exceedingly difficult to determine. A delay in picking the structure apart and then waiting for the CAPE VIEWER to enter the jurisdiction of the United States is not unreasonable nor unjustifiable, especially given that FBP only formed in 2012. Although FBP avers that Glory Wealth was aware of ICI's bankruptcy from the start, it offers no support for this contention. Reply at 12-13, ECF No. 126. Furthermore, even if Glory Wealth's failure to assert its claim against ICI at the Greek bankruptcy proceeding triggered laches and amounted to an unreasonable delay, which the Court finds it did not, FBP must still prove prejudice, White, 909 f.2d at 102, which it cannot.

As with Flame, FBP only obliquely referenced prejudice resulting from Glory Wealth's

delay. In its Reply, however, it offers evidentiary and economic prejudice in a rehashing of its arguments regarding Flame's delay. For the reasons articulated above, the Court finds no prejudice. Moreover, as Glory Wealth contends, its Scheme of Arrangement with its creditors was caused at least partially by ICI's breach of charter party, so punishing Glory Wealth for unraveling and then pursuing ICI's alleged alter ego and fraudulent transferees would be decidedly inequitable in the balance that must occur here. Giddens, 355 F.2d at 127.

Thus, neither prong of laches is met with respect to Glory Wealth's claims, and the doctrine is unavailable to FBP as a defense here.

**D.     ALTER EGO PLEADINGS**

Finally, the Court turns to the heart of the motions to vacate—whether Flame and Glory Wealth have met their burdens to sustain the attachments of the CAPE VIEWER.

### 1. THE PLEADINGS AND PARTIES' EXHIBITS

First, however, there is a question of whether the Court can consider documents outside the pleadings in addressing a Rule E Motion. See SPL Shipping Ltd., Order at 3 (citing to the Second Circuit's decision in Williamson v. Recovery Ltd. P'ship, 542 F.3d 43 (2d Cir. 2008), as support for the position that a "district court does not abuse its discretion when it considers evidence outside of the pleadings on a motion to vacate an order").

The Second Circuit in Williamson affirmed the district court's vacatur of an attachment when the district court was "not persuaded by the Plaintiffs' additional evidence, a verified complaint by the Plaintiffs to this same effect, particularly because the individual Defendants also proffered affidavits in support of their vacatur application specifically denying any contractual relationship with the Plaintiffs and denying that [one individual defendant] was authorized to bind them." 542 F.3d at 53.

15

However, the Fourth Circuit has not reached this question. The underlying district court case in <u>Vitol</u> focused solely on the pleadings. <u>See</u> <u>Vitol, S.A. v. Capri Marine, Ltd.</u>, 2011 WL 5577618 (D. Md. Aug. 22, 2011) <u>aff'd sub nom.</u> <u>Vitol</u>, 708 F.3d 527. And Judge Davis, recently examining an alter ego question in admiralty, looked to the plaintiff's Verified Complaint, Motion for Attachment, Brief in Opposition to Claimant's Motion to Quash the Order of Attachment and Garnishment, and attached exhibits in determining whether that plaintiff had met its Rule E burden. <u>Dry Handy Investments, Ltd. v. Corvina Shipping Co. S.A.</u>, 2013 WL 6408388 at *3-4 (E.D. Va. Dec. 6, 2013).

The Court is of the opinion that it may consider documents outside the pleadings in considering a Supplemental Rule E Motion but should limit itself to the documents offered in the parties' Motions in support and opposition to the vacatur. This is because the purpose of Rule E(4)(f) is to contest the validity of a maritime attachment. <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, 460 F.3d 434, 440 (2d Cir. 2006), <u>overruled on other grounds by</u> <u>Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.</u>, 585 F.3d 58 (2d Cir. 2009); <u>see</u> Supplemental Rule E(4)(f). If clear documentation exists to vacate, the court should not indifferently ignore it. The consequences of prolonged attachment on facially deficient or clearly erroneous grounds are too severe. Therefore, this Court will examine the pleadings, Defendant's exhibits attached to its Motions, and Plaintiffs' memoranda and exhibits in opposition to FBP's Motions.

