## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

FLAME S.A.,

                Plaintiff,

GLORY WEALTH SHIPPING PTE LTD.,

                Consolidated Plaintiff,

      v.

INDUSTRIAL CARRIERS, INC.,
VISTA SHIPPING, LTD.,
FREIGHT BULK PTE. LTD., and
VIKTOR BARANSKIY,

                Defendants.

Civil Action Nos.
2:13-cv-00658-RGD-LRL
2:13-cv-00704-RGD-LRL


## CONSOLIDATED PLAINTIFF GLORY WEALTH SHIPPING PTE LTD'S
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ............................................................................1

I.     THE PARTIES ..................................................................................................1
     A.    Plaintiff Flame S.A. ............................................................................1
     B.    Consolidated Plaintiff Glory Wealth Shipping Pte Ltd....................1
     C.    Intervenor Plaintiff Noble Chartering Inc. .....................................2
     D.    Defendant Viktor Baranskiy .............................................................2
     E.    Defendant Sergei Baranskiy...............................................................3
     F.    Defendant Freight Bulk Pte. Ltd. .....................................................4
     G.    Defendant Industrial Carriers, Inc....................................................6
     H.    Defendant Vista Shipping, Inc. .........................................................8

II.    ACTIVITIES OF VIKTOR BARANSKIY FROM 2005 THROUGH JUNE 2008 .....13

III.   THE BUSINESS OF INDUSTRIAL CARRIERS AND ITS INSOLVENCY.............14
     A.    The Business of Industrial Carriers..................................................14
     B.    Overlapping Employees of Industrial Carriers and Vista ................15
     C.    Shipping Market Conditions From January 2008 to December 2008 .............16

IV.   THE DROP IN INDUSTRIAL CARRIERS' EQUITY VALUE FROM JULY 2008 UNTIL THE BANKRUPTCY FILING ON OCTOBER 15 2008 ......................18

V.    INDUSTRIAL CARRIERS' USE OF "PAYING" AND "RECEIVING" AGENTS: THE "FRAUDULENT CONDUITS" .........................................................20

VI.   THE USE OF "CASH CONVERTERS" A/K/A "MONEY WASHERS" A/K/A "MONEY LAUNDERERS" BY INDUSTRIAL CARRIERS, VIKTOR BARANSKIY AND VISTA.........................................................................................23

VII.  VISTA BEGINS OPERATING WITH FRAUDULENTLY TRANSFERRED INDUSTRIAL CARRIERS' FUNDS, CLIENTS, VESSELS AND EMPLOYEES....26
     A.    The Formation of Vista and the Commencement of Its Business....................26
     B.    Vista and Viktor Baranskiy's Use of Cash and Cash Ledgers..........................27
     C.    The Direct Cash Transfers From Industrial Carriers on the Eve Of Its Bankruptcy .............................................................................................28
           1.    The "Admitted" "Commission" .........................................................28
           2.    Vista's Known Startup Cash and Beneficial Payments ......................32
           3.    The Actual Sources of Vista's Known Startup Cash and Beneficial Payments ......................................................................................34
           4.    Vista Commenced Operations By Usurping the Fayette and the Profitable Harmony Falcon Charter From Industrial Carriers .............38
                A.    The Harmony Falcon Charter .............................................38
                B.    Fayette..................................................................................41
           5.    The Significant Industrial Carriers-Edelweiss-Vista Relationship .......42

VIII.   THE MISSING INDUSTRIAL CARRIERS MONEY, THE FRAUDULENT CONDUITS, AND VISTA'S ABNORMAL BUSINESS SUCCESS ..........................43
    A.    The Regional Investment Bank, Riga Latvia Connection.................................46
    B.    Viktor Baranskiy Dominates and Controls All of the Vista Entities, Including Freight Bulk which Commingle Assets and Funds ..........................48

IX.   MONEY LAUNDERING AND ILLICIT ACTIVITY ................................................52

X.   GLORY WEALTH HAS STANDING AND AUTHORITY TO BRING THIS ACTION ........................................................................................................................54

XI.   THE VESSEL WAS INTENTIONALLY LOADED WHILE ATTACHED ..............55

PROPOSED CONCLUSIONS OF LAW ........................................................................56

I.   SUBJECT MATTER JURISDICTION .........................................................................56

II.   CHOICE OF LAW ......................................................................................................56

III.   VEIL PIERCING AND FRAUDULENT TRANSFER IN ADMIRALTY .................58

IV.   THE VEIL PIERCING FACTORS APPLIED..............................................................62
    A.    The Industrial Carriers – Vista Relationship...................................................62
        1.    Siphoning of Funds - Creditor Fraud ......................................................62
        2.    Other Alter Ego Factors ..........................................................................64
    B.    The Vista – Freight Bulk Relationship .............................................................66

V.   FRAUDULENT TRANSFER .......................................................................................71
    A.    Choice of Law ....................................................................................................71
    B.    The Assets Fraudulently Transferred to Vista ..................................................73
    C.    Virginia Law ......................................................................................................75
    D.    Delaware Law .....................................................................................................78
    E.    The Tests for Insolvency....................................................................................79

VI.   VIKTOR BARANSKIY BREACHED HIS FIDUCIARY DUTY TO CREDITORS ................................................................................................................80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. California*,
    460 U.S. 605 (1983)...................................................................................72

*Armstrong v. U.S.*,
    7 F. Supp. 2d 758 (W.D. Va. 1998) ...........................................................75

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ...........................................................................79

*Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*,
    85 F.3d 44 (2d Cir. 1996) ...........................................................................59

*Balzer & Assocs., Inc. v. The Lakes on 360, Inc.*,
    463 S.E.2d 453 (Va. 1995)..........................................................................76

*Bergesen d.y. A/S v. Lindholm*,
    760 F. Supp. 976 (D. Conn. 1991)..............................................................61

*Blue Whale Corp. v. Grand China Shipping Dev. Co. Ltd.*,
    722 F.3d 488 (2d Cir. 2013)...........................................................57, 58, 71

*Bordagain Shipping Co. v. Saudi-American Lines, S.A.*,
    1979 A.M.C. 1058 (E.D.La.1978) ..............................................................62

*Chan v. Society Expeditions*,
    123 F.3d 1297 (9th Cir. 1997) ....................................................................56

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)....................................................................................72

*Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC*,
    851 F. Supp. 2d 504 (S.D.N.Y. 2012).........................................................56

*In re Coleman*,
    285 B.R. 892 (W.D. Va. 2002) ...................................................................76

*DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*,
    540 F.2d 681 (4th Cir. 1976) ......................................................................59

*Flame S.A. v. Freight Bulk Pte. Ltd.*,
    -- F.3d --- (4th Cir. Aug. 5, 2014)..............................................................57

*Greenwich Marine, Inc. v. S.S. Alexandria*,
339 F.2d 901 (2d Cir. 1965)...................................................................61, 62

*Keffer v. H.K. Porter Co.*,
872 F.2d 60 (4th Cir. 1989) ........................................................................59

*Lauritzen v. Larsen*,
345 U.S. 571 (1953)....................................................................................57

*Loving Saviour Church v. U.S.*,
556 F. Supp. 688 (D.S.D. 1983) .................................................................58

*In re M/V RICKMERS GENOA Litigation*,
643 F. Supp. 2d 553 (S.D.N.Y. 2009).........................................................59

*Maersk, Inc. v. Neewra, Inc.*,
443 F. Supp. 2d 519 (S.D.N.Y. 2006).........................................................59

*MAG Portfolio Consult, GMBH v. Merlin Biomed Group, LLC*,
268 F.3d 58 (2d Cir. 2001)..........................................................................61

*McDonald v. Williams*,
174 U.S. 397 (1899)....................................................................................80

*In re Meredith*,
357 B.R. 374 (E.D. Va. 2006)......................................................................75

*Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*,
485 F. Supp. 2d 399 (S.D.N.Y. 2007).........................................................59

*Norfolk S. Ry. Co. v. Kirby*,
543 U.S. 14 (2004)......................................................................................72

*North American Catholic Educational Programming Foundation, Inc v.
Gheewalla*,
930 A.2d 92 (Del. Supr. 2007).............................................................79, 80

*Northern Tankers (Cyprus) Ltd. v. Backstrom*,
967 F. Supp. 1391 (D. Conn.1997).....................................................65, 66, 69

*OS Shipping Co. Ltd. v. Global Maritime Trust(s) Private Ltd.*,
No. 11-CV-377, 2011 WL 1750449 (D. Or. May 6, 2011) ........................64

*Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*,
160 F.3d 170 (4th Cir. 1998) .......................................................56, 60, 71

*Prod. Res. Group v. NCT Group, Inc.*,
863 A.2d 772 (Del. Ch. 2004)..............................................................79, 80

iv

*Rosenquist v. Economou*,
No. 2010-002 (Sup. Ct. Marshall Islands Oct. 5, 2011) ....................................................67, 73

*Sabine Towing & Transp. Co. v. Merit Ventures, Inc.*,
575 F. Supp. 1442 (E.D. Tex. 1983) ..........................................................................61, 65, 69

*Sequoia Prop. & Equip. Ltd. P'ship v. U.S.*,
No. CV-F 97-5044, 1998 WL 471643 (E.D. Cal. June 4, 1998) ...........................................58

*Southern Pacific Co. v. Jensen*,
244 U.S. 205 (1917) ...............................................................................................................72

*SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*,
No. 06 Civ. 15375, 2008 WL 4900770 (S.D.N.Y. Sept. 10, 2008) .......................................61

*Sullivan v. Gen. Helicopters, Int'l*,
564 F. Supp. 2d 496 (D. Md. 2008) .......................................................................................71

*In re SunSport*,
260 B.R. 88 (E.D. Va. 2000) ..................................................................................................75

*Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*,
339 U.S. 684 (1950) ....................................................................................................58, 59, 62

*Talen's Landing, Inc. v. M/V Venture, II*,
656 F.2d 1157 (5th Cir. 1981) ..................................................................................... *passim*

*In re Tarangelo*,
378 B.R. 128 (E.D. Va. 2007) ................................................................................................75

*Temple v. Jones, Son & Co.*,
19 S.E.2d 57 (Va. 1942) ..........................................................................................................76

*In re Transamerica Airlines, Inc.*,
No. Civ. A. 1039-N, 2006 WL 587846 (Del. Ch. Feb. 28, 2006) ..........................................80

*Tri-State Vehicle Leasing, Inc v. Dutton*,
461 A.2d 1007 (Del. Supr. 1983) ...........................................................................................78

*U.S. v. Maxwell*,
189 F. Supp. 2d 395 (E.D. Va. 2002) .....................................................................................77

*U.S. v. West*,
299 F. Supp. 661 (D. Del. 1969) ............................................................................................78

*United States v. Aramony*,
166 F.3d 655 (4th Cir. 1999) ..................................................................................................72

v

*United States v. Lentz*,
  524 F.3d 501 (4th Cir. 2008) ...............................................................72

*Vaughan v. Atkinson*,
  369 U.S. 527 (1962).............................................................................61

*Vitol S.A. v. Primerose Shipping Co. Ltd.*,
  708 F.3d 527 (4th Cir. 2013) ....................................................... *passim*

*Williamson v. Recovery Ltd. P'ship*,
  542 F.3d 43 (2d. Cir. 2008)............................................................56, 61

## Statutes

6 Del. C. § 1301 *et seq.*................................................................................78

28 U.S.C. § 1333 ..................................................................................56, 72

Marshall Islands Business Corporations Act, 52 MIRC, Part I, § 13 ...........67

Scheme of Arrangement ...........................................................................54, 55

Section 210 of the Singapore Companies Act (Cap. 50, 1994 Rev. Ed.) ......54

Uniform Fraudulent Transfer Act. ............................................................72, 78

Va. Code Ann. § 55-80 ..............................................................................75

## Other Authorities

Fed. R. Civ. P. 16(b) ...............................................................................1, 56

U.S. Const. art. III, § 2.................................................................................72

#32183996_v2

## CONSOLIDATED PLAINTIFF GLORY WEALTH'S
## PROPOSED FINDINGS OF FACT

Consolidated Plaintiff Glory Wealth Shipping Pte, Ltd. ("**Glory Wealth**"), by its undersigned counsel, submits the following Proposed Findings of Fact in accordance with the Court's Rule 16(b) Scheduling Order (ECF No. 268):

## I.     THE PARTIES

### A.     Plaintiff Flame S.A.

1.      Flame S.A. ("**Flame**") is a corporation or other business entity duly organized and existing under and by virtue of the laws of Switzerland, with an office and principal place of business in Switzerland. (ECF No. 55 at 3).

### B.     Consolidated Plaintiff Glory Wealth Shipping Pte Ltd.

2.      Consolidated Plaintiff Glory Wealth is a corporation or other business entity duly organized and existing under and by virtue of the laws of Singapore, with an office and principal place of business in Singapore. (ECF No. 54 at 1).

3.      On or about June 5, 2008, Industrial Carriers time chartered from Glory Wealth the vessel M/V MINERAL CAPEASIA for a period of 12-13 months via fixture recap pursuant to the New York Produce Exchange Form with Rider Clauses (the "**Glory Wealth Charter**"). Under the terms of the Charter, the daily charter hire rate required to be paid by Industrial Carriers to Glory Wealth was $183,000 per day payable 15 days in advance.  Industrial Carriers failed to pay the 4th installment of hire which became due on 17 September 2008, or any further payments due under the Glory Wealth Charter.  (ECF No. 54 at 4).

1

**C.     Intervenor Plaintiff Noble Chartering Inc.**

4.      Intervenor Plaintiff Noble Chartering Inc. ("**Noble**") is a corporation or other business entity duly organized and existing under and by virtue of the laws of the British Virgin Islands, with its principal place of business in care of OffShore Incorporation Limited, OffShore Incorporation Center, Road Town, British Virgin Islands. (ECF No. 242 at 2).

**D.     Defendant Viktor Baranskiy**

5.      Defendant Viktor Baranskiy ("**Viktor Baranskiy**") is a foreign citizen and resident of Ukraine. (ECF No. 55 at 4).

6.      Viktor Baranskiy is the son of defendant Sergei Baranskiy ("**Sergei Baranskiy**"). (Baranskiy Dep. Tr., at 27:13).

7.      Viktor Baranskiy is the beneficial owner of Defendant Vista Shipping, Ltd. ("**Vista**") and Defendant Freight Bulk Pte. Ltd. ("**Freight Bulk**").

8.      Viktor Baranskiy is an owner and 18% shareholder of Defendant Industrial Carriers, Inc. ("**Industrial Carriers**"). (Plaintiffs' Ex. 55).

9.      Viktor Baranskiy was chartering manager of Industrial Carriers (Baranskiy Dep. Tr. at pg. 32; Flame Ex. 302; ECF No. 19-1 at pg. 7-13; Plaintiffs' Ex. 4), and worked from Industrial Carriers' Ukraine office, Industrial Carriers Ukraine ("**IC Ukraine**"), which office was found by a Greek Appellate Bankruptcy Court to be Industrial Carriers "center of main interests" and from which office all of Industrial Carriers commercial and financial dealings were ultimately executed.  (Plaintiffs' Ex. 255).  Until June 19, 2008, just four days before Defendant Vista was incorporated, IC Ukraine was called Diamant Co. Ltd ("**Diamant**").   (Plaintiffs' Exs. 55, 250-255).

10.     Viktor Baranskiy is also the sole ultimate beneficial owner and Chief Executive Officer of all companies in a group of companies known as the "Palmira Group," including Vista and Freight Bulk. (Plaintiffs' Exs. 50, 51).

11.     Viktor Baranskiy's Ukrainian Work Record Card lists his current employer as Transflot Service Ltd. (Flame Trial Ex. 302; ECF No. 19-1 at pg. 7-13).   Viktor Baranskiy officially reports a salary of US$150 per month from Transflot Service Ltd.  (Bobrenko Dep. Tr. at 45:13-22).

12.     Viktor Baranskiy is an alter ego and fraudulent transferee of Industrial Carriers.

13.     Freight Bulk has admitted that Viktor Baranskiy received $1,588,145 from defendant Industrial Carriers, which funds were used to found Vista and fund Vista's initial operations.  (Richards Report at 6-7; ECF No. 334 at pg. 12-13).  These funds were sent by Industrial Carriers and received by Viktor Baranskiy when Industrial Carriers had defaulted on its payment obligations to creditors, was insolvent, and/or was in Greek Bankruptcy proceedings.

**E.     Defendant Sergei Baranskiy**

14.     Defendant Sergei Baranskiy ("**Sergei Baranskiy**") is a foreign citizen and resident of a foreign country.  (ECF No. 55 at 18).

15.     Sergei Baranskiy is Viktor Baranskiy's father. (Baranskiy Dep. Tr. at 27:13). From June through October 2008, Sergei Baranskiy was the Chairman and on the board of directors of Industrial Carriers.  (Plaintiffs' Exs. 55, 250-255).  Sergei Baranskiy is a 33% shareholder of Industrial Carriers. *Id.*

16.     Together with Viktor Baranskiy, Viktor Baranskiy and Sergei Baranskiy own 51% of Industrial Carriers.  (ECF No. 377 at 9; Plaintiffs' Exs. 55, 250-255).  Viktor Baranskiy

3

and Sergei Baranskiy dominated and controlled Industrial Carriers and are the alter egos of Industrial Carriers.

17.     Sergei Bararnskiy is currently a shareholder of Chaika Agency Co. Ltd. ("**Chaika**"), which provides chartering and operational services to Milestone Shipping S.A. ("**Milestone**").  (Flame Ex. 379; GW Ex. 409, Appendix at 62).

18.     Milestone is a corporation or other business entity duly organized and existing under and by virtue of the laws of Panama.  (GW Ex. 409, Appendix at 57-61).  Milestone was incorporated in November 2008, less than one month after Industrial Carriers filed for bankruptcy.  (*Id.* at 58).  Systemo AG, Cascado AG and Integri S.A. are the corporate directors of Milestone.  (GW Ex. 409, Appendix at 60).

19.     Chaika is controlled by Sergei Baranskiy and Vladimir Tarasov, who are both shareholders and directors of Industrial Carriers. Milestone and Chaika share an address, and are located at 1 Chernomorskaya Str., Apt. 34, 65014, Odessa, Ukraine, the <u>same address</u> as Diamant and IC Ukraine. (*Id.* at 62; Baranskiy Dep. Tr. at pg. 39).  Milestone provided approximately $1.5 million dollars in startup-financing to Vista, to be repaid "according to the liquidity" of Vista.  (Plaintiffs' Ex. 125; GW. Ex. 409, footnote 33 at 24).

20.     Milestone and Vista continue to provide short term loans to each other without consideration or an enforceable contract.  (Plaintiffs' Exs. 124, 125; FB001834-35, FB001844-45).

## F.     Defendant Freight Bulk Pte. Ltd.

21.     Defendant Freight Bulk is a corporation or other business entity organized and existing under and by virtue of the laws of Singapore. (ECF No. 55 at 4).

