IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| FLAME S.A., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 2:13-cv-658 |
| | ) | 2:13-cv-704 |
| GLORY WEALTH SHIPPING PTE LTD. | ) | |
| | ) | |
| Consolidated Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| INDUSTRIAL CARRIERS, INC. | ) | |
| VISTA SHIPPING, INC., and | ) | |
| FREIGHT BULK PTE. LTD., | ) | |
| | ) | |
| Defendants. | ) | |

**FREIGHT BULK PTE. LTD.'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Specially Appearing Defendant Freight Bulk Pte. Ltd. ("FBP"), by and through its

counsel, hereby submits its Proposed Findings of Fact and Conclusions of Law.

**Victor Baransky**

1.  Victor Baransky's mother and father separated in 2003 and became officially

divorced in 2006.

2.  His mother received a large divorce settlement at that time from his father, Sergei

Baransky.

3.  Until 2003, Viktor Baransky lived with his mother, after which time, he rented an

apartment of his own.

4.  Victor Baransky had not lived with his father after his parents separated.

1

5.  At the age 20, in 2005, while still in college,  Victor Baransky started to work at an Industrial Carriers, Inc. related company (collectively referred to as "ICI") as a trainee, where his father was a significant shareholder.

6.  Over the next two years, Victor Baransky progressed from a trainee at various divisions to a chartering broker. Up to 2008,  Victor Baransky received from ICI a total of up to USD 0.5 million in salary and bonus for his work, including brokerage work.

**ICI Shareholding**

7.  Up to 2008, Victor Baransky's father, Sergei Baransky, was a 40.5% shareholder at ICI.

8.  At the end of 2007, Sergei Baransky decided his position at the company was strong enough to increase his share in ICI to 51%, yet he wanted to do it in such a way as not to upset too much other existing shareholders.

9.  Starting 2008, Sergei Baransky appointed Victor Baransky a nominal 18% shareholder of ICI for Sergei Baransky's benefit, at the same time reducing his "official" share from 40.5% to 33%, thereby receiving a 51% controlling stake over ICI.

10. Via such nomination as nominal shareholder, Victor Baransky never became a bona fide shareholder of ICI, never receiving stock certificates, never attending board meetings, nor receiving any dividends for Q1 and Q2 of 2008.

11. After such nomination, nothing changed in Victor Baransky's professional life as he continued as previously, working in a chartering department, chartering ships.

12. While departing ICI in September 2008, Victor Baransky informed Vitaly Cherepanov and Sergei Baransky that he is to be officially stricken as a nominal shareholder form all records which may be so indicating.

**Hasten**

13. In early 2007, Victor Baransky registered his first company, Hasten Enterprises, to be utilized at a later time as business opportunities may present themselves.

14. Hasten Enterprises was dormant for over a year, until early 2008.

15. Upon establishing contact with Metinvest, Victor Baransky started to conduct personal business, outside of his scope of duties at ICI, connecting Chinese iron ore buyers with Metinvest.

16. All Chinese remitters to Hasten account are well known and respectable Chinese steel companies.

17. Such business did not compete or contradict any interests of ICI and did not result in any financial disadvantage to ICI.

18. Victor Baransky received commissions from these Chinese iron ore buyers for every Metinvest shipment he brokered for them.

19. These commissions were not related to whether iron ore was carried by ICI or other companies' chartered ships, Victor Baransky brokered for and received from Chinese iron ore buyers commissions for both types of deals.

.

20. Such commissions were paid into Victor Baransky's Hasten account, periodically, when earned, as soon as shipments took place and Metinvest was paid.

21. Victor Baransky  invested these commissions with his acquaintance Roman Inde's importing business.

22. Only Chinese iron ore byers, unrelated in any way to ICI, were paying into Hasten account.

23. ICI or its related companies never paid any money into such account.

24. Almost all such commissions payments were made at a time when ICI was not in any trouble, and continued after Victor Baransky's started his own company, Vista, for contemporaneous, not ICI, freights brokered by Victor Baransky after going on his own with Vista.

25. Total amount of commissions was around USD 600,000 by October 2008.

26. In October 2008, the balance in the account was approximately USD 41,000, as commissions previously received into the account were at the time invested with Roman Inde.

