**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| FLAME S.A., | |
| Plaintiff, | |
| GLORY WEALTH SHIPPING PTE LTD., | |
| Consolidated Plaintiff, | |
| NOBLE CHARTERING INC., | Civil Action Nos. |
| Intervenor Plaintiff, | 2:13-cv-00658-RGD-LRL |
| | 2:13-cv-00704-RGD-LRL |
| v. | |
| INDUSTRIAL CARRIERS, INC., | |
| VISTA SHIPPING, INC., | |
| FREIGHT BULK PTE. LTD., | |
| VIKTOR BARANSKIY, and | |
| SERGEI BARANSKIY, | |
| Defendants. | |

**PLAINTIFF FLAME S.A.'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Flame S.A. ("Flame"), by its undersigned counsel, submits the following Proposed Findings of Fact and Conclusions of Law in accordance with the Court's Rule 16(b) Scheduling Order (ECF No. 268):

**PROPOSED FINDINGS OF FACT**

**I.      THE PARTIES**

      **A.      Plaintiff Flame S.A.**

1.      Flame is a corporation or other business entity duly organized and existing under and by virtue of the laws of Switzerland, with an office and principal place of business in Switzerland. (ECF No. 55 at 3.)

**B.     Consolidated Plaintiff Glory Wealth Shipping Pte Ltd.**

2.      Consolidated Plaintiff Glory Wealth Shipping Pte Ltd. ("Glory Wealth") is a corporation or other business entity duly organized and existing under and by virtue of the laws of Singapore, with an office and principal place of business in Singapore. (ECF No. 54 at 1.)

**C.     Intervenor Plaintiff Noble Chartering Inc.**

3.      Intervenor Plaintiff Noble Chartering Inc. ("Noble") is a British Virgin Islands corporation with its principal place of business in c/o OffShore Incorporation Limited, OffShore Incorporation Center, Road Town, British Virgin Islands. (ECF No. 242 at 2.)

**D.     Defendant Industrial Carriers, Inc.**

4.      Defendant Industrial Carriers, Inc. ("Industrial Carriers") is a corporation or other business entity incorporated in the Republic of the Marshall Islands on September 21, 1999. (Pls.' Joint Exs. 250-255; Glory Wealth's Ex. 413; ECF No. 19-1 at 2.)

5.      At all times relevant to this lawsuit, Industrial Carriers was registered to do business in New York, and was a party in multiple lawsuits filed in the Southern District of New York. (ECF No. 55 at 3.)

6.      Industrial Carriers remains an active company in the Marshall Islands. (Publicly available information, at www.register-iri.com.)

**E.     Defendant Viktor Baranskiy**

7.      Defendant Viktor Baranskiy ("Viktor Baranskiy") is a foreign citizen and resident of Ukraine. (ECF No. 55 at 4.)

8.      Viktor Baranskiy is an 18% shareholder of Industrial Carriers. (Pls.' Joint Ex. 55.)

9.      Viktor Baranskiy is the sole ultimate beneficial owner and Chief Executive Officer of all companies in a group of companies known as the "Palmira Group," including Vista and Freight Bulk. (Pls.' Joint Exs. 50, 51.)

10.     Viktor Baranskiy's Ukrainian Work Record Card lists his current employer as Transflot Service Ltd. (Flame's Trial Ex. 302; ECF19-1, at 7-13.)

**F.     Defendant Sergei Baranskiy**

11.     Defendant Sergei Baranskiy ("Sergei Baranskiy") is a foreign citizen and resident of a foreign country. (Pls.' Joint Ex. 251.)

12.     Sergei Baranskiy is Viktor Baranskiy's father. (Baranskiy Dep. Tr. 27:13, Dec. 12, 2013.)

13.     From June through October 2008, Sergei Baranskiy was Chairman of the board of directors of Industrial Carriers. (Pls.' Joint Ex. 251.)

14.     Sergei Baranskiy is a 33% shareholder of Industrial Carriers. (Pls.' Joint Ex. 55.)

15.     Viktor Baranskiy and Sergei Baranskiy own a combined total of 51% of Industrial Carriers. (Pls.' Joint Ex. 55; ECF No. 377 at 9.)

**G.     Defendant Vista Shipping, Inc.**

16.     Defendant Vista is a corporation or other business entity duly organized and existing under and by virtue of the laws of the British Virgin Islands, and at all times relevant to this lawsuit, was registered to do business in New York. (Glory Wealth's Ex. 420; ECF No. 55 at 3.)

17.     Vista is the beneficial owner of a vessel called the M/V CAPE VIEWER, which is currently under attachment in the Eastern District of Virginia. (Pls.' Joint Ex. 3; ECF No. 55 at 4; ECF No. 7.)

18.     Vista is an alter ego of Freight Bulk, and is jointly and severally liable for the debts of Freight Bulk.[1] (ECF No. 377 at 24.)

19.     Vista is an alter ego of Industrial Carriers, and is jointly and severally liable for the debts of Industrial Carriers. (ECF No. 377 at 24.)

20.     Vista was formerly part of a group of companies called the "Vista Group." (Pls.' Joint Ex. 49.)

21.     The "Vista Group" consisted of the following eleven entities, each of which are or were owned by Viktor Baranskiy (Pls.' Joint Ex. 49):

| NAME | COUNTRY OF REGISTRATION | DATE OF REGISTRATION |
| --- | --- | --- |
| Vista Shipping Ltd. | British Virgin Islands | June 24, 2008 |
| Alpen Shipmanagement Co. | Marshall Islands | September 10, 2008 |
| Palmira Enterprises S.A. | Marshall Islands | November 11, 2008 |
| Atlanta Trading | Marshall Islands | December 8, 2008 |
| Columbus Maritime Co. Ltd. | Ukraine | December 11, 2008 |
| Volga-Balt partnership | Ukraine | August 1, 2009 |
| Black Sea Azov Service | Ukraine | August 13, 2009 |
| Smart Trading LLP | England & Wales | September 23, 2009 |
| Maritime Services Company Ltd. | Marshall Islands | October 26, 2009 |
| Sea Breeze Navigation Inc. | Marshall Islands | October 26, 2009 |
| Coral Sea Spirit Inc. | Marshall Islands | October 26, 2009 |

---

[1] By Court Order, it is established for the purposes of this action that Freight Bulk and Vista are alter egos of each other. (ECF No. 377 at 24).

22.     As of December 31, 2010, the Vista Group ceased existing, and the Vista Group of companies became known as the "Palmira Group." (Pls.' Joint Exs. 50; 51.)

**H.     The Palmira Group**

23.     The "Palmira Group" consists of the following fifty-nine entities, each of which are or were owned by Viktor Baranskiy (Pls.' Joint Ex. 51):

| NAME | COUNTRY OF REGISTRATION | DATE OF REGISTRATION |
|---|---|---|
| Palmira Holding N.V. | The Netherlands | December 27, 2012 |
| Hachi Holding Ltd | Marshall Islands | January 18, 2011 |
| Rainbow Consultants Co. | Marshall Islands | January 19, 2011 |
| Albara Di Mezzana Shipping Co. | Marshall Islands | January 19, 2011 |
| Freight Bulk Ltd. | Marshall Islands | April 20, 2012 |
| Privilege Win. Company Ltd. | Marshall Islands | October 5, 2012 |
| Express Fortune Limited | Marshall Islands | October 5, 2012 |
| Oil and Bulk Trading Co. | Marshall Islands | June 27, 2012 |
| Walktown Network LLP | United Kingdom | June 10, 2008 |
| Vista Shipping Ltd. | British Virgin Islands | June 24, 2008 |
| Alpen Shipmanagement Co. | Marshall Islands | September 10, 2008 |
| Palmira Enterprises S.A. | Marshall Islands | November 11, 2008 |
| Vista Maritime International Ltd. | Marshall Islands | June 2, 2011 |
| Columbus Maritime Shipping Corporation | Marshall Islands | July 4, 2011 |
| Ocean Stevedoring Company | Marshall Islands | April 20, 2012 |
| Alpina Investments Group Corp. | Belize | February 27, 2009 |
| Rechmortrans Ltd. | Russia | February 19, 2013 |

| | | |
|---|---|---|
| Costa Palma Navigation Inc. | Marshall Islands | February 18, 2010 |
| Saiwai Maru Shipping Co. | Marshall Islands | June 2, 2010 |
| Sweet Wind Enterprises Ltd. | Marshall Islands | June 2, 2010 |
| Moon Shadow Marine Co. | Marshall Islands | June 3, 2010 |
| Marine Traveler Co. | Marshall Islands | January 19, 2011 |
| Mystique Voyageur Shipping Ltd. | Marshall Islands | January 19, 2011 |
| Shine Cristal Navigation Co. | Marshall Islands | January 19, 2011 |
| Serena Sea Navigation Co. | Marshall Islands | January 19, 2011 |
| Lucky Constellation Ltd. | Marshall Islands | May 27, 2011 |
| Evening Star Shipping Co. | Marshall Islands | May 27, 2011 |
| Ocean Soul Trade Co. | Marshall Islands | May 27, 2011 |
| Polar Galaxy Co. | Marshall Islands | May 27, 2011 |
| Caravela Shipping Ltd. | Marshall Islands | June 2, 2011 |
| Alba Navigare Co. | Marshall Islands | June 2, 2011 |
| Sonic Star Navigation Co. | Marshall Islands | September 29, 2011 |
| Orbis Maritime Co. | Marshall Islands | September 29, 2011 |
| Sea Star Holding Ltd. | Marshall Islands | September 29, 2011 |
| Velas Escarlata Ltd. | Marshall Islands | September 29, 2011 |
| Royal Sea Enterprises Ltd. | Marshall Islands | January 31, 2012 |
| Porta De Mare Shipping Co. | Marshall Islands | January 31, 2012 |
| Stella Polare Ltd. | Marshall Islands | January 31, 2012 |
| Sea Logistic International Ltd. | Marshall Islands | January 31, 2012 |
| Transintercontinental Corp. | Marshall Islands | January 31, 2012 |
| Tristar Enterprises Ltd. | Marshall Islands | February 7, 2012 |

| | | |
|---|---|---|
| Constellation Maritime Group Ltd. | Marshall Islands | April 20, 2012 |
| Freight Bulk Pte. Ltd. | Singapore | September 21, 2012 |
| Fast Delivery Maritime Ltd. | Marshall Islands | September 29, 2012 |
| International Marine Trading Co. | Marshall Islands | September 29, 2012 |
| Maritime Worldwide Shipping Ltd. | Marshall Islands | October 5, 2012 |
| Atlantic Marine Division Corp. | Marshall Islands | October 5, 2012 |
| Prime Star Holding Inc. | Marshall Islands | February 25, 2013 |
| Trans-Service Ltd. | Russia | February 18, 2013 |
| Polycenter LLP | United Kingdom | June 10, 2008 |
| Atlanta Trading Co. | Marshall Islands | December 8, 2008 |
| Smart Trading LLP | United Kingdom | September 23, 2009 |
| Huan Hwa Trading Ltd. | Marshall Islands | June 3, 2010 |
| Sea Traffic Shipping Co. | Marshall Islands | June 3, 2010 |
| Black Sea Shipping Index LLP | United Kingdom | June 13, 2011 |
| General Cargo Survey LLP | United Kingdom | November 16, 2011 |
| Daredeck Limited | Limited | January 10, 2013 |
| Maritime Services Company Ltd. | Marshall Islands | October 26, 2009 |
| Sea Breeze Navigation Inc. | Marshall Islands | October 26, 2009 |

## I.   Defendant Freight Bulk Pte. Ltd.

24.   Defendant Freight Bulk is part of the Palmira Group and is owned by Viktor Baranskiy. (Pls.' Joint Ex. 51.)

25.   Freight Bulk is a corporation or other business entity duly organized and existing under and by virtue of the laws of Singapore. (Pls.' Joint Exs. 51, 76; ECF No. 55 at 4.)

26.     Freight Bulk is the registered owner of a vessel called the M/V CAPE VIEWER, which is currently under attachment in the Eastern District of Virginia. (Pls.' Joint Ex. 76; ECF No. 55 at 4; ECF No. 7.)

27.     Freight Bulk is an alter ego of Vista, and is jointly and severally liable for the debts of Vista. (ECF No. 377 at 24.)

28.     Freight Bulk is an alter ego of Industrial Carriers, and is jointly and severally liable for the debts of Industrial Carriers. (ECF No. 377 at 24.)

## II.     BACKGROUND

### A.     Flame's Lawsuit

29.     Flame and Industrial Carriers entered into four (4) Forward Freight (Swap) Agreements (hereinafter referred to as the "Agreements") dated March 12, 2008, May 19, 2008, August 14, 2008, and August 29, 2008. (Pls.' Joint Exs. 12-15.)

30.     On or about October 15, 2008, Industrial Carriers filed for bankruptcy in the Piraeus Multimember Court of First Instance (Ex-Parte Jurisdiction—Admiralty Division, Piraeus, Greece). (Pls.' Joint Exs. 250-255; ECF No. 319-2 at 1.)

31.     Under the terms and conditions of the Agreements, Industrial Carriers defaulted and breached the Agreements when, on or about October 15, 2008, Industrial Carriers applied to the Piraeus Multimember Court of First Instance (Ex-Parte Jurisdiction—Admiralty Division, Piraeus, Greece) for the granting of a petition for bankruptcy and for the appointment of a Reporting Judge and a Receiver in respect of its affairs. (Pls.' Joint Exs. 12-15; Pls.' Joint Exs. 250-255.)

32.     Industrial Carriers' October 15, 2008 bankruptcy application was ultimately rejected on the basis that the Centre of Main Interest was not in Greece. (Pls. Joint Ex. 255; ECF No. 377 at 17.)

33.     On December 22, 2010, Flame commenced an action against Industrial Carriers in the United States District Court for the Southern District of New York, seeking recognition of the foreign judgment invoking the Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. (ECF No. 52-1.)