## 2. SUPPLEMENTAL RULE E'S STANDARD OF REVIEW

After receiving notice of a Supplemental Rule B attachment, the defendant is entitled to contest the attachment at a prompt hearing pursuant to Rule E(4)(f). The plaintiff then has the "burden to show that 1) it has a valid *prima facie* admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within

the district; and 4) there is no statutory or maritime law bar to the attachment." <u>Vitol</u>, 708 F.3d at

541. Supplemental Rule E provides "the complaint shall state the circumstances from which the

claim arises with such particularity that the defendant or claimant will be able, without moving

for a more definite statement, to commence an investigation of the facts and to frame a

responsive pleading." Fed.R.Civ.P. Adm. Supp. R. E(2)(A).[11]

The Fourth Circuit explains that Rule E carries a heightened particularity standard,[12]

although that standard remains "not clearly defined," requiring a "complaint to allege sufficient

facts to support a *reasonable belief* that the property is subject to forfeiture." <u>Vitol</u>, 708 F.3d at

542 (emphasis in original) (discussing <u>United States v. Mondragon</u>, 313 F.3d 862 (4th Cir.

2002)). The Court notes the tension between the requirement that a plaintiff show it has a valid

*prima facie* claim against defendant and a heightened pleading requirement. <u>See</u> <u>SPL Shipping</u>

<u>Ltd. v. Gujarat Chiminex Ltd.</u>, No. 06 Civ. 15375, Order at 2-3 (S.D.N.Y. Sep. 10, 2008).

However, the Fourth Circuit emphasizes that "Rule E(2)(a) needs little interpretation. It is plainly

written and means precisely what it says." <u>Vitol</u>, 708 F.3d at 542. And at bottom, the question

under the "reasonable belief test" is whether FBP could, "without moving for a more definite

statement, 'frame a responsive pleading.'" <u>Id.</u> at 545.

### 3.   DISCUSSION & APPLICATION

Having outlined the scope of documentation the Court may examine and the appropriate

test it must apply, the Court turns to the reasonable belief test's application to the alter ego

question.

---

[11] Although courts in the Second Circuit dispute the standard to be applied to the pleadings under Supplemental Rules B and E, <u>see</u> <u>Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transp. N.V.</u>, 2007 WL 1989309 (S.D.N.Y. July 6, 2007) (discussing cases and the Rule B and E pleading standards used by various courts) aff'd sub nom. <u>Transportes Navieros y Terrestres S.A. de C.V. v. Fairmount Heavy Transp., N.V.</u>, 572 F.3d 96 (2d Cir. 2009), the Fourth Circuit has provided a standard. <u>Vitol</u>, 708 F.3d at 541-43.
[12] FBP argues that since discovery has taken place this standard may amount to a preponderance of the evidence standard. <u>See</u> <u>Hawknet Ltd., v. Overseas Shipping, et al</u>, 07 Civ. 5912, Mem. & Order, (S.D.N.Y. May 5, 2009). But discovery here has been limited and often contested, as the motions to compel and stay demonstrate.

The Fourth Circuit has "articulated several factors that 'guide the determination of whether one entity constitutes the alter ego of another.' " Id. at 544 (quoting Ost–West–Handel Bruno Bischoff GmbH v. Project Asia Line, 160 F.3d 170, 174 (4th Cir.1998)). These factors include:

> gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness[,] . . . intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length.