4

22.     Freight Bulk is the registered owner of a vessel called the M/V CAPE VIEWER, which is currently under attachment in the Eastern District of Virginia. (ECF No. 55 at 4; ECF No. 7).

23.     On or about November 27, 2013, the CAPE VIEWER presented at the DTA terminal in Norfolk, Virginia to receive a load of coal pursuant to the Trip Time Charter and the Voyage Time Charter.  (Noble Ex. 620).

24.     The CAPE VIEWER was attached by the U.S. Marshal on November 29, 2013. (Noble Ex. 622).

25.     National Maritime Services was appointed as the Substitute Custodian in place of the U.S. Marshal.  (ECF No. 8).

26.     The CAPE VIEWER was loaded with 104,606.893 metric tons of coal before it was taken off berth and moved to anchor.   (Noble Exs. 623, 627; GW Ex. 454 at NOBLE000972).

27.     The CAPE VIEWER was attached by the U.S. Marshal before the coal was loaded.  *Id.*

28.     On December 18, 2013, Glory Wealth filed a Verified Complaint against Industrial Carriers, Vista and Freight Bulk seeking an Order of Attachment of *inter alia,* the Cape Viewer, under Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, in this Court, in action styled 13-cv-704 (RGD)(LRL) (E.D.V.A.).  The next day, the requested attachment order was issued by this Court.  (13-cv-704, ECF. Nos. 1, 6).

29.      On December 20, 2013, this Court issued an order consolidating Flame and Glory Wealth's attachment actions.  (ECF No. 39).

5

30.     On January 10, 2014, the Court issued an Opinion and Order denying Freight Bulk's Motion to Vacate Order of Attachment.  (ECF No. 57).

31.     Freight Bulk subsequently filed a number of motions to dismiss the amended complaints of Flame and Glory Wealth on various grounds, including but not limited to failure to state a claim, statute of limitations, laches, equitable vacatur and unclean hands (ECF Nos. 103, 105), all of which motions were denied by order of this Court dated May 20, 2014.  (ECF No. 249).

32.     As a result of the Rule B attachments issued on behalf of Flame and Glory Wealth, the CAPE VIEWER has remained under judicial custody in the Eastern District of Virginia.

33.     Freight Bulk has been determined to be the alter ego of Vista, and is jointly and severally liable for the debts of Vista.  (ECF No. 377 at 24).

### G.     Defendant Industrial Carriers, Inc.

34.     Defendant Industrial Carriers is a corporation or other business entity organized and existing under and by virtue of the laws of the Marshall Islands, and at all times relevant to this lawsuit, was registered to do business in New York, and was a party in multiple lawsuits filed in the Southern District of New York.  (ECF No. 55 at 3).

35.     Industrial Carriers operated from and via IC Ukraine (formerly Diamant), the current offices of Milestone and Chaika.   (GW Ex. 409, Appendix at 62; Baranskiy Dep. Tr. at pg. 39).

36.     Industrial Carriers applied to the Piraeus Multimember Court of First Instance (Ex-Parte Jurisdiction—Admiralty Division, Piraeus, Greece) for the granting of a petition for

6

bankruptcy and for the appointment of a Reporting Judge and a Receiver in respect of its affairs. (ECF No. 319-2 at 1).

37.     Industrial Carriers' bankruptcy petition was denied by the Greek Appellate Court because it was found that Industrial Carriers center of main interests was Ukraine, not Greece. (Plaintiffs' Exs. 254, 255).

38.     Glory Wealth commenced arbitration against Industrial Carriers in London pursuant to clause 45 of the Glory Wealth charter.  The London Arbitration Panel issued the lengthy and reasoned Award, dated October 29, 2009 (the "Glory Wealth Arbitration Award"). (ECF No. 54 at 5).

39.     The Award grants Glory Wealth its claim for outstanding hire in the amount of $3,715,482.18, with interest compounded quarterly from October 2008 at the rate of 4.75%, and $34,813,271.00 in damages, with interest compounded quarterly from March, 2009 at the rate of 4.75%.  With respect to the unpaid hire interest has accrued to at least $1,011,709.82.  With respect to the damages, interest has accrued to at least $6,842,309.91.  As such, Industrial Carriers is currently liable to Glory Wealth in the amount of at least $46,382,772.91.   Glory Wealth's claims against Industrial Carriers remain unpaid to date by Industrial Carriers.  (*Id.* at 5-6).

40.     On December 18, 2013, Glory Wealth, pursuant to the approval of the Glory Wealth Scheme Administrator, commenced an action against Industrial Carriers in the United States District Court for the Southern District of New York, seeking recognition of the Glory Wealth Arbitration Award.  (1:13-cv-08979 (LTS), S.D.N.Y., ECF No. 1).

7

41.     On May, 12, 2014, United States District Court for the Southern District of New York issued a judgment against Industrial Carriers in the amount of $46,382,772.91.  (13-cv-08979, ECF No. 17).

42.     On or about July 17, 2014, Glory Wealth commenced proceedings in the High Court of Justice, Queen's Bench Division, Commercial Court for issuance of a judgment from that Court recognizing and enforcing the Glory Wealth Arbitration Award.

**H.     Defendant Vista Shipping, Inc.[1]**

43.     Defendant Vista is a corporation or other business entity organized and existing under and by virtue of the laws of the British Virgin Islands, and at all times relevant to this lawsuit, was registered to do business in New York.  (ECF No. 55 at 3).  Vista was incorporated on or about June 24, 2008 (i) just five days after and in connection with Diamant's restructuring/conversion and/or renaming to IC Ukraine, and (ii) while Baranskiy was still working for Industrial Carriers.  (Plaintiffs' Ex. 377; Baranskiy Dep. Tr. at 29:7-30:11).

44.     Vista is the beneficial owner of a vessel called the M/V CAPE VIEWER, which is currently under attachment in the Eastern District of Virginia.  (ECF Nos. 7, 55 at 4).

45.     Vista is an alter ego of Freight Bulk, and is jointly and severally liable for the debts of Freight Bulk.  (ECF No. 377 at 24).

46.     Vista was formerly part of a group of companies called the "Vista Group." (Plaintiffs' Ex. 49.)

---

[1] Glory Wealth notes that the named defendant in the caption of this action is Vista Shipping, Inc.  However, based on numerous corporate records, invoices and financial statements produced by the parties, Vista Shipping, Ltd. is the proper corporate designation of Defendant "Vista Shipping."  A motion to change the caption of this case is forthcoming.

47.     The "Vista Group" initially consisted of the following eleven entities, each of which are or were owned by Viktor Baranskiy (*Id.* at FB000939):

| NAME | NATURE OF BUSINESS | COUNTRY OF REGISTRATION | DATE OF REGISTRATION |
| --- | --- | --- | --- |
| Vista Shipping Ltd. | Operator | British Virgin Islands | June 24, 2008 |
| Alpen Shipmanagement Co. | Operator | Marshall Islands | September 10, 2008 |
| Palmira Enterprises S.A. | Operator | Marshall Islands | November 11, 2008 |
| Atlanta Trading | Purchaser of ore | Marshall Islands | December 8, 2008 |
| Columbus Maritime Co. Ltd. | Agent for administration work at ports | Ukraine | December 11, 2008 |
| Volga-Balt partnership | Ship owner | Ukraine | August 1, 2009 |
| Black Sea Azov Service | Ship owner | Ukraine | August 13, 2009 |
| Smart Trading LLP | Commodity trader (ore) | England & Wales | September 23, 2009 |
| Maritime Services Company Ltd. | Newly Established | Marshall Islands | October 26, 2009 |
| Sea Breeze Navigation Inc. | Newly Established | Marshall Islands | October 26, 2009 |
| Coral Sea Spirit Inc. | Newly Established | Marshall Islands | October 26, 2009 |

48.     As of December 31, 2010, the Vista Group ceased existing, and most of the Vista Group entities became part of the "Palmira Group." (Plaintiffs' Ex. 50 at 3, 11-12; Plaintiffs' Ex. 51).

9

49.     As of June 30, 2013, the "Palmira Group" consists of the following fifty-nine entities, including Defendant Freight Bulk, each of which are or were owned by Viktor Baranskiy (Plaintiffs' Ex. 51 at FB000901-000902):

| NAME | NATURE OF BUSINESS | COUNTRY OF REGISTRATION | DATE OF REGISTRATION |
| --- | --- | --- | --- |
| Palmira Holding N.V. | Holding company | The Netherlands | December 27, 2012 |
| Hachi Holding Ltd | Holding company | Marshall Islands | January 18, 2011 |
| Rainbow Consultants Co. | Holding company | Marshall Islands | January 19, 2011 |
| Albara Di Mezzana Shipping Co. | Holding company | Marshall Islands | January 19, 2011 |
| Freight Bulk Ltd. | Holding company | Marshall Islands | April 20, 2012 |
| Privilege Win. Company Ltd. | Holding company | Marshall Islands | October 5, 2012 |
| Express Fortune Limited | Holding company | Marshall Islands | October 5, 2012 |
| Oil and Bulk Trading Co. | Holding company | Marshall Islands | June 27, 2012 |
| Walktown Network LLP | Operator | United Kingdom | June 10, 2008 |
| Vista Shipping Ltd. | Operator | British Virgin Islands | June 24, 2008 |
| Alpen Shipmanagement Co. | Operator | Marshall Islands | September 10, 2008 |
| Palmira Enterprises S.A. | Operator | Marshall Islands | November 11, 2008 |
| Vista Maritime International Ltd. | Operator | Marshall Islands | June 2, 2011 |
| Columbus Maritime Shipping Corporation | Operator | Marshall Islands | July 4, 2011 |

10

| | | | |
|---|---|---|---|
| Ocean Stevedoring Company | Operator | Marshall Islands | April 20, 2012 |
| Alpina Investments Group Corp. | Operator | Belize | February 27, 2009 |
| Rechmortrans Ltd. | Operator | Russia | February 19, 2013 |
| Costa Palma Navigation Inc. | Ship owner/transhipment | Marshall Islands | February 18, 2010 |
| Saiwai Maru Shipping Co. | Ship owner/transhipment | Marshall Islands | June 2, 2010 |
| Sweet Wind Enterprises Ltd. | Ship owner/transhipment | Marshall Islands | June 2, 2010 |
| Moon Shadow Marine Co. | Ship owner/transhipment | Marshall Islands | June 3, 2010 |
| Marine Traveler Co. | Ship owner/transhipment | Marshall Islands | January 19, 2011 |
| Mystique Voyageur Shipping Ltd. | Ship owner/transhipment | Marshall Islands | January 19, 2011 |
| Shine Cristal Navigation Co. | Ship owner/transhipment | Marshall Islands | January 19, 2011 |
| Serena Sea Navigation Co. | Ship owner/transhipment | Marshall Islands | January 19, 2011 |
| Lucky Constellation Ltd. | Ship owner/transhipment | Marshall Islands | May 27, 2011 |
| Evening Star Shipping Co. | Ship owner/transhipment | Marshall Islands | May 27, 2011 |
| Ocean Soul Trade Co. | Ship owner/transhipment | Marshall Islands | May 27, 2011 |
| Polar Galaxy Co. | Ship owner/transhipment | Marshall Islands | May 27, 2011 |
| Caravela Shipping Ltd. | Ship owner/transhipment | Marshall Islands | June 2, 2011 |

11

| Alba Navigare Co. | Ship owner/transhipment | Marshall Islands | June 2, 2011 |
|---|---|---|---|
| Sonic Star Navigation Co. | Ship owner/transhipment | Marshall Islands | September 29, 2011 |
| Orbis Maritime Co. | Ship owner/transhipment | Marshall Islands | September 29, 2011 |
| Sea Star Holding Ltd. | Ship owner/transhipment | Marshall Islands | September 29, 2011 |
| Velas Escarlata Ltd. | Ship owner/transhipment | Marshall Islands | September 29, 2011 |
| Royal Sea Enterprises Ltd. | Ship owner/transhipment | Marshall Islands | January 31, 2012 |
| Porta De Mare Shipping Co. | Ship owner/transhipment | Marshall Islands | January 31, 2012 |
| Stella Polare Ltd. | Ship owner/transhipment | Marshall Islands | January 31, 2012 |
| Sea Logistic International Ltd. | Ship owner/transhipment | Marshall Islands | January 31, 2012 |
| Transintercontinental Corp. | Ship owner/transhipment | Marshall Islands | January 31, 2012 |
| Tristar Enterprises Ltd. | Ship owner/transhipment | Marshall Islands | February 7, 2012 |
| Constellation Maritime Group Ltd. | Ship owner/transhipment | Marshall Islands | April 20, 2012 |
| Freight Bulk Pte. Ltd. | Ship owner/transhipment | Singapore | September 21, 2012 |
| Fast Delivery Maritime Ltd. | Ship owner/transhipment | Marshall Islands | September 29, 2012 |
| International Marine Trading Co. | Ship owner/transhipment | Marshall Islands | September 29, 2012 |
| Maritime Worldwide | Ship | Marshall Islands | October 5, 2012 |

12

| | | | |
|---|---|---|---|
| Shipping Ltd. | owner/transhipment | | |
| Atlantic Marine Division Corp. | Ship owner/transhipment | Marshall Islands | October 5, 2012 |
| Prime Star Holding Inc. | Ship owner/transhipment | Marshall Islands | February 25, 2013 |
| Trans-Service Ltd. | Ship owner/transhipment | Russia | February 18, 2013 |
| Polycenter LLP | Trading | United Kingdom | June 10, 2008 |
| Atlanta Trading Co. | Trading | Marshall Islands | December 8, 2008 |
| Smart Trading LLP | Trading | United Kingdom | September 23, 2009 |
| Huan Hwa Trading Ltd. | Trading | Marshall Islands | June 3, 2010 |
| Sea Traffic Shipping Co. | Technical maintenance | Marshall Islands | June 3, 2010 |
| Black Sea Shipping Index LLP | Other | United Kingdom | June 13, 2011 |
| General Cargo Survey LLP | Other | United Kingdom | November 16, 2011 |
| Daredeck Limited | Other | Limited | January 10, 2013 |
| Maritime Services Company Ltd. | Disposed in 2012 | Marshall Islands | October 26, 2009 |
| Sea Breeze Navigation Inc. | Disposed in 2012 | Marshall Islands | October 26, 2009 |

## II.   ACTIVITIES OF VIKTOR BARANSKIY FROM 2005 THROUGH JUNE 2008

50.     Baranskiy's official Ukrainian work record card ("**workbook**") states that he was employed by Diamant (renamed IC Ukraine on June 19, 2008) beginning February 1, 2005. (Flame Ex. 302, ECF No. 19-1 at 11; Baranskiy Dep. Tr. at 14:22-15:6).

13

51.     Industrial Carriers' business and operations were performed by IC Ukraine (formerly named Diamant) throughout the relevant time period.  Baranskiy carried an Industrial Carriers business card.  (Plaintiffs' Exs. 156, 157; Baranskiy Dep. Tr. at 15:20-16:1).

52.     Baranskiy's first job title was trainee, then a junior vessel operator, and then he was promoted to the chartering department.  (Baranskiy Dep. Tr. at 16:5-8; 18:10-14; 19:17-18).

53.     At all relevant times Baranskiy was chartering vessels on behalf of Industrial Carriers. (Plaintiffs' Ex. 155, ECF No. 19-1 at 2; Baranskiy Dep. Tr. at 19:23-20:2).

54.     In January 2008, Viktor Baranskiy was awarded 18% of the shares of Industrial Carriers.  (Baranskiy Dep. Tr. at 24:17-25:11).  According to Baranskiy, he was given 18% ownership as a bonus for this performance.  (ECF No. 19-1 ¶ 7; Baranskiy Dep. Tr. at 24:17-25:5).

55.     On July 1, 2008, two weeks after Diamant was renamed IC Ukraine, Baranskiy's official Ukrainian workbook states that he became employed as a Logistics Manager at IC Ukraine.  (Flame Ex. 302, ECF No. 19-1 at 11).

56.     On June 24, 2008, (i) just five days after and in connection with Diamant's restructuring/conversion and/or renaming to IC Ukraine, and (ii) while Baranskiy was still working for Industrial Carriers, Vista was incorporated in the British Virgin Islands.  (Flame Ex. 302, ECF No. 19-1 at 3; Plaintiffs' Ex. 377; Baranskiy Dep. Tr. at 29:7-30:11).

## III.   THE BUSINESS OF INDUSTRIAL CARRIERS AND ITS INSOLVENCY

### A.     The Business of Industrial Carriers

57.     Industrial Carriers business was the chartering of vessels.  It did not own vessels, but rather chartered vessels from vessel-owners and then re-chartered them to shippers or other intermediate vessel charterers.   Industrial Carriers also entered into derivative financial

14

instruments called Forward Freight Agreements ("**FFA's**") which agreements constitute a "bet" on the future price of ocean freight.  (Plaintiffs' Ex. 12-15).

58.     The chartering of vessels was Industrial Carriers' main business activity, while FFAs was Industrial Carriers' secondary business activity.  (Plaintiffs' Ex. 4).

59.     A significant shipper and client of Industrial Carriers during 2007 and 2008 was Fayette International Holding Ltd ("**Fayette**").  (GW Ex. 436).

60.     Viktor Baranskiy played a very significant role in Industrial Carriers' chartering business and as of at least July 1, 2008, Viktor Baranskiy was named manager of Industrial Carriers' chartering department.  (Baranskiy Depo. Tr. at 19:18-20:2).

61.     Industrial Carriers made profits of ~$39 million in 2007.  It began 2008 with approximately $39 million in cash.  Furthermore, Industrial Carriers reported profits of ~$40 million in the first half of 2008.  (Plaintiffs' Ex. 55, 161; ECF No. 319-1).

**B.     Overlapping Employees of Industrial Carriers and Vista**

62.     In 2008, the following people were owners of, or employed by, Industrial Carriers:

    a.     Sergei Baranskiy (Chairman/Director; 33% shareholder)

    b.     Vitaliy Cherepanov (Director, Treasurer, 21.8% shareholder)

    c.     Viktor Baranskiy (Chartering Department manager; 18% shareholder)

    d.     Vladimir Tarasov (14% shareholder)

    e.     Alex Kozminikh (13.2% shareholder)

    f.     Michael Ivanov (Chartering Department employee)

    g.     Alex Grigoriev (Chartering Department manager)

    h.     Vladimir Ivanov (Operations Department employee)

    i.     Vladimir Yudaev (Operations Department employee)

(Plaintiffs' Ex. 4; Baranskiy Dep. Tr. at 59-60, 76-77, 112; Ivanov Dep. Tr. at 95-97; Plaintiffs' Ex. 161, ECF 319-1 at 35).

63.     Viktor Baranskiy, Sergei Baranskiy, Vladimir Tarasov, and Michael Ivanov each worked in Industrial Carriers' IC Ukraine office, which was located at 1 Chernomorskaya Str., Apt. 34, 65014, Odessa, Ukraine.  (Baranskiy Dep. Tr. at 39; Ivanov Dep. Tr. at 24; Plaintiffs' Ex. 161, ECF 319-1 at 35).