**ICI path**

27. ICI was formed in 1999.

28. ICI never owned any ships.

29. ICI was mainly chartering long term and sub chartering short term, often on a single voyage basis.

30. ICI's business included chartering only.

31. ICI never carried Fayette International Holdings BVI's ("Fayette") iron ore until Victor Baransky introduced Fayette to ICI.

32. ICI was profitable in 2007, and very profitable at least up through first half of 2008.

33. ICI formed IC Ukraine in the Summer of 2008.

34. Victor Baransky was assigned to IC Ukraine shortly after its creation.

35. ICI had offices in Odessa, Athens, Moscow, Rio de Janeiro, and a representative office in Shanghai.

36. At the final stage of its existence, in 2008, ICI carried cargo all over the world.

37. IC Ukraine office was located at Chernomorskaya 1, Odessa.

38. ICI's ultimate beneficial owners were Sergei Baransky, Vitaly Cherepanov, Andrei Kozminykh and Vladimir Tarasov

39. In 2008, shortly before starting to collapse, ICI employed over 50 people in Ukraine alone.

40. As evidenced by ICI's 2007 audited report, the main cargo which was handled by ICI was bulk fertilizers carried mainly from Baltic Sea and Black Sea to Pakistan, India and South East Asia.

41. The cargo for carriage was provided by the following main clients: Agrosin, DH-Dhekelia, Belorussian Potash Company and Tavitha Translogistics Limited.

42. Viktor Baranskiy was not in charge of these accounts and after collapse of ICI, Vista or any of its Victor Baransky-controlled sister companies did not do any business with these companies.

5

43. ICI was involved in bunker swaps hedging transactions with OW Bunker of Denmark.

44. Periodically, ICI made considerable payments to OW Bunker's account in Nordea Bank, Denmark as a result of the bunker swaps.

45. OW Bunker is a respectable, blue chip international fuel company headquartered in Denmark.

46. In 2008, ICI on average had 50-60 ships on charter, paying up to USD 183,000 per day per ship for chartering such ships.

47. ICI's entry into FFA contracts with Flame, which resulted in an award on which this suit against ICI is based, is not hedging but is speculation.

48. Flame's entry into FFA contracts with ICI which resulted in an award on which this suit against ICI is based, is not hedging but is speculation.

49. ICI's person in charge of finances, Vitaly Cherepanov, was located in Greece.

50. ICI's filing for bankruptcy was being overseen by Vitaly Cherepanov, Sergei Baransky and Nina Karagiorgi.

51. ICI was making payments to its trade creditors up until October 5, 2008.

52. ICI filed for bankruptcy on October 15, 2008, in Greece, where Vitaly Cherepanov and ICI's finance office were located.

53. Victor Baransky at no point in time had control over ICI.

54. Victor Baransky was just a nominal shareholder of 18% shares, with his father, Sergei Baransky, being the ultimate beneficial owner of such shares.

55. During August and September 2008, ICI made 3 payments, totaling USD 9,068,087.15 to Glory Wealth, for chartering M/V Mineral Capeasia at a rate of USD 183,000 per day.

56. ICI's bankruptcy in Greece was rejected not due to a finding that it was fraudulent, but due to a finding that Ukraine is a more proper forum.

57. Victor Baransky never gave any instructions per ICI to MFB Solicitors or to anyone else after he left ICI shortly before its collapse in October 2008.

**Fayette International Inc**.

58. Fayette International Inc. is a subsidiary of Metinvest, a major player on the Ukrainian market per various commodities.

59. In early 2008, Victor Baransky made a personal contact with Alexander Senchenko, a Fayette broker in charge of Fayette's iron ore business.

60. Such personal contact led to friendship, and Victor Baransky was able to bring Fayette's iron ore business to ICI, which never carried Fayette's iron ore up until Victor Baransky introduced such client.

61. Metinvest and Fayette were personal clients of Victor Baransky, with whom Victor Baransky was doing more than ICI-related business, such as connecting Chinese steel producers with Metinvest.