34.     Flame's judgment against Industrial Carriers was recognized by the United States District Court for the Southern District of New York on September 14, 2011. (ECF No. 1-7.)

35.     Flame's judgment was entered in the Southern District of New York on October 4, 2011. (ECF No. 1-8.)

36.     On December 21, 2012, Noble entered into a contract of affreightment with Vitol S.A. ("Vitol") to carry one cargo of coal per quarter in 2013 from Norfolk, Virginia to various potential discharge ports, including Le Havre, France ("Voyage Charter"). (Noble's Ex. 602.)

37.     On October 11, 2013, Flame registered its judgment in the Eastern District of Virginia. (ECF No. 1-9.)

38.     On October 17, 2013, Noble entered into a trip time charter agreement to deliver cargo being loaded at Norfolk, Virginia to various discharge ports, including Le Havre, France ("Trip Time Charter"). (Flame's Ex. 308; Noble's Ex. 601.)

39.     Under the charter party, Noble had the sole authority to control where the Vessel was traded in accordance with the terms of the charter party. (ECF Nos. 184-1, 159-1; Flame's Ex. 308; Noble's Ex. 601.)

40.     On November 22, 2013, Flame filed a Verified Complaint against Industrial Carriers, Vista, and Freight Bulk, and on the same day asked the Court to enter an Order of Attachment under Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. (ECF No. 1.)

41.     On the same day, the Court granted Flame's Motion for Order of Attachment, and appointed a substitute custodian to take the place of the U.S. Marshal after attachment. (ECF No. 7.)

42.     At Noble's direction, on November 28, 2013, the M/V CAPE VIEWER presented at the DTA terminal in Norfolk, Virginia. (ECF Nos. 184-1, 159-1; Flame's Ex. 308; Noble's Ex. 601.)

43.     Flame had no control over where Noble sent the Vessel to be traded. (ECF No. 184-1; ECF Nos. 184-1, 159-1; Flame's Ex. 308; Noble's Ex. 601.)

44.     Freight Bulk is the registered owner, and Vista is the beneficial owner, of the M/V CAPE VIEWER, which is currently under attachment in the Eastern District of Virginia. (Pls.' Joint Ex. 3; Pls.' Joint Ex. 76; ECF No. 55 at 4; ECF No. 7.)

45.     On November 29, 2013, the M/V CAPE VIEWER was attached by the U.S. Marshal. (ECF No. 407 ¶ 33.)

46.     National Maritime Services was appointed as the Substitute Custodian in place of the U.S. Marshal. (ECF No. 8.)

47.     After the M/V CAPE VIEWER was attached it was loaded with 104,606.893 metric tons of coal before it was taken off berth and moved to anchor. (Glory Wealth Ex. 454.)

48.     On December 2, 2013, Freight Bulk filed a Motion to Vacate Order of Attachment. (ECF. No. 11.)

49.     On January 9, 2014, Flame filed an Amended Complaint. (ECF No. 55.)

50.     On January 10, 2014, the Court issued an Opinion and Order denying Freight Bulk's Motion to Vacate Order of Attachment. (ECF No. 57.)

51.     As a result of the Rule B attachments issued on behalf of Flame and Glory Wealth, the M/V CAPE VIEWER remains under judicial custody in the Eastern District of Virginia.

**B.     Activities of Viktor Baranskiy From 2005 Through 2008**

52.     Viktor Baranskiy's official Ukrainian work record card ("workbook") states that he was employed by Diamant Co. Ltd. ("Diamant") during the period of February 1, 2005 to July 1, 2008. (Flame's Ex. 302; ECF No. 19-1 at 11; Baranskiy Dep. 14:22-15:6, Dec. 12, 2013.)

53.     Although Viktor Baranskiy's workbook stated he was employed by Diamant during the time period of February 1, 2005 to July 1, 2008, Viktor Baranskiy was actually working for Industrial Carriers, and he carried an Industrial Carriers business card. (Flame's Ex. 302; Baranskiy Dep. 15:20-16:1, Dec. 12, 2013.)

54.     Viktor Baranskiy's first job title was trainee, then a junior vessel operator, and then he was promoted to the chartering department. (Baranskiy Dep. 16:5-8; 18:10-14; 19:17-18, Dec. 12, 2013.)

55.     On July 1, 2008, Viktor Baranskiy's official Ukrainian workbook states that he became employed as a Logistics Manager at IC Ukraine. (Flame's Ex. 302; ECF No. 19-1 at 11.)

56.     IC Ukraine is the Ukrainian representative office of Industrial Carriers. (Ivanov Dep. Tr. 24:11-14, July 1, 2014.)

57.     At all times while working in the chartering department after being promoted in 2006, Viktor Baranskiy was chartering vessels on behalf of Industrial Carriers. (Flame's Ex. 302; ECF No. 19-1 at 2; Baranskiy Dep. 19:23-20:2, Dec. 12, 2013.)

58.     In 2008, Viktor Baranskiy dominated and controlled the daily operations of Industrial Carriers. (Pls.' Joint Ex. 55.)

59.     On June 24, 2008, Vista was incorporated while Baranskiy was still working for Industrial Carriers. (Flame's Ex. 302; ECF No. 19-1 at 3.)

60.     In September and October 2008, Viktor Baranskiy and Sergei Baranskiy together owned 51% of Industrial Carriers. (Pls.' Joint Ex. 55.)

61.     In September and October 2008, Viktor Baranskiy's father, Sergei Baranskiy, was Chairman of the Board of Directors for Industrial Carriers. (Pls.' Joint Ex. 251.)

62.     In October 2008, despite Industrial Carriers' insolvency and bankruptcy filing on or about October 15, 2008, Industrial Carriers transferred $1,588,109 to Viktor Baranskiy, without consideration. (Pls.' Joint Ex. 251; Flame's Ex. 307.)

### C.     Overlap of Employees Between Industrial Carriers and Vista

63.     As of December 31, 2007, the owners of Industrial Carriers were as follows (Pls.' Joint Ex. 161):

| Shareholder's Name | Shareholder Percentage |
| :---: | :---: |
| S. Baranskiy | 40.5% |
| V. Cherepanov | 26.5% |
| V. Tarasov | 17.0% |
| A. Kozminkikh | 16.0% |
| Total | 100% |

64.     At a shareholder meeting on February 1, 2008, it was agreed that Viktor Baranskiy would be "admitted" as a shareholder effective January 1, 2008. (Pls.' Joint Ex. 55.)

65.     After the admission of Viktor Baranskiy as a shareholder the ownership interests were as follows (Pls.' Joint Ex. 55):

| Shareholder's Name | Shareholder Percentage |
|---|---|
| S. Baranskiy | 33.0% |
| V. Cherepanov | 21.8% |
| V. Baranskiy | 18.0% |
| V. Tarasov | 14.0% |
| A. Kozminkikh | 13.2% |
| Total | 100% |

66.     Once Viktor Baranskiy obtained an ownership interest in Industrial Carriers, he and his father, Sergei Baranskiy, held 51% of the shares of Industrial Carriers and, thereby, controlled the company. (Pls.' Joint Ex. 55.)

67.     In 2008, the following people were owners of, or employed by, Industrial Carriers: (Pls.' Joint Exs. 4; 55):

    1.    Sergei Baranskiy (Chairman/Director; 33% shareholder)
    2.    Vitaliy Cherepanov (Director, Treasurer, 21.8% shareholder)
    3.    Viktor Baranskiy (Chartering Department employee; 18% shareholder)
    4.    Vladimir Tarasov (14% shareholder)
    5.    Alex Kozminikh (13.2% shareholder)
    6.    Michael Ivanov (Chartering Department employee)
    7.    Alex Grigoriev (Chartering Department manager)
    8.    Vladimir Ivanov (Operations Department employee)
    9.    Vladimir Yudaev (Operations Department employee)
    10.    Daniel Su (Shanghai representative)

68.     Viktor Baranskiy, Sergei Baranskiy, Vladimir Tarasov, and Michael Ivanov each worked in Industrial Carriers' IC Ukraine office, which was located at 1 Chernomorskaya Str., Apt. 34, 65014, Odessa, Ukraine. (Pls.' Joint Ex. 4.)

69.     Viktor Baranskiy, Michael Ivanov, Vladimir Ivanov, Vladimir Yudaev, and Daniel Su were and are key employees of Industrial Carriers and Vista. (Pls.' Joint Ex. 3.)

**D.     Industrial Carriers and Vista Dominated and Controlled Companies For the Sole Purpose of Collecting Funds to Hinder, Delay, or Defraud Creditors**

70.     Industrial Carriers, as a corporate practice, routinely disregarded corporate formalities. As evidenced by the financial statements, audited by PricewaterhouseCoopers and Deloitte, Industrial Carriers owned and controlled the following companies for the sole purpose of being a depository for money due and owing Industrial Carriers (Pls.' Joint Exs. 55; 161):

1.     Weaver Investment, Inc.
2.     Selene Ship Management S.A.
3.     Auster Marine Co.
4.     Treselle Navigation Ltd.
5.     Cardinia Management Co.
6.     Tempest Service Inc.

71.     According to the audited financial statements of Industrial Carriers and its subsidiaries, the sole activity of these subsidiaries was to maintain bank accounts which were used to receive funds due to Industrial Carriers. (Pls.' Joint Exs. 55; 161.)

72.     These companies were established in order to avoid Rule B attachment of Industrial Carriers' assets. (Baranskiy Dep. Tr. 71:17-73:1, Dec. 12, 2013.)

73.     It is not the general practice in the maritime community, or in any other business, for independent companies to make or receive large payments on behalf of other independent companies, yet such payments were, and are, made and received regularly by the six affiliated companies for Industrial Carriers. Indeed, the sole activity of these six companies was to maintain bank accounts for the sole purpose to receive funds for Industrial Carriers. (Pls.' Joint Exs. 55; 161.)

74.     Despite being subsidiaries of Industrial Carriers, whose sole purpose to receive funds for Industrial Carriers, Industrial Carriers did not include any of its subsidiaries in its bankruptcy petition. (Pls.' Joint Ex. 251.)

75.     Instead, the registrations for all of these subsidiaries were annulled (involuntarily dissolved) as follows (Glory Wealth's Ex. 413; ECF No. 19-1 at 3):

1.     Weaver Investment Inc. on October 1, 2010
2.     Selene Shipmanagement S.A. on October 1, 2010
3.     Auster Marine Co. on July 28, 2011
4.     Treselle Navigation Inc. on April 1, 2010
5.     Cardinia Management Co. on June 15, 2012
6.     Tempest Services Inc. on October 1, 2010

76.     At all relevant times herein, Industrial Carriers created and operated an incestuous group of companies with the sole purpose of their creation being to facilitate Industrial Carriers avoiding its debts and defrauding its creditors. (Glory Wealth's Ex. 413-415; ECF No. 19-1 at 3.)

77.     The practice of directing payments to its wholly owned subsidiaries was utilized by Industrial Carriers to evade creditors. (Glory Wealth's Ex. 413-415; ECF No. 19-1 at 3.)

78.     Vista employs the same deceptive method used by Industrial Carriers to hinder, delay, or defraud creditors, as evidenced by its practice of directing payments to other companies whose sole purpose to receive funds for Vista. (Pls.' Joint Exs. 208 – 217.)

**E.     Industrial Carriers Was Insolvent as of June 30, 2008**

79.     A primary component of Industrial Carriers' business in 2008 was chartering vessels from vessel owners, and then using the chartered vessels to carry cargo for cargo shippers. (Pls.' Joint Exs. 250-255; Glory Wealth's Ex. 413-415.)

80.     On June 30, 2008, Industrial Carriers had assets totaling $100,928,564, but its commitments on future charter-in agreements was $496,476,210 due within one year, $287,210,075 due within one to five years, and approximately $49,000,000 due in more than five years. (Pls.' Joint Exs. 55; 161; Glory Wealth's Ex. 415 at 9-10.)

81.     As a result of its obligations, including having more than $800 million in future charter-in commitments as of June 30, 2008, and minimal future long-term charter-out (sub-

charter) arrangements as of that date, on a fair value basis, Industrial Carriers' liabilities were far in excess of its assets, and Industrial Carriers was therefore insolvent as of June 30, 2008. (Pls.' Joint Exs. 55; 161; Glory Wealth's Ex. 415 at 9.)

**F.    Industrial Carriers Made Wire Transfers of Large Quantities of Cash To Third Parties, While Insolvent, Without Consideration**

82.    Although Industrial Carriers was in a tenuous financial position due to its extreme negative balance sheet, in June 2008 Industrial Carriers began making wire transfers of huge sums of money to third-party companies, without receiving consideration in return. (Pls.' Joint Exs. 55; 161; Glory Wealth's Ex. 415 at 12; Pls.' Joint Exs. 228, 229; Glory Wealth Exs. 245, 246.)