Id. (citations and internal quotation marks omitted). "The conclusion to disregard the corporate entity may not, however, rest on a single factor, whether undercapitalization, disregard of [a] corporation's formalities, or what-not, but must involve a number of such factors; in addition, it must present an element of injustice or fundamental unfairness." De Witt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 687 (4th Cir. 1976). An element of injustice or fundamental unfairness is the most important factor. Ost-West-Handel, 160 F.3d at 176. "[T]he question of whether to pierce the corporate veil is a fact-intensive inquiry . . . . and it is only in those 'extraordinary cases, such as the corporate form being used for wrongful purpose,' where 'courts will pierce the corporate veil and disregard the corporate entity.'" Vitol, 708 F.3d at 544. As both parties have adopted the allegations of each other concerning the alter ego, piercing the veil question, the Court considers the allegations together but delineates which party alleged which fact for the purposes of clarity.

    a.   GROSS UNDERCAPITALIZATION, INSOLVENCY, SIPHONING OF FUNDS, INTERMINGLING OF FUNDS

Neither Flame nor Glory Wealth alleges that FBP is grossly undercapitalized, although Glory Wealth alleges that ICI was "severely undercapitalized." Am. Compl. ¶ 21. However, they

both point to ICI's insolvency and an alleged siphoning and intermingling of funds from ICI to its successor companies, Vista and, later, FBP. Flame in particular provides a litany of allegations linking ICI with Vista and FBP with Vista.

For instance, Flame alleges that ICI was financially stable just six weeks before it filed for bankruptcy in Greece. And that when ICI filed, its subsidiaries did not also file for bankruptcy. Although formed before ICI's bankruptcy, Vista did not begin its operations until after ICI declared bankruptcy. In 2008, based upon its study of ICI's 2008 balance sheets, Flame alleges ICI transferred cash to its related companies without explanation, resulting in $57.2 million disappearing from ICI. Vista also allegedly took control of the M/V HARMONY FALCON, which ICI owned before its bankruptcy but Vista then came to control, chartering it in October 2008. FBP avers that the ship was owned by a Vietnamese company, and produced an Equasis Report showing its owner, from July 3, 2008, was FALCON SHIPPING CO., which is based in Vietnam. Chalos Declr. Ex. 7. But this report does not explain the chartering of this Mongolian-flagged vessel, from whom and where the Vietnamese company purchased the ship, or who controls this Vietnamese organization.

Flame also alleges that the CAPE VIEWER is listed as part of Vista's fleet on Vista's website, while FBP is listed as the Registered Owner of the CAPE VIEWER. Flame further alleges that Mr. Baranskiy treats his corporate bank accounts as his own, and he testified to using the corporate ATM card for his cash needs. Dep of Viktor Baranskiy Tr. at 107-08.

Glory Wealth adds that Vista and FBP's assets are nothing more than the former assets of ICI. These allegations coupled with the maze of companies linked to Mr. Baranskiy, as admitted in his deposition, including Hachi, Sea Traffic, Vista, and FBP, certainly raises the reasonable belief that the companies siphoned and intermingled funds between each other. As does the

19

purchase of the CAPE VIEWER itself, outlined in the factual section above.[13]

In addition Glory Wealth points out that Mr. Baranskiy's accumulation of over $100 million such that the CAPE VIEWER and other vessels could be purchased without mortgages in the short timeframe from ICI's bankruptcy to Vista and FBP's beginnings is fantastical. Although "fantasy" is not a legal term, this allegation is particularly noteworthy given Mr. Baranskiy's testimony that he started Vista and FBP with his own funds and a cash loan from his mother, despite the market collapse in 2008 and his own limited salary and savings. Glory Wealth contends that the initial capital Mr. Baranskiy used came from ICI and was converted and siphoned to purchase the Vista fleet utilizing FBP and related entities to do so.

These allegations paint a picture of funds siphoned between numerous entities controlled by Mr. Baranskiy upon the insolvency of ICI as well as an intermingling of those funds between these successor companies, including FBP. Although there are a number of steps needed to link ICI to FBP, the Court thinks these allegations permit FBP to frame a responsive pleading without need for a more definite statement and thus pass the reasonable belief test. Vitol, 708 F.3d at 542, 545.