64.     Viktor Baranskiy, Michael Ivanov, Vladimir Ivanov, Vladimir Yudaev, and Daniel Su work or have worked for Vista. (Plaintiffs' Ex. 3; Baranskiy Dep. Tr. at 101-103; Ivanov Dep. Tr. at 16, 95-97).

### C.     Shipping Market Conditions From January 2008 to December 2008

65.     The "Baltic Index" is a daily rate, issued in U.S. dollars, that assesses the price of moving raw materials by sea based on various vessel classifications. The Baltic Index daily rate for Capesize-class vessels can be accessed via subscription on Bloomberg L.P. The Bloomberg Capesize-class Baltic Dry Index is called the "BCAVRT Index." (GW. Ex. 409, Appendix at 7-8).

66.     The Baltic Index rate for Capesize-class vessels plummeted between July 2008 and December 2008.  (*Id.*).

67.     (GW Ex. 409, Appendix at 7)[2]:

| DATE | LAST PRICE |
|---|---|
| 01/02/2008 | $153,295 |
| 02/01/2008 | $103,646 |

---

[2] The Baltic Index rate is calculated on normal business days. No rate is calculated on weekends or holidays.

16

| | |
|---|---|
| 03/03/2008 | $132,050 |
| 04/01/2008 | $134,427 |
| 05/01/2008 | $173,658 |
| 06/02/2008 | $225,186 |
| 07/01/2008 | $157,323 |
| 08/01/2008 | $148,426 |
| 09/01/2008 | $112,502 |
| 09/15/2008 | $64,761 |
| 10/01/2008 | $38,897 |
| 10/15/2008 | $13,070 |
| 11/03/2008 | $5,716 |
| 11/17/2008 | $3,670 |
| 12/01/2008 | $2,364 |
| 12/15/2008 | $9,740 |
| 12/24/2008 | $8,889 |

68.     The Baltic Index demonstrates that shipping rates began the year above $150,000, climbed above $200,000 in June 2008, then crashed below $3,000 by December 2008. Between June, 2008 and November 3, 2008, shipping rates crashed from $225,186 to $5,716, a decrease of approximately 98%.  (*Id.*).

69.     Industrial Carriers was engaged in the chartering of vessels, and chartered pursuant to medium and long-term charter agreements at the height of the shipping market.  An example of such a charter is the charter party for the M/V Mineral Capesia, dated June 5, 2008 between Glory Wealth and Industrial Carriers for a period of 12-13 months.  Such charters would

17

result in significant losses for Industrial Carriers beginning in July 2008, when the freight market dropped more than 30%, and shippers and cargoes would not pay pre-July 2008 freight rates, but Industrial Carriers was obligated to pay pre-July 2008 charter hire.   (ECF No. 54 at 4).

70.    After three to four months of declining rates, Industrial Carriers elected to file for bankruptcy protection, notifying creditors of its intention not to pay its debts. On or about October 15, 2008 Industrial Carriers filed bankruptcy in Greece.  (Plaintiff's Exs. 250, 251; GW Ex. 410).

71.    By at least September 2008, Industrial Carriers was in selective default, electing not to pay commercial creditors such as but not limited to Glory Wealth.  Industrial Carriers was insolvent by at least the weeks immediately prior to September 2008.  (13-cv-704, ECF. No. 3-1).

72.    As set forth in detail below, during this three-to-four month time period, Industrial Carriers made serious and significant fraudulent transfers to Industrial Carriers insiders, including but not limited to Defendants Viktor Baranskiy and Vista, to the direct detriment of Industrial Carriers' creditors, including but not limited to Flame and Glory Wealth.

**IV.    THE DROP IN INDUSTRIAL CARRIERS' EQUITY VALUE FROM JULY 2008 UNTIL THE BANKRUPTCY FILING ON OCTOBER 15 2008**

73.    Industrial Carriers' June 30, 2008 Balance Sheet, its October 15, 2008 Balance Sheet, and the differential between the two are set forth below.

18

| | | 6/30/08 | | 10/15/08 | | Δ + or (-) |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Fixed Assets - Property, Plant & Equipment | $ | 337,030.00 | $ | 384,006.00 | | |
| **Total Fixed Assets** | **$** | **337,030.00** | **$** | **384,006.00** | **$** | **46,976.00** |
| Restricted Cash - Long Term | $ | 10,027.00 | $ | - | | |
| Money Available in Bank - Cash | $ | 39,236,853.00 | $ | 3,123,076.00 | | |
| Restricted Cash - Current | $ | 3,500,000.00 | $ | - | | |
| Treasury | $ | - | $ | 357,460.00 | | |
| **Total Cash** | **$** | **42,746,880.00** | **$** | **3,480,536.00** | **$** | **(39,266,344.00)** |
| Claims (Without Derivatives) - Accounts Receivable | $ | 66,541,787.00 | $ | 18,879,735.00 | | |
| Claims (From Derivatives) - Derivative Financial Instruments | $ | 35,662,310.00 | $ | 418,699.00 | | |
| **Total  Claims** | **$** | **102,204,097.00** | **$** | **19,298,434.00** | **$** | **(82,905,663.00)** |
| Inventories | $ | 20,197,334.00 | $ | - | | |
| **Total Current Assets** | **$** | **165,148,311.00** | **$** | **22,778,970.00** | | |
| **Total Assets** | **$** | **165,485,341.00** | **$** | **23,162,976.00** | | **$(142,322,365.00)** |
| **Liabilities** | | | | | | |
| Liabilities (Without Derivatives) - Trade/Other Accounts Payable | $ | 60,090,239.00 | $ | 34,555,806.00 | | |
| Liabilities (With Derivatives) - Derivative Financial Instruments | $ | - | $ | 4,077,980.00 | | |
| **Total Claim Liabilities** | **$** | **60,090,239.00** | **$** | **38,633,786.00** | **$** | **(21,456,453.00)** |
| Due to Shareholders | $ | 4,453,645.00 | $ | - | | |
| Provision for other Liabilities and Charges (Long Term) | $ | 12,893.00 | $ | - | | |
| **Total Liabilities** | **$** | **64,556,777.00** | **$** | **38,633,786.00** | **$** | **(25,922,991.00)** |
| **Net Position - Total Equity** | **$** | **100,928,564.00** | **$** | **(15,470,810.00)** | | **$(116,399,374.00)** |

74.

(GW Exs. 409, 410, 446; Plaintiffs' Ex. 55).

75.     The most notable fact is that in a in a period of 105 days, Industrial Carriers'
equity value decreased by over $116 million.  (*Id.*).

76.     This is an extremely significant diminution in value over such a short period of
time. The following are the apparent reasons for the proposed loss in value:

77.     Accounts Receivable: On June 30, 2008, Industrial Carriers showed accounts
receivable of approximately $102 million. As of October 15, 2008, that amount dropped to
approximately $19 million. $83 million of the $116 million, or 72%, of the decrease in equity
value is related to accounts receivable. (*Id.*).

78.     Cash: On June 30, 2008, Industrial Carriers showed cash of almost $43 million. As of October 15, 2008, that amount dropped to approximately $3 million. (*Id.*).

79.     Accounts Payable: On June 30, 2008, Industrial Carriers showed $60 million in accounts payable. By October 15, 2008, that amount decreased to $39 million. This change in accounts payable of $21 million is most likely partially responsible for the $40 million drop in cash position. (*Id.*).

80.     Inventory: On June 30, 2008, Industrial Carriers showed over $20 million in inventories as assets on the balance sheet. As of October 15, 2008, that amount had dropped to zero. The notes to the financials state that this inventory line relates to bunkers. (*Id.*).

81.     It does not make sense that accounts receivable would decrease so substantially without a significant, simultaneous increase in cash. Next, based on the information provided, there appears to be no explanation for $19 million of the total $40 million decrease in cash. (*Id.*). As set forth in detail below, the answer to why the value of Industrial Carriers was diminished so quickly was that it was being diverted out of Industrial Carriers and into, *inter alia*.

## V.     INDUSTRIAL CARRIERS' USE OF "PAYING" AND "RECEIVING" AGENTS: THE "FRAUDULENT CONDUITS"

82.     Industrial Carriers' accounts receivable diminished in the 105 days between June 30, 2008 and October 15, 2008. *Id.*  These receivables appear to have been diverted away from Industrial Carriers through its subsidiary companies. Industrial Carriers employed a system whereby accounts receivable and accounts payable were processed through multiple inter-company transfers using shell companies that were either wholly-owned subsidiaries, related companies, or "Cash Converters." (*Id.*).

83.     Plaintiffs have identified the companies receiving money or other assets on behalf of Industrial Carriers. The following is a list of related companies, whose existence and

20

relationship to Industrial Carriers was <u>disclosed</u> in the Industrial Carriers audited financial statements:

> Weaver Investments Inc. ("**Weaver**");
>
> Selene Shipmanagement S.A. ("**Selene**");
>
> Auster Management Co. aka Auster Marine Co. ("**Auster**")
>
> Cardinia Management Co. ("**Cardinia**");
>
> Tempest Services Inc. ("**Tempest**");
>
> Branwyn Marine Corp. ("**Branwyn**"); and
>
> Treselle Navigation Ltd. ("**Treselle**").

(Plaintiffs' Ex. 55 at pg. 8).

84.      All of these entities made Industrial Carriers payments and received payments due to Industrial Carriers from Industrial Carriers counterparties.   (Plaintiffs' Ex. 59; GW Ex. 421).

85.      Weaver, Tempest, Auster, Selene, Cardinia, and Treselle are listed in the Industrial Carriers 2008 Financials as being wholly owned and controlled subsidiaries. The 2008 Financials also state that "[t]heir sole activity is to maintain bank accounts which are used in the operation of Industrial Carriers Inc."  (Plaintiffs' Ex. 55 at pg. 8).

86.      Three of these entities are particularly relevant in this case:  Branwyn, Auster, and Weaver.

87.      Auster made a bunker (marine fuel oil) payment to a bunker provider in connection with the profitable Harmony Falcon Charter usurped from Industrial Carriers by Vista, and hence not only did Vista wrongfully benefit from the charter, it benefited from the payment.  (GW Ex. 431; GW- DB_0000026).

88.     As described in detail below, Weaver received approximately $478 million of Industrial Carriers' receivables in 2008 alone.  (GW Ex. 436; BNPP-NY0001-1432).

89.     Branwyn is particularly important because it utilized the following banking address on its wire transfers (Industrial Carriers' Greek address) (the "**C/O Industrial Carriers Account**"):

> c/o Industrial Carriers Inc
> 3 Xanthou Str
> 16674 Glyfada

(GW Ex. 445; GW-DB_0000006).

90.     During its analysis of wire transfers relevant to this case, Glory Wealth discovered that the following three entities also used the C/O Industrial Carriers Account.  These three entities, like Industrial Carriers, Weaver, Branwyn, and most of the other Industrial Carriers Fraudulent Conduits are Marshall Islands companies, and are all founded on April 11, 2008, and utilized Industrial Carriers' Piraeus Greece HSBC Bank:

> Syriana Marine Co. ("**Syriana**");[3]
>
> Phaedra International Inc. ("**Phaedra**"); and [4]
>
> Noxana Investments Ltd. ("**Noxana**").[5]

(GW Ex. 409, Appendix at 10-12).

91.     For these reasons, like Weaver, Tempest, Auster, Selene, Cardinia, and Treselle, the entities Syriana, Phaedra and Noxana are <u>also</u> Industrial Carriers Fraudulent Conduits.

---

[3] Syriana (Marshall Islands Company 29411) was founded April 11, 2008 – annulled July 1, 2010).  (GW Ex. 409, Appendix at 11).

[4] Phaedra (Marshall Islands Company 29430) was founded April 11, 2008 – annulled July 1, 2010). (*Id.* at 10).

[5] Noxana (Marshall Islands Company 29437) was founded April 11, 2008 – annulled July 1, 2010). (*Id.* at 12).

92.     Glory Wealth understands that Freight Bulk will deny that Syriana, Phaedra and Noxana are connected to Industrial Carriers.  Their denial is solely on the basis that "Phaedra" shares the first two letters ("PH") with another shipping organization.  (Richards Report at 42-44).  As to Syriana and Noxanna, Freight Bulk merely contends and that there are reasons why a non-Industrial Carriers linked company would use the C/O Industrial Carriers Account.  (*Id.* at 41-45).

93.     Industrial Carriers created and operated an incestuous group of companies with the sole purpose of Industrial Carriers avoiding its debts by defrauding creditors.  (Baranskiy Dep. Tr. at 71:19-72:18).

94.     The practice of directing payments to its wholly owned subsidiaries was utilized by Industrial Carriers to evade creditors.  (*Id.*).

95.     It is not the general practice in the maritime community, or in any other business, for independent companies to make or receive large payments on behalf of other independent companies.

96.     Vista continued the same payment diversion methods as Industrial Carriers in order to hinder, delay, or defraud creditors, as evidenced by its practice of directing payments to companies, such as Alpen Shipmanagement Co. and Palmira.  (Plaintiffs' Exs. 164, 185).

**VI.     THE USE OF "CASH CONVERTERS" A/K/A "MONEY WASHERS" A/K/A "MONEY LAUNDERERS" BY INDUSTRIAL CARRIERS, VIKTOR BARANSKIY AND VISTA**

97.     Industrial Carriers, Viktor Baranskiy and Vista make regular and extensive use of money laundering entities that facilitate the inflow and outflow of both cash and bank credits within Ukraine and throughout other parts of the world (the "**Cash Converters**" a/k/a "**Money Washers**" a/k/a "**Money Laundering Entities**").

23

98.    Cash Converters/Money Laundering Entities known to be used by Industrial Carriers, Vista and Viktor Baranskiy including the following:  (1) Paladin Shipping Co. Ltd. ("**Paladin**"); (2) Charlotte LLP; (3) Trend Index Limited ("**Trend Index**"); (4) Redbridge Benefits LLP ("**Redbridge**"); and Interflar Limited ("**Interflar**").[6]  (GW Ex. 430, 432; GW-JPM_0000003; GW-HSBC_0000284; FLAME002340; Bobrenko Dep. Tr. at 208-212; 216-221; 257; 294-302).

99.    As a general proposition, these Cash Converters/Money Laundering Entities performed two functions for Industrial Carriers, Vista and Viktor Baranskiy.

100.    First, they convert bank credits stored in bank accounts outside Ukraine into cash in Ukraine.  This is done by facilitating a wire transfer or book transfer from a bank account to a Cash Converter/Money Laundering Entity such as Redbridge or Trend Index, which maintain accounts at Regional Investment Bank, Riga Latvia.  Typically, such wire transfers reference a fictitious consulting agreement or are labeled "spare parts," "equipment," "cars," etc. Upon completion of the wire transfer, Trend Index would then provide cash in the same amount, minus a commission, to Vista in Ukraine.  (Bobrenko Dep. Tr. at pg. 257-259; 267-272; 297-302; Plaintiffs' Ex. 10).

101.    Second, the Cash Converters/Money Laundering Entities convert cash in Ukraine into bank credits outside Ukraine for Vista.  In this type of transaction, cash would be delivered in Ukraine by Vista to the principals of the relevant Cash Converter/Money Laundering Entity. The Cash Converter/Money Laundering Entity would then initiate a wire transfer or book transfer from the Cash Converter/Money Laundering Entity's bank account, located outside of

---

[6] Many of the Money Laundering Entities have been shut down and no longer exist. It appears that the life of these companies is approximately 1-3 years.  (GW Ex. 409, Appendix at 23-55).

#32183996_v2

Ukraine, pursuant to instructions provided by Vista.  These instructions could direct that the wire transfer be made to a Vista-owned or controlled bank account or it could direct that the wire transfer be made to the bank account of a wholly independent third party, such as a counterparty or vessel owner, to facilitate payment to that counterparty.  Typically, such wire transfers would reference a fictitious consulting agreement or be labeled "spare parts" or "equipment."  The money laundering transactions were given false descriptions masking the true nature and purpose of the transactions. (*Id.*; Plaintiffs' Ex. 202). See also Vista Shipping (Plaintiffs' Ex. 202), Alpen Shipmanagement (Plaintiffs' Ex. 164), Palmira Enterprises (Plaintiffs' Ex. 185), and Sea Traffic account statements (Plaintiffs' Ex. 193) at Regional Investment Bank, Riga Latvia.

102.   The nature of these Cash Conversion/Money Laundering transactions is described in detail by Ms. Bobrenko throughout her deposition, Ms. Bobrenko describes how Redbridge could help a person convert $25 million in bank credits located at Regional Investment Bank in Riga Latvia into $25 million in cash in Ukraine.  (Bobrenko Dep. Tr. at 297-300).

103.   In a vacuum, there is nothing illegal or wrongful about Cash Conversion.  Absent a law, policy or regulation prohibiting such activity, it would be perfectly lawful for Industrial Carriers or Vista to send money to a Cash Converter, and for the Cash Converter to deliver cash to Viktor Baranskiy. (GW Ex. 409).

104.   But this is not a vacuum.  Where Cash Conversions are executed for the purpose of concealing the origins of fraudulent transfers, avoiding tax obligations, currency controls or applicable corporate laws, then the process of Cash Conversion becomes Money Laundering, and the Cash Converters, Money Launderers.  (*Id.*).

105.   In this case, Defendants used the Money Laundering Entities to conceal the origin of Vista's capitalization and subsidies, avoid Ukrainian tax and corporate laws, and effectuate

the Industrial Carriers Bankruptcy Fraud.  As such, the process and relevant entities will be referred to as Money Laundering and Money Laundering Entities, respectively.  (*Id.*).

## VII.  VISTA BEGINS OPERATING WITH FRAUDULENTLY TRANSFERRED INDUSTRIAL CARRIERS' FUNDS, CLIENTS, VESSELS AND EMPLOYEES

### A.  The Formation of Vista and the Commencement of Its Business

106.  Vista was incorporated on or about June 24, 2008 (i) just five days after, and in connection with, Diamant's restructuring/conversion and/or renaming to IC Ukraine, and (ii) while Baranskiy was still working for Industrial Carriers.  (Flame Ex. 377; Baranskiy Dep. Tr. at 29:7-30:11).

107.  On or about the first week of October 2008, just days before Industrial Carriers' bankruptcy filing, Vista commenced its business – the chartering of vessels -- the precise and exact business of Industrial Carriers.  (Baranskiy Dep. Tr. at 32:19-33:6; Plaintiffs' Ex. 6).

108.  Like any such chartering enterprise, Vista needed at least four things to begin its operations:

(i) initial cash to fund operations;

(ii) a chartered in vessel;

(iii) a customer to whom the vessel could be re-chartered; and

(iv) chartering/operational employees and administrative assets.

Vista received all of these things from Industrial Carriers while Industrial Carriers was insolvent and about to file for bankruptcy, to the detriment of Industrial Carriers' creditors including Glory Wealth.