**Ukraine Iron ore**

62. Ukraine's iron ore exports to China were insignificant until about 2008, exploding in 2009, 2010 and 2011.

63. Such explosive growth in export to China happened due to formerly-opened to Ukrainian iron ore European markets closing due to economic crisis.

64. Increase in Ukrainian iron ore exports to China was countercyclical, i.e. such exports increased exponentially, in 2009-2012, while the rest of the world's industries were suffering from the greatest recession since great depression of 1930-es.

65. The main producer of Ukrainian iron ore is Metinvest, whose subsidiary is Fayette.

**Victor Baransky Commissions from ICI for Fayette charters**

66. In consideration for bringing Fayette's business to ICI, and in consideration of chartering ICI-chartered ships with Fayette cargo, ICI agreed to pay commissions to Victor Baransky for every Fayette cargo carried by ICI-chartered ships.

67. Such commissions were considered earned and due to Victor Baransky immediately upon ICI being paid by Fayette, per Victor Baransky agreement with ICI and revenue/expense matching principle.

68. Almost all such Fayette shipments-related commissions were earned in the period of up to September, 2008, when ICI was not in any trouble.

69. Throughout 2008, as the amount of commissions earned and due to him by ICI was growing, Victor Baransky decided to keep the already-earned commissions with ICI for time being, preferring to get them in one large sum at the end of the year.

70. Standard commission in the industry is either 1.25% of freight or USD 1 per ton of cargo carried.

71. Yet, as Fayette business was very profitable for ICI and since it was Victor Baransky who brought this client to ICI, Victor Baransky was able to negotiate with ICI a better deal, with commission being calculated as 1.25% of freight plus USD 1 per ton of cargo carried.

72. Upon deciding to leave ICI in September 2008, Victor Baransky demanded that such already-earned commissions be paid out to him.

73. He made such demand in writing to ICI's CFO Vitaly Cherepanov.

74. Vitaly Cherepanov approved the payment of such already-earned commissions to Victor Baransky, at the end of September, 2008.

75. Such commissions in the total amount of USD 1,588,109.00 were sent to an account designated to VB on September 26 and 29, 2008.

76. Such commissions went to Trend Index account for the benefit of Victor Baransky, as he did not at the time yet set up an operating account for Vista.

77. Such commissions payment became frozen in transit for some banking verification reason, was released and Victor Baransky received it only on October 24, 2008, after having paid all expenses for Vista's first charter out of capital personally borrowed from mother and friends.

78. Other than the commissions payment, there were no other direct or indirect payments out of ICI or its companies to Victor Baransky or Vista.

79. There were other commission payments from ICI to other brokers who were leaving the company at the time Victor Baransky commissions were paid out.

80. ICI was continuing to pay bills of its creditors as they were coming due all the way until October 5, 2008

81. ICI's struggled for life and attempted to perform at least some existing charter obligations, including obligations for Harmony Falcon, paying USD 199,326 thousand for bunker for Harmony Falcon to reposition it to Black Sea in an attempt to have this ship carry Fayette's ore to China.

**Charter Market Collapse**

82. In the weeks leading to Lehman Brother's bankruptcy, charter rates were decreasing.

83. Around Lehman Brothers' bankruptcy and thereafter, charter rates collapsed more than ten tenfold.

84. Collapse of Lehman Brothers led to a world-wide freeze in shipping commerce as freight owners were not able to obtain letters of credit due to a freeze-up of banking system.

85. World-wide freeze in shipping commerce led to many charter ships operators not able to find work for ships under charter

86. Baltic Panamax Index-based charter rates in November-December 2008 were USD 3,500-8,000 per day, and many ship owners were even agreeing to reposition for no fee except bunkers.

87. By 2009, charter rates rebounded, for Cape-size ships reaching USD 79,000 per day in July 2009.

88. Charter rates for Mediterranean delivery in mid-October 2008 for Panamax-size ships were USD 15,800, having experienced a significant drop from similar rates for September 2008.

89. Black sea-originated charter rates are at premium to Mediterranean-based charter rates.

**ICI insolvency**

90. During the Summer and early Fall of 2008, ICI was paying all bills as they were becoming due.

91. In August 2008, Flame was not worried about the state of ICI's finances, entering into 2 unsecured FFA agreements, whose purpose, just as for ICI so as for Flame, was speculation and not hedging.