83.    Between June 6, 2008 and July 23, 2008, Industrial Carriers and its subsidiary, Auster Marine Co., made the following transfers to unknown recipients at Nordea Bank in Denmark: (Glory Wealth's Ex. 415 at 12; Joint Exs. 228, 229; Glory Wealth Exs. 245, 246.)

| DATE | AMOUNT | ORIGINATOR | BENEFICIARY INFORMATION | INSTRUCTIONS |
|---|---|---|---|---|
| 06/06/2008 | $5,500,000 | INDUSTRIAL CARRIERS, INC. | NORDEA BANK DENMARK A/S | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 1583763076 |
| 06/17/2008 | $6,000,000 | AUSTER MARINE CO. | NORDEA BANK DENMARK A/S | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 169359351 |
| 07/07/2008 | $9,000,000 | INDUSTRIAL CARRIERS, INC. | NORDEA BANK DENMARK A/S | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 189431945 |
| 07/17/2008 | $8,400,000 | INDUSTRIAL CARRIERS, INC. | NORDEA BANK DENMARK A/S | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE |

| | | | | 199353986 |
|---|---|---|---|---|
| 07/17/2008 | $2,240,000 | INDUSTRIAL CARRIERS, INC. | NORDEA BANK DENMARK A/S | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 199371601 |
| 07/21/2008 | $5,871,000 | INDUSTRIAL CARRIERS, INC. | NORDEA BANK DENMARK A/S | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 203362066 |
| 07/23/2008 | $2,325,600 | INDUSTRIAL CARRIERS, INC. | NORDEA BANK DENMARK A/S | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 205377235 |

**TOTAL**   **$39,336,600**

84.     The transfers totaling more than $39 million are suspect because (Glory Wealth's Ex. 415 at 12):

      a.     The beneficiary on these transfers was concealed on the bank wire information, and the only note on the wires is "IN CVR OF THE DIRECT PAYMENT."[2]

---

[2] According to a May 2009 report prepared by the Bank for International Settlements ("BIS") to the Basel Committee on Banking Supervision titled "Due diligence and transparency regarding cover payment messages related to cross-border wire transfers:"

Cover payments are used by a bank to facilitate funds transfers on behalf of a customer to a beneficiary, most often in another country, but also in the same country when a foreign currency is used. They typically involve both (i) a transaction in a currency other than that of the country in which the originator's or beneficiary's bank is domiciled, and (ii) the originator's and beneficiary's banks not having a relationship with each other that allows them to settle with each other directly. In this circumstance, the originator's bank may directly instruct the beneficiary's bank to effect the payment and advise that transmission of funds to "cover" the interbank obligation created by the payment order has been arranged through a separate channel.

b.    From July 2007 to May 2008, Industrial Carriers and its related entities made approximately eighty-nine transfers to accounts at Nordea Bank, and of those eighty-nine transactions, only three wire transfers were greater than $1 million—the largest being approximately $1.55 million.

c.    The timing of the payments occurred when shipping rates were dropping and Industrial Carriers was at risk for significant losses.

d.    The payments were in even dollar amounts, which are unusual compared to other Industrial Carriers wire information.

85.    ICI siphoned more than $39 million to unknown beneficiaries. These wire transfers were sent using an "In Cover Payment" method that concealed the name of the ultimate beneficiary. (Glory Wealth's Ex. 415 at 14.)

**G.    Industrial Carriers Used Companies With An Address of "c/o Industrial Carriers Inc." to Hinder, Delay, or Defraud Creditors**

86.    Branwyn Marine Corp. ("Branwyn"), Syriana Marine Co. ("Syriana"), Phaedra International Inc. ("Phaedra"), and Noxana Investments Ltd. ("Noxana") are all entities controlled by Industrial Carriers, and each of these companies uses the following address, according to bank wire information (Pls.' Joint Exs. 55; 161; Glory Wealth's Ex. 415 at 14; Glory Wealth's Ex. 445):

---

The BIS report goes on to discuss that a problem with cover payments is that full transparency for the cover intermediary banks is not ensured, which can limit a cover intermediary bank's ability to assess risks and identify individuals and entities whose transactions must be blocked, rejected or frozen. (Glory Wealth's Ex. 415 at 13.)

c/o Industrial Carriers, Inc.
3 Xanthou Str
16674 Glyfada

87.     Branwyn was a corporation or other business entity duly organized and existing under and by virtue of the laws of the Marshall Islands. (Publicly available information, at www.register-iri.com.)

88.     Branwyn was controlled by Industrial Carriers, shared Industrial Carriers' business address in Greece, and had transactions and balances with Industrial Carriers. (Pls.' Joint Exs. 55; 161; Glory Wealth's Ex. 415 at 14.)

89.     However, Branwyn was not included in the Industrial Carriers bankruptcy proceedings in Greece and was eventually annulled on July 28, 2011. (Pls.' Joint Exs. 250-255; Publicly available information, at www.register-iri.com.)

90.     Syriana was a corporation or other business entity duly organized and existing under and by virtue of the laws of the Marshall Islands. (Publicly available information, at www.register-iri.com.)

91.     Syriana was controlled by Industrial Carriers, shared Industrial Carriers' office address in Greece, and had transactions and balances with Industrial Carriers. (Pls.' Joint Exs. 55; 161; Glory Wealth's Ex. 415 at 14.)

92.     However, Syriana was not included in the Industrial Carriers bankruptcy proceedings in Greece and was eventually annulled on July 1, 2010. (Pls.' Joint Exs. 250-255; Publicly available information, at www.register-iri.com.)

93.     Phaedra was a corporation or other business entity duly organized and existing under and by virtue of the laws of the Marshall Islands. (Publicly available information, at www.register-iri.com.)

94.     Phaedra was controlled by Industrial Carriers, shared Industrial Carriers' office address in Greece, and had transactions and balances with Industrial Carriers. (Pls.' Joint Exs. 55; 161; Glory Wealth's Ex. 415 at 14.)

95.     However, Phaedra was not included in the Industrial Carriers bankruptcy proceedings in Greece and was eventually annulled on July 1, 2010. (Pls.' Joint Exs. 250-255; Publicly available information, at www.register-iri.com.)

96.     Noxana was a corporation or other business entity duly organized and existing under and by virtue of the laws of the Marshall Islands. (Publicly available information, at www.register-iri.com.)

97.     Noxana was controlled by Industrial Carriers, shared Industrial Carriers' office address in Greece, and had transactions and balances with Industrial Carriers. (Pls.' Joint Exs. 55; 161; Glory Wealth's Ex. 415 at 14.)

98.     However, Noxana was not included in the Industrial Carriers bankruptcy proceedings in Greece and was eventually annulled on July 1, 2010. (Pls.' Joint Exs. 250-255; Publicly available information, at www.register-iri.com.)

99.     Syriana, Phaedra and Noxana were all registered in the Republic of the Marshal Islands on April 11, 2008 and were all annulled on July 1, 2010. (Publicly available information, at www.register-iri.com.)

**H.     Industrial Carriers Used "Money Changing" Companies to Hinder, Delay, or Defraud Creditors**

100.    In the week before Industrial Carriers filed for bankruptcy on October 15, 2008, Industrial Carriers, through Syriana, Phaedra, and Noxana, made several wire transfers totaling $1,856,282.08. (Glory Wealth's Ex. 415 at 14-15; Pls' Joint Exs. 221; 229; 246; Glory Wealth's Ex. 449.) The transfers were as follows:

| DATE | AMOUNT | ORIGINATOR | BENEFICIARY INFORMATION | INSTRUCTIONS |
|---|---|---|---|---|
| 10/06/2008 | $500,000 | SYRIANA MARINE CO. | REGIONAL INVESTMENT BANK JSC 70 55 065 965 F/F/C LV71RIBR00019080N0000 REDBRIDGE BENEFITS LLP FAX 2108940507 | PMNT FOR CARS |
| 10/07/2008 | $100,000 | SYRIANA MARINE CO | COMMERZBANK AG | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 281365040 |
| 10/08/2008 | $479,500 | PHAEDRA INTERNATIONAL INC. | UBS AG | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 282362912 |
| 10/08/2008 | $350,000 | NOXANA INVESTMENTS LTD | DRESDNER BANK AG | /ACC/IN CVR OF THE DIRECT PAYMENT R//EFERENCE 282361554 |
| 10/10/2008 | $426,782.08 | SYRIANA MARINE CO | REGIONAL INVESTMENT BANK JSC 70 55 065 965 F/F/C LV71RIBR00019080N0000 REDBRIDGE BENEFITS LLP FAX 2108940507 | /ACC/PMNT FOR CARS. BEEF FAX //2108940507 |

**TOTAL**    **$1,856,282.08**

101.    The October 7, 2008 and October 8, 2008 wire transfers by Syriana ($100,000), Phaedra ($479,500) and Noxana ($350,000) did not disclose the beneficiary as they were executed utilizing the "In Cover Payment" method. This method of wire transfer is used to hide

the name of the ultimate beneficiary. (Glory Wealth's Ex. 415 at 15; Pls' Joint Ex. 221; Glory Wealth's Ex. 449.)

102.    Two of these payments were directed to a company called Redbridge Benefits LLP ("Redbridge"). (Glory Wealth's Ex. 415 at 15; Pls.' Joint Exs. 221; 228; 245; Glory Wealth's Ex. 449.)

103.    Redbridge is a corporation or other business entity duly organized and existing under and by virtue of the laws of England and Wales. (Pls.' Joint Ex. 150.)

104.    Freight Bulk describes Redbridge as a "money changing" company. A "money changing" company accepts wire transfers of currency and converts the currency into cash—U.S. dollars. "Money changing" companies generate revenue through various methods—sometimes illegitimate—and often invoice transactions as the sale of goods, such as cars or clothing. The notations listed on the wire transfers above indicate that "money changing" companies also sell cars to generate cash. (Glory Wealth's Ex. 415 at 15-16; Bobrenko Dep. Tr. 209:21-210:2; 299:4-300:7, July 5, 2014.)

105.    Charlotte LLP ("Charlotte"), Trend Index LLP ("Trend Index"), Paladin Shipping Co. Ltd. ("Paladin") are also "money changing" companies. (Bobrenko Dep. Tr. 209:21-210:2; 299:4-300:7, July 5, 2014; Bobrenko Dep. Tr. 212:19-213:3; 299:11-13, July 5, 2014.)

106.    Charlotte is a corporation or other business entity duly organized and existing under and by virtue of the laws of the United Kingdom. (Pls.' Joint Ex. 152.)

107.    Paladin is a corporation or other business entity duly organized and existing under and by virtue of the laws of Belize. (Publicly available information; at www.belizecompaniesregistry.gov.bz)

108.    Trend Index LLP is a corporation or other business entity duly organized and existing under and by virtue of the laws of New Zealand. (Pls.' Joint Ex. 149.)

109.    Edelweiss Consultants SA is a corporation or other business entity duly organized and existing under and by virtue of the laws of the Marshall Islands. (Freight Bulk's Ex. 1001.)

110.    Vista also uses Redbridge, Charlotte, Paladin, Edelweiss, and Trend Index to convert wire transfers to cash. (Bobrenko Dep. Tr. 209:21-210:2; 299:4-300:7, July 5, 2014.)

111.    Vista's Chief Financial Officer, Katerina Bobrenko ("Bobrenko"), testified that Vista maintains a "petty cash" ledger (the "Vista Cash Ledger"). The Vista Cash Ledger records transactions conducted in cash. (Pls.' Joint Ex. 10; Bobrenko Dep. Tr. 199:4-24, July 5, 2014.)

112.    The Vista Cash Ledger shows the following wire transfers from Redbridge Benefits LLP to Vista for the purpose of "cash transform." (Pls.' Joint Ex. 10.) No legitimate business reason exists for using Redbridge to convert funds to cash. Some examples are as follows:

| DATE | AMOUNT | DESCRIPTION | NOTES |
|---|---|---|---|
| 1/22/09 | $75,000.00 | "Cash transform" | "return cash transform" |
| 3/26/09 | $134,365.00 | "Cash transform" | "return cash transform" /"67921.00" |
| 3/26/09 | $60.02 | "Cash transform" | "return cash transform" / "reimburse bank expense" |
| 3/31/09 | $50,000.00 | "Cash transform" | "return cash transform" |
| 3/31/09 | $54.60 | "Cash transform" | "return cash transform" / "reimbursement bank exp 52600 – 52545.40" |
| 4/1/09 | $43,439.02 | "Cash transform" | "return cash transform / x5" |
| 4/1/09 | $31,500.00 | "Cash transform" | "return cash transform / |

| | | | x5" |
|---|---|---|---|
| 4/1/09 | $500.00 | "Cash transform" | "return cash transform / x5" |
| 4/2/09 | $51.77 | "Cash transform" | "return cash transform" / "reimbursement bank exp" |
| 4/10/09 | $100,000.00 | "Cash transform" | "return cash transform" |
| 4/16/09 | $190,000.00 | "Cash transform" | "return cash transform" |
| 4/23/09 | $100,000.00 | "Cash transform" | "return cash transform" |
| 4/30/09 | $50,000.00 | "Cash transform" | "return cash transform" |

113.     Vista has also made over $5 million worth of wire transfers to Redbridge from Alpen Shipmanagement's bank account. (Pls.' Joint Ex. 164.) Some examples of these transfers include:

| DATE | AMOUNT | ORIGINATOR | BENEFICIARY |
|---|---|---|---|
| 4/20/2009 | $50,150[3] | Redbridge Benefits LLP | Alpen Shipmanagement Co. |
| 4/23/2009 | $190,000[4] | Redbridge Benefits LLP | Alpen Shipmanagement Co. |
| 5/12/2009 | $50,150[5] | Redbridge Benefits LLP | Alpen Shipmanagement Co. |
| 5/14/2009 | $65,130[6] | Redbridge Benefits LLP | Alpen Shipmanagement Co. |
| 5/18/2009 | $153,580[7] | Redbridge Benefits LLP | Alpen Shipmanagement Co. |

---

[3] (Pls.' Joint Ex. 164 at FB003394.)
[4] (Pls.' Joint Ex. 164 at FB003389.)
[5] (Pls.' Joint Ex. 164 at FB003400.)
[6] (Pls.' Joint Ex. 164 at FB003402.)
[7] (Pls.' Joint Ex. 164 at FB003406.)

| 5/19/2009 | $1,001,000[8] | Redbridge Benefits LLP | Alpen Shipmanagement Co. |
| --- | --- | --- | --- |
| **TOTAL** | **$1,510,010** | Redbridge Benefits LLP | Alpen Shipmanagement Co. |

### I.   Industrial Carriers Transferred Large Sums to Edelweiss Consultants SA, While Insolvent, Without Consideration

114.   From March 3, 2008, to August 25, 2008, Industrial Carriers and its affiliated entities, Selene Shipmanagement SA and Auster Marine Co., made wire transfers totaling $1,674,019.44 to Edelweiss. (Glory Wealth Ex. 415 at 31; Pls.' Joint Ex. 228; 245.) The following transfers were made:

| DATE | AMOUNT | ORIGINATOR | BENEFICIARY NAME | INSTRUCTIONS |
| --- | --- | --- | --- | --- |
| 03/03/2008 | $250,000 | INDUSTRIAL CARRIERS INC | EDELWEISS CONSULTANTS SA | CONSULTANCY AGREEMENT DATED JULY 7, 2007 |
| 04/07/2008 | $280,736.44 | SELENE SHIPMANAGEMENT SA | EDELWEISS CONSULTANTS SA | HT-10/2007-9C |
| 04/14/2008 | $197,340 | AUSTER MARINE CO | EDELWEISS CONSULTANTS SA | CONSULTING AGREEMENT DD 07.09.2007 |
| 05/13/2008 | $345,000 | AUSTER MARINE CO | EDELWEISS CONSULTANTS SA | NULL |
| 05/29/2008 | $197,377 | AUSTER MARINE CO | EDELWEISS CONSULTANTS SA | STATEMENT HT-10/2007-9C |

---

[8] (Pls.' Joint Ex. 164 at FB003406.)

| 06/30/2008 | $297,980 | AUSTER MARINE CO | EDELWEISS CONSULTANTS SA | CONSULTANCY CONTRACT 7/11/2007 |
|---|---|---|---|---|
| 08/25/2008 | $105,586 | INDUSTRIAL CARRIERS INC | EDELWEISS CONSULTANTS SA | DIVIDENTS 2007 |

**TOTAL     $1,674,019.44**

115.    No explanation has been given for what "consultancy services" were provided to Industrial Carriers in exchange for these large sums of money. Similarly, no explanation has been given for one of these payments made for "dividents," which appears to be a reference to a dividend payment. (Glory Wealth Ex. 415 at 31.)