> b. NON-FUNCTIONING OF OFFICERS, CONTROL BY A DOMINANT SHAREHOLDER, FAILURE TO OBSERVE CORPORATE FORMALITIES AND MAINTAIN PROPER CORPORATE RECORDS, ARMS-LENGTH DEALINGS, DEGREE OF DISCRETION SHOWN BY ALLEGEDLY DOMINATED CORPORATION

Mr. Baranskiy is alleged to be an eighteen percent (18%) shareholder of ICI. Although he disputes this ownership in his deposition, he affirmed an ownership until sometime between September and November 2008 in his declaration. When his disputed shares are combined with those of his father, the two would control a majority of ICI. Mr. Baranskiy is also alleged to

---

[13] Glory Wealth also contends that FBP is properly considered a successor-in-interest of ICI.

control Vista and FBP.

Flame also alleges that FBP's business decisions are made by Mr. Baranskiy and Michael Ivanov, Vladimir Ivanov, and Vladimir Yudaev, who are all also alleged to be directors and officers of ICI, Vista, and FBP. FBP provided the Court its "Company Information" as maintained by the Accounting and Corporate Regulatory Authority of Singapore, ECF No. 104, Ex. 1, wherein Mr. Baranskiy and Haslina Binte Abu Bakar are named Directors, Lim Soh Sea and Masdewiana Binte Mohd Kasim are Secretaries, and Freight Bulk Limited is the shareholder. FBP contends that this information demonstrates the facial invalidity that Baranskiy, the misters Ivanov, and Yudaev are the directors and officers of FBP on paper. But Flame is making the more nuanced allegation that Baranskiy, Ivanov, Ivanov, and Yudaev are the true directors and officers of FBP and the Singaporean nationals are simply "nominal directors" required by Singaporean law in order to incorporate in that nation, and whom Baranskiy has never met. Baranskiy Dep. Tr. at 22-23. Thus the Court does not give Defendant's Company Information significant weight.

Glory Wealth alleges Mr. Baranskiy interchangeably utilizes Vista and its affiliates to make payments, citing successive charter payments from different Baranskiy-controlled entities for the M/V Great Dynasty, although FBP is not listed among those to have paid. Glory Wealth further alleges that Vista and ICI share employees, profitable contracts, and chartering routes and that Viktor Baranskiy is shareholder, director, and/or managerial employee—or has some other ability to control—every corporate or company Defendant and that he ultimately exercises complete dominion and control over all Defendants.

These allegations put FBP on notice, and it can surely form a responsive pleading. The allegations are clear that Mr. Baranskiy is or was a director and/or shareholder of ICI, the

director or beneficial owner of Vista, Hachi, Sea Traffic, and FBP, and that he controls them all alone or, in the case of ICI, in tandem with his father. The allegations that the entities' officers are all the same, that these different entities are not given discretion in their operations but are controlled by Mr. Baranskiy, are significant and specific. In addition, the deposition testimony that Vladimir Varna maintains the books for nearly every company involved colors these allegations.

Finally, Mr. Baranskiy's deposition testimony that ICI set up entities to avoid Rule B attachments is troubling given the maze of entities here and the allegations that ICI and FBP are alter egos under the control of Mr. Baranskiy. The allegations evince more than a "close business relationship." Vitol, 708 F.3d at 548. They permit FBP to frame a responsive pleading without need for a more definite statement and thus pass the reasonable belief test. Id. at 542, 545.

c.    INJUSTICE OR FUNDAMENTAL UNFAIRNESS

If true, the allegations depict a scheme of entities born out of a fraudulent bankruptcy proceeding, controlled by a single individual, established to avoid creditors and admiralty jurisdiction in the United States. Such a scheme, if true, is precisely the type of injustice or fundamental unfairness that must be guarded against. Otherwise, ICI would be permitted to avoid its creditors by filing for bankruptcy and reforming as a series of new entities and thereby take advantage of the "peripatetic nature of maritime parties, the 'transitory' status of their assets, and the inability of claimants to obtain security 'in a world of shifting assets, numerous thinly-capitalized subsidiaries, flags of convenience and flows of currencies.'" Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd., 722 F.3d 488, 499 (2d Cir. 2013).