109.  To wit, and as described in exacting detail below, Viktor Barankiy, an 18% shareholder of Industrial Carriers (and with his father, a majority shareholder of the same) commenced Vista's operations with:

(i) millions of dollars of Industrial Carriers' funds sent to Viktor Baranskiy via the Money Laundering Entities ("**Direct and Admitted Fraudulent Transfers**");

(ii) the chartered-in vessel M/V Harmony Falcon (the "**Harmony Falcon Charter**") which was under charter to Industrial Carriers and noted on Industrial Carriers' bankruptcy filing, but which charter was transferred to Vista without consideration or documentation;

(iii) Fayette, one of Industrial Carriers best customers, who it was known would require the services of the Harmony Falcon; and

(iv) office space, operational know how, and subsequently, the employees of Industrial Carriers.

### B.    Vista and Viktor Baranskiy's Use of Cash and Cash Ledgers

110.    Throughout this section, the term "cash" will be used to refer to physical, paper currency.

111.    Viktor Baranskiy and Vista, make extensive use of cash in their operations – including the payment of employee bonuses and reported shareholder payouts to Viktor Baranskiy.  (Brobrenko Dep. Tr. at 34:8-20, 36:2-37:12, 40:20-41:6, 273:6-21, 285:8-287:19, 306:15-307:9; Plaintiffs' Ex. 10, 305, 306).

112.    Solely by way of example, Freight Bulk has admitted that of the $58,428,000 Viktor Baranskiy reportedly received in dividends from Vista/Palmira in 2012, approximately 70% was paid in cash.  (Bobrenko Dep. Tr. at pg. 306-307).  The fact that Bobrenko testified to the existence of numerous cash boxes and the unordinary use of vast cash deposits raises an immediate red flag with respect to the legitimacy and legality of certain aspects of Vista's operations.  (GW Ex. 409 at 18).

113.    To accommodate and store this high volume of cash, Vista makes use of numerous cash storage boxes provided by third parties in Ukraine.  (Bobrenko Dep. Tr. at pg. 36-40, 159, 187-188, 209, 217-219, 248, 268-272).

114.   Vista Shipping, as well as Viktor Baranskiy personally, maintained ledgers recording the inflow and outflow of many tens of millions of dollars of physical, paper currency transactions.  (Plaintiffs' Ex. 10, 146, 204, 305, 306).

115.   Freight Bulk has produced what is purported to be Vista Shipping's cash ledger ("**Vista Shipping Ledger**").  (*Id.*).  Freight Bulk has also produced what appears to be Viktor Baranskiy's personal cash ledger ("**VB Ledger**") documenting his "investments" in Vista Shipping.   Other Vista entities also allegedly maintain ledgers.  (*Id.*).

### C.   The Direct Cash Transfers From Industrial Carriers on the Eve Of Its Bankruptcy

#### 1.   The "Admitted" "Commission"

116.   Initially, Viktor Baranskiy stated under oath that he did not receive any funds from Industrial Carriers to start Vista.

a.   ""On or about June 24, 2008, I incorporated Vista, whilst I was still employed at ICI. The primary purpose of the creation of Vista was to create a separate business outside of my employment at ICI. All monies that were invested in Vista came from my personal funds or funds that I borrowed. None of the initial funding for Vista was obtained from ICI or its affiliates."  (ECF No. 19-1 ¶ 8).

b.   Q: "From the time you started your company in 9 November of 2008, it's your testimony that you were able to manage to have cash available in the tune of 11 about $100 million? A: I had more cash available. More than that. Q: And none of that came from ICI? A: None. Q: So your testimony as you sit here today is that your father has not provided you with any

28

financial benefits to assist you in any of your business dealings since you

left ICI? A: No.  (Baranskiy Dep. Tr. at 144:8-144:15, 144:18-144:23).

117.    Freight Bulk stated the same numerous times in Court papers (E.g., ECF No. 246

¶ 53; ECF No. 246 ¶¶ 8, 25).

118.    Freight Bulk has now admitted that Viktor Baranskiy received approximately

$1,588,000 from Industrial Carriers on the eve of Industrial Carriers' insolvency, in *response* to

Industrial Carriers pending insolvency, and that these funds were used to capitalize Vista.  (ECF

No. 334 at 12-13; Plaintiffs' Exs. 10, 202, 306).

119.    In September and October 2008, Viktor Baranskiy's father, Sergey Baranskiy,

was Chairman of the Board of Directors for Industrial Carriers.  In September and October 2008,

Viktor Baranskiy and Sergey Baranskiy together owned 51% of Industrial Carriers.  (Baranskiy

Dep. Tr. at 25:19-22).  In October 2008, despite Industrial Carriers' insolvency and bankruptcy

filing on or about October 15, 2008, Industrial Carriers transferred $1,588,109 to Viktor

Baranskiy, without consideration.  (ECF No. 334).

120.    Freight Bulk contends that this $1,588,000 constituted "commissions" due to

Viktor Baranskiy for bringing in the Fayette business to Industrial Carriers.  (ECF No. 334 at

12).

121.    First, Freight Bulk does not have any evidence of an agreement for Viktor

Baranskiy to receive commissions and this story is inconsistent with the award of 18% of the

shares of Industrial Carriers to Viktor Baranskiy for the same Fayette business.

a.    "In January 2008, I was further promoted and given as a bonus for my

hard work and good results, 18% of the total shares in ICI. I was never an

executive of ICI and never had any authority over ICI's management or

29

other corporate day-to-day affairs. In fact, despite my share holding, no distributions were ever paid to me." (ECF No. 19-1 ¶ 7).

122.    Second, the "commission" story is fundamentally incompatible with the testimony of Industrial Carriers during its Greek Bankruptcy proceedings, wherein it was stated that Industrial Carriers internal operating expenses for <u>all of 2008</u> were approximately $2 million. (Plaintiffs' Ex. 254 at pg. 19).  If Baranskiy's "commission" story were true, then there would have only been $250,000 in expenses until the end of September 2008, and Viktor Baranskiy would have received 75% of Industrial Carriers total internal expenses for the year via the "commission."

123.    Freight Bulk contends that the "commission" payments are evidenced by two outgoing payments from Industrial Carriers and Fraudulent Conduit Auster as follows:

| Source | Date | Amount | Originator | Beneficiary |
|---|---|---|---|---|
| FLAME026702 | September 26, 2008 | $850,002.78 | Industrial Carriers | Raiffeisen Zentralbank Oesterriech |
| FLAME026702 | September 29, 2008 | $738,143.00 | Auster Marine Co. | Raiffeisen Zentralbank Oesterriech |

(Def.'s Ex. 1014; Richards Appendix 7; FLAME026702).

124.    However, Freight Bulk's above summary of these wire transfers conveniently omits these wire transfers' references, which indicate that these wire transfers were associated with unrelated payments of Industrial Carriers charter hire obligations by including the references:  "D/A M/V EAGLE 1 AKTI MIAOULI BRANCH PIRAEUS" and "MV LIAN HUA FENG FINAL HIRE BLNCE .ACC.HELD AT YR VIA FIESCHI 11 ABI 05428 CAB 01400." (GW Ex. 443; FLAME026702).

30

125.   The references for the payments in question, were inputted (by Industrial Carriers) as charter hire payments for specific vessels, not "commission" payments to Viktor Baranskiy. (*Id.*).   Indeed, there are numerous payments in the approximate amount of $800,000 and $700,000 and it is evident that Freight Bulk cherry-picked two of these in order to support the fabricated "commission" story.

126.   To the extent relevant, Vista's admitted receipt of approximately $1,588,000 from Industrial Carriers appears to be more closely aligned with a purported loan agreement between the Milestone (and Chaika), a shipping entities operating from IC Ukraine's former address and owned/controlled by Sergei Baranskiy, Vista entity Alpen Shipmanagement as borrower in the amount of $1,554,600 dated December 19, 2008 (the "**Milestone Loan**").  (Plaintiffs' Ex. 125).

127.   The Milestone Loan, as typical of loans given by parents to their children, does not provide for traditional payment terms, but rather repayment "according to the liquidity of [Alpen]." (Plaintiffs' Ex. 125).  The amount "loaned" is very close to the sum of $843,396.78 and $730,683.20 ($1,574,079.98).   Even assuming that the post-dated loan agreement reflects the $843,396.78 and $730,683.20, it is immaterial whether the siphoned Industrial Carriers funds were diverted to the Undisclosed Fraudulent Conduits, then to the Money Laundering Entities, then to Milestone, then to Vista.

128.   In any event, Freight Bulk only admitted that Vista and Baranskiy received approximately $1.57 million directly from Industrial Carriers, during the eve of Industrial Carriers' bankruptcy, after first denying the same and then only when confronted with the analysis set forth below.  (ECF No. 334).

31

### 2. Vista's Known Startup Cash and Beneficial Payments

129.   In the first two weeks of October 2008, the following amounts are known to have

either come into Vista Shipping's direct control, or were sent to a bunkers supplier by Industrial

Carriers on Vista Shipping's behalf.  A discussion of each line in this table is set out below.  As

noted above, Freight Bulk has admitted that the $843,396.78 and $730,883 line items came

directly from Industrial Carriers on the eve of and in response to Industrial Carriers' imminent

bankruptcy filing.  (*Id.*; Richards Report).

| Initial Capitalization | | |
|---|---|---|
| **Date** | **Description** | **Amount** |
| 10/2/08 | Auster Bunker Payment | $ 199,326.00 |
| 10/16/08 | Edelweiss Contribution | $ 98,000.00 |
| 10/23/08 | Harmony Falcon Hire Payments | $ 1,218,021.00 |
| 10/24/08 | Banque Heritage | $ 843,396.78 |
| 10/24/08 | Banque Heritage | $ 730,683.20 |
| | **Sum** | **$ 3,089,426.98** |

(GW Exs. 431, 432, 447; GW-DB_0000026; GW-JPM_0000003; GW-HSBC_0000284;

Platiniffs' Ex. 202 at FB003333-FB003352; Plaintiffs' Ex. 304 at FB148908-FB148918).

130.   On October 2, 2008, Industrial Carriers' Disclosed Fraudulent Conduit, Auster,

made a transfer in the amount of $199,326.00 to B and L Transoil Holdings Ltd. (INV PRO

FORMA MV HARMONY FALCON / BUNKER JEDDHA).  (GW-DB_0000026).  This was a

bunker payment for the Harmony Falcon, which bunkers Vista ultimately utilized in connection

with the profitable Harmony Falcon Charter.  As a result of this $199,326.00 payment, Vista was

unjustly enriched and earned an additional, $199,326.00 on the Harmony Falcon Charter at

Industrial Carriers expense.

131.   Edelweiss transferred $98,000 to Vista Shipping on October 16, 2008. (GW-

JPM_0000003).  This is the first transfer that appears on the bank statements in Vista Shipping's

Banque Heritage account. (Plaintiffs' Exs. 10, 306 at FB003333).  There is a connection between Industrial Carriers and Edelweiss, and Edelweiss and Vista (which is discussed below). These funds were transferred from Edelweiss to Vista Shipping's Banque Heritage account on October 16, 2008, transferred from that same account to an unknown source on October 20, 2008, and reported on Viktor Baranskiy's personal Cash Ledger on October 16, 2008.  (*Id.*; Plaintiffs' Ex. 305).

132.    The Harmony Falcon charter hire totaling $1,218,021.00 was paid directly to the owners of the Harmony Falcon via Money Laundering Entities, Paladin and Trend Index. (GW Exs. 432-435; GW-JPM_0000003; GW-HSBC_0000284).  This occurred in three separate payments totaling $1,218,021.00, as set forth below.  The sum of $1,218,021.00 appears on both Viktor Baranskiy's Cash Ledger and Vista Shipping's Cash Ledger as both incoming and outgoing transfers with reference to the Harmony Falcon hire payment.  (Plaintiffs' Exs. 10, 305, 306).

133.    On October 15, 2008, after the undocumented transfer of the Harmony Falcon charter from Industrial Carriers to Vista Shipping, Paladin, a Money Laundering Entity Vista has admitted using, made a wire transfer in the amount of $800,021.00 to Falcon Shipping, the owner of the Harmony Falcon, with the following reference: T/C M/V Harmony Falcon ACC Time Charter DD 13.10.08 ACC INV No 141008/01 DD 29.11.2008.  (GW-JPM_0000003).  It is clear that Paladin, a known Money Laundering Entity, made the first charter hire payment on Vista Shipping's behalf.

134.    On October 16, 2008, Trend Index, a Money Laundering Entity directly associated with both Industrial Carriers and Vista, made a payment of $188,000.00 to Falcon

33

Shipping on behalf of Vista.  (GW-HSBC_0000284).  This transfer also relates to the Harmony Falcon Charter.

135.    On October 21, 2008, Paladin made a second transfer, in the amount of $230,000, to Falcon Shipping on behalf of Vista Shipping.  (GW-JPM_0000003).  This transfer is also related to the charter of the Harmony Falcon.

136.    In a series of cash transactions and wire transfers, the sums of $843,396.78 and $730,683.20, were transferred from Viktor Baranskiy's Cash Ledger to Vista Shipping's Cash Ledger (Plaintiffs' Exs. 10, 305), removed from Vista Shipping's Cash Ledger and provided to known Money Laundering Entity, Trend Index, which in turn made two wire transfers in the amount of $843,396.78 and $730,683.20 into Vista Shipping's Banque Heritage Account.  (GW-JPM_0000003; Plaintiffs' Ex. 202).

137.    In sum, in the first three weeks of operations, October 1 through October 24, Vista Shipping necessarily required a total of $3,089,405.98, as Vista's use and obtainment of this sum is reflected on independent, third party banking records.  (GW Ex. 447).

138.    The following section will set forth the direct evidence that in addition to the $199,326.00 payment made by Auster, an Industrial Carriers disclosed subsidiary, an additional $1,856,282.08 was diverted from Industrial Carriers between October 6th and October 10th in a series of highly suspicious transfers, made one week prior to the Industrial Carriers bankruptcy.

**3.    The Actual Sources of Vista's Known Startup Cash and Beneficial Payments**

139.    As noted above, Freight Bulk has admitted that the $843,396.78 and $730,883 line items came directly from Industrial Carriers on the eve of and in response to Industrial Carriers' imminent bankruptcy filing.  (ECF 334; See Richards Report).

34

140.   However, Glory Wealth does not accept that the wire transfers from Industrial Carriers proposed by Freight Bulk as reflecting these sums accurately describe these transfers. The Freight Bulk proposed transfers occur conveniently early and the wire transfer references do not support Freight Bulk's contentions.   Rather, the wire transfer references support the proposition that these were ordinary charter payments for the M/V Eagle 1 and M/V Lian Hua Feng, no different from other Industrial Carriers outgoing payments for these same vessels. (FLAME026702).

141.   Rather, the actual sources of Vista's startup-capital were as follows:

### Initial Sources of Capitalization

| Date | Description | Amount |
|---|---|---|
| 10/2/08 | Auster Bunker Payment | $    199,326.00 |
| 10/6/08 | Syriana Transfer | $    500,000.00 |
| 10/7/08 | Syriana Transfer | $    100,000.00 |
| 10/8/08 | Phaedra Transfer | $    479,500.00 |
| 10/8/08 | Noxana Transfer | $    350,000.00 |
| 10/10/08 | Syriana Transfer | $    426,782.08 |
| 10/16/08 | Edelweiss Wire to Heritage | $     98,000.00 |
| 11/24/08 | Redbridge Benefits | $    214,000.00 |
| N/A | Fayette Freight Prepayment | $    732,996.00 |
| **Sum** | | **$  3,100,604.08** |

(GW Ex. 448).

142.   The $3,100,604.08 was used to fund the known startup capital requirements of $3,089,426.98 set forth above. Of paramount importance is that of the $3,100,604.08, $199,326.00 came from Industrial Carriers Disclosed Fraudulent Conduit Auster (GW-DB_0000026), and $1,856,282.08 came from Industrial Carriers Undisclosed Fraudulent Conduits Syriana, Phaedra, and Noxana.   (GW Exs. 430, 431; UBS-GWS0000001; GW-COMMERZ_0000001; GW-HSBC_0000284; FLAME002340).

35

*143.* As noted above, there were three undisclosed Industrial Carriers affiliates, using "care of Industrial Carriers" bank accounts – Syriana, Phaedra, Noxana. (*Id.*).

144. In the week prior to the Industrial Carriers bankruptcy filing, and just after Vista usurped the Harmony Falcon Charter and required financing as set forth above, Syriana, Phaedra, Noxana made five highly suspicious transfers out of the Industrial Carriers bank accounts. These transfers totaled $1,856,282.08.  (*Id.*).

**Undisclosed Fraudulent Conduits Payments: October 6-10**

| Dates | From | Account From | To | Amount |
|---|---|---|---|---|
| 10/6/08 | Syriana | c/o Industrial Carriers | Redbridge | $ 500,000.00 |
| 10/7/08 | Syriana | c/o Industrial Carriers | N/A | $ 100,000.00 |
| 10/8/08 | Phaedra | c/o Industrial Carriers | N/A | $ 479,500.00 |
| 10/8/08 | Noxana | c/o Industrial Carriers | N/A | $ 350,000.00 |
| 10/10/08 | Syriana | c/o Industrial Carriers | Redbridge | $ 426,782.08 |
| | | | | $ 1,856,282.08 |

(GW Ex. 449).

145. It is known that two of these transfers, totaling $926,782.08, were sent to Redbridge, a known Money Laundering Entity Vista has acknowledged using to obtain cash in Ukraine.  (GW-HSBC_0000284; FLAME002340; Bobrenko Deposition pg. 217-218, 220-221, 257-258).  For these transfers, there appears to be complete information concerning a direct diversion of Industrial Carriers funds to Vista's Money Laundering Entities.

146. Vista's Money Laundering Entities also made wire payments to Falcon Shipping on behalf of Vista for the M/V Harmony Falcon.  This is evidence of even more Industrial Carriers funds that would have had to be diverted to the Money Laundering Entities.  (GW Ex. 432; GW-JPM_0000003; GW-HSBC_0000284).

147. The remaining three transfers by Syriana, Phaedra and Noxana from the "C/O Industrial Carriers" accounts set forth above, were effected utilizing the "in cover of" method of

36

wire transfer such that the true identity of the beneficiary cannot be currently ascertained. However, these three transfers, totaling $929,500.00, were made by intentionally undisclosed Industrial Carriers affiliates: (a) using the "care of Industrial Carriers" bank accounts, (b) during the same four-day time period, and (c) when, according to the review of the information produced, none of these entities had previously made wire transfers using the "care of Industrial Carriers" accounts.  (GW Ex. 430; GW-COMMERZ_0000001; UBS-GWS0000001).

148.    Vista had precise and specific capitalization needs, and it appears that near complete information concerning the first three weeks of Vista's initial capitalization and financing requirements are known.  (GW Ex. 450).