92. Flame did not have any ships on charter in 2008.

93. Flame expert Katz, in his November 2013 report, stated that ICI was demonstrating strong financial performance through August 2008.

94. ICI indeed was solvent and paying bills as they were coming due until late September or even early October, 2008, when it stopped paying its creditors on October 5, 2008.

95. ICI's insolvency was due to natural market causes and not a result of any malfeasance by Victor Baransky or Vista.

**Bunkering payment by ICI**

**96.** Such USD 199,326 payment was made so the ship could get to Odessa for loading from its previous location.

97. Such payment was made when ICI was still hoping to perform Fayette freight shipment, before it stopped payments to all creditors on October 5, 2008.

98. Vista did not benefit from such bunker payment as it ended up paying higher than Mediterranean-based market rate for chartering Harmony Falcon once the ship was repositioned into the Black Sea.

**Late September / early October 2008 payments by ICI**

99. Phaedra, Noxana and Syriana are not Victor Baransky companies and are not related to him in any way.

100. There have never been any payments out of or into Vista or its Victor Baransky-controlled sister companies accounts out of or from Syriana, Phaendra, or Noxana.

101. Payments by ICI to Phaedra, Noxana and Syriana, while may or may not have been fraudulent, have no relationship to Victor Baransky or Vista.

102. There is no evidence that various payments, disputed by FBP, out of ICI or its sister companies accounts, have been for the benefit of Victor Baransky or Vista.

103. Other than USD 1.5 million of a legitimately earned and paid commission, there were no transfers out of ICI or its sister companies to Victor Baransky or his companies, directly or indirectly.

**Edelweiss**

104. Edelweiss is a company of Alexander Senchenko, an employee of Fayette in 2008 and subsequent years.

105.     Alexander Senchenko is in no way related to ICI, any of its directors, officers or shareholders.

106.     Edelweiss was receiving commissions from ICI for shipments of Fayette's iron ore by ICI-chartered ships.

107.     Such commissions were being paid by ICI concurrently with receipt of freights from Fayette, per accounting principle of matching revenues and expenses.

108.     Edelweiss made personal loan to Victor Baransky, in the amount of USD 98,000, to capitalize Vista at the start of its operations.

109.     Edelweiss was receiving commissions from Vista after demise of ICI and upon Vista starting to carry Fayette's iron ore to China.

110.     Edelweiss is not controlled in any way by Vista or Victor Baransky.

111.     Alexander Senchenko is not just a business colleague of Victor Baransky, but a friend as well, and provided Edelweiss corporate documentation as a courtesy to Victor Baransky, to demonstrate that Edelweiss is in no way related to ICI.

## Victor Baransky financial situation upon departing ICI

112.     Had up to USD 1 million in investments frozen with Roman Inde.

113.     Did not yet receive commissions from ICI as they were frozen in transit.

114.     Vista did not have an account yet.

115.     Fayette needed to move cargo yet ICI was no longer able to perform its charter and defaulted on it.

**Trend Index**

116.    Trend index is a money exchange company which conducted transactions not just for Victor Baransky and Vista, but on occasions transferred money of other customers into such blue chip companies such as Maersk, China Airlines, CMA-CGM, K-Line.

117.    Victor Baransky found out about its existence from his co-workers while he was still working for IC Ukraine.

118.    Trend index charged 0.88 percent for its service of receiving Victor Baransky's commission and for subsequently sending to Vista.

119.    Trend index was used for transfer of Victor Baransky's chartering commission earned at ICI because Vista yet did not have an account, and Hasten account had a daily transfer limit of USD 60 K which would have undermined Victor Baransky's ability to make large sum outgoing payments.

**Vista's initial capital**

120.    Vista's start-up capital consisted of: USD 98 K personal loan to VB from Edelweiss; USD 1.218 M  personal loan to Victor Baransky from his mother, the money she received and invested into assets many years prior as part of her divorce settlement; USD 45 K from Victor Baransky's personal savings; USD 179 K of VB capital unfrozen by Roman Inde.