116.    Vista's first bank statement entry records an incoming transfer of US$98,000 from Edelweiss. (Pls.' Joint Ex. 9; Flame 024995.)

117.    Vista and its affiliates maintain a relationship with Edelweiss, as several payments for "consultancy services" were received by Vista from Edelweiss. (Glory Wealth Ex. 415 at 31; Pls.' Joint Ex. 228; 245.)

118.    No explanation has been given for what "consultancy services" were received by Vista from Edelweiss.

**J.      Industrial Carriers Transferred Assets, Including The Right to Charter the M/V HARMONY FALCON, To Vista, While Insolvent, Without Consideration**

119.    Industrial Carriers chartered the M/V HARMONY FALCON, a Panamax class bulk cargo vessel, with a delivery date of September 28, 2008, and a daily hire rate of USD $18,000 per day. (Pls.' Joint Ex. 5; ECF No. 319-2 at 2; Baranskiy Dep. 94:18-19, Dec. 12, 2013.)

120.    The M/V HARMONY FALCON was included on Industrial Carriers' November 26, 2008 list of vessels submitted to the Greek bankruptcy court. (Pls.' Joint Ex. 5.)

121.    A debit note dated December 24, 2008 sent by Vista to Falcon Shipping, the owner of the M/V HARMONY FALCON, shows a charter hire date of September 26, 2008, and a delivery date of September 28, 2008—the same date listed on Industrial Carriers' vessel list submitted in bankruptcy. (Pls.' Joint Ex. 6 at FB001513.)

122.    Vista's Statement of Account sent to Falcon Shipping shows a daily hire rate of USD $18,000—the same hire rate listed on Industrial Carriers' vessel list submitted in bankruptcy. (Pls.' Joint Ex. 6 at FB001512.)

123.    In September 2008, the average daily hire rate for Panamax class bulk cargo vessels, which is listed on the Baltic Panamax Index (BPITC), was $39,836,68.(Glory Wealth Ex. 413 at 6.)

124.    In October 2008, the average daily hire rate for Panamax class bulk cargo vessels crashed to $11,429,83. (Glory Wealth Ex. 413 at 6.)

125.    On October 1, 2008, Vista's cash ledger shows the following entries, all related to the M/V HARMONY FALCON: (1) $45,200 debit (indicating funds received) from "Victor" noting "Pmnt hire for Harmony Falcon," (2) $30,562.50 paid to Falcon Shipping for the hire of the Harmony Falcon, (3) $2,081.69 paid to Barwill for "Final D/A," and (4) $12,524 paid to Davkovich Maritime for "Final D/A." (Pls.' Joint Ex. 10 at FB003032.)

126.    On October 2, 2008, one day after Vista made charter expense payments for the M/V HARMONY FALCON, Auster Marine Co., an entity controlled by Industrial Carriers, paid $199,326 to B & L Transoil for bunkers at Jeddah, Saudi Arabia, for the M/V HARMONY FALCON. (Pls.' Joint Ex. 160.)

127.    Various documents refer to Vista chartering the M/V HARMONY FALCON, its first vessel, on or about October 14, 2008, at a daily hire rate of USD $18,000 per day. (Pls.' Joint Exs. 6, 8; Baranskiy Dep. 94:12-23, Dec. 12, 2013.)

128.    On October 15, 2008, Paladin made a hire payment in the amount of $800,021, on Vista's behalf, to the owners of the M/V HARMONY FALCON. Pls.' Joint Ex. 8.)

129.    Paladin is a "money changing" company. (Bobrenko Dep. Tr. 209:21-210:2; 299:4-300:7, July 5, 2014.)

130.    On October 16, 2008, Trend Index made a hire payment in the amount of $188,000, on Vista's behalf, to the owners of the M/V HARMONY FALCON (Pls.' Joint Ex. 8.)

131.    On October 21, 2008, Paladin made another hire payment in the amount of $230,000, on Vista's behalf, to the owners of the M/V HARMONY FALCON (Pls.' Joint Ex. 8.)

132.    A time sheet for the M/V HARMONY FALCON, with Vista as owners, indicates that cargo loading was completed at Odessa on October 22, 2008, and notes that the charter party date was September 13, 2008—consistent with the Industrial Carriers charter. (Pls.' Joint Ex. 7 at FB146803.)

133.    On October 23, 2008, Vista's cash ledger shows a $1,218,000 debit (indicating funds received) from "Victor" noting "Pmnt hire for Harmony Falcon," to Falcon Shipping. (Pls.' Joint Ex. 10 at FB003032.)

134.    On October 27, 2008, Fayette International Holdings made a freight payment of $2,766,305.71 to Vista for the M/V HARMONY FALCON. (Pls.' Joint Ex. 9 at FB003333.)

135.    On October 30, 2008, Bunkers International sent an invoice in the amount of $204,500 to "Falcon Shipping and/or Master, Owners, Operators, Charterers, Managers,

Managing Agents" of the M/V HARMONY FALCON for bunkers at Jeddah, Saudi Arabia. (Pls.' Joint Ex. 6 at FB001515.)

136.    On November 5, 2008, Vista paid a "Balance D/A MV Harmony Falcon" in the amount of $6,812.72 to an unknown party. (Pls.' Joint Ex. 9 at FB003333.)

137.    On November 12, 2008, Vista paid $318,083.39 to Fayette International Holdings BVI, with a note stating that the payment was for the agreed balance owed to the charterer, less charges. (Pls.' Joint Ex. 11.)

138.    On December 4, 2008, Vista's cash ledger shows a payment related to the M/V HARMONY FALCON for "other nonrecurring operations" in the amount of $19,328.71, which has a note describing the payment as "Facilitation Payment '1.'" (Pls.' Joint Ex. 10 at FB003032.)

139.    A time sheet for the M/V HARMONY FALCON, with Vista as owners and Fayette as charterers, indicates that cargo discharge was completed at Xiaocuo, China on December 5, 2008, and notes that the charter party date was September 13, 2008—consistent with the Industrial Carriers charter. (Pls.' Joint Ex. 7 at FB146802.)

140.    On December 24, 2008, Vista sent a debit note to Falcon Shipping for the M/V HARMONY FALCON. The debit note states that the date of delivery as 13:15 GMT on September 28, 2008, and the date of redelivery at 06:30 GMT on December 5, 2008. It also indicates a charter party date of September 26, 2008. (Pls.' Joint Ex. 6 at FB001513.)

141.    On January 13, 2009, Vista sent a Final Voyage Statement of Account ("FVSOA") to Fayette. (Pls.' Joint Ex. 6.)

142.    The FVSOA shows that 64,429,042 metric tons of cargo was loaded aboard the M/V HARMONY FALCON at an ocean freight rate of USD $55 per metric ton, for a total of

$3,543,597.31. Reductions are made to this amount, including Fayette's October 27, 2008 freight payment of $2,766,305.71, a $732,966.63 "sign up payment" that was paid by Fayette to Vista, and despatch reductions. (Pls.' Joint Ex. 6.)

143.    Similar to the crash in hire rates between September 2008 and October 2008, the average daily freight rates paid by cargo shippers to vessel owners or charters also crashed. The ocean freight rate of $55 per metric ton listed in the FVSOA was well over the market rate.

144.    A statement of account for the M/V HARMONY FALCON charter shows that the M/V HARMONY FALCON was chartered at a hire rate of $18,000 USD per day. (Pls.' Joint Ex. 6.)

145.    The document also shows the following remittances: (1) $800,021 on October 15, 2008, (2) $188,000 on October 16, 2008, and (3) $230,000 on October 21, 2008. (Pls.' Joint Ex. 6.)

146.    These remittances match the hire payments made by Paladin Shipping Co. Ltd. and Trend Index Ltd. to Falcon Shipping, on behalf of Vista, for the M/V HARMONY FALCON. (Pls.' Joint Ex. 8.)

147.    On behalf of Vista Shipping Ltd., Sergey Bakalo sent an email dated February 5, 2014 to Maritime Shipsale Services Ltd., listing all the ships Vista had ever chartered. The M/V HARMONY FALCON was not on the list. The list indicates that the first vessel Vista ever chartered is the GRAND PANAGIOTIS on December 5, 2008. (Pls.' Joint Ex. 44.)

148.    Industrial Carriers' right to charter the Harmony Falcon was fraudulently conveyed to Vista Shipping.

**K.    Industrial Carriers Fraudulently Transferred $1,588,109 Directly to Viktor Baranskiy While Insolvent, Without Consideration**

149.    In September and October 2008, Viktor Baranskiy's father, Sergei Baranskiy, was Chairman of the Board of Directors for Industrial Carriers. (Pls.' Joint Exs. 250-255.)

150.    In September and October 2008, Viktor Baranskiy and Sergei Baranskiy together owned 51% of Industrial Carriers. (Pls.' Joint Ex. 55.)

151.    In October 2008, despite Industrial Carriers' insolvency and bankruptcy filing on or about October 15, 2008, Industrial Carriers transferred $1,588,109 to Viktor Baranskiy, without consideration. (Flame's Ex. 307.)

**L.    Industrial Carriers Siphoned Money to Third Parties, Including Viktor Baranskiy and Vista, To Hinder, Delay, and Defraud Creditors Prior To Filing For Bankruptcy in October 2008**

152.    Industrial Carriers' financial statements show that it was profitable from 2005 through 2007 and for the six months ending June 30, 2008 (Pls.' Joint Exs. 55, 161):

|  | 30 JUNE 2008 | 31 DECEMBER 2007 | 31 DECEMBER 2006 | 31 DECEMBER 2005 |
|---|---|---|---|---|
| **GROSS REVENUE** | $556,295,520 | $560,804,497 | $182,849,400 | $175,473,844 |
| **PROFIT** | $80,627,022 | $36,136,046 | $819,251 | $10,784,206 |

153.    Industrial Carriers' balance sheet shows that by June 30, 2008, it had more than $100 million of equity, which included more than $42 million of cash (Pls.' Joint Exs. 55, 161):

|  | 30 JUNE 2008 | 31 DEC 2007 | 31 DEC 2006 | 31 DEC 2005 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Non-Current Assets** | | | | |

| | | | | |
|---|---|---|---|---|
| Fixed Assets – Property, plant & equipment | 337,030 | 362,670 | 429,657 | 408,274 |
| Due from Shareholders | 0 | 221,300 | 236,304 | 251,308 |
| **Current Assets** | | | | |
| Inventories | 20,197,334 | 14,222,740 | 3,230,591 | 2,968,781 |
| Trade and Other Receivables | 66,541,787 | 42,945,630 | 3,923,888 | 4,429,247 |
| Due from Shareholders | 0 | 42,945,630 | 3,923,888 | 4,429,247 |
| Restricted Cash | 10,027 | 2,853,163 | 1,785,920 | 8,970,424 |
| Derivative Financial Instruments | 35,662,310 | - | - | - |
| Money Available in Bank – Cash | 39,236,853 | 17,695,666 | 2,432,907 | 5,900,711 |
| Restricted Cash – Current | 3,500,000 | - | - | - |
| **Total Assets** | 165,485,341 | 78,311,195 | 12,049,267 | 22,938,745 |
| **LIABILITIES** | | | | |
| Trade and Other Accounts Payable | 60,090,239 | 36,822,030 | 7,850,878 | 8,332,684 |
| Derivative Financial Instruments | - | 1,154,730 | - | - |
| Due to Shareholders | 4,453,645 | - | - | - |
| Provision for other liabilities and charges (long term) | 12,893 | 12,893 | 12,893 | 10,976 |
| **Total Liabilities** | 64,556,777 | 37,989,653 | 7,863,771 | 8,343,660 |
| **Net Position – Total** | **100,928,564** | **40,321,542** | **4,185,496** | **14,595,085** |

**Equity**

154.    Industrial Carriers filed for bankruptcy in Greece on or about October 15, 2008. (Pls.' Joint Ex. 251.)

155.    A comparison of Industrial Carriers' June 30, 2008 balance sheet and the balance sheet that was submitted with Industrial Carriers' Greece bankruptcy filing is as follows (Pls.' Joint Exs. 55, 251):

|  | 30 JUNE 2008 | 15 OCT 2008 |
|---|---|---|
| **ASSETS** | | |
| Fixed Assets – Property, plant & equipment | 337,030 | 384,006 |
| Restricted Cash – Long Term | 10,027 | - |
| Money Available in Bank – Cash | 39,236,853 | 3,123,076 |
| Restricted Cash – Current | 3,500,000 | |
| Treasury | - | 357,460 |
| Claims (Without Derivatives) – Accounts Receivables | 66,541,787 | 18,879,735 |
| Claims (From Derivatives) Derivative Financial Instruments | 35,662,310 | 418,699 |
| Inventories | 20,197,334 | |
| **Total Assets** | 165,485,341 | 23,162,976 |
| **LIABILITIES** | | |
| Liabilities (Without Derivatives) - Trade and Other Accounts Payable | 60,090,239 | 34,555,806 |
| Liabilities (With Derivatives) - Derivative Financial Instruments | - | 4,077,980 |

| | | |
|---|---|---|
| Due to Shareholders | 4,453,645 | |
| Provision for other liabilities and charges (long term) | 12,893 | |
| **Total Liabilities** | 64,556,777 | 38,633,786 |
| **Net Position – Total Equity** | **100,928,564** | **(15,470,810)** |

156.    A review of the changes in the more significant balance sheet categories from June 30, 2008 through the October 15, 2008 bankruptcy filing shows as follows (Glory Wealth's Ex. 413 at 9-11):

- *Cash*—Industrial Carriers' cash decreased from $42.7 million as of June 30, 2008 to $3.1 million in the October 15, 2008 Greece bankruptcy documents, a decrease of $39.6 million. Industrial Carriers' did not include its wholly-owned subsidiaries, whose sole activity was to maintain bank accounts which were used in the operations of Industrial Carriers, in its bankruptcy petition. Because those subsidiaries did not also file for bankruptcy, Industrial Carriers should have listed the amounts held by the subsidiaries as intercompany receivables (or amounts due from related parties) as an asset in the bankruptcy filing. No such disclosure was made.