Furthermore, if Vista and FBP are, as alleged, alter egos of each other and ICI, then ICI's practice of forming entities to protect itself from Rule B attachments places a cloud of suspicion

over FBP's formation. If FBP was created to guard against Rule B attachments, then surely the alleged alter egos would be working an injustice upon ICI's creditors. It would also enable a party to defeat the purpose of Rule B, which is "to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment." Vitol, 708 F.3d at 539.

In sum, Flame and Glory Wealth have done enough to create a reasonable belief to support their respective alter ego claims. Id. at 545. The allegations here rise above the close business relationship alleged in Vitol, id., particularly with Mr. Baranskiy's alleged involvement and control in each entity described.

### E.    EQUITABLE VACATUR

Glory Wealth's Attachment must surmount one final hurdle — equitable vacatur. The doctrine of equitable vacatur expands the ways by which a district court may vacate a proper maritime attachment. Aqua Stoli, 460 F.3d at 444-45.

The Second Circuit, opining upon the doctrine and a district court's equitable power in admiralty, wrote:

> While . . . the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

Id. at 445. In discussing the second category of equitable vacatur, the court continued: "A maritime attachment would likewise be properly vacated if the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets." Id. at 444-45. Our Fourth Circuit did not

address this question in <u>Vitol</u>, but did cite the <u>Aqua Stoli</u> case repeatedly and approvingly. <u>Vitol</u>, 708 F.3d 527. Thus this Court concludes that it has the power to vacate an attachment on equitable grounds, and the Court may do so even if a plaintiff complies with Rule B. <u>Aqua Stoli</u>, 460 F.3d at 444-45. Equity, however, does not demand vacatur; equity permits it. <u>Id.</u>

FBP contends that the Court should vacate Glory Wealth's Attachment under this doctrine because Glory Wealth can obtain personal jurisdiction over FBP in Singapore, where both companies are incorporated. Glory Wealth responds that sending the case to Singapore would be meaningless because FBP is no more than a paper company in that nation. Glory Wealth further contends that equitable vacatur is used when parties are attaching vessels to harass defendants, and that "district," as used in the <u>Aqua Stoli</u>, is a term of art meant to refer to judicial districts in the United States, not foreign jurisdictions. Glory Wealth also argues that FBP's alleged alter egos and controllers, in particular Mr. Baranskiy and Vista, have gone into hiding by removing Vista's website and selling vessels, thereby making their hands unclean and thus ineligible for equitable relief. Finally, Glory Wealth contends that the cases that did vacate attachments for foreign jurisdictions had underlying comity concerns or developed out of the flawed <u>Winter Storm</u> line of cases in the Second Circuit.[14] FBP replies that Vista is not FBP and that at its core this case involves a foreign dispute between foreign companies with no ongoing or continuous business operations in the United States.

FBP hangs its hat on the second category of vacatur — that both it and Glory Wealth are subject to *in personam* jurisdiction in Singapore. The Court therefore focuses on that category. In order to do so, the Court must determine whether "district" as used in <u>Aqua Stoli</u> contemplates foreign jurisdictions or American judicial districts. If the doctrine, as articulated in <u>Aqua Stoli</u>,

---

[14] <u>See</u> *supra* n.5.

does contemplate foreign jurisdictions, then the attachment may be vacated.