149.    Only by diverting funds from Industrial Carriers was Vista able to capitalize its operations.  (*Id.*).  The evidence supporting the allegation that Vista Shipping received money from the Undisclosed Fraudulent Conduits is substantial and significant.  Moreover, Freight Bulk has now admitted that Vista received the $843,396.78 and $730,883 payments directly from Industrial Carriers during the eve of Industrial Carriers formally filing for bankruptcy and in response to the same.  (Richards Report at 22, 78; ECF No. 334 at 12).

150.    Finally, it should be noted that even if Vista received a "bridge" loan from an unknown sources, including but not limited to Milestone, while the fraudulently transferred $843,396.78 and $730,883 was in transit, that does not change the fact that the fraudulent proceeds were still received by Vista, unavailable to Industrial Carriers creditors such as Glory Wealth, unavailable for Industrial Carriers to perform the Harmony Falcon Charter (as discussed below), and used to secure such bridge financing.

37

151.    For this reason, it is clear that Freight Bulk's defense that Vista was started with a "million dollars in a suitcase" leaves out two critical details:  it was at least $1.5 million, and it came directly from Industrial Carriers on the eve of its Bankruptcy.

### 4.    Vista Commenced Operations By Usurping the Fayette and the Profitable Harmony Falcon Charter From Industrial Carriers

### A.    The Harmony Falcon Charter

152.    Industrial Carriers chartered the M/V HARMONY FALCON, a 1982-built Panamax class bulk cargo vessel (IMO No. 8005264), with a delivery date of September 28, 2008, and a daily hire rate of USD $18,000 per day. (Plaintiffs' Ex. 5; ECF No. 319-2 at 2; Baranskiy Dep. 94:18-19, Dec. 12, 2013).  The M/V HARMONY FALCON was at all relevant times owned by Falcon Shipping Co.  (*Id.*).

153.    A February 5, 2014 email sent by Sergey Bakalo to Maritime Shipsale Services Ltd., on behalf of Vista Shipping Ltd., lists all ships Vista had ever chartered to date. The M/V HARMONY FALCON is not on the list, and the list states that the first vessel Vista ever chartered is the GRAND PANAGIOTIS on December 5, 2008.  (Plaintiffs' Ex. 44).

154.    A debit note dated December 24, 2008 sent by Vista to Falcon Shipping Co, the owner of the M/V HARMONY FALCON, shows a charter hire date of September 26, 2008, and a delivery date of September 28, 2008. (Plaintiffs' Ex. 6 at FB001513).

155.    A time sheet for the M/V HARMONY FALCON, with Vista as owners and Fayette as charterers, indicates that cargo discharge was completed at Xiaocuo, China on December 5, 2008, and notes that the charter party date was September 13, 2008. (Plaintiffs' Ex. 7 at FB146802).

156.    On December 24, 2008, Vista sent a debit note to Falcon Shipping for the M/V HARMONY FALCON. The debit note states that the date of delivery as 13:15 GMT on

38

September 28, 2008, and the date of redelivery at 06:30 GMT on December 5, 2008. It also indicates a charter party date of September 26, 2008.  (Plaintiffs' Ex. 6 at FB001513).

157.    Vista's Statement of Account sent to Falcon Shipping shows a daily hire rate of USD $18,000. (Plaintiffs' Ex. 6 at FB001512).

158.    On October 2, 2008, Auster Marine Co., a subsidiary of Industrial Carriers, paid $199,326 to B & L Transoil for bunkers at Jeddah, Saudi Arabia, for the M/V HARMONY FALCON.  (GW Ex. 431; GW-DB_0000026).

159.    A time sheet for the M/V HARMONY FALCON, with Vista as owners, indicates that cargo loading was completed at Odessa on October 22, 2008, and notes that the charter party date was September 13, 2008. (Plaintiffs' Ex. 7 at FB146803).  The vessel departed Odessa and delivered cargo in China stopping for bunkers in Singapore.  (Plaintiffs' Ex. 6).

160.    On January 13, 2009, Vista sent a FVSOA (Final Voyage Statement of Account) to Fayette Inc.  (Plaintiffs' Ex. 6).  The FVSOA shows that 64,429,042 metric tons of cargo were loaded aboard the M/V HARMONY FALCON at an ocean freight rate of USD $55 per metric ton, for a total of $3,543,597.31.  (*Id.*)   The FVSOA and Viktor Baranskiy's Cash Ledger show that Fayette made a prepayment in the amount of in the amount of $732,996.  (*Id.*; Flame Ex. 305).

161.    On October 27, 2008, Fayette International holdings made a freight payment of $2,766,305.71 to Vista for the M/V HARMONY FALCON.  (Plaintiffs' Ex. 9 at FB003333).

162.    On November 12, 2008, Vista paid $318,083.39 to Fayette International Holdings BVI, with a note stating that the payment was for the agreed balance owed to the charterer, less charges.  (BNPP-NY_0213-0214).

39

163.    Freight Bulk has acknowledged that Vista made a profit of at least $1 million on the first Harmony Falcon voyage.  (Richards Report at 101-102).

164.    The profit on this voyage was in fact $2 million.  (GW Ex. 409 at 21; Plaintiffs' Ex. 6).

165.    This profit was wrongfully usurped from Industrial Carriers.

166.    Glory Wealth understands that it is Freight Bulk's position that Vista did not "usurp" the Harmony Falcon charter.  Rather, the Harmony Falcon charter as between Industrial Carriers, Falcon Shipping and Fayette was "frustrated" by Industrial Carriers' bankruptcy. Vista's obtaining the charter was an accommodation to Fayette.  See Richards Report; Plaintiffs' Exs. 250-255).

167.    Freight Bulk's fantastical and lengthy "frustration" story effectively is that Industrial Carriers was unable to perform the Harmony Falcon Charter because it had made a general cessation of payments.  (Richards Report at 65).  However, this story ultimately hinges on two facts asserted by Freight Bulk that are simply untrue.

168.    First, Glory Wealth understands that Freight Bulk will argue that Industrial Carriers did not have the funds to make the Harmony Falcon hire payments in the beginning of October.  However, it is clear that Industrial Carriers had millions of dollars of cash on hand when it filed for bankruptcy, and Freight Bulk has admitted that Industrial Carriers sent Viktor Baranskiy the $1.5 million commission so Vista could operate the Harmony Falcon Charter instead.  (Plaintiffs' Exs. 250-255).

169.    Second, Freight Bulk's frustration story is predicated on Freight Bulk's contention that Industrial Carriers' general cessation of payments began on October 5, 2008. (Richards Report at pg. 62-63).  The October 5 cessation of payments by Industrial Carriers is an

40

<u>absolute requirement</u> for the timeline of the Harmony Falcon Charter "frustration" to be plausible.

170.    However, it is clear from Industrial Carriers' Greek Bankruptcy filings, recently obtained by Glory Wealth as rebuttal evidence, that Industrial Carriers <u>was operating</u> and made no cessation of payments until <u>October 14, 2014</u>.  (Plaintiffs' Exs. 250-255).

171.    As such, Freight Bulk's "frustration" argument (to the extent that it is a legal defense, which is denied) fails on the facts because Vista usurped the Harmony Falcon charter during the first week of October.

172.    In sum, the profits of the Harmony Falcon charter were wrongfully usurped by Vista, to the detriment of creditors including but not limited to Flame and Glory Wealth.

## B.    Fayette

173.    Fayette International was originally a significant client of Industrial Carriers.  In 2008 alone, Fayette International paid Industrial Carriers at least $19 million.  (GW Ex. 436; BNPP-NY0051-0188).

174.    In October 2008, despite being a controlling shareholder (with his father) of Industrial Carriers, and owing fiduciary duties to Industrial Carriers, it is evident that Viktor Baranskiy began Vista Shipping's operations with Fayette International as its original and principal client.  Fayette International was the sub-charterer/shipper with respect to the initial voyage of the Harmony Falcon, Vista's first chartered vessel. For this voyage alone, Fayette paid Vista/Baranskiy $3,499,302.30.  (Plaintiffs' Ex. 6 at FB001506).

175.    In the first quarter of 2009 alone (January 6, 2009 through April 6, 2009), Vista received a total of $39,000,950.00 in revenue.   (Plaintiffs' Ex. 185).   Of that amount, $37,295,049.00 -- or more than 95% -- was received from Fayette International.  (*Id.*)   All of

41

this revenue, and any corresponding profits, should have remained with Industrial Carriers if Viktor Baranskiy had not violated his fiduciary duties by poaching Fayette International and Industrial Carriers had followed appropriate bankruptcy procedures, and continued operating the paper business of chartering with Fayette as a client.

### 5.    The Significant Industrial Carriers-Edelweiss-Vista Relationship

176.    Edelweiss received approximately $1.8 million in wire transfers from Industrial Carriers or its subsidiaries in the seven months leading up to its initial deposit of $98,000 in Vista Shipping's Heritage account.    (GW-JPM_0000003; GW-CITI_0004190; GW-HSBC_0000284).    It is unclear for what purpose Edelweiss received the funds from Industrial Carriers or for what purpose Edelweiss transferred money to Vista; however, it is clear Edelweiss had a relationship with both parties.

177.    Edelweiss and Industrial Carriers, or its subsidiaries, conducted numerous wires during 2008. These transfers of $1.8 million are set forth below:

- 3/3/2008        Industrial Carriers, Inc. sends $250,000 to Edelweiss Consultants SA

- 4/7/2008        Selene Shipmanagement sends $280,736.44 to Edelweiss Consultants SA

- 4/14/2008        Auster Marine sends $197,340 to Edelweiss Consultants SA

- 5/13/2008        Auster Marine sends $345,000 to Edelweiss Consultants SA

- 5/29/2008        Auster Marine sends $197,377 to Edelweiss Consultants SA

- 6/30/2008        Auster Marine sends $297,980 to Edelweiss Consultants SA

- 7/11/2008        Fist, Inc. sends $40,000 to Edelweiss Consultants SA

42

- 8/25/2008     Industrial Carriers sends $105,586 to Edelweiss Consultants SA for dividend payment

- 10/15/2008     Edelweiss sends $98,000 to Vista Shipping Ltd.

(GW Ex. 437; GW-JPM_0000003; GW-CITI_0004190; GW-HSBC_0000284).  Fist, Inc. is a known related company to Industrial Carriers and lists 3 Xanthou Street, Glyfada as its address in its Intra Bank Transfers (defined below).  (GW-DB_0000003-62).

178.     From the transactions themselves it is difficult to determine what, if any, services were provided. However, in one of the payments made by Industrial Carriers on August 25, 2008 in the amount of $105,586.00, the wire notes state that the payment is for "Dividents 2007." (GW-CITI_0004190; GW-HSBC_0000284).  To the extent that this notation is correct, it would mean that Edelweiss had some ownership interest in Industrial Carriers during 2007. This ownership interest is not disclosed in Industrial Carriers' audited financials.  It appears for most, if not all wire transfers in which Edelweiss was either beneficiary or originator, an Industrial Carriers or Vista entity was the other party to the transaction.  In sum, while the precise contours of the Industrial Carriers-Edelweiss-Vista relationship are unclear, Edelweiss indisputably represents a significant link between Industrial Carriers and Vista. Additionally, the money paid to Edelweiss, either as an equity holder or "consultant" were paid at a time when Industrial Carriers was either near insolvency or actually insolvent.

## VIII.   THE MISSING INDUSTRIAL CARRIERS MONEY, THE FRAUDULENT CONDUITS, AND VISTA'S ABNORMAL BUSINESS SUCCESS

179.     Much of the facts set forth above have focused on the initial capitalization of Vista, the suspected sources for that capitalization, and the fact that Industrial Carriers was the source of that initial capitalization, as well as the source of Vista's initial charter, client and employees.

43

180.     However, whether Vista was capitalized with $1 million dollars in a suitcase, $3 million dollars of cash diverted from Industrial Carriers, or the $7 million indicated in Vista's December 31, 2009 audited financials (Plaintiffs' Ex. 49 at FB000950), it is extremely difficult to believe that within two years, with a 25 year old at the helm, Vista was generating one billion dollars in revenue, over a hundred million dollars in profits, and had amassed hundreds of millions of dollars worth of mortgage free vessels. All of this was achieved at a time when shipping rates were at record lows and shipping companies throughout the world were experiencing financial distress.

181.     Instead, Vista was subsidized directly or indirectly by funds diverted from Industrial Carriers, through the Fraudulent Conduits and Money Laundering Entities as discussed above.

182.     According to its first set of audited financials, ending on December 31, 2009 ("**Vista 2009 Financials**"), Vista engaged in the business of international shipping, including such activities as the hiring and operation of ships, as well as the trading of ores and other materials.  (Plaintiffs' Ex. 49 at FB000939).  By December 31, 2009, Vista was already operating through eleven subsidiaries.  (*Id.*).  For the years ending 2009, 2010, 2011, and 2012 the Vista Shipping Group and Palmira Groups revenues and net profit were, respectively, as follows:

| Year Ending | Revenue | Net Profit |
| --- | --- | --- |
| 2009 | $ 211,159,000.00 | $  24,570,000.00 |
| 2010 | $ 562,514,000.00 | $  75,854,000.00 |
| 2011 | $ 987,947,000.00 | $  95,828,000.00 |
| 2012 | $ 669,563,000.00 | $ 127,512,000.00 |

(GW Ex. 51; Plaintiffs' Ex. 50).

44

183.     In 2008 the Disclosed Fraudulent Conduits received approximately $520 million.

| Fraudulent Conduit Activity January 2008 through November 2008 | | | | | |
|---|---|---|---|---|---|
| **Intermediary Bank** | **# of Trans** | **Funds In** | **# of Trans** | **Funds Out** | **Net Activity** |
| Weaver | 310 | $ 478,397,221.00 | 4 | $ 2,449,093.00 | $ 475,948,128.00 |
| Selene | 1 | $ 120,000.00 | 313 | $ 88,827,089.00 | $ (88,707,089.00) |
| Auster | 56 | $ 24,959,344.00 | 186 | $ 70,277,073.00 | $ (45,317,729.00) |
| Diamant | 150 | $ 14,696,613.00 | 28 | $ 98,131.00 | $ 14,598,482.00 |
| Cardinia | 0 | $      - | 0 | $      - | $      - |
| Tempest | 0 | $      - | 0 | $      - | $      - |
| Treselle | 0 | $      - | 0 | $      - | $      - |
| **Total** | **517** | **$ 518,173,178.00** | **.** | **159,202,293** | **356,521,792** |

(GW Ex. 453).

184.     The Fraudulent Conduit that conducted the most transfers, both in number and value was Weaver. In total, the information includes evidence of transfers in the amount of approximately $478 million.  (GW Ex. 452).

185.     This analysis provides convincing circumstantial evidence that Industrial Carriers had the ability to siphon off company assets to the detriment of creditors. It shows that $478 million in transfers came into Weaver during 2008, and only $2.5 million went out of Weaver during the same time period, leaving $475 million unaccounted for.  (*Id.*).  There is no evidence based on the wire transfers reviewed that transactions from Weaver to Industrial Carriers were ever made. If such transfers exist, they would have to have been made through another source (check, cash, Intra-Bank Transfer) other than a wire.  (GW Ex. 409 at pg. 37).

186.     There is no evidence that the Fraudulent Conduits conducted any business not directly related to Industrial Carriers. First, as discussed previously, the Industrial Carriers interim financials state that the Disclosed Fraudulent Conduits existed for the purpose of holding bank accounts used in the operation of Industrial Carriers' business. Second, some of the wire bank to bank detail specifically states that Weaver was the beneficiary on behalf of Industrial Carriers.  (GW Ex. 438; BNPP-NY0168-0169; BNPP-NY0189).   Third, there are myriad

45

examples of documents sent by Industrial Carriers to third parties in which those parties are instructed to send payment to Weaver.  (Plaintiffs' Ex. 59, GW Ex. 421; GW Ex. 409, Appendix at 64-71).

187.    Although the analysis above related to Weaver is relevant and significant on its own, Glory Wealth also analyzed the transfers of the Fraudulent Conduits together as a group. The table below shows the results of that analysis.

| Fraudulent Conduit Activity January 2008 through November 2008 | | | | | |
|---|---|---|---|---|---|
| **Intermediary Bank** | **# of Trans** | **Funds In** | **# of Trans** | **Funds Out** | **Net Activity** |
| Weaver | 310 | $ 478,397,221.00 | 4 | $    2,449,093.00 | $ 475,948,128.00 |
| Selene | 1 | $      120,000.00 | 313 | $ 88,827,089.00 | $ (88,707,089.00) |
| Auster | 56 | $ 24,959,344.00 | 186 | $ 70,277,073.00 | $ (45,317,729.00) |
| Diamant | 150 | $ 14,696,613.00 | 28 | $        98,131.00 | $ 14,598,482.00 |
| Cardinia | 0 | $               - | 0 | $                 - | $                 - |
| Tempest | 0 | $               - | 0 | $                 - | $                 - |
| Treselle | 0 | $               - | 0 | $                 - | $                 - |
| **Total** | **517** | **$  518,173,178.00** | **.** | **159,202,293** | **356,521,792** |

(GW Ex. 453).

188.    This table shows that the aggregate wires of the Fraudulent Conduits result in a net of $356,521,792 in incoming funds to the Fraudulent Conduits.

189.    This serves as circumstantial evidence for how the $83 million in decreased accounts receivable discussed above was moved out of Industrial Carriers. Stated differently, the accounts receivables were never received by Industrial Carriers, but rather, were diverted to the Fraudulent Conduits and funneled, in part, to Vista.  (*Id.*)

### A.    The Regional Investment Bank, Riga Latvia Connection

190.    Industrial Carriers' primary bank account was located at HSBC (Greece). (GW_HSBC_0000001-2).   The HSBC (Greece) account was utilized for most transactions involving Industrial Carriers' counterparties, and the same bank was utilized by the Fraudulent Conduits and undisclosed affiliates of Industrial Carriers.  (*Id.*)

46

191.    However, in late 2007 Industrial Carriers began utilizing a bank account at Regional Investment Bank, Riga Latvia for US dollar international wire transfers.   GW-JPM_0000001; GW Ex. 439.  It appears that Industrial Carriers' Riga Latvia Account was used by Industrial Carriers in a secondary capacity when measured by transaction volume, transaction amounts, and counterparties (key clients Fayette International, Fujian Sansteel International Trade Co. Ltd., and Tavitha Translogistics Limited, among others).  (GW Ex. 440; BNPP-NY 0051; GW-BOC_0000276; GW-JPM_0000001).

192.    Regional Investment Bank, Riga Latvia is ***also*** the bank (a) where the known Money Laundering Entities [described in detail above] maintain[ed] bank accounts, and (b) at which Vista maintains its principal bank accounts.

193.    Normally, when one company (X) makes a USD wire transfer to another company (Y), and X and Y utilize different banks, the wire transfer between X's and Y's banks "clear" through "clearing banks" in New York.  However, when X and Y utilize the same bank, the bank can make transfers between X and Y "internally" (i.e. within the bank, referred to herein as "**Intra Bank Transfers**").   Intra  Bank  Transfer  records  are  not  available  from  the correspondent banks, which facilitate the ability to divert funds without detection because the funds never pass through a third party intermediary bank.  (GW Ex. 409 at pg. 40).