121.    Such capital was sufficient to fully pay for Harmony Falcon charter.

122.     No part of Victor Baransky commissions for ICI charters constitutes initial capital, as no part of such commission went to pay for any part of Harmony Falcon charter as it was received only after such charter was fully paid for.

**Harmony Falcon**

123.     Harmony Falcon was the cheapest charter hire that ICI had as of late September 2008.

124.     USD 200 K bunker payment which ICI paid in early October 2008 to get Harmony Falcon to Black Sea did not result in any improper gain to Vista, as Vista paid USD 18,000 charter rate per day, much higher than then hire rate at Red Sea where the ship would have been absent bunker payment by ICI.

125.     ICI chartered Harmony Falcon in late September 2008, as is customary - on a 15-day basis, with delivery on September 28, 2008 through October 13, 2008.

126.     As ICI fell apart and ceased operations in early October 2008, it was simply impossible for it to continue with Harmony Falcon charter.

127.     Harmony Falcon charter was a liability on ICI's hands, ICI being required to pay charter hire to Falcon Shipping yet being unable to earn any freight from Fayette as ICI did not have any money to complete the voyage for this or any other of a number of ships listed on its statement to Greek Court.

128.     ICI was unable to continue with Harmony Falcon charter due to impending collapse, did not fulfil its obligations for Harmony Falcon thereby losing the charter on the ship on October 13, 2008.

129.      Vista chartered Harmony Falcon, on October 14, 2008, which is evidenced

by 3 wire transfers of hire payment: 1st – USD 800,021.00 (FB097964), 2nd –

USD 188,000.00 (FB097962), 3rd – USD 230,000.00 (FB097965), and hire

statement SOA (FB001512), only after ICI defaulted on its charter to Falcon

Shipping on October 13, 2008.

130.      Vista paid for Harmony falcon charter, in full, with its own, and not ICI

money.

131.      Due to Vista being a new, independent market player, Falcon Shipping

required advance pre-payment of the entire charter, not just 15-days advanced hire

as is customary, which Vista did.

132.      Due to Vista not yet having an account at the time of having to pay for

Harmony Falcon, it remitted to Harmony Falcon owners, through third parties

unrelated to ICI, fees to be paid by such owners on behalf of Vista throughout the

voyage to China.

133.      With the exception of the early October, 2008 repositioning bunker

payment by ICI while the ship was still under its charter, it was Vista who paid

charter and for all Harmony Falcon expenses for the trip to China carrying

Fayette's iron ore.

134.      ICI was not able to complete Harmony Falcon charter to carry Fayette ore

to China because it became insolvent.

135.      Harmony Falcon was the only ship available and known to Victor Baransky

in the vicinity of Black Sea to carry the Fayette cargo once ICI defaulted on its

obligation under a charter agreement for Harmony Falcon to Falcon Shipping, on October 13, 2008.

136.　　Vista entered into a freight agreement to carry Fayette cargo of iron ore to China on October 13, 2008, a day before it entered into a charter agreement for Harmony Falcon, as evidenced by Bill of Lading No.1 covering 53,770.828 mt cargo (FB001510), Bill of Lading No. 1 Y-N covering 10,658.214 mt cargo (FB001509), and Final Voyage Statement of Account (FB001506).

137.　　Even before shipment took place, Fayette reduced its negotiated amount of freight to be paid to Vista of 3,543,597.00 by USD 44,295.00 "address commission" and by USD 732,996.63 discount due to falling rates.

138.　　Profit of Harmony falcon charter, carrying Fayette's iron ore to China, was USD 1,079,078.

139.　　Vista's chartering Harmony Falcon did not damage ICI, as by the time Vista chartered the ship, ICI already stopped paying its bills and became insolvent.

140.　　Vista chartering Harmony Faclon actually benefitted ICI, by reducing its outstanding liabilities for chartered ships.  Had Vista not chartered Harmony Falcon, ICI would have been liable to Falcon Shipping for a significantly larger amount than it ended up being liable for.

141.　　ICI did not even know that Vista chartered Harmony Falcon upon ICI defaulting on its charter on October 13, 2008, evidenced by inclusion of Harmony Falcon charter into ICI's list of liabilities filed with Greek Bankruptcy Court in November 2008.