- *Accounts Receivable / Claims (without Derivatives)*—Accounts receivable decreased from $66.5 million as of June 30, 2008 to $18.9 million in the October 15, 2008 Greece bankruptcy documents, a decrease of $47.6 million. According to its financial statements, Industrial Carriers' management did not anticipate that any receivables would not be collected. A decrease in accounts receivable means that Industrial Carriers' cash balance should have increased by $47.6 million after

June 30, 2008, but before filing for bankruptcy, because of the change in accounts receivable.

- *Derivative Financial Instruments / Claims (with Derivatives)*—Derivative financial instruments declined from $35.6 million as of June 30, 2008 to $0.4 million in the October 15, 2008 Greece bankruptcy documents, a decrease of $35.2 million. This indicates that the value of the derivative financial instruments that Industrial Carriers held declined in value by $35.2 million. The decline in value of the derivative financial instruments is at least partially related to the decline in FFA values. The change in the value of FFA contracts is reflected on Industrial Carriers' balance sheet, but this line item does not reflect cash inflows or outflows.

- *Inventories*—Inventories declined from $20.2 million as of June 30, 2008 to zero as shown in the October 15, 2008 Greece bankruptcy filings, a decrease of $20.2 million. The inventories reflected on Industrial Carriers' balance sheet were the inventory for bunkers. Bunkers are the fuel that is used to power the ships. Typically when such inventory declines in value, it is an indication that it was either used in operations or sold back to the ship owner. To the extent Industrial Carriers was paid for the bunker inventory, it would have received additional cash.

157.   Industrial Carriers' liabilities between June 30, 2008 and October 15, 2008 were as follows (Glory Wealth's Ex. 413 at 9-11):

- *Trade and Other Accounts Payable / Liabilities (without Derivatives)*—Trade and other accounts payable declined from $60.1 million as of June 30, 2008 to $34.6

million in the October 15, 2008 Greece bankruptcy documents, a decrease of $25.5 million. A decrease in accounts payable is an indication that cash was used to pay the accounts payable after June 30, 2008, but before the bankruptcy filing.

- *Derivative Financial Instruments / Liabilities (with Derivatives)*—Derivative financial instruments liabilities increased from zero as of June 30, 2008 to $4.1 million as shown in ICI's October 15, 2008 bankruptcy filing, an increase of $4.1 million. This indicates that the value of the derivative financial instruments that Industrial Carriers held declined in value by $4.1 million. The decline in value of the derivative financial instruments may be partially related to the decline in FFA values. Changes in the value of FFA contracts are reflected on Industrial Carriers' balance sheet, but this line item does not reflect cash inflows or outflows.

- *Due to Shareholders*—The amount due to shareholders declined from $4.5 million as of June 30, 2008 to $0 (zero) in the October 15, 2008 Greece bankruptcy documents, a decline of $4.5 million. A decrease in the amount due to shareholders is an indication that the loan was either forgiven or the amount was paid to the shareholders.

158.   Industrial Carrier's balance sheet indicates cash should have increased by $47.6 million because of the collection of accounts receivable and approximately $20.2 million for the bunker inventory. In addition, cash should have decreased by $25.5 million as a result of the decrease in account payable and $4.5 million from a decrease in the amount owed to shareholders. Therefore, based upon the available information, Industrial Carriers' cash should have increased by at least $17.6 million ($47.6 million - $25.5 million - $4.5 million). Further, if

the bunker inventory was sold and not used in the operations, cash should have increased by $37.8 million ($17.6 million + $20.2 million). (Glory Wealth's Ex. 413 at 11.)

159.   Instead, Industrial Carriers' cash actually decreased by $39.6 million. This difference between the expected amount of cash and the actual cash balance is $57.2 million ($17.6 million + $39.6 million).

160.   The difference between the expected and actual cash balances is highly suspect given Industrial Carriers did not include its wholly-owned subsidiaries, whose sole purpose was to maintain bank accounts to receive funds due to Industrial Carriers. (Glory Wealth's Ex. 413 at 2, 11.)

### M.   Industrial Carriers' Directors Maintain a Relationship With Vista

161.   Sergei Baranskiy, Industrial Carriers' Chairman of the Board (and Viktor Baranskiy's father), is currently a shareholder of Chaika Agency Co. Ltd. ("Chaika"), which is the exclusive managing agent for chartering and operational services to Milestone Shipping S.A. ("Milestone"). (Flame's Ex. 379; publicly available information at www.milestone.com.ua/our-business.)

162.   Milestone is a corporation or other business entity duly organized and existing under and by virtue of the laws of Panama. (Publicly available information at http://registro-publico.gob.pa/index.php/en/.)

163.   Milestone was incorporated in November 2008, less than one month after Industrial Carriers filed for bankruptcy. (Publicly available information at http://registro-publico.gob.pa/index.php/en/; Glory Wealth's Ex. 415 at 35.)

164.   Milestone is a shipping company whose chartering and operations matters are controlled by Chaika, which acts as Milestone's exclusive managing agent. (Flame's Ex. 379; publicly available information at www.milestone.com.ua/our-business.)

165.    Chaika is controlled by Sergei Baranskiy and Vladimir Tarasov, who are both shareholders and directors of Industrial Carriers. (Flame's Ex. 379; Pls.' Joint Exs. 250-255.)

166.    Milestone and Chaika share an address, and are located at 1 Chernomorskaya Str., Apt. 34, 65014, Odessa, Ukraine, the same address as the former office of IC Ukraine LLC ("IC Ukraine") and Diamant Co. Ltd., Ukrainian companies controlled by Industrial Carriers. (Pls.; Joint Ex. 1; Flame's Ex. 379; publicly available information at www.milestone.com.ua/contacts; Glory Wealth's Ex. 415; Ivanov Dep. Tr. 49:16-50:7, July 1, 2014.) page 49.)

167.    Milestone Shipping, S.A. lends money to and borrows money from entities controlled by Viktor Baranskiy. (Pls.' Joint Exs. 124-140, 162; Glory Wealth's Ex. 415 at 35.)

168.    On December 19, 2008, Milestone lent Vista $1,554,600 and on March 25, 2009 Milestone lent Vista $300,000. (Pls.' Joint Exs. 124-125.)

169.    Although the $300,000 loan agreement was between Milestone and Vista, the signature block on the loan agreement lists the borrower as Palmira Enterprises S.A., and is signed by Viktor Baranskiy on behalf of Palmira Enterprises. (Pls.' Joint Ex. 124 at FB001845.)

170.    The terms of these loans did not provide for any interest and were to be repaid "according to the liquidity of the company." These short term loans are a sham: without consideration or enforceable terms. (Pls.' Joint Exs. 124-125.)

171.    In addition, there are at least nine loan agreements between Milestone, as the lender, and Alpen Shipmanagement, as the borrower. The loan agreements are shown in the table below:

| Loan Agreement No. | Amount | Date | Bates number |
| --- | --- | --- | --- |
| 1 | $2,300,000 | April 18, 2012 | Pls.' Joint Ex. 131 |
| 2 | $2,000,000 | March 4, 2013 | Pls.' Joint Ex. 132 |

| 3 | $1,200,000 | September 1, 2009 | Pls.' Joint Ex. 133 |
| 3 | $1,600,000 | March 4, 2013 | Pls.' Joint Ex. 134 |
| 8 | $1,000,000 | April 29, 2013 | Pls.' Joint Ex. 162 |
| 9 | $1,000,000 | March 2, 2010 | Pls.' Joint Ex. 135 |
| 9 | $1,500,000 | May 16, 2013 | Pls.' Joint Ex. 136 |
| 10 | $900,000 | May 28, 2013 | Pls.' Joint Ex. 137 |
| 11 | $1,000,000 | June 21, 2013 | Pls.' Joint Ex. 138 |
| 11 | $1,000,000 | December 28, 2010 | Pls.' Joint Ex. 140 |
| 12 | $500,000 | December 6, 2013 | Pls.' Joint Ex. 139 |
| **TOTAL** | **$14,000,000** | | |

172.    Further, there are five loan agreements between Milestone, as the lender, and Palmira Enterprises, S.A., as the borrower. The terms of all of these loans were the same with no interest being charged and repayment "according to the liquidity of the company."  (Pls.' Joint Exs. 126-130.) The loan agreements are listed on the following table:

| Loan Agreement No. | Amount | Date | Bates number |
|---|---|---|---|
| 2 | $300,000 | March 16, 2009 | Pls.' Joint Ex. 126 |
| 4 | $1,700,000 | November 12, 2009 | Pls.' Joint Ex. 127 |
| 6 | $2,500,000 | January 8, 2010 | Pls.' Joint Ex. 128 |
| 7 | $200,000 | March 2, 2010 | Pls.' Joint Ex. 129 |
| 18 | $400,000 | August 19, 2011 | Pls.' Joint Ex. 130 |
| **TOTAL** | **$5,100,000** | | |

173.    Milestone loaned Viktor Baranskiy's companies over $20 million without consideration or enforceable terms.

174.    Milestone and Vista are not part of the same group and are competitors of each other. (Pls.' Joint Exs. 49-51; publicly available information at www.milestone.com.ua/our-business.) It is unusual and suspicious that one company who appears to be a competitor of another would lend money to the competitor. It is also unusual that there would be no interest charged and no specific repayment terms. (Pls.' Joint Exs. 124-140, 162.)

175.    Sergei Baranskiy, who is Viktor Baranskiy's father and the former Chairman of the board of directors of Industrial Carriers, controls a company called Chaika Agency Ltd. ("Chaika"), which provides exclusive agency services to Milestone. (Flame's Ex. 379.)

176.    While Milestone and Vista were loaning money to each other without consideration or an enforceable contract, Milestone's daily operations were dominated and controlled by Sergei Baranskiy through its agent, Chaika. (Pls.' Joint Exs. 124-140, 162; Flame's Ex. 379; publicly available information at www.milestone.com.ua/our-business.)

**N.    Fayette International Holdings Limited**

177.    Fayette International Holdings Limited ("Fayette") is a corporation or other business entity duly organized and existing under and by virtue of the laws of a foreign country. (Publicly available information at http://www.fayette-intl.com/bbs/company2.php.)

178.    Fayette is the exclusive charterer of the steel trader Metinvest International S.A. ((Publicly available information at http://www.fayette-intl.com/bbs/company2.php.)

179.    Fayette and Metinvest were Industrial Carriers customers that Viktor Baranskiy took with him from Industrial Carriers when he started Vista. (Ivanov Dep. Tr. 64:20-21, July 1, 2014.)

180.    Vista's first vessel fixture, with the vessel M/V HARMONY FALCON, was used to carry cargo for Fayette. (Pls.' Joint Exs. 6-7, 11.)

**O.    Hasten Enterprises Received Funds Due To Industrial Carriers, Without Consideration**

181.    Hasten Enterprises Limited is an entity that is 100% owned by Viktor Baranskiy. (Pls.' Joint Ex. 49; Flame's Ex. 336.)

182.    Viktor Baranskiy testified during his December 12, 2013 deposition that in 2006 he set up Hasten Enterprises "solely for the purpose of collecting funds from brokerage, but not shipping brokerage, trading brokerage." (Baranskiy Dep. Tr. 99:18-100:4.)

183.    However, the record indicates Hasten received funds other than trading brokerage commission. (Glory Wealth's Exs. 415, 444.) For example:

- On November 7, 2007, Fujian Sansteel paid Hasten Enterprises $142,758 for "Iron Ore Pellets" and $66,780 for "Iron Ore Concentrate."