Although the Second Circuit has not answered this question, a number of judges in the Southern District of New York have, and they disagree. Three have ruled that vacatur to foreign jurisdictions is permissible, Honk Kong City-Dragon Shipping Co. Ltd. v. Benxi Iron & Steel (Grp.) Int'l Econ. & Trading Co., Ltd., 2009 WL 2526219 (S.D.N.Y. Aug. 19, 2009) (Keenan, J.); Transfield Er Cape Ltd., v. STX Pan Ocean Co. Ltd., 09 Civ 1250 (S.D.N.Y. Mar. 16, 2009) (Koeltl, J.); OGI Oceangate Transp. Co. Ltd. v. RP Logistics PVT. Ltd., 2007 WL 1834711 (S.D.N.Y. June 26, 2007) (Sweet, J.), while one has twice rejected that reading. Foolproof Navigation S.A. v. Trimarine Corp. S.A., 08 CIV. 9833 (CM), 2009 WL 1675079 (S.D.N.Y. June 11, 2009) (McMahon, J.); Prestigious Shipping Co. Ltd. v. Agrocorp Int'l PTY Ltd., 2007 WL 2847210 (S.D.N.Y. Oct. 1, 2007) (McMahon, J.). Another Judge of that Court likened "district" with "domicile" and declined to vacate an attachment, finding plaintiff's domicile to be distinct from the location where it was party to litigation or arbitration. Peter Döhle Schiffahrts KG v. Sesa Goa Ltd., 642 F. Supp. 2d 216 (S.D.N.Y. 2009) (Scheindlin, J.).

The Court agrees with Judge McMahon. Equitable vacatur does not permit a Court to vacate an attachment to a foreign jurisdiction. Aqua Stoli was concerned with American judicial districts, not foreign jurisdictions. The cases it cites for the proposition of equitable vacatur involved attachments brought in neighboring federal district courts, Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50 (2d Cir. 1965), or concerned service of process within the state of New York but not the precise federal judicial district of the attachment. Integrated Container Serv., Inc. v. Starlines Container Shipping, Ltd., 476 F. Supp. 119, 122 (S.D.N.Y. 1979).

In discussing equitable vacatur, the Aqua Stoli Court wrote:

25

Following <u>Integrated</u> and the other pre-Rule E(4)(f) cases, we believe that an attachment may be vacated only in certain limited circumstances. Although the precise boundaries of a district court's vacatur power are not before us, we are persuaded that vacatur may be warranted when the defendant can show that it would be subject to *in personam* jurisdiction in another jurisdiction convenient to the plaintiff. <u>See</u> <u>Integrated</u>, 476 F.Supp. at 124; <u>cf.</u> <u>Det Bergenske Dampskibsselskab v. Sabre Shipping Corp.</u>, 341 F.2d 50, 52–53 (2d Cir.1965) (discussing, but not resting on, the district court's vacatur of an attachment issued in the Eastern District because the defendant was present in the Southern District). The concept of "convenience," however, is a narrowly circumscribed one: A district court may vacate a maritime attachment only if the defendant would be subject to an *in personam* lawsuit in a jurisdiction adjacent to the one in which the attachment proceedings were brought. An "across the river" case where, for example, assets are attached in the Eastern District but the defendant is located in the Southern District is a paradigmatic example of a case where an attachment should be vacated. It is less clear to us that a district court could vacate an attachment on convenience grounds where the adjacent district is more remote and therefore less obviously "convenient" to the plaintiff. A maritime attachment would likewise be properly vacated if the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets. Vacatur is also proper if the defendant's assets sufficient to satisfy a judgment have already been secured elsewhere, yet plaintiff seeks a further attachment.

460 F.3d at 444-45. Although this language primarily focuses on the first ground for equitable vacatur, its overall tenor indicates that the <u>Aqua Stoli</u> court was concerned with federal judicial districts. This tenor and the Second Circuit's reliance on cases focused on districts within the United States federal court system, not foreign jurisdictions, as noted above, compel this conclusion. Furthermore, as Judge McMahon concluded, the term "district" is a "term of art under federal jurisprudence and refers to a district within the United States Federal Court System." <u>Prestigious</u>, 2007 WL 2847210 at *1. Thus under its equitable powers, the Court cannot vacate an attachment based on Glory Wealth and FBP's location in a foreign jurisdiction.[15]

---

[15] The parties did not raise, and the Court does not think it particularly applicable, but this question evokes strains of that dated doctrine <u>forum</u> <u>non</u> <u>conveniens</u>. See <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235 (1981).