194.    It is likely that the Industrial Carriers' Riga Latvia Account was a mechanism by which substantial sums of Industrial Carriers cash was looted via Intra Bank Transfers to other entities including:

-   The known Money Laundering Entities (who converted these funds into cash in Ukraine, some of which was recorded on Vista Shipping's Cash Ledger, and

47

- Vista (who either kept funds or converted the same to cash via the Money Laundering Entities).

195.    Above, Glory Wealth pointed out the dramatic diminution of Industrial Carriers' cash and accounts receivable between June 30, 2008 and October 15, 2008.  (GW Ex. 446).  The extraordinary business success of Vista is attributable to the missing Industrial Carriers cash and receivables.

**B.    Viktor Baranskiy Dominates and Controls All of the Vista Entities, Including Freight Bulk which Commingle Assets and Funds**

196.    Viktor Baranskiy dominates the Vista companies, including Freight Bulk, all of which disregard corporate formalities.  (ECF No. 334).

197.    Furthermore, even a superficial analysis of the relationship between Freight Bulk and Vista entity Sea Traffic Shipping Co. ("**Sea Traffic**"), which capitalized Freight Bulk, reveals domination and disregard of corporate formalities.  (Plaintiffs' Ex. 123; GW Ex. 441). These conclusions are as follows:

198.    Viktor Baranskiy controls or has the ability to control all commercial and financial dealings of all entities in the Vista Group.  (Baranskiy Dep. Tr. at 81:11-20; 166:15-18; 172:16-18; Brobrenko Dep. Tr. at 29:23-30:6; Ivanov Dep. Tr. at 93:25-94:10; ECF No. 334).

199.    Akin to the Industrial Carriers, Vista quickly formed and implemented a complex paying agent system.  Myriad examples of this include but are not limited to payments due to Vista Shipping being diverted to Palmira and Alpen bank accounts.  (Plaintiffs' Exs. 164, 185, 208-217).

200.    There has been deposition testimony that not all of the Vista entities maintain bank accounts. (Baranskiy Dep. Tr. at 108:4-109:2).   The corporate structure of Vista is unnecessarily complex, with numerous companies serving as nothing but money transfer and

48

receiving agents and numerous intermediate holding entities.  On the whole the Vista entity structure is overly complex, which suggests its true intent is to provide a cover to ownership interests and asset transfers.

201.   As per deposition testimony, the entities that comprise Vista are "off the shelf" companies with pre-selected directors who have never met or conferred with any of the Vista management.  (Zorin Dep. Tr. at 28:19-29:7; 142:17-144:20).  This lack of director participation by independent third parties facilitates inappropriate corporate actions such as the diversion of assets and brings into question the legitimacy of the corporations as separate entities.

202.   A specific example is the case of the Cape Viewer. The Cape Viewer is under attachment in this proceeding.  (ECF No. 7).  As set forth below, the details concerning the vessel's ownership structure and financing are strongly indicative of domination and disregard of corporate form.

203.   The vessel is registered to Freight Bulk Shipping Pte Ltd. ("**Freight Bulk Singapore**"), a Singapore entity.  (ECF No. 246 at 3; Plaintiffs' Ex. 76).

204.   Freight Bulk Singapore's shares are owned by a Marshall Islands entity called Freight Bulk Limited. ("**Freight Bulk Marshall Islands**").  (Plaintiffs' Ex. 76).  Per deposition testimony, Freight Bulk Marshall Islands, does not maintain any bank accounts or serve any business purpose.  Freight Bulk Marshall Islands is owned by Marshall Islands company Hachi Holding Ltd.  (*Id.*)

205.   Freight Bulk Singapore was provided a "loan" of $18,500,000.00 by Vista entity Sea Traffic pursuant to a "loan agreement" dated August 9, 2012, more than a month before Freight Bulk Singapore was incorporated.  (Plaintiffs' Ex. 123).

206.     Vista, not Freight Bulk Singapore, was responsible for repayment of the Sea Traffic loan, evincing a disregard for corporate formalities. (*Id.*)

207.     For reasons unknown, on February 18, 2014, months after this commencement of this litigation, Freight Bulk Singapore made a single wire transfer to Sea Traffic in the amount of $39,138.42. (GW Ex. 441; GW-DB_0000007). No other such payment has ever been made and this payment was made purely in response to the instant litigation. More unusually, this payment violated the terms of the loan agreement in question, which provided that Vista was responsible for such payments.

208.     Vista has paid Freight Bulk Singapore's legal fees for this action. (GW Ex. 442; GW-DB_0000008; GW-DB_0000062).

209.     Freight Bulk Singapore never received any payments in connection with the chartering of the Cape Viewer, or its other vessel, the Cape Climber.

210.     Sea Traffic, the Vista Entity that purportedly made the Freight Bulk Loan, maintained an average daily account balance in the $100,000 range in 2010 and 2011. (Plaintiffs' Ex. 193). Moreover, Viktor Baranskiy testified that Vista funds were used to purchase the Cape Viewer. (Baranskiy Dep. Tr. at pg 143).

211.     There is a ship management agreement dated December 18, 2012 between Vista and Freight Bulk. (Plaintiffs' Ex. 76 at FBP00022-00033; Baranskiy Dep. Tr. at 45:1-8).

212.     Although Bakalo is employed by Echo Technology, he signed the ship management agreement on behalf of Vista. (Plaintiffs' Ex. 76 at FBP00031-00033; Bakalo Dep. Tr. at 14-15, 26-29; Baranskiy Dep. Tr. at 45:1-21).

213.     Although Bakalo signed documents on behalf of Vista, he also signed documents on behalf of Freight Bulk. (Plaintiffs' Exs. 105, 106, 110, 111).

214.   Zorin also signed documents on behalf of Freight Bulk Pte, the Buyer in the MOA for the purchase of the Cape Viewer (Plaintiffs' Ex. 76 at FBP00003-17) and on behalf of Black Sea Azov Services (Flame Ex. 311 at FB002940).

215.   Although Vista is not the registered owner of the Vessel, Vista and Freight Bulk act as though Vista possesses a "bareboat charter" for the Vessel, although no bareboat charter exists.  (Noble Ex. 601).

216.   As further evidence that the Vista entities' corporate forms are disregarded and fraudulently used to avoid creditors, particularly with respect to the Cape Viewer, the following emergent information concerning change of ownership of Vista received from Freight Bulk on July 14, 2014. According to a purported stock transfer certificate dated March 31, 2013, Palmira Holding NV transferred the shares of Hachi Holding Ltd., which entity owns the shares of Vista and Freight Bulk Marshall Islands, which in turn owns the shares of Freight Bulk Singapore, which is registered owner of the Cape Viewer, to Mrs. Liliya Dariy, Viktor Baranskiy's mother. (Plaintiffs' Ex. 207).  The transfer of these shares in the face of the instant litigation concerning the Cape Viewer evidences the intent to avoid creditor claims.

217.   On July 23, 2014, Freight Bulk, via its counsel, represented that the transfer of ownership was made to frustrate Glory Wealth's enforcement of its claim and recovery of any judgment obtained in this action.  "Such transfer of nominal ownership took place… out of desire [sic] to make it more difficult for Flame and possibly Glory Wealth to do any more unlawful and outright criminal actions, as such transfer of nominal ownership happened right after the time FBP realized that its ship was criminally and fraudulently lured to the US."  (ECF No. 334 at 20-21).

## IX.     MONEY LAUNDERING AND ILLICIT ACTIVITY

218.     Vista/Baranskiy not only had contacts within the money-laundering world, but also *owned* at least one company (Walktown) that has connections with alleged money launderers.  (Flame Ex. 378).

219.     Systemo AG, Cascado AG, Integri SA, the corporate directors of Milestone, are also the corporate directors of Waterlux AG, owner of the MV Faina, a vessel that was intercepted on its way to the Sudan carrying illegal weapons.  (*Id.*, Appendix at 199).

220.     As discussed above, both Industrial Carriers and Vista had also numerous transactions with two Money Laundering Entities, Redbridge, and Trend Index.  (GW Ex. 430, 432; GW-JPM_0000003; GW-HSBC_0000284; FLAME002340; Bobrenko Dep. Tr. at 208-212; 216-221; 257; 294-302).

221.     Trend Index's original directors were Stella Port-Louis ("**SPL**") and GT Group ("**GT**").  Similar to Vanagels, SPL has served as a director for over 300 hundred companies.  Per an article in stuff.co.nz dated May 29, 2011:

> A United States Justice Department investigation into the banking giant Wachovia, also tied Taylor-linked companies to the movement of drug money. Wachovia was fined more than $202m for helping disguise the illegal origins of up to $479 billion for Mexican drug lords, predominantly the murderous Sinaloa cartel. Four Taylor companies "filtered" $50m in drug money through banks in Latvia and on to Wachovia. Each of the companies had just one director – Stella Port-Louis, 32, of the Seychelles, until recently a director of around 300 New Zealand companies.

(*Id.*, Appendix at 124).

222.    Not only has Vista/Baranaskiy transacted with companies owned by Milltown Corporate Services Limited ("**Milltown**") and Ireland & Overseas Acquisition LLP ("**Ireland**") - Redbridge and Trend Index - but they have purchased companies whose original directors were also the former directors of Redbridge.  As of May 2013, two companies owned by Vista per its audited financial statements, Rainbow Consultants Co., LLP ("**Rainbow**") and Albara Di Mezzana Shipping Co., LLP ("**Albara**") were listed as directors for Walktown Networks, LLP ("**Walktown**"). Walktown's original directors were none other than Milltown and Ireland. (Flame Ex. 378).

223.    Redbridge's original directors were two companies: Milltown and Ireland.  (*Id.*, Appendix at 30).   Polycenter LLP also has Ireland and Overseas Acquisition Limited and Milltown Corporate Services Limited as corporate directors, as did Charlotte LLP, a company which was used to transfer funds to Vista and make cash conversions.  (*Id.*, Appendix at 33-35).

224.    Both Milltown and Ireland were owned by two individuals, Erik Vanagels ("**Vanagels**") and Stan Gorin ("**Gorin**"). Through Milltown and Ireland, Vanagels and Gorin served as directors of over 300 other corporations.   The Vanagles connection has been recently quoted in the media in relation to numerous criminal cases involving illicit arms trading, government corruption, money laundering and fraud:

The Faina vessel Case – Ukraine / Sudan – Illicit Arm Trading

The Chernomorenoftegas Case – Ukraine – Gov. Corruption

The flu vaccines Case – Ukraine – Gov. Corruption

The Ukrspetseksport Case – Ukraine – Illicit Arm Trading

The Rockford Funding Case – Latvia – Financial Fraud

The Moldavian Cases – Moldavia / Romania – Gov. Corruption / Fraud

53

The Hermitage Capital Management Case – Russia / Switzerland – Massive Money Laundering

The Trade Construction Company LLC Case – Russia – Financial Fraud

Hoa Le Duc's Mafia Case – Romania / Vietnam / China – Organized Crime

The EURO 2012 Case – Ukraine – Corruption

The Mexicam (sic) Sinaloa Drug Cartel Case – Mexico – Organized Crime / Drug

The GT Group Case – North Korea / Iran – Illicit Arm Trading / Terrorism financing

The ex.ua file-exchange Case – Ukraine – Massive Internet Piracy

The forextime.com Case – Russia / New Zeeland / Nigeria – Money Laundering / Financial Fraud".

(*Id.*, Appendix at 125-131).

## X.   GLORY WEALTH HAS STANDING AND AUTHORITY TO BRING THIS ACTION

225.    Glory Wealth is currently in a Scheme of Arrangement pursuant to Section 210 of the Singapore Companies Act ("**Scheme of Arrangement**"), as ordered by the High Court of the Republic of Singapore ("**Singapore Court**"). (GW Ex. 411).

226.    The Scheme of Arrangement provides that the Glory Wealth retains control of its affairs during the Scheme of Arrangement period, including a mandatory obligation on Glory Wealth to prosecute claims of the Glory Wealth against third parties, such as Industrial Carriers Vista and Freight Bulk.  (*Id.*).

227.    Pursuant to the scheme of arrangement, Glory Wealth has pursued more than 30 claims against third parties and approximately $50 million in proceeds from these claims has been distributed to Glory Wealth's creditors.  (GLORY-0001703-1706).

228.    Glory Wealth's has the power and express mandate to pursue this action for the benefit of Glory Wealth's creditors under the Scheme of Arrangement.   See Scheme of Arrangement paragraphs 2.2.1 (imposing an obligation on Glory Wealth to "use all reasonable efforts to recover and collect the Prescribed Receivables and/or make all Prescribed Claims and prosecute all Prescribed Proceedings."  (GW Ex. 411).

229.    Glory Wealth is pursuing this action, incurring fees and expenses with the express knowledge and approval of Tam Chee Chong, Scheme Administrator of Glory Wealth's Scheme of Arrangement.  (GW Ex. 412).

## XI.    THE VESSEL WAS INTENTIONALLY LOADED WHILE ATTACHED

230.    On December 21, 2012, Noble entered into a contract of affreightment with Vitol S.A. ("**Vitol**") to carry one cargo of coal per quarter in 2013 from Norfolk, Virginia to various potential discharge ports, including Le Havre, France ("**Voyage Charter**").  (Noble Ex. 602).

231.    On October 17, 2013, Noble entered into a trip time subcharter agreement to deliver cargo being loaded at Norfolk, Virginia to Le Havre, France ("**Trip Time Subcharter**"). (Noble Ex. 601).

232.    On November 14, 2013 and November 29, 2013, Noble paid hire to Vista in the total amount of $911,214.65 in connection with the Trip Time Subcharter.  (Noble Ex. 615, 621).

233.    On November 19, 2013, Noble paid expenses to T. Parker Host in the amount of $134,000.00.  Beginning November 19, Noble has had free storage of the cargo on the vessel. (Noble Ex. 617).

234.    Noble first had knowledge that the vessel was attached on November 29, 2013. (GW Ex. 454 at NOBLE 00916).  Yet Noble chose to load the vessel with knowledge that the arrest order had not been lifted, stating "[w]e will continue to load unless told otherwise.  If we

finish and the problem has not been resolved, then I assume that the vessel will have to remain in port until the problem is resolved.  (*Id.* at NOBLE 000928).  Noble loaded 104,606 metric tons of cargo until it stopped on or around December 2 due to draft restrictions in port, at which time Noble was aware of continuing court hearings regarding the attachment.  (Noble Ex. 630 at NOBLE 00997-998).

**CONSOLIDATED PLAINTIFF GLORY WEALTH'S
PROPOSED CONCLUSIONS OF LAW**

Consolidated Plaintiff Glory Wealth Shipping Pte, Ltd. ("**Glory Wealth**"), by its undersigned counsel, submits the following Proposed Conclusions of Law in accordance with the Court's Rule 16(b) Scheduling Order (ECF No. 268):

**I.      SUBJECT MATTER JURISDICTION**

1.      The Court has subject-matter jurisdiction over Glory Wealth's claim in this action under 28 U.S.C. § 1333 for breach of a maritime contract.

**II.     CHOICE OF LAW**

2.      Until recently, federal courts sitting in admiralty automatically applied federal common law when federal common law when examining corporate identity.  *See, e.g, Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC,* 851 F. Supp. 2d 504 (S.D.N.Y. 2012) (engaging in analysis citing cases in rejecting defendant's argument that contractual choice of law should apply to veil piercing question); *see also, Vitol S.A. v. Primerose Shipping Co. Ltd.,* 708 F.3d 527 (4th Cir. 2013); *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d. Cir. 2008); *Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998); *Chan v. Society Expeditions,* 123 F.3d 1297 (9th Cir. 1997); *Talen's Landing, Inc. v. M/V Venture, II*, 656 F.2d 1157 (5th Cir. 1981).

56

3.      In *Blue Whale Corp. v. Grand China Shipping Dev. Co. Ltd.,* 722 F.3d 488 (2d Cir. 2013), the Second Circuit held that admiralty courts must engage in a *Lauritzen*[7] choice of law analysis to determine the law applicable to piercing the corporate veil in admiralty actions such as this.  However, the court also held that in a case with "multi-national foreign parties locked in dispute" that have "shifting" and "transitory" assets, the location of the defendant's attached property being in the United States will often result in the United States having the "strongest point of contact," resulting in the application of federal common law to the question of veil piercing.

4.      This is the first case in the Fourth Circuit to address the issue of piercing the corporate veil since *Blue Whale.*

5.      Recently, in *Flame S.A. v. Freight Bulk Pte. Ltd.*, -- F.3d --- (4th Cir. Aug. 5, 2014), the Fourth Circuit cited the Second Circuit's analysis in *Blue Whale* with approval.

6.      All of the parties, including Defendant Freight Bulk, have argued that federal common law applies to the question of piercing the corporate veil.

7.      Even if this court were to apply the choice of law test enunciated in *Blue Whale,* federal common law would result.  In particular, Plaintiffs are Singapore and Swiss corporate entities.  Defendant Freight Bulk is a Singapore entity, Defendant Vista is a British Virgin Islands entity, Defendant Sergei Baranskiy is a Ukranian citizen, Defendant Viktor Baranskiy is a Ukranian citizen, and Defendant Industrial Carriers is a Marshall Islands Company operated from Ukraine and to a lesser extent, Greece, where its bankruptcy application was filed.  Most of the other companies in the Palmira Group are Marshall Islands entities.  The property at issue in this dispute, the Vessel CAPE VIEWER, is under attachment in this district.  As such, due to the

---

[7] *Lauritzen v. Larsen*, 345 U.S. 571 (1953).

location of the Vessel in the United States being the strongest point of contact in this dispute, federal common law would result if the *Blue Whale* analysis were employed.

## III.    VEIL PIERCING AND FRAUDULENT TRANSFER IN ADMIRALTY

8.    Alter ego and fraudulent transfer are separate and distinct causes of action. *Loving Saviour Church v. U.S.*, 556 F. Supp. 688, 690 (D.S.D. 1983). ("Two distinct lines of analysis are helpful in resolving the issue in this case: A) the fraudulent conveyance theory, and B) the alter ego theory."); *Sequoia Prop. & Equip. Ltd. P'ship v. U.S.*, No. CV-F 97-5044, 1998 WL 471643, at *4 (E.D. Cal. June 4, 1998) ("The fraudulent conveyance, alter ego and nominee theories are discrete, despite the similar factual basis necessary to establish each theory"). However, as will be demonstrated below, and particularly in the case of fraudulent transfers made from bankruptcy or insolvent entities, fraudulent transfer and more generally, injustice to creditors, is a central component of the veil-piercing analysis.