142.    Paladin is a shipping company in Odessa unrelated to Victor Baransky, it is also unrelated to ICI, and its services to wire payment for Harmony Falcon was necessitated by absence of Vista account at the time and mother's personal loan being in cash.

143.    It was Vista's money with which all expenses of Harmony Falcon charter were paid, including Odessa port dues, charter hire, bunkers in Odessa, Suez dues southbound, Jedda port dues en route to China, bunkers in Jedda en route to China, Singapore port dues, bunkers in Singapore, port dues in China.

**Vista's initial employees and business**

144.    Vista almost went out of business, as, after successful Harmony Falcon charter, it could not secure another cargo for shipment for almost two months.

145.    Vista was started at a leaky basement.

146.    As Vista's operations started only after ICI's collapse, and those few former ICI people who came did not come all at once but came one by one, over a period of few months, Vitol's factor "overlap of directors and employees" is not applicable.

147.    Even if such factor is applicable, there is no overlap in ICI's and Vista's shareholders, directors or other personnel, as only a handful of people, out of more than 50, ended up working for Vista.

**Entites, unrelated to Vista, formed by former ICI shareholders, officers or directors after ICI collapse.**

148.     Phaethon, an unrelated to Victor Baransky company formed by ICI's bona fide shareholder Andre Koaminykh after the collapse of ICI, is operating in the same business segment as ICI, and utilizing the same business strategy as ICI.

149.     Phaethon currently has around 50 ships on charter, does not own any ships, same business model as ICI had.

150.     Itiro, a company formed by former ICI employees, which is not related to Victor Baransky, was sued by Glory Wealth in 2008, with Glory Wealth alleging at the time that it, and not Vista or FBP, was the alter ego of ICI.

151.     Milestone, a company formed by former ICI employees, which is not related to Victor Baransky, still operates out of the same address as where IC Ukraine was located.

152.     Other companies unrelated to Victor Baranksy which were either formed by former ICI employees or where great number of former ICI employees went to upon ICI's demise are Aquavita, Varamar, Europe Maritime, and Prime Transport.

153.     Upon collapse of ICI, many of its former employees, officers, directors and shareholders formed their separate entities which operate in the shipping industry to the present day.

**Vista's success**

154.     Vista's success is due to legitimately-earned trade revenue from carrying Fayette iron ore to China and other legitimate business activities.

155.     Vista was the first company who started carrying Ukrainian iron ore with super big, Cape-size vessels.

156.     Vista pioneered transshipment for loading larger ships with Ukrainian iron ore.

157.     Vista and its sister companies are involved in oil trading, iron ore trading, transshipment, ship ownership, ship management, crewing, and is not doing FFA's and bunker swaps as ICI was doing.

158.     All revenue received by Vista and its Victor Baransky-controlled sister companies was legitimately-earned trade revenue and was received not in cash but via bank transfers into bank accounts.

159.     Since October 2008 to present day, Vista and its Victor Baransky-controlled sister companies earned over two billion dollars in revenue from shipping iron ore to China and other legitimate business activities.

160.     The key to Vista and its Victor Baranksy-controlled sister companies success is exclusive relationship with Fayette, whose iron ore such companies were carrying to China.

161.     Vista's success in large part is due to Chinese iron ore market growing exponentially after 2008, while charter rates, after collapsing at the time of ICI's demise, rebounded and were relatively strong from 2009 through 2013.

**Loans to Milestone**

162.     All loans by Victor Baransky companies Vista or Alpen to or from Milestone were repaid in full.

163.     Milestone is a separate and unrelated company to Vista or any of Victor

Baransky companies.

164.     Few business dealings which were between Vista and Milestone were

conducted at arm's length.

## Ukraine business environment

165.     Cash is needed to pay employees, expenses in Ukraine as it is a cash-based

economy.

166.     It is impossible to open USD account for Ukraine-registered companies

without Central Bank of Ukraine approval, and such approval is very difficult to

obtain for small and medium-size companies.

167.     Central Bank of Ukraine requires businesses to sell 50% of their USD

revenue to it, at a punitive exchange rate.

168.      Ukrainian companies with USD accounts are often subject to extortion by

corrupt government officials.