- On December 27, 2007, Hasten Enterprises received a remittance from Richmine Resources Ltd in the amount US$31,728.24 for the "MV Swift Fame." However, Industrial Carriers and its subsidiaries made payments related to the charter of the MV Swift Fame. Thus, the remittance from Richmine Resources Ltd. was related to the charter of the MV Swift Fame and belonged to ICI. These payments include:

  o    December 27, 2007—ICI made wire transfer to E.N. Bisso and Son Inc. for the MV Swift Fame

  o    January 4, 2008—ICI made a wire transfer to Seacliff Agency, LLC for the MV Swift Fame

     o     January 29, 2008—Auster Marine made a wire transfer to Seabulk International for the MV Swift Fame.

- On April 16, 2008, Fujian Sansteel made three transfers of $44,974, $44,974, and $35,084 to Hasten Enterprises. The payments indicate that they were for the demurrage payment for the MV Hai Fu Star.

- On April 29, 2008, Hasten Enterprises received $67,069.93 from China Hua Dong Corp.

- On June 4, 2008, Hasten Enterprises received US$60,641 from Gain Better Group Ltd for "zi xun fei."

184.    Further, according to the audited financial statements of the Vista Group, Hasten, on behalf of Viktor Baranskiy, made a capital contribution of $779,000 to Alpen Shipmanagement Co. and a capital contribution of $535,000 to Palmira Enterprises, Vista's wholly-owned companies. (Pls.' Joint Ex. 49 at FB000947.)

185.    Thus, despite Viktor Baranskiy's testimony, Hasten received amounts that are not trading brokerage commissions, but rather are payments related to the charter of vessels that Industrial Carriers chartered. Based on the foregoing, Hasten received funds that belonged to Industrial Carriers and those funds were used to capitalize Vista.

**P.    Initial Funds to Start Vista Shipping - Industrial Carriers' Assets Were Used to Capitalize Vista**

186.    Viktor Baranskiy testified during his December 12, 2013 deposition that he capitalized Vista with roughly USD $1 million cash that was given to him by his mother in a suitcase. (Baranskiy Dep. Tr. 103:9-14; 136:17-25; 137:1-10, Dec. 12, 2013.)

187.    Viktor Baranskiy also testified that he obtained some funds from a "bonus" from Industrial Carriers, although he also testified that he never received a bonus larger than $500,000

from Industrial Carriers. (Baransky Dep. Tr. 34:5-8; 97:7-17, Dec. 12, 2013.) Viktor Baranskiy's

testimony is not supported by the evidence in the record.

188.    The first four deposits into Vista's Banque Heritage account are as follows (Pls.'

Joint Ex. 9; Glory Wealth's Ex. 415 at 33):

| DATE | COMPANY | AMOUNT |
|---|---|---|
| 10/16/2008 | Edelweiss Consultants SA | $98,000 |
| 10/24/2008 | Trend Index Limited Level 5 | $843,398.78 |
| 10/24/2008 | Trend Index Limited Level 5 | $730,683.20 |
| 10/27/2008 | Fayette International Holdings Ltd. | $2,766,305.71 |
| | **TOTAL** | **$4,438,387.69** |

189.    Edelweiss, Trend Index, and Fayette are all companies connected to Industrial

Carriers.

190.    Industrial Carriers transferred $1,674,019.44 to Edelweiss between March 3, 2008

and August 25, 2008, while insolvent, and without consideration. (Glory Wealth Ex. 415 at 31;

Pls.' Joint Ex. 228; 245.)

191.    Other funds were paid by third parties for the benefit of Vista, or on Vista's

behalf, in connection with the charter of the M/V HARMONY FALCON (Pls.' Joint Ex. 8;

Glory Wealth's Ex. 415 at 33):

| DATE | COMPANY | AMOUNT |
|---|---|---|
| 10/15/2008 | Paladin Shipping Co Ltd. | $800,021 |
| 10/16/2008 | Trend Index Limited Level 5 | $188,000 |
| 10/21/2008 | Paladin Shipping Co Ltd. | $230,000 |

|  |  |
|---|---|
| **TOTAL** | **$1,218,021** |

192.    Paladin and Trend Index are both "money changing" companies. (Bobrenko Dep. Tr. 209:21-210:2; 299:4-300:7, July 5, 2014; Bobrenko Dep. Tr. 212:19-213:3; 299:11-13, July 5, 2014.)

193.    Further, the Vista Group's financial statements for the period ending December 31, 2009 were audited by PricewaterhouseCoopers. (Pls.' Joint Ex. 49.)

194.    The Vista Audit report shows the changes in equity of the Vista Group from the date Vista was incorporated, June 24, 2008, to the end of the period, December 31, 2009. The beginning equity as of the date of Vista's incorporation is zero ($0). The equity changed due to the "Establishment of companies," which shows a total equity of $7,051,000. This amount reflects the cash and assets contributed to the company by the owners to start the companies. (Pls.' Joint Ex. 49 at FB000938.)

195.    A schedule in the notes of the Vista Group financial statements provides a breakdown of this $7,051,000 by entity (Pls.' Joint Ex. 49 at FB000950):

| Company | Total Share and Paid in Capital |
|---|---|
| Vista Shipping | $5,337,000 |
| Alpen Shipmanagement | $779,000 |
| Palmira Enterprises | $535,000 |
| Black Sea Azov Service | $400,000 |
| Atlanta Trading | $0 |
| Maritime Service | $0 |
| **Total** | **$7,051,000** |

196.     According to the audited financial statements, the capital contributions for Alpen Shipmanagement and Palmira Enterprises came from Hasten Enterprises, an entity that received funds due to Industrial Carriers, and 100% owned by Viktor Baranskiy. (Pls.' Joint Ex. 49 at FB000947; Glory Wealth's Exs. 415, 444.)

197.     Further, Vista Shipping was established with a contribution of $5,337,000 of cash and/or assets to the company, not just $1 million in cash from his mother, plus loans from friends, as Mr. Baranskiy testified. (Pls.' Joint Ex. 49 at FB000950; Baranskiy Dep. Tr. 103:9-14; 136:17-25; 137:1-10, Dec. 12, 2013.)

198.     The $5,337,000 initial capital identified in Vista's audited financial statement can be verified by various ledgers and statements that were produced in this matter. In particular, Viktor Baranskiy's cash ledger contains the following entries (Flame's Ex. 305):

| Date | Subcontract | Comments | Amount |
|---|---|---|---|
| Initial Entry | Fayette International Holdings | Transfer of Debt | (732,996.63) |
| 10/1/2008 | V | Initial Capital / Pmnt hire for Harmony Falcon | 45,200.00 |
| 10/15/2008 | unreal acc USD | Initial Capital | 401,671.00 |
| 10/16/2008 | Vista USD Heritage | Initial Capital / From Edelweiss | 98,000.00 |
| 10/21/2008 | unreal acc USD | Initial Capital | 230,460.00 |
| 10/23/2008 | V | Initial Capital / Pmnt hire for Harmony Falcon | 1,218,000.00 |
| 10/23/2008 | V | Initial Capital / Pmnt bunker for Harmony Falcon | 179,000.00 |
| 10/24/2008 | V | Initial Capital | 843,396.78 |
| 10/24/2008 | V | Initial Capital | 730,683.20 |

| 11/1/2008 | V | Initial Capital | 110,000.00 |
|---|---|---|---|
| 12/9/2008 | unreal cash | Initial Capital | 3,781.25 |
| 1/6/2009 | V | Initial Capital | 35,000.00 |
| 2/1/2009 | V | Initial Capital | 220,000.00 |
| 3/1/2009 | V | Initial Capital | 100,000.00 |
| 4/7/2009 | V | Initial Capital | 25,000.00 |
| 9/8/2009 | Initial Capital | 5.00 | |
| 9/8/2009 | V | Initial Capital | 500,000.00 |
| 9/9/2009 | V | Initial Capital | 380,000.00 |
| 9/9/2009 | V | Initial Capital | 500,000.00 |
| 11/3/2009 | Initial Capital | 5,500.00 | |
| 12/14/2009 | Initial Capital | 6,000.00 | |
| 12/22/2009 | V | Initial Capital | 435,000.00 |
| **Total** | | | **$5,333,700.60**[9] |

199.     According to this cash ledger, a portion of the initial capital to start Vista Shipping came from the chartering of the Harmony Falcon and Edelweiss.

200.     Further, a portion of the funds to capitalize Vista came from Trend Index and Paladin Shipping, which are entities that are utilized by Viktor Baranskiy to convert funds into cash. (Bobrenko Dep. Tr. 209:21-210:2; 299:4-300:7, July 5, 2014; Bobrenko Dep. Tr. 212:19-213:3; 299:11-13, July 5, 2014.)

201.     In sum, the evidence presented at trial establishes that Vista was initially capitalized with approximately $5.3-$5.6 million, based on Vista's own audit report, Viktor Baranskiy's personal cash ledger, and Vista's Banque Heritage account statement. Viktor

---

9 The Audited financial statement of Vista Shipping (Pls.' Joint Ex. 49) shows that the initial capital of Vista Shipping is $5,337,000, as compared to $5,333,700 as shown on the Viktor Baranskiy's cash ledger. (Flame's Ex. 305.) The difference of $3,300 has not been explained.

Baranskiy's December 12, 2013 deposition testimony that he capitalized Vista with approximately $1 million cash in a suitcase given to him by his mother, several small loans, and a bonus from Industrial Carriers that was no greater than $500,000, is inconsistent with the evidence presented at trial.

202.    Trend Index Limited and Paladin Shipping are entities that are utilized by Viktor Baranskiy to convert funds into cash.

**Q.    Viktor Baranskiy Admits He Routinely Hinders, Delays, and Defrauds Creditors**

203.    Viktor Baranskiy routinely transfers money and other assets to avoid Rule B attachment by creditors. (Baranskiy Dep. Tr. 71:17-73:1, December 12, 2013.)

204.    Viktor Baranskiy routinely transfers money and other assets to his mother Liliya Dariy to hinder, delay, or defraud creditors. In particular, Viktor Baranskiy transferred all 500 shares of Hachi Holding Ltd., the ultimate parent company of Freight Bulk, the registered owner of the M/V CAPE VIEWER, to his mother on March 14, 2014.  (Pls.' Joint Ex. 76 at FBP00002; Pls.' Joint Ex. 207; ECF No. 334 at 6-7.)

205.    Vista, and later Freight Bulk, was capitalized with funds and other assets that were fraudulently siphoned out of Industrial Carriers, while Industrial Carriers was insolvent.

206.    Industrial Carriers is the alter ego of Vista and Freight Bulk, and Vista and Freight Bulk are jointly and severally liable for the debts of Industrial Carriers.

**R.    Vista and Freight Bulk**

207.    Vista and Freight Bulk are alter egos, and each is jointly and severally liable for the debts of the other.[10] (ECF No. 377 at 24.)

---

[10] By Court Order, it is established for the purposes of this action that Freight Bulk and Vista are alter egos of each other. (ECF No. 377 at 24).

## PROPOSED CONCLUSIONS OF LAW

### I.   BASIS OF SUBJECT-MATTER JURISDICTION

The Court has subject-matter jurisdiction over Flame's claims in this action under 28 U.S.C. § 1333. *Flame S.A. v. Indus. Carriers, Inc.*, No. 13-0658, 2014 WL 108897 (E.D. Va. Jan. 10, 2014) *aff'd sub nom.*, *Flame S.A. v. Freight Bulk Pte. Ltd.*, No. 14-1189, 2014 WL 3828075 (4th Cir. Aug. 5, 2014).

### II.   APPLICABLE LAW

"It is well established that an admiralty court can review questions of fraud and alter ego." *Ost-W.-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.*, 160 F.3d 170, 174 (4th Cir. 1998) (citing *Swift & Co. Packers v. Compania Colombiana Del Caribe*, 339 U.S. 684, 689 n.4 (1950)). "[I]n an admiralty case, a court applies federal common law and can look to state law in situations where there is no admiralty rule on point." *Id.* (citing *Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir. 1981); *Bell v. Tug Shrike*, 332 F.2d 330, 332-33 (4th Cir. 1964)); *see Sullivan v. Gen. Helicopters, Int'l*, 564 F. Supp. 2d 496, 502 (D. Md. 2008). Because there is no admiralty rule governing a federal court's alter ego analysis, the Court must apply federal common law.

The federal common law alter ego factors in the Fourth Circuit are derived from *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684-87 (4th Cir. 1976) and *Keffer v. H.K. Porter Co.*, 872 F.2d 60, 65 (4th Cir. 1989). An additional factor was later considered in *U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 828-29 (4th Cir. 1992). The factors "include gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 544 (4th Cir. 2013) (quoting *Ost-W.-Handel Bruno Bischoff GmgH*, 160 F.3d at 174). "Other factors properly considered by [a] district court . . . include

- 48 -

intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length." *Id.* (citing *Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd.*, 622 F. Supp. 2d 46, 53 (S.D.N.Y. 2009)).

"In applying these factors a court must focus on 'reality and not form, [on] how the corporation operated and the individual defendant's relationship to that operation.'" *Ost-W.-Handel Bruno Bischoff GmgH*, 160 F.3d at 174 (quoting *DeWitt*, 540 F.2d at 685). "An element of injustice or fundamental unfairness is the most important factor." *Flame S.A. v. Indus. Carriers, Inc.*, No. 13-0658, 2014 WL 2114688, at *10 (E.D. Va. May 20, 2014) (citing *Ost-W.-Handel Bruno Bischoff GmgH*, 160 F.3d at 176).

## III. ANALYSIS

The Court has previously held that Vista and Freight Bulk are alter egos of each other. (ECF No. 377 at 24.) Based on the Findings of Fact, and as discussed below, the Court holds that Industrial Carriers and Vista are also alter egos of each other, and each is liable for the debts of the other.

### A. Freight Bulk and Vista are Alter Egos

On July 16, 2014, Flame filed a Motion for Sanctions and for Partial Reconsideration of the Court's April 30, 2014 Order. (ECF No. 326.) In its Motion and accompanying memorandum of law (ECF No. 327), Flame cited many examples of Freight Bulk's failure to provide discovery to Flame in violation of this Court's April 30, 2014 Order granting Flame's third and fourth motions to compel (ECF Nos. 179, 181). Freight Bulk filed a memorandum of law in opposition to Flame's Motion for Sanctions (ECF No. 334), and Flame filed a reply memorandum of law in further support (ECF No. 342).