Moreover, equity is fundamentally a question of the Court's discretion,[16] and the Court would not vacate this attachment even if "district" encompassed a foreign jurisdiction on the facts here. Mr. Baranskiy is head of FBP, and he has registered and personal addresses in Ukraine. Baranskiy Dep. Tr. at 13. Although Mr. Baranskiy thinks FBP's corporate records are in Singapore, id. at 106, and its bank account is in a Singaporean branch, id., the other entities that make up the alleged alter egos maintain their corporate or company records in the same location in Ukraine, indeed in the possession of the same man, Vladimir Varna, and use a Latvian bank. Id.

It would be inequitable to vacate this attachment and force Glory Wealth to bring suit in Singapore against FBP and its alleged alter egos there, especially with so much of the relevant evidence being located in Ukraine. Otherwise, the usefulness of an attachment would be defeated by paper companies, which Glory Wealth alleges FBP is, taking advantage of the "peripatetic nature of maritime parties, the 'transitory' status of their assets, and the inability of claimants to obtain security 'in a world of shifting assets, numerous thinly-capitalized subsidiaries, flags of convenience and flows of currencies.'" Blue Whale Corp., 722 F.3d at 499 (internal citations omitted).

In a supplemental memorandum filed with leave of the Court,[17] FBP also contends that because Glory Wealth has commenced discovery in another case against FBP and other entities, the Court should vacate the attachment. At its heart, the claim seems to be that Glory Wealth is abusing the processes of the courts by litigating the same action in two separate forums and potentially creating inconsistent outcomes. FBP cites McDermott Gulf Operating Co. v. Con-

---

[16] Aqua Stoli,460 F.3d at 444-45 ("[A] district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.")(emphasis added).
[17] Glory Wealth was permitted to respond.

Dive, LLC, for the proposition that a court sitting in admiralty "has inherent authority to vacate an attachment upon a showing of any improper practice or a manifest want of equity on the part of the plaintiff." 2009 WL 1537871, at *5 (S.D. Ala. 2009). However, that case is readily distinguishable, as the plaintiffs there violated a Mexican court order "absent which conduct they could not have obtained the attachment to begin with." Id. at 6. There is nothing so drastic here.[18] Instead, Glory Wealth is pursuing alter ego claims against FBP and others (many more than those Defendants named here) in New York and an alter ego claim based on its attachment and consequent Supplemental Rule B *in personam* jurisdiction in the Eastern District of Virginia. To the extent that FBP alleges Glory Wealth has delayed in sending subpoenas under New York state law resulting from its action in New York Supreme Court, the proper venue to seek relief is the New York courts.

For these reasons, the Court will not vacate the Glory Wealth's attachment on equitable grounds.

## IV. CONCLUSION

The Court **DENIES** both FBP's Motion to Vacate, Motion to Dismiss Flame's Amended Complaint, ECF No. 103, and FBP's Motion to Vacate, Motion to Dismiss Glory Wealth's Amended Complaint. ECF No. 105. The Court also **DENIES** FBP's earlier Motion to Vacate Attachment as moot. ECF No. 40.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED.**

---

[18] FBP also argues that litigating this action in different forums constitutes a clear abuse of process. Stolt Tankers B.V. v. Geonet Ethanol, LLC, 591 F. Supp. 2d 612, 619 (S.D.N.Y. 2008). But Stolt only described "abuse of process" as "where a plaintiff attaches defendant's funds in one district where it could have easily brought a suit on the merits against defendant in another district." Id. This is precisely the second category of vacatur the Court has addressed above.

Robert G. Doumar
Senior United States District Judge

_____

UNITED STATES DISTRICT JUDGE

Norfolk, VA
May 20, 2014

29