9.    Fraudulent transfer was the original basis upon which the United States Supreme Court held that a veil-piercing action was cognizable in admiralty.  Over sixty years ago, the Supreme Court decided *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684 (1950), a case in which the plaintiff-appellant had effected a maritime attachment of a vessel in the Panama Canal Zone for claims arising from cargo damage.  The plaintiff then learned that the vessel's Colombian owner *purportedly* had sold the vessel to another Colombian entity (*allegedly* owned by insiders and shareholders) several days earlier.  339 U.S. at 686-87. The Supreme Court reversed the district court and circuit courts, holding that equitable claims challenging the propriety of defendants' corporate activities fell within the admiralty jurisdiction and could be asserted under U.S. admiralty law.  The Supreme Court upheld the attachment based upon the allegation that the vessel was purportedly sold to insiders, whereas here it is not

58

contested that Vista shares common ownership with Industrial Carriers and is controlled by an Industrial Carriers insider - Viktor Baranskiy.

10.     Since then, the federal maritime law has adopted unique rules governing corporate liability, irrespective of whether corporate entities expected, *ex ante,* that their corporate relationship would be scrutinized in a maritime action due "unique corporate arrangements that exist in the maritime industry." *In re M/V RICKMERS GENOA Litigation*, 643 F. Supp. 2d 553, 557 (S.D.N.Y. 2009) (multiple citations omitted); *see also Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.,* 485 F. Supp. 2d 399, 404 (S.D.N.Y. 2007); *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.,* 85 F.3d 44 (2d Cir. 1996)) (noting special equitable need to permit piercing the corporate veil in a "world of shifting assets, numerous thinly capitalized subsidiaries, flags of convenience and flows of currencies"); *Maersk, Inc. v. Neewra, Inc.,* 443 F. Supp. 2d 519, 530-31 (S.D.N.Y. 2006) (noting same in the context of "an international web of suspect corporations and individual actors who employ tacit alliances and shifting identities as the primary tools of their malfeasance").

11.     Over the past 60 years since *Swift*, maritime courts across the country have articulated factors relevant to the veil piercing analysis, which factors were largely incorporated into the national body of maritime law from both applicable state and non-maritime federal common-law precedent.  *See e.g., Vitol S.A. v. Primerose Shipping Co. Ltd.,* 708 F.3d 527 (4th Cir. 2013) (quoting well established 4th Circuit alter ego factors).  The federal common law alter ego factors in the Fourth Circuit are derived from *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 684-87 (4th Cir. 1976) and *Keffer v. H.K. Porter Co.,* 872 F.2d 60, 65 (4th Cir. 1989).  The *DeWitt-Keffer-Allied Towing* factors include:  (1) gross undercapitalization; (2) insolvency; (3) siphoning of funds; (4) failure to observe corporate

formalities and maintain proper corporate records; (5) non-functioning of officers; (6) control by

a dominant stockholder; (7) overlap of directors; and (8) injustice or fundamental unfairness.

*Ost-W.-Handel Bruno Bischoff GmgH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir.

1998).  Other cases also include "intermingling of funds; overlap in ownership, officers, directors

and other personnel; common office space; the degrees of discretion shown, and whether the

dealings of the entities are at arm's length."  *Vitol S.A.*, 708 F.3d at 544.

12.     "In applying these [veil piercing factors] a court must focus on reality and not

form, [on] how the corporation operated and the individual defendant's relationship to that

operation." *Id.* at 542.

13.     Other courts have held that a plaintiff can pierce a corporate veil by showing that

a person or corporation exercises dominion and control over its alter ego by examining the

following factors:

> (1) common or overlapping stock ownership between parent and subsidiary; (2)
> common or overlapping directors and officers; (3) use of same corporate office;
> (4) inadequate capitalization of subsidiary; (5) financing of subsidiary by parent;
> (6) parent exists solely as holding company of subsidiaries; (7) parent's use of
> subsidiaries' property and assets as its own; (8) informal intercorporate loan
> transactions; (9) incorporation of subsidiary caused by parent; (10) parent and
> subsidiary's filing of consolidated income tax returns; (11) decision-making for
> subsidiary by parent and principals; (12) subsidiary's directors do not act
> independently in interest of subsidiary but in interest of parent; (13) contracts
> between parent and subsidiary that are more favorable to parent; (14) non-
> observance of formal legal requirements; (15) existence of fraud, wrongdoing or
> injustice to third parties.

*Id.* at 1402 (citing *Bergesen d.y. A/S v. Lindholm*, 760 F. Supp. 976, 987 (D. Conn.
1991)).

14.     Additional recognized factors include: (16) overlap in personnel, (17) common

address and telephone numbers, (18) the degree of discretion shown by the allegedly dominated

corporation, and (19) payment or guarantee of the corporation's debts by the dominating entity.

60

*MAG Portfolio Consult, GMBH v. Merlin Biomed Group, LLC,* 268 F.3d 58, 63-64 (2d Cir. 2001); *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.,* No. 06 Civ. 15375, 2008 WL 4900770, at *3 (S.D.N.Y. Sept. 10, 2008); *Bergesen d.y. A/S v. Lindholm*, 760 F. Supp. 976, 987 (D. Conn. 1991); *Sabine Towing & Transp. Co. v. Merit Ventures, Inc*., 575 F. Supp. 1442 (E.D. Tex. 1983).

15.     As recently articulated by the Second Circuit Court of Appeals, the determination is to be made as follows: "[t]here is no set rule as to how many of these factors must be present to warrant piercing the corporate veil and courts have considered additional factors as well. Instead of a firm rule, the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d. Cir. 2008) (this case and quote was cited with approval by the Fourth Circuit in *Vitol*, 708 F.3d at 544).

16.     Thus ultimately, the test for piercing the corporate veil in admiralty is an equitable one.  "Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief." *Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962) (citing *Swift & Co. v. Compania Caribe*, 339 U.S. 684, 691-92 (1950)). This equity principle also was articulated by then-Second Circuit Judge Thurgood Marshall in *Greenwich Marine, Inc. v. S.S. Alexandria,* 339 F.2d 901, 905 (2d Cir. 1965), where he stated: "[t]he inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district court sitting as an admiralty judge…"

#32183996_v2

## IV.    THE VEIL PIERCING FACTORS APPLIED

### A.    The Industrial Carriers – Vista Relationship

17.    As an initial matter, Court ordered that adverse inferences against Freight Bulk for its failure to provide any Industrial Carriers documents in violation of the Court's April 30, 2014 discovery Order. (ECF No. 377 at 24).  Thus, it is to be presumed that "had any Industrial Carriers, Inc. documents been produced by FBP… those documents would have been favorable to [Glory Wealth] and harmful to the Defendants" with respect to veil piercing and fraudulent transfer. *Id.*

### 1.    Siphoning of Funds - Creditor Fraud

18.    In maritime law, fraud on creditors such as the transfer of assets to insiders in the face of known claims and/or insolvency is one of the most important considerations when piercing the corporate veil.  *See Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684 (1950) (transfer of a vessel by a company with claims against it to another insider company was sufficient to pierce the corporate veil under maritime law).

19.    Aside from the fact that the transfers here are more sophisticated, and their severity is compounded by what now appears to be a bad-faith bankruptcy filing followed by bankruptcy fraud, they are indistinguishable from *Swift* and *Bordagain* – another maritime case in which the corporate veil was pierced.  *See, e.g., Talen's Landing, Inc. v. M/V VENTURE, II,* 656 F.2d 1157, 1161 (5th Cir. 1981), describing the holding in *Bordagain Shipping Co. v. Saudi-American Lines, S.A.,* 1979 A.M.C. 1058, 1071-72 (E.D.La.1978), *aff'd per curiam*, 623 F.2d 710 (5th Cir. 1980) ("[W]here the controlling entity of one corporation siphons off assets of that corporation into another controlled corporation in order to place the assets of a siphoned corporation beyond the reach of legitimate creditors, justice and equity decree that the Court

62

should pierce the corporate veil with respect to these attempted transfers as assets in order to prevent the innocent creditor from being the victim of what Judge Schwartz termed 'reprehensible conduct'").

20.     In this case, the following assets of Industrial Carriers were siphoned and fraudulently transferred to Vista:

a)      **The "Commission" Payment:** Freight Bulk and Viktor Baranskiy, despite first denying receipt of any funds from Industrial Carriers, has admitted that Vista received approximately $1.5 million from Industrial Carriers immediately prior to the Industrial Carriers bankruptcy filing.  Any claim that this payment was a "commission" due and owing to Viktor Baranskyi is not credible.  There is no commission agreement or any other documentation relating to this payment.  This lack of documentation along with the adverse inference imposed by Magistrate Judge Leonard's Order weighs heavily against Defendants' allegation of a commission and in favor of an intention to defraud creditors. The payment of the $1.5 million is evidence of fraud.

b) **The Harmony Falcon Charter Profits:** The Harmony Falcon Charter was wrongfully usurped from Industrial Carriers and is an example of the siphoning of assets from Industrial Carriers to Vista, as well as comingling of assets and not dealing at arm's length.  No charter contract between Vista and Falcon Shipping was produced, giving the inference that non existed and Vista simply performed the September 2008 charter of Industrial Carriers.

c) **Vista Startup Financing:** Vista received $1,856,282 from Industrial Carriers through five wire transfers made by three entities (Syriana, Phaedra and Noxana) the week prior to Industrial Carriers' bankruptcy filing.  Most of the $1,856,282 was sent to an entity

63

called Redbridge (defined above), a "cash conversion entity" whose purpose is to convert bank credits outside Ukraine into cash (physical, paper currency) inside Ukraine, and vice-versa.  Defendants use of Redbridge for "cash conversions" during the formation of Vista suggests that the transfer of funds was conducted fraudulent and with the intention to hide the true beneficiary, in an effort to avoid creditors.

**d) Fayette:**  Vista took one of Industrial Carriers' most significant clients, Fayette for no consideration.  Vista had profits of at least $2 million from the Harmony Falcon charter with Fayette which should have gone to Industrial Carriers.

**e) The "Missing Industrial Carriers Money:**  Vista's extraordinary success – a 23 year old converting approximately a $3.5 million initial investment into a billion dollar company during a recession in the shipping industry – was more likely than not the product of Vista's business being subsidized by the millions of dollars "missing" from Industrial Carriers' balance sheet including payments for bunkers for ships chartered by Vista.

### 2.   Other Alter Ego Factors

21.   **Undercapitalization:**  When an entity does not pay its debts as a consequence of being undercapitalized when incorporated, this act constitutes a fraud or injustice "separate and apart" from the primary debtor's inability to pay.  *See OS Shipping Co. Ltd. v. Global Maritime Trust(s) Private Ltd.,* No. 11-CV-377, 2011 WL 1750449 (D. Or. May 6, 2011).   Here, the fraudulent transfers from Industrial Carriers caused Industrial Carriers to become undercapitalized.

22.   **The "Milestone Loans:** Vista makes and receives loans on non-commercial, insider terms with Milestone, a company owned and controlled by Viktor Baranskiy's father,

64

who in turn owned and controlled Industrial Carriers and operated from the same addresses as Diamant and IC Ukraine.

23.     **Common Ownership, Business Management and Employees:** Industrial Carriers' former ownership and management was usurped by Vista's ownership and management. Key employees immediately began operating under the name Vista, chartering the same ships that Industrial Carriers had chartered to move the same cargoes of iron ore from the Black Sea to China that Industrial Carriers had been transporting for the same clients, all of which business activities were carried out from the Ukraine. Vista and Industrial Carriers have overlapping ownership - Viktor Baranskyi, who was a 18% shareholder of Industrial Carriers is the sole beneficial owner of Vista. This bears a striking resemblance to the shareholding defendants in *Northern Tankers (Cyprus) Ltd. v. Backstrom*, 967 F. Supp. 1391, 1402 (D. Conn.1997) (noting that shares of defendant entities beneficially owned either directly or indirectly by two individuals).   Vista and Industrial Carriers also have high and low level overlapping personnel, without whom Vista could not have begun its operations.

24.     **Common Address:** Vista and Industrial Carriers initially shared a common address.  Milestone Shipping S.A. began its operations exactly when Industrial Carriers filed for bankruptcy and operates from the same address as Industrial Carriers.  *See Sabine Towing & Transportation Co., Inc. v. Merit Ventures*, 575 F. Supp. 1442, 1446 (E.D.Tex. 1983) (noting that a common address allows "a great deal of interrelationship between the companies").

25.     **Corporate Formalities:**   Failure to observe corporate formalities strongly supports piercing the corporate veil.  *Talen's Landing, Inc. v. M/V VENTURE, II*, 656 F.2d 1157, 1160 (5th Cir. 1981) (where failure to observe corporate formalities was "the most striking example of non-separateness," including inter-corporate loan transactions transferring funds

65

from one corporation to another).  Industrial Carriers used "paying and receiving agents" to make and receive substantial payments akin to the intercorporate loan transactions present in *Northern Tankers*, 967 F. Supp at 1405; *see also Talen's Landing* at 1161; *cf. Vitol*, 708 F.3d at 548 (where loans between closely related companies were largely repaid). Vista also made extensive use of "cash" (i.e. physical, paper currency), and black-market "cash conversion entities."  Vista, Industrial Carriers, and the cash conversion entities all maintained bank accounts at Regional Investment Bank, Riga Latvia, which would have enabled "book transfers" between the accounts, making illicit or fraudulent transfers nearly impossible to detect from wire transfer records.  These activities suggest a lack of respect for corporate formality and proper recordkeeping in support of piercing the corporate veil between Industrial Carriers and Vista.

26.    Accordingly, it is in the interests of justice to pierce the corporate veil between Vista and Industrial Carriers.

**B.    The Vista – Freight Bulk Relationship**

27.    This Court has already ruled that Vista and Freight Bulk are the alter-egos of each other for the purposes of this action. (ECF No. 377 at 24).   As such, Glory Wealth shall briefly apply the Vista-Freight Bulk alter-ego factors and will reserve the right to amend and further explicate in the event that the Court's ruling is overturned.

28.    At the broadest of levels, all of the corporate veils of the 60+ corporate entities should be pierced because the group operates in a manner fundamentally contrary to the concept of limited liability, in total disregard of corporate form and corporate formalities, "…out of the post-Sovietique 'Never Never Land' called Ukraine." (ECF No. 334 at 19).

29.    But even though the Vista entities, including Vista and Freight Bulk are "operating" from Ukraine, they are not Ukrainian companies and subject to corporate laws other

than that of Ukraine.  Freight Bulk is a Singapore company governed by Singapore's strict corporate governance laws.  Vista is a British Virgin Islands company that is similarly governed by strict corporate governance laws.  Freight Bulk's holding companies, including Hachi, as well as Industrial Carriers, are Marshall Islands entities that are governed by corporate statutes and common law that are virtually identical to those of the state of Delaware.  *Rosenquist v. Economou*, No. 2010-002, at *10 (Sup. Ct. Marshall Islands Oct. 5, 2011) ("The parties also correctly agree that Marshall Islands law instructs this Court to look to Delaware corporate law. *See* 52 MIRC, Part I, § 13 (noting the Marshall Islands Business Corporations Act 'shall be applied and construed to make the laws of the Republic… uniform with the laws of the State of Delaware')").  These are the corporate standards by which the defendants in this case are obliged to govern themselves.

30.    **Total Domination by Viktor Baranskiy:**  Vista concedes that "at all times Victor Baranksy was, and currently is, the sole ultimate beneficial owner of FBP, Vista and all of FBP's sister companies."  (ECF No. 334 at 6).  Furthermore, the testimony in this case demonstrates that Viktor Baranskiy makes major commercial and financial decisions on behalf of all of the companies.

31.    **Fraudulent Transfers Since this Action Was Filed:** According to a purported stock transfer certificate dated March 31, 2013, Palmira Holding NV, the holding company of the Palmira Group (f/k/a Vista Group), transferred the shares of Hachi Holding Ltd., which entity owns the shares of Vista as well as Freight Bulk Marshall Islands, which owns the shares of Freight Bulk, which is registered owner of the Cape Viewer, to Mrs. Liliya Dariy, Viktor Baranskiy's mother for 1 Euro.  The stated purpose of this action was to make it harder for creditors such as Glory Wealth to recover.  (ECF No.334 at 6-7).

32.     **The Overly Complex "Shell Company" Structure and Asset Commingling:**
Akin to the Industrial Carriers, Vista quickly formed and implemented a complex paying agent
system.  Myriad examples of this include but are not limited to payments due to Vista Shipping
being diverted to Palmira and Alpen bank accounts.  Also solely by way of example, Vista has
paid Freight Bulk Singapore's legal fees for this action.  Moreover, the entities that comprise
Vista are "off the shelf" companies with pre-selected corporate directors who have never met or
conferred with any of the Vista management.  Alpen Shipmanagement and Palmira Shipping are
paying agents of Vista.

33.     **The Money Laundering Entities and Illicit Activity:** Vista employs cash and
money laundering entities to shift assets in violation of the norms of business and law to conceal
the source and nature of funds and group assets, and likely to avoid Ukraine taxes and currency
laws.

34.     **The Sham Sea Traffic Loan:** Freight Bulk Singapore was provided a "loan" of
$18,500,000.00 by Vista entity Sea Traffic pursuant to a "loan agreement" dated August 9, 2012,
more than a month before Freight Bulk Singapore was incorporated.  Vista, not Freight Bulk
Singapore, was responsible for repayment of the Sea Traffic loan, evincing a disregard for
corporate formalities.  For reasons unknown, on February 18, 2014, months after this
commencement of this litigation, Freight Bulk Singapore made a single wire transfer to Sea
Traffic in the amount of $39,138.42.  No other such payment has ever been made and this
payment was made purely in response to the instant litigation.  More unusually, this payment
violated the terms of the loan agreement in question, which provided that Vista was responsible
for such payments.  Magistrate Leonard's order states that the Sea Traffic loan was "sham
transaction for the sole purpose of avoiding creditors."  ECF No. 377 at 24.

35.      **The Sham Freight Bulk-Vista Vessel Management Agreement:** There is a ship management agreement dated between Vista and Freight Bulk. Although Bakalo is employed by Echo Technology, he signed the ship management agreement on behalf of Vista.  Although Vista is not the registered owner of the Vessel, Vista and Freight Bulk act as though Vista possesses a "bareboat charter" for the Vessel, although no bareboat charter exists.

36.      These factors easily surpass cases in which the corporate veil has been pierced. For example, in *Talen's Landing*, the Fifth Circuit Court of Appeals found that the "record clearly supported the [District] Court's finding [to pierce the corporate veil" where there was "a total domination of both corporations, a confusion of corporate records and finances, and a failure to follow usual corporate formality." 656 F.2d  at 1160.  In particular, the court focused on the non-participation of the corporate treasurer, the undercapitalization of one of the entities, and the same address of the entities.  The Fifth Circuit also based its decision on the "most striking example of non-separateness… intercorporate loan transactions [made at owner's] sole discretion by merely transferring the funds from one corporation to another without any loan documentation." *Id.*

37.      In *Sabine Towing & Transp. Co. v. Merit Ventures, Inc*., 575 F. Supp. 1442 (E.D. Tex. 1983) the Court pierced the corporate veil by finding parent companies liable for obligations of subsidiary because, among other things, the subsidiary was improperly capitalized, the parent abruptly stopping of lending monies to subsidiary which resulted in its "final collapse," there were "loans" made between companies without any formal documents, the parent made "major financial decisions," for the subsidiary, and the events surrounding the final day of the subsidiary showed an injustice to third parties was committed.  *See also Northern*

*Tankers*, 967 F. Supp. at 1402-03 (alter ego individuals in position of authority "set policy for the group").