## Allegations of money laundering

169.     Converting one's legitimately-earned income in the bank account into

paper cash via companies which specialize on such conversions is not money

laundering.

170.     Plaintiffs' allegations of money laundering were made in bad faith, are

frivolous and libelous.

**Cape Viewer**

171.     Purchase of Cape Viewer was proper under the circumstances, had valid business reasons to be done the way it was done, and does not evidence alter ego relationship between Vista, FBP, Sea Traffic or any other Victor Baransky company.

172.     The origin of funds for which Cape Viewer was purchased is legitimately-earned trade income by Vista and its Victor Baransky-controlled sister companies, and not ICI funds.

**Vista and FBP**

173.     Vista is not an alter ego of FBP.

174.     Victor Baranksy at all times was the sole beneficial owner of Vista, FBP and all other companies of Palmira Group.

175.     Sergei Baransky has no relationship to Vista, FBP or any other Victor Baransky-controlled company.

## CONCLUSIONS OF LAW

1.      A Court may pierce a corporate veil only under extraordinary circumstances. <u>Vitol, S.A. v. Primerose Shipping Co. Ltd.</u>, 708 F.3d 527, 543-44 (4th Cir. 2013).

2.      In order to pierce the corporate veil the Fourth Circuit established sever factors intended to "guide the determination of whether one entity constitutes the alter ego of another." <u>Vitol</u> , 708 F.3d 527 at 541.

3.    These factors include:

> gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness… intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length.

Id. (citing Ost-West-Handel Bruno Bischoff GMBH v. Project Asia Line, Inc., 160 F.3d 170, 174 (4th Cir. 1998)).

4. Vista did not siphon ICI's capital base.

5. FBP did not siphon ICI's capital base.

6. Victor Baransky did not siphon ICI's capital base.

7. Vista started operations after the demise of ICI and is not a "mere continuation" of ICI.

8. FBP started operations after the demise of ICI and is not a "mere continuation" of ICI.

9. Vista did not receive any fraudulent transfers of ICI funds.

10. FBP Vista did not receive any fraudulent transfers of ICI funds.

11. Victor Baransky did not receive any fraudulent transfers of ICI funds.

12. Vista is not successors in interest of ICI.

13. FBP is not successor in interest of ICI.

14. FBP is not an alter ego of Vista.

15. M/V Cape Viewer was not purchased with ICI money.

16. FBP is a separate and independent company from, and has no relationship to, ICI.

17. Vista is a separate and independent company from, and has no relationship to, ICI.

18. Applying the Fourth Circuit's <u>Vitol</u> factors to the facts of this case, results in a conclusion that ICI is not an alter ego of Vista, FBP, Victor Baransky or any of his companies.

Dated: August 11, 2014                    Respectfully submitted,

                                By:     /s/ Sergei Kachura (pro hac vice)
                                        LAW OFFICE OF SERGEI KACHURA
                                        Sergei Kachura (*Pro Hac Vice*)
                                        311 North Center Avenue
                                        Brownwood, TX 76801
                                        Tel: 301.358.5196
                                        Email: svkachura@yahoo.com

                                        -AND-

                                        /s/ Patrick M. Brogan
                                        Mr. Patrick M. Brogan (VSB No. 25568)
                                        DAVEY & BROGAN, P.C.
                                        101 Granby Street, Suite 300
                                        Norfolk, Virginia 23510
                                        Telephone: 757.622.0100
                                        Facsimile: 757.622.4924
                                        Email: pbrogan@daveybroganpc.com

                                        *Attorneys for Specially Appearing*
                                        *Defendant FREIGHT BULK PTE. LTD*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2014 I electronically transmitted and caused to be served upon all counsel of record, FREIGHT BULK PTE. LTD.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, using the CM/ECF System for the Eastern District of Virginia and via e-mail.

/s/ Patrick M. Brogan
Mr. Patrick M. Brogan (VSB No. 25568)
DAVEY & BROGAN, P.C.
101 Granby Street, Suite 300
Norfolk, Virginia 23510
Telephone: 757.622.0100
Facsimile: 757.622.4924
Email: pbrogan@daveybroganpc.com
*Counsel for Specially Appearing*
*Defendant FREIGHT BULK PTE. LTD*