After the Motion was fully briefed, on August 8, 2014, the Court issued a Memorandum Opinion granting in part and denying in part Flame's Motion for Sanctions (ECF No. 377). The Court held that Freight Bulk violated the Court's April 30, 2014 Order, and that as a consequence:

> FBP's disobedience has directly impacted Plaintiffs' ability to prove that Viktor Baransky's companies are alter egos for each other, which Plaintiffs must establish to prove their case. The documents that FBP failed to produce, or produced very late, i.e. ICI corporate records, Mr. Baransky's emails and attachments, the loan repayment terms at issue regarding the CAPE VIEWER, and the employee work records, all conceivably would bear on the issue of the extent to which the named Defendants intermingle corporate assets and employees, and are, in fact, alter egos for each other. FBP's violation of the discovery orders has made it that much more difficult for Plaintiffs to prove their alter ego theory, which may very well have been the purpose of FBP's noncompliance.

(ECF No. 377 at 23.) After reaching these conclusions, the Court continued:

> Accordingly, because of FBP's violation of the discovery orders, and because of its history of repeated abuses and non-compliance in this matter, the following sanctions are appropriate. First, pursuant to Federal Rule of Civil Procedure 37(b)(2)(A)(i), the Court FINDS and designates as established for purposes of this action that: 1) Freight Bulk Pte. Ltd and Vista Shipping, Inc. are alter egos of one another; 2) the loan from Sea Traffic Shipping Co. to Freight Bulk Pte. Ltd. for the purchase of the CAPE VIEWER was a sham transaction for the sole purpose of avoiding creditors; and 3) had any Industrial Carriers, Inc. documents been produced by FBP in compliance with the Court's discovery orders, those documents would have been favorable to the Plaintiffs and harmful to the Defendants.

(ECF No. 377 at 23-24.) As a consequence of this Court's Order granting in part Flame's Motion for Sanctions, it is already established for purposes of this action that Freight Bulk and Vista are alter egos of each other.

However, even in the absence of this sanction by the Court, Flame presented evidence at trial that allows the Court to find, as a matter of law, that Freight Bulk and Vista are alter egos.[11] For instance, the "loan" from Vista to Sea Traffic, and then from Sea Traffic to Freight Bulk, was a sham transaction that was not performed with the usual corporate formalities. In effect, the transaction was a siphoning of funds from Vista to Freight Bulk, which was done without consideration. The "loan agreement" had no terms of repayment, and no payments were made on the "loan" until after Flame initiated this lawsuit.

It is not disputed by Freight Bulk that Viktor Baranskiy is the sole, dominant shareholder of all companies in the Palmira Group, including Vista, Freight Bulk, and Sea Traffic. (ECF No. 407 ¶ 9.) Moreover, the testimony of Katerina Bobrenko indicates that, with the exception of Viktor Baranskiy, who fills the role of Chief Executive Officer, each of these companies has non-functioning officers.[12] Although Katerina Bobrenko holds the title of Chief Financial Officer, she is under-qualified to hold this position in a billion-dollar shipping company—in terms of both education and work experience. Her testimony establishes that she exercises almost no leadership over the financial affairs of the Palmira Group companies. Instead, she follows the orders of Viktor Baranskiy, and her daily job duties involve making wire transfers at Viktor Baranskiy's direction, and managing the employees of the accounting department. These job duties are more similar to that of a senior bookkeeper than a CFO. Other than Viktor Baranskiy and Katerina Bobrenko, no other officers of any Palmira Group company have been identified.

---

[11] Freight Bulk admits that it is an alter ego of Vista: "FBP does recognize that its chances to defend FBP and Vista from an ultimate finding of alter ego of each other are not overwhelming." (ECF No. 404 at 9.)

[12] Freight Bulk contests that Viktor Baranskiy is the Chief Executive Officer of the Palmira Group companies. Thus, it is unclear if any person fills the role of officer in these companies.

Bobrenko's unsubstantial position within the Palmira Group is also confirmed by her bonus compensation of $6,000 for the year 2013. (Bobrenko Dep. Tr. 35:17-19, July 4, 2014.) This is a meager sum compared to the $500,000 bonus earned by Michael Ivanov for his duties during the same period (Ivanov Dep. Tr. 197:2-4, July 2, 2014), is absolutely dwarfed by Viktor Baranskiy's dividend payment of $58 million for the year 2012 (Bobrenko Dep. Tr. 280:2-282:11, July 5, 2014), and is even low compared to Sergey Bakalo's bonus of $20,000, given that Bakalo is an inexperienced, low-level employee in the Sale & Purchase department (Bakalo Dep. Tr. 65:3-15, July 3, 2014).

Katerina Bobrenko further testified that the companies within the Palmira Group routinely transfer money to each other, without the usual corporate formalities of written loan agreements or other documentation. Palmira Group funds are also routinely siphoned to "money-changing" companies, which convert funds earned in various currencies to cash, in U.S. dollars. The U.S. dollars are then placed into "cash boxes" at a bank down the street from Vista's offices. In effect, the funds of many different companies within the Palmira Group are routinely converted to cash and commingled within a single cash box. Bobrenko also testified that many Palmira Group companies do not have bank accounts. Moreover, as a general practice, the Palmira Group companies often leave bank accounts undercapitalized until the bank account is needed, and then funds are transferred into the account from a different Palmira Group account.

Finally, the testimony of Viktor Baranskiy, Michael Ivanov, Katerina Bobrenko, Dimitry Zorin, and Sergey Bakalo establishes that the Palmira Group companies do not follow corporate formalities by maintaining distinct employment for each of its employees. All of these witnesses testified that they have "official employers"—that is, employers listed in their Ukrainian Workbooks, as disclosed to the Ukrainian government. These employees earn an "official salary"

that is disclosed to the Ukrainian government. But each of these employees also work for "unofficial employers" and earn "unofficial salaries."

These facts, when considered together, establish the elements of alter ego. Although the Court has already held that Freight Bulk and Vista are alter egos as a sanction for Freight Bulk's abusive discovery practices, the Court would have reached the same conclusion after viewing the evidence presented at trial.

### B.      Industrial Carriers and Vista are Alter Egos

Flame holds a judgment against Industrial Carriers, and to prevail in this action, Flame must also prove that Industrial Carriers and Vista are alter egos. In making the Findings of Fact above and Conclusions of Law below, the Court has drawn adverse inferences against Freight Bulk for its failure to provide any Industrial Carriers documents to Flame in violation of the Court's April 30, 2014 discovery Order. (ECF No. 377 at 24.) Thus, to the extent documents were not provided to Flame, the Court finds that the contents of those documents would have been helpful to Flame and harmful to Defendants.

Based on the Findings of Fact, the Court holds that Flame has met its burden of proving that Industrial Carriers and Vista are alter egos.

### 1.      Industrial Carriers Fraudulently Transferred Funds in Excess of $40 Million While Insolvent, and With the Intent to Defraud Creditors

The Findings of Fact indicate that Industrial Carriers transferred funds in excess of $40 million while it was insolvent. Because no admiralty or federal common law rule applies to govern the analysis of fraudulent transfer, state law applies. *Ost-W.-Handel Bruno Bischoff GmgH*, 160 F.3d at 174. Under Virginia law, these transfers were fraudulent.

Virginia's fraudulent transfer statutes are found at Va. Code §§ 55-80-81. Va. Code § 55-80 is entitled "Void fraudulent acts; bona fide purchasers not affected." It provides:

- 53 -

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Establishing a fraudulent transfer under Va. Code § 55-80 requires proving fraudulent intent. The circumstances surrounding a transfer made with fraudulent intent are commonly referred to as the "badges of fraud." "From the existence of [certain circumstances], fraudulent intent may legitimately be inferred . . . . These [circumstances] are, among others, (1) the close relationship of the parties, (2) the grantor's insolvency, (3) pursuit of the grantor by creditors at the time of the transfer, (4) inadequate consideration, and (5) retention of possession of the property by the grantor." *Armstrong v. United States*, 7 F. Supp. 2d 758, 764 (W.D. Va. 1998) (quoting *In re AMA Corp.*, 175 B.R. 894, 896 (Bankr. W.D. Va. 1995)).

Va. Code § 55-81 is entitled "Voluntary gifts, etc., void as to prior creditors." It provides:

> Every gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, or which is upon consideration of marriage, by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made, but shall not, on that account merely, be void as to creditors whose debts shall have been contracted or as to purchasers who shall have purchased after it was made. Even though it is decreed to be void as to a prior creditor, because voluntary or upon consideration of marriage, it shall not, for that cause, be decreed to be void as to subsequent creditors or purchasers.

In cases where a transfer is alleged to have been made without receipt of consideration by an insolvent debtor, "fraud or other malicious intent is not an element required to prove the voidability of the transfer." *Balzer & Assocs., Inc. v. The Lakes on 360, Inc.*, 463 S.E.2d 453, 455

- 54 -

(Va. 1995) (citing *Consolidated Tramway Co. v. Germania Bank*, 93 S.E. 572, 573 (Va. 1917)). "In other words, a transfer undertaken by an insolvent debtor, or by a debtor who is thereby rendered insolvent, without return to him of valuable consideration is *de jure* fraudulent as against any existing creditor without any need to prove intent to defraud." *Id.* "Once a party has established a *prima facie* case in support of its claim that a transfer is voidable, the burden of producing evidence to rebut the *prima facie* case shifts to the opposing party." *Id.* at 457.

Industrial Carriers was insolvent as of June 30, 2008. Thus, after June 30, 2008, any transfers made by Industrial Carriers to third parties, without consideration, are "*de jure* fraudulent" as against any existing creditor, including Flame. Flame was a creditor of Industrial Carriers as early as March 2008, when the first of the four FFAs were executed. No reasonable explanation has been provided for the transfers of nearly $40 million to accounts at Nordea Bank, with the beneficiary of the transfer concealed, and the only note on the wire transfer stating "IN CVR OF THE DIRECT PAYMENT." No evidence has been provided of any consideration for these transfers, either. These huge transfers of cash were made while Industrial Carriers was under an obligation to fulfill many charter-in agreements—obligations that that greatly outweighed its assets on hand.

Similarly, no reasonable explanation has been given for Industrial Carriers' transfers totaling $1,856,282.08 via Syriana, Phaedra, and Noxana the week before it filed for bankruptcy. These payments were also made either "IN CVR OF THE DIRECT PAYMENT" or transferred to "money-changing" entities "for cars."

Finally, no reasonable explanation has been given for Industrial Carriers' transfers to Edelweiss totaling $1,674,019.44. No evidence has been provided that demonstrates what "consultancy services" Edelweiss provided to Industrial Carriers to earn this large sum of money.

Based on the suspicious nature of these transactions, and no reasonable explanation provided for them by Freight Bulk, the Court finds that the transfers were made in violation of Va. Code § 55-81. Moreover, the Court also finds that these transfers were made with intent to delay, hinder or defraud creditors because the "badges of fraud" are present. First, Viktor Baranskiy was an 18% shareholder of Industrial Carriers. He is also the son of Sergei Baranskiy, the Chairman of the Board of Directors of Industrial Carriers. Thus, Industrial Carriers and Vista share a close relationship. Second, Industrial Carriers' insolvency is apparent as of June 30, 2008, as was the pursuit of creditors for repayment of Industrial Carriers' debts. Third, there is no evidence of any consideration for transfers. Fourth, because Viktor Baranskiy is a shareholder of Industrial Carriers, in effect, he retains possession of Industrial Carriers' assets under the name of Vista, without the burdens of Industrial Carriers' debts. Because the transfers were made with intent to delay, hinder or defraud creditors, the Court finds that the transfers were also made in violation of Va. Code § 55-80.

These fraudulent transfers also support a finding of alter ego. Industrial Carriers' insolvency is apparent as of June 30, 2008, because Industrial Carriers' June 30, 2008 balance sheet showed liabilities greatly exceeding assets. The fraudulent transfers are also clear evidence of injustice or fundamental unfairness perpetrated on Flame. The transfers without consideration also show that Industrial Carriers siphoned funds. Freight Bulk has provided no evidence establishing to whom these siphoned funds were transferred. Consequently, the Court draws an adverse inference that the funds were transferred, at least in part, to Vista, and were used by Vista as initial capitalization. The failure to provide documentation regarding these transfers also establishes that Industrial Carriers failed to follow corporate formalities and maintain proper corporate records.

The finding that Industrial Carriers siphoned funds to Vista is further established by Viktor Baranskiy's inconsistent statements regarding his source of initial capitalization for Vista. Viktor Baranskiy testified during his December 12, 2013 deposition that the funds he used to capitalize Vista were roughly $1 million in cash he received from his mother in a suitcase, several small loans, and a bonus he received from Industrial Carriers. Baranskiy Dep. Tr. 137:2-138:5, Dec. 12, 2013.) He also testified that his bonus from Industrial Carriers was no greater than $500,000. Baranskiy Dep. Tr. 34:5-8, Dec. 12, 2013.) Viktor Baranskiy's statement regarding $1 million in cash in a suitcase is dubious, at best. Freight Bulk also later stated that Viktor Baranskiy received "commissions" from Industrial Carriers, while Industrial Carriers was insolvent, totaling $1,588,109, over three times as much as Viktor Baranskiy testified during his December 12, 2013 deposition.

The evidence does not support Viktor Baranskiy's version of events. Vista was capitalized with approximately $5.3-$5.6 million, according to Vista's own audit report and an analysis of Viktor Baranskiy's personal cash ledger and Vista's Banque Heritage account statements. This is three to four times as much money as Viktor Baranskiy testified about during his December deposition.