38.    For these reasons, both the Industrial Carriers-Vista relationship and the Vista-Freight Bulk relationship are clearly of an alter-ego nature, and are completely distinguishable from the allegations at issue in *Vitol.*

39.    In *Vitol*, the Fourth Circuit assumed without deciding that the allegations at issue were sufficient to hold that the primary judgment debtor Capri Marine was an alter ego of Gerassimos.    These allegations included that "[t]he ALAMBRA was later resold at a substantially higher price to a bona fide third party, and the assets of the sale were distributed throughout the Kalogiratos Group including repayment of [Capri's] loan." 708 F.3d at 545.

40.    But this was only the first of two veil-piercings necessary to reach the THOR, the vessel under attachment, and Primerose, its owner. "Even assuming that Capri Marine is an alter ego of Gerassimos, that status does not resolve the issue in the case at bar as to whether alter ego liability can attach to S & P." *Id.*

41.    As to piercing the corporate veil of S & P, the allegations were substantially weaker:

> At best, Vitol has made allegations with particularity only to support a reasonable belief that the two fleets maintain a close business relationship. Vitol's allegations that the Primerose fleet was started with funds from the Starlady fleet establish little more than that Starlady has invested in Primerose, and not how that event gives Starlady control over Primerose's affairs or establishes any ownership rights. Moreover, allegations that the fleets share similar coloration are not probative of the core question of whether the two entities have disregarded corporate formalities. And while sharing office space may be an indicium of alter ego, we do not believe that shared office space on its own is sufficient to compel a conclusion that Starlady and/or Gerassimos dominated and controlled Primerose.

*Id.* at 545-46.

70

42.     Here, this is not a case of Industrial Carriers "investing" in Vista as a general proposition.   Rather, in the wake of and immediately prior Industrial Carriers' demise and bankruptcy, the assets of Industrial Carriers that should have been made available to creditors were siphoned out, the employees and Harmony Falcon Charter was usurped, and Industrial Carriers received no consideration – let alone an ownership interest – in Vista.   In essence Viktor Baranskiy in concert with the other owners of Industrial Carriers transferred funds to Viktor Baranskiy to create a successor corporation.   Meanwhile, the Vista-Freight Bulk relationship easily surpasses what the Fourth Circuit "assumed but did not decide" was sufficient for allegations of the Capri Marine-Gerassimos relationship.

## V.     FRAUDULENT TRANSFER

### A.     Choice of Law

43.     Federal maritime choice-of-law analysis determines what relevant substantive law applies to the fraudulent transfer inquiry in this case.  As with the alter-ego analysis, it is clear that United States law has the strongest "points of contact" with the claim by virtue of the location of the fraudulent transferee's attached property within this district.  *See Blue Whale Corp. v. Grand China Shipping Development Co., Ltd.*, 722 F.3d 488, 499-500 (2d Cir. 2013).

44.     "It is well established that an admiralty court can review questions of fraud and alter ego." *Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998).  "[I]n an admiralty case, a court applies federal common law and can look to state law in situations where there is no admiralty rule on point." *Id.* (citing *Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir. 1981); *Bell v. Tug Shrike*, 332 F.2d 330, 332-33 (4th Cir. 1964)); *see also Sullivan v. Gen. Helicopters, Int'l*, 564 F. Supp. 2d 496, 502 (D. Md. 2008).

71

45.     In the United States, fraudulent transfer actions are normally brought under the law and statutes of the various states.  Here, the Cape Viewer was attached in Virginia.  As such, it would seem clear and obvious that Virginia fraudulent transfer law should apply.

46.     Moreover, under the "law of the case" doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  *Arizona v. California*, 460 U.S. 605, 618 (1983); *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999).  The doctrine furthers important interests of finality and judicial economy, and prevents endless cycles of litigation.  *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quotation omitted).  It applies to questions actually decided and those decided by "necessary implication." *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008), *cert. denied,* 129 S.Ct. 303 (2008).  Here, this Court has already applied Virginia fraudulent transfer law in this case, specifically to the issue of laches (ECF No. 249).  Accordingly, Virginia law is the "law of the case" and should be applied to the fraudulent transfer analysis.

47.     However, most states, including Delaware, have adopted the Uniform Fraudulent Transfer Act.  Virginia has not.  There is no question that national uniformity is an important principle of maritime law. Article III, Section 2 of the United States Constitution and 28 U.S.C. §1333 grant federal courts original jurisdiction over actions arising in admiralty.   This jurisdiction enables the achievement of national uniformity in the application of United States maritime law.  As explained by the U.S. Supreme Court nearly a century ago, as well as recently. *Southern Pacific Co. v. Jensen,* 244 U.S. 205, 216 (1917) (discussing importance of national uniformity in maritime law); *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 28-29 (2004) (same).

48.     In this case, Industrial Carriers and the Fraudulent Conduits, including Weaver, Auster, Syriana Noxana and Phaedra, as well as the majority of the 60+ entities in the Vista

group, including Freight Bulk's holding entity Freight Bulk Marshall Islands and its holdings company Hachi, are Marshall Islands companies. Marshall Islands has adopted, wholesale, the corporate law of Delaware. *Rosenquist v. Economou* at *10, supra. Utilizing the law of Delaware would promote the interest of uniformity, as the outcome of this case with respect to fraudulent transfer should not be dependent on in which U.S. state the Cape Viewer was attached.

49.     Ultimately, as described above, this admiralty court is a court of equity, and it may look to state law as a guide for reaching appropriate results. The result is the same under either Virginia or Delaware law: Viktor Baranskiy and Vista is the fraudulent transferee of Industrial Carriers and should be found liable as such.

       **B.     The Assets Fraudulently Transferred to Vista**

50.     As set forth in detail in the proposed findings of fact above: 5 categories of assets were fraudulently transferred to Vista at a time when Industrial Carriers was insolvent. These assets are:

   a.  **The admitted "Commission" payment in the approximate amount of $1.5 million**. With respect to this transfer, there is no dispute that it was made to Viktor Baranskiy on the eve of and in response to Industrial Carriers' bankruptcy and that it was further utilized to capitalize Vista. After first denying receiving funds from Industrial Carriers, Freight Bulk now claims that these funds represented due and owing commissions to Viktor Baranskiy.

   b.  **The Harmony Falcon Charter Profits:** It is admitted that the Harmony Falcon Charter was transferred to Vista on the eve of and in response to Industrial Carriers' insolvency. Freight Bulk claims that the charter was frustrated, but the

73

evidence clearly demonstrates that at the time of the transfer, Industrial Carriers had sufficient resources and assets to perform the Harmony Falcon charter.

c. **Other Vista Startup Financing:** Vista received $1,856,282 from Industrial Carriers through five wire transfers made by three Industrial Carriers' related entities, Syriana, Phaedra and Noxana, the week prior to Industrial Carriers' bankruptcy filing.  Most of the $1,856,282 was sent to an entity called Redbridge (defined above), a "cash conversion entity" whose purpose is to convert bank credits outside Ukraine into cash (physical, paper currency) inside Ukraine, and vice-versa.  Redbridge was admitted to be owned by Roman Inde, a business partner of Viktor Baranskiy.  Defendants use of Redbridge for "cash conversions" during the formation of Vista suggests that the transfer of funds was conducted fraudulent and with the intention to hide the true beneficiary, in an effort to avoid creditors.

d. **The "Missing Industrial Carriers Money:**  Vista's extraordinary success – the conversion of a $3.5 million initial investment into a company with a billion dollars per year in revenues during a recession in the mature shipping industry was the product of Vista's business being subsidized by the millions of dollars "missing" from Industrial Carriers' balance sheet, which transfers necessarily occurred after the Industrial Carriers semi-annual financial statement was prepared.

e. **Fayette:**  Viktor Baranskiy, an owner/insider and Vista took one of Industrial Carriers' most significant clients, Fayette for no consideration.

74

## C.     Virginia Law

51.     The Virginia fraudulent transfer law is governed by Va. Code Ann. § 55-80 which

states:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real
> or personal, every suit commenced or decree, judgment or execution suffered or
> obtained and every bond or other writing given with intent to delay, hinder or
> defraud creditors, purchasers or other persons of or from what they are or may be
> lawfully entitled to shall, as to such creditors, purchasers or other persons, their
> representatives or assigns, be void. This section shall not affect the title of a
> purchaser for valuable consideration, unless it appears that he had notice of the
> fraudulent intent of his immediate grantor or of the fraud rendering void the title
> of such grantor.

52.     Under Virginia fraudulent transfer law, circumstantial evidence regarding the

facts surrounding the transfer, or "badges of fraud," may be used to establish that challenged

transfer was made with requisite intent to delay, hinder or defraud creditors. *In re Tarangelo*,

378 B.R. 128 (E.D. Va. 2007).   Fraudulent intent in conjunction with conveyance may

legitimately be inferred through circumstantial evidence. *E.g., Armstrong v. U.S.*, 7 F. Supp. 2d

758 (W.D. Va. 1998).  The establishment of a successor-in-interest company with funds of the

debtor during the period of insolvency is strong evidence of a fraudulent intent.

53.     Badges of fraud, to which Virginia courts may look in deciding whether the

alleged fraudulent transfer was made with requisite intent to delay, hinder or defraud creditors,

include: (1) transferor's retention of interest in transferred property; (2) that transfer was between

family members for alleged antecedent debt; (3) pursuit of transferor by creditors at time of

transfer; (4) lack or gross inadequacy of consideration; (5) retention or possession of property by

transferor; and (6) fraudulent incurrence of indebtedness after transfer. *Id.; In re Meredith*, 357

B.R. 374 (E.D. Va. 2006).  Other cases also include (7) concealment of facts and false pretenses

by transferor. *In re SunSport*, 260 B.R. 88 (E.D. Va. 2000).

54.     An intention to hinder or delay creditors need not be the primary, active, controlling purpose behind debtor's conveyance, in order to permit avoidance of transfers under Virginia fraudulent conveyance law.  It is enough that it is one of the purposes which debtor entertained, whether directly, or as an incident to some more active purpose, and, further, a court may infer a fraudulent intent from the circumstances surrounding the transfer. *In re Coleman*, 285 B.R. 892 (W.D. Va. 2002).

55.     Furthermore, in cases where a transfer is alleged to have been made without receipt by an insolvent debtor of valuable consideration, "fraud or other malicious intent is not an element required to prove the voidability of the transfer." *Balzer & Assocs., Inc. v. The Lakes on 360, Inc.*, 463 S.E.2d 453, 455 (Va. 1995) (citing *Consolidated Tramway Co. v. Germania Bank*, 93 S.E. 572, 573 (Va. 1917)). "In other words, a transfer undertaken by an insolvent debtor, or by a debtor who is thereby rendered insolvent, without return to him of valuable consideration is *de jure* fraudulent as against any existing creditor without any need to prove intent to defraud." *Id.* "Once a party has established a *prima facie* case in support of its claim that a transfer is voidable, the burden of producing evidence to rebut the *prima facie* case shifts to the opposing party." *Id.* at 457.

56.     All of the fraudulent transfers listed above implicate virtually all of the above-stated badges of fraud so as to support a finding that the transfers made from Industrial Carriers to Vista insiders were made with fraudulent intent.

57.     Viktor Baranskiy was an 18% shareholder of Industrial Carriers. He is also the son of Sergei Baranskiy, the Chairman of the Board of Directors of Industrial Carriers. Thus, Industrial Carriers and Vista share a close relationship.  See *Temple v. Jones, Son & Co.*, 19 S.E.2d 57 (Va. 1942) (where a father-son transaction was subject to close scrutiny).

76

58.     As an initial matter, the existence of an antecedent debt, and in particular, an obligation of Industrial Carriers to pay commissions to Viktor Baranskiy is flatly denied as contrary to fact.

59.     However, even if this court were to find that a commission agreement existed, the transfer is still nonetheless fraudulent and Viktor Baranskiy and Vista are liable for the same. The existence of a pre-existing debt does not prevent a conveyance from being fraudulent for lack of "valuable consideration" or "consideration deemed valuable in law," within the meaning of Virginia fraudulent conveyance statutes. *U.S. v. Maxwell*, 189 F. Supp. 2d 395 (E.D. Va. 2002).  The transfer was necessarily made at the request of Viktor Baranskiy with the approval and consent of Viktor Baranskiy's father, Sergei Baranskiy, chairman of Industrial Carriers' board of directors. Thus, the payment was a preferential payment to an insider and family member.

60.     Moreover, even assuming that Viktor Baranskiy's dubious story was true, the commission payment could have been made to Viktor Baranskiy's Hasten bank account, which had been established in 2007 and which account was allegedly established to accept commissions.  Instead, the payment was made through the Money Laundering entities to conceal its nature, origin and ultimate destination from creditors, evidencing "concealment of facts and false pretenses by transferor."

61.     As to the remaining transfers, there is no question that they satisfy the definition of fraudulent transfer.  No consideration is even alleged, and the Harmony Falcon defense of frustration is not legally cognizable as per the analysis above.

### D.   Delaware Law

62.   Fraudulent transfers under Delaware law are governed by the Uniform Fraudulent

Transfer Act, adopted by Delaware at 6 Del. C. § 1301 *et seq.*, which states:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor
> whose claim arose before the transfer was made or the obligation was incurred if
> the debtor made the transfer or incurred the obligation without receiving a
> reasonably equivalent value in exchange for the transfer or obligation and the
> debtor was insolvent at that time or the debtor became insolvent as a result of the
> transfer or obligation.

> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose
> before the transfer was made if the transfer was made to an insider for an
> antecedent debt, the debtor was insolvent at that time and the insider had
> reasonable cause to believe that the debtor was insolvent.

63.   Under this statute, the test for fraudulent conveyance contains two steps: 1)

determination of whether transfer is made for less than fair consideration and 2) whether

transferor is rendered insolvent as result of the transfer. *Tri-State Vehicle Leasing, Inc v. Dutton*,

461 A.2d 1007 (Del. Supr. 1983).

64.   Here, the actual intent of the parties is of no consequence. *U.S. v. West*, 299 F.

Supp. 661 (D. Del. 1969).  Adequacy of consideration is not normally questioned since purchaser

need only give valuable consideration to qualify for bona fide purchaser status, but generally

person who purchases for grossly inadequate consideration is not a bona fide purchaser. *Id.*

65.   Although Delaware does not follow the Virginia common law "badges of fraud,"

transfers between family members are heavily scrutinized because it suggests that consideration

may not have been adequate.  A heavier burden is placed upon a grantee to establish fair

consideration for transfer of assets.  Once a creditor has established that the conveyance was to a

close relative and was unsupported by fair consideration, grantee has burden to show solvency of

debtor to avoid finding of fraudulency. *Id.*

78

66.     For the reasons discussed above, all of the transfers discussed above constitute fraudulent transfers under Delaware law because they were made while Industrial Carriers was insolvent to an insider without consideration.

### E.     The Tests for Insolvency

67.     There are two competing approaches to assessing insolvency—"equitable" insolvency and "balance sheet" insolvency. Under either test, Industrial Carriers was insolvent at the time of all of the alleged transfers. Delaware courts have determined that insolvency may be demonstrated by either of these.   *North American Catholic Educational Programming Foundation, Inc v. Gheewalla*, 930 A.2d 92, 98 (Del. Supr. 2007) (stating that the Chancery Court opined that insolvency may be demonstrated by meeting the definition of equitable insolvency or balance sheet insolvency); *Prod. Res. Group v. NCT Group, Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004) (stating that to meet the burden of sufficiently pleading insolvency, the plaintiff must plead facts that show that the corporation is either equitably insolvent or meets the test of balance sheet insolvency).

68.     As set forth above, Industrial Carriers is a Marshall Islands company and the Marshall Islands have adopted the corporate law of Delaware.

69.     Equitable insolvency is "an inability to meet maturing obligations as they fall due in the ordinary course of business." *Gheewalla*, 930 A.2d at 98; *Prod. Res. Group v. NCT Group, Inc.*, 863 A.2d at 782 (quoting *Siple v. S & K Plumbing & Heating, Inc.,* No. 6731, 1982 WL 8789, at *2 (Del. Ch. Apr. 13, 1982)). This definition of insolvency ignores the balance sheet and instead focuses on the corporation's ability to pay its current debts.  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

79

70.     Here, Industrial Carriers was in selective default by at least September, 2008, failing to pay creditors including Glory Wealth.

71.     Balance sheet insolvency, on the other hand, is "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof." *Gheewalla*, 930 A.2d at 98; *Prod. Res. Group*, 863 A.2d at 782 (quoting *Siple*, 1982 WL 8789, at *2); *McDonald v. Williams*, 174 U.S. 397, 403 (1899) (defining an insolvent corporation as an entity with assets valued less than its debts).

72.     As set forth above, beginning in July, 2008, freight rates began to plummet, and continued to plummet throughout August and September, while Industrial Carriers had significant and substantial long-term hire obligations at peak rates.  After this point, Industrial Carriers assets were substantially below liabilities and there was no reasonable prospect that Industrial Carriers business could be successfully continued.  That is not to suggest that Industrial Carriers should not have been the subject of an orderly bankruptcy, where its receivables were collected and its profitable charters and customers maintained for the benefit of creditors and loss-making charters/contracts rejected.  Instead, Industrial Carriers assets were fraudulently siphoned and dispersed to insider Viktor Baranskiy and Vista, to the detriment of creditors such as Glory Wealth.

## VI.     VIKTOR BARANSKIY BREACHED HIS FIDUCIARY DUTY TO CREDITORS

73.     As noted above, Industrial Carriers is a Marshall Islands company and the Marshall Islands have adopted the corporate law of Delaware.  When a corporation becomes insolvent, its directors owe fiduciary duties to the insolvent corporation for the benefit of its creditors, while continuing to bear the task of attempting to maximize the economic value of the firm for any potential residual benefit to the shareholders. *Gheewalla*, 930 A.2d at 103; *cf. In re*

80

*Transamerica Airlines, Inc.*, No. Civ. A. 1039-N, 2006 WL 587846, at *7 (Del. Ch. Feb. 28, 2006) ("When a company becomes insolvent, its directors owe fiduciary duties to the company's creditors, as well as its stockholders").

74.    Here, Industrial Carriers was a closely held corporation dominated by the Baranskiy family of shareholders.  As such, they owed the same fiduciary duties as directors.

75.    Viktor Baranskiy had a duty to creditors such as Glory Wealth to ensure that Industrial Carriers' receivables were collected and its profitable charters and customers maintained for the benefit of creditors such as Glory Wealth.  Instead, Viktor Baranskiy received millions of dollars in fraudulent transfers, usurped the profitable Harmony Falcon charter, and usurped Fayette, one of Industrial Carriers most profitable clients.

#32183996_v2