The Court finds that, given the suspicious nature of the transfers out of Industrial Carriers, Viktor Baranskiy's position at Industrial Carriers, and Viktor Baranskiy's inconsistent testimony, Industrial Carriers siphoned funds to Vista. The Court makes this finding, in part, by drawing adverse inferences against Freight Bulk for its failure to provide Industrial Carriers documents. However, even without taking the adverse inferences, the Court's finding that Industrial Carriers siphoned funds to Vista would be the same.

      2.      **Industrial Carriers Fraudulently Transferred $1.5 Million Directly to Viktor Baranskiy While Insolvent**

Freight Bulk admits that Viktor Baranskiy accepted $1,588,109 from Industrial Carriers to satisfy "commissions" owed to him in October 2008, while the company was insolvent and within weeks of its bankruptcy filing. This payment of $1,588,109 was also a fraudulent transfer, which was made while Viktor Baranskiy's father, Sergei Baranskiy, was chairman of Industrial Carriers' board of directors. Thus, the payment was also a preferential payment to an insider. *See, e.g.*, 11 U.S.C. § 547(b).

Freight Bulk argues that the payment was made to Viktor Baranskiy "in accordance with the laws of Ukraine per priority payment of employees' earned remuneration in time of corporate distress," but this argument is unpersuasive. First, Freight Bulk cites no provision of Ukrainian law to support its assertion, nor does it cite any provision of law to support the notion that the Court should even apply Ukrainian law to perform this analysis. Second, Industrial Carriers is not a Ukrainian company, it is a Marshall Islands company. Thus, Ukrainian law is irrelevant.

Industrial Carriers' fraudulent transfer of $1,588,109, which was also a preferential payment to an insider, also indicates that Industrial Carriers is an alter ego of Vista and Viktor Baranskiy. First, when the payment was made, Industrial Carriers was insolvent, and only weeks away from its bankruptcy filing. Second, the fraudulent transfers are evidence of injustice or fundamental unfairness perpetrated on Flame. Third, the transfers without consideration show that Industrial Carriers siphoned funds to Viktor Baranskiy, which he then used to fund Vista's business activities. This finding is further supported by Viktor Baranskiy's prior inconsistent statement that his bonuses received at Industrial Carriers were no greater than $500,000, as discussed above. Fourth, because Freight Bulk has not provided any documentation for these transfers, other than a spreadsheet purportedly created by Viktor Baranskiy himself, Flame has

established that Industrial Carriers failed to follow corporate formalities and maintain proper corporate records.

### 3. Industrial Carriers Fraudulently Transferred its Right to Charter the M/V HARMONY FALCON to Vista While Insolvent

The Findings of Fact indicate that Industrial Carriers fraudulently transferred its right to charter the M/V HARMONY FALCON to Vista. The circumstantial evidence to support this notion is strong. For instance, although Vista chartered other vessels in 2008—the M/V GLOBAL CHALLENGER, M/V MAGPIE, M/V TRANS OCEAN, M/V GRAND PANAGIOTIS, and the M/V BASIL—the charter party and fixture recap for the M/V HARMONY FALCON are conspicuously and suspiciously missing. (Ivanov Dep. Tr. 91:12-19, July 1, 2014.) Furthermore, although virtually all charter parties are negotiated by email, Freight Bulk contends that even the emails evidencing the M/V HARMONY FALCON charter party are lost, because the email account containing the emails was neglected, and eventually the emails were destroyed. (ECF No. 319 at 2-3.) The Court is not persuaded by these contentions, in part because of the lack of credibility of the statements.

Other circumstantial evidence also supports Flame's allegations. For instance, although Sergey Bakalo testified that he sent a marketing email of sorts, boasting about the multitude of ships that Vista had chartered since its inception, conspicuously missing from Bakalo's list is Vista's first vessel it ever chartered—the M/V HARMONY FALCON. (Pls.' Joint Ex. 44.)

There is also direct evidence that Industrial Carriers fraudulently transferred the right to charter the M/V HARMONY FALCON to Vista. Although Vista claims that it conducted its own charter of the M/V HARMONY FALCON, in a transaction that was separate and distinct from the Industrial Carriers charter party, this claim is not credible in light of the post-fixture documents presented at trial. For instance, the M/V HARMONY FALCON is on the list of

vessels presented by Industrial Carriers to the Greek bankruptcy court as vessels that Industrial Carriers could no longer afford to maintain on charter. The "delivery date" for the M/V HARMONY FALCON is listed as September 28, 2008, while the "daily hire" rate is listed as $18,000 per day. (ECF 319-2 at 2.)

On December 24, 2008, Vista sent to Falcon Shipping a debit note showing the delivery date on Vista's charter of the M/V HARMONY FALCON as September 28, 2008. This date matches the date of Industrial Carriers' charter, and flatly contradicts Vista's claim that it entered into a separate charter party for the M/V HARMONY FALCON in October 2008. Moreover, Vista's Statement of Account sent to Falcon Shipping also shows a daily hire rate of $18,000. An identical daily hire rate is suspect in itself, but it is even more incredible given that between September 2008 and October 2008, shipping rates did not just decline, they crashed. There is no reasonable business explanation for why Vista and Falcon Shipping would choose to enter into a separate charter party at rates above the market rate.

On October 1, 2008, Vista made its first payment related to the charter of the M/V HARMONY FALCON, as noted by Vista's bank records. On October 2, 2008, the following day, Auster Marine Co., a company controlled by Industrial Carriers, purchased bunkers for the M/V HARMONY FALCON. Vista does not dispute that Auster Marine Co. purchased $199,326 worth of bunkers on October 2, 2008 at Jeddah, Saudi Arabia. Vista was the beneficiary of Auster Marine Co.'s purchase of bunkers, and no evidence has been provided that Vista paid consideration to Auster Marine Co. or to Industrial Carrier's bankruptcy estate for the bunkers.

The fraudulent transfer of the right to charter the M/V HARMONY FALCON supports a finding of alter ego. First, Industrial Carriers transferred its rights to Vista while it was insolvent. Vista earned profits of approximately $1.7 million because of the fraudulent transfer, and none of

the proceeds were paid to Industrial Carriers. Second, the fraudulent transfers are evidence of injustice or fundamental unfairness perpetrated on Flame. Third, the transfers without consideration show that Industrial Carriers siphoned funds and/or assets to Vista. Fourth, because Freight Bulk has not provided any documentation for Vista's alleged charter of the M/V HARMONY FALCON, Flame has established that Vista failed to follow corporate formalities and maintain proper corporate records with regard to this transaction.

### 4.    Industrial Carriers' Directors Breached a Fiduciary Duty to Flame

"[C]orporate directors have a fiduciary duty to the corporation and to its shareholders, and they must govern themselves accordingly." *In re James River Coal Co.*, 360 B.R. 139, 170 (Bankr. E.D. Va. 2007) (citing Va. Code § 13.1-690).

> Once a corporation enters the zone of insolvency, the fiduciary duties owed by the Directors extend also to the corporation's creditors. "[W]hen a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors, and that they cannot by transfer of its property or payment of cash, prefer themselves or other creditors."

*Id.* (quoting *Poth v. Russey*, 281 F. Supp. 2d 814, 826 (E.D. Va. 2003)). By allowing Industrial Carriers to siphon funds while insolvent and make preferential payments to Viktor Baranskiy, Industrial Carriers' Directors, including Sergei Baranskiy, Chairman of the board of directors (and Viktor Baranskiy's father) breached a fiduciary duty to Flame.

## IV.    CONCLUSION

Based on the findings of fact and conclusions of law, the Court finds:

- While insolvent, Industrial Carriers siphoned approximately $40 million to unknown entities using a method of payment designed to conceal the beneficiaries, and at least $5.3-$5.6 million eventually was transferred to Vista for use as initial capital.

- While insolvent, Industrial Carriers fraudulently transferred the right to charter the M/V HARMONY FALCON to Vista for Vista's first vessel charter, which allowed Vista, a startup company, to earn $1.7 million in profit on one voyage, during the worst economic downturn in decades.

- While insolvent, Industrial Carriers made a direct fraudulent transfer of approximately $1.5 million to Viktor Baranskiy.

- Vista operates on the same trade routes as Industrial Carriers.

- Vista has the same customers and conducts the same business as Industrial Carriers.

- Vista and Industrial Carriers share the same key employees.

- Vista, and later Freight Bulk, was capitalized with funds and other assets that were fraudulently siphoned out of Industrial Carriers, while Industrial Carriers was insolvent.

- Industrial Carriers is the alter ego of Vista and Freight Bulk, and Vista and Freight Bulk are jointly and severally liable for the debts of Industrial Carriers.

- Vista and Freight Bulk are alter egos, and each is jointly and severally liable for the debts of the other.[13] (ECF No. 377 at 24.)

---

[13] By Court Order, it is established for the purposes of this action that Freight Bulk and Vista are alter egos of each other. (ECF No. 377 at 24).

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| FLAME S.A., | |
| Plaintiff, | |
| GLORY WEALTH SHIPPING PTE LTD., | |
| Consolidated Plaintiff, | |
| NOBLE CHARTERING INC., | Civil Action Nos. |
| Intervenor Plaintiff, | 2:13-cv-00658-RGD-LRL |
| | 2:13-cv-00704-RGD-LRL |
| v. | |
| INDUSTRIAL CARRIERS, INC., | |
| VISTA SHIPPING, INC., | |
| FREIGHT BULK PTE. LTD., | |
| VIKTOR BARANSKIY, and | |
| SERGEI BARANSKIY, | |
| Defendants. | |

**PROPOSED ORDER AND JUDGMENT**

WHEREFORE, upon consideration of the evidence presented to the Court at the trial of this action, and for the reasons stated in the accompanying Findings of Fact and Conclusions of Law, it is ORDERED as follows:

1.     Judgment is entered in favor of Plaintiff Flame S.A. and against Defendant Freight Bulk Pte. Ltd. in the amount of $21,000,000, plus interest and costs.

2.     Defendants Vista Shipping, Inc., Industrial Carriers, Inc., and Viktor Baranskiy are jointly and severally liable for the Judgment entered against Freight Bulk Pte. Ltd.

3.    The Clerk of Court shall arrange for the immediate sale of the M/V CAPE VIEWER.

Entered: _____

_____
United States District Judge

_/s/ Steven M. Stancliff_
Steven M. Stancliff, VSB No. 73853
David C. Hartnett, VSB No. 80452
*Attorneys for Plaintiff Flame S.A.*
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, VA 23510
Tel:  (757) 623-3000
Fax: (757) 623-5735
sstancliff@cwm-law.com
dhartnett@cwm-law.com

- and -

William R. Bennett, III, Esquire
Lauren B. Wilgus, Esquire
Nicholas R. Tambone, Esquire
*Attorneys for Plaintiff Flame S.A.*
*Admitted Pro Hac Vice*
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY  10174
Tel:  (212) 885-5000
Fax: (212) 885-5001
WBennett@BlankRome.com
LWilgus@BlankRome.com
NTambone@BlankRome.com

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on this 19th day of August, 2014, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such electronic filing to the following counsel of record:

Patrick M. Brogan
Bryan K. Meals
DAVEY & BROGAN, P.C.
101 Granby Street, Suite 300
Norfolk, Virginia 23510
Tel: (757) 622-0100
Fax: (757) 622-4924
Email: pbrogan@daveybroganpc.com
       bmeals@daveybroganpc.com
*Attorneys for Defendant Freight Bulk PTE, LTD.*

Sergei Kachura (pro hac vice)
LAW OFFICE OF SERGEI KACHURA
311 N. Center Ave.
Brownwood, TX 76801
Tel:  (301) 358-5196
Fax: (325) 646-3628
Email: svkachura@yahoo.com
*Attorney for Defendant Freight Bulk PTE, LTD.*

Leonard Fleisig
David H. Sump
WILCOX SAVAGE, P.C.
440 Monticello Ave; Suite 2200
Norfolk, VA 23510
Email: dsump@wilsav.com
      lfleisig@wilsav.com
*Attorneys for Noble Chartering, Inc.*

Paul Myung Han Kim
John Joseph Reilly
SQUIRES SANDERS (US), LLP
30 Rockefeller Plaza; 23rd Floor
New York, NY 10112
Tel: (212) 872-9841
Fax: (212) 872-9815
Email: paul.kim@squiresanders.com
      John.reilly@squiresanders.com
*Attorneys for Noble Chartering, Inc.*

Mark T. Coberly
Dustin M. Paul
VANDEVENTER BLACK LLP
101 W. Main Street
500 World Trade Center
Norfolk, VA 23510
Tel: (757) 446-8600
Fax: (757) 446-8670
Email: mcoberly@vanblk.com
      dpaul@vanblk.com
*Attorneys for Vitol, S.A.*

James H. Power (pro hac vice)
Robert T. Hicks
HOLLAND & KNIGHT, LLP
31 West 52nd Street,
New York, NY 10019
Tel: (212)513-3200
Fax: (212)385-9010
Email: James.power@hklaw.com
      Robert.Hicks@hklaw.com
*Attorneys for Consolidated Plaintiff*
*Glory Wealth Shipping Pte Ltd.*

Michael E. Unger (pro hac vice)
FREEHILL, HOGAN & MAHAR LLP
80 Pine Street, New York, NY 10005
Tel: (212) 425-1900
Fax: (212) 425-1900
Email: unger@freehill.com
*Attorney for Vitol, S.A.*

                    */s/ Steven M. Stancliff*
                    Steven M. Stancliff, VSB No. 73853
                    David C. Hartnett, VSB No. 80452
                    *Attorneys for Plaintiff Flame S.A.*
                    CRENSHAW, WARE & MARTIN, P.L.C.
                    150 W. Main Street, Suite 1500
                    Norfolk, VA 23510
                    Tel:  (757) 623-3000
                    Fax: (757) 623-5735
                    sstancliff@cwm-law.com
                    dhartnett@cwm-law.com