IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION


FLAME S.A.,

     Plaintiff,

GLORY WEALTH SHIPPING PTE LTD.,

     Consolidated Plaintiff,

                                    CIVIL NO. 2:13-cv-658

NOBLE CHARTERING, INC.,

     Intervening Plaintiff

     v.

INDUSTRIAL CARRIERS, INC., VISTA
SHIPPING, LTD., and FREIGHT BULK
PTE. LTD., et al,

     Defendants.


## MEMORANDUM OPINION

The Court issues this Memorandum Opinion as a result of a bench trial in this matter to resolve Plaintiffs' claims of alter ego and fraudulent transfer against Defendant, Freight Bulk Pte, Ltd ("FBP"), and its related entities, through a maritime attachment.

On November 22, 2013, Plaintiff, Flame S.A. ("Flame") moved the Court to grant a writ of judicial attachment for the M/V CAPE VIEWER ("CAPE VIEWER" or "Vessel") under Supplemental Admiralty Rule B, which ship ostensibly titled in the name of FBP. The Vessel was attached November 29, 2013. After many, many motions, a bench trial was held to determine: (1) whether FBP, Vista Shipping Ltd. ("Vista"), Industrial Carriers, Inc. ("ICI"), and Viktor Baranskiy are alter egos of one another, and (2) whether ICI fraudulently transferred

1

funds and contracts to Viktor Baranskiy, Vista, and FBP in order to avoid its creditors.

The bench trial began August 26, 2014 and ended abruptly on September 4, 2014 when Viktor Baranskiy, a named Defendant, and his *pro hac vice* attorney, Sergei Kachura, fled the area in the middle of Baranskiy's cross examination while testifying. Plaintiffs have filed post-trial briefs under the Court's direction. The Court now issues the following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

This was a simple case that became complex. The case involves a company and a man. The company, ICI, was in dire straits and defaulted on its obligations to Flame and Glory Wealth Pte Ltd. ("Glory Wealth"), among others; that man, Viktor Baranskiy, went on to amass multi-millions in assets in an organization comprised of numerous entities. Viktor Baranskiy did so by succeeding to and with the assets of ICI in forming and maintaining numerous companies, including Vista. Vista was brought about by ICI's actions in 2008 and thereafter. None of Viktor Baranskiy's many organizations or assets, except the CAPE VIEWER, is located in Virginia. None of the entities involved in this litigation does business in Virginia or is present in Virginia for purposes of process. The only link between these companies and the Commonwealth of Virginia is the CAPE VIEWER, which is owned by FBP, which in turn is owned by Freight Bulk Ltd, which in turn is owned by Hachi Holding, all of which are controlled by Viktor Baranskiy and ultimately from and because of ICI. The CAPE VIEWER, with title in FBP, was chartered by Noble to carry coal owned by Vitol S.A. ("Vitol"). Neither Noble nor Vitol has any relationship other than utilizing the CAPE VIEWER, with FBP and its affiliated companies. It is this chain of debt, ownership, and events that the Court considers.

For the reasons set forth herein, the Court **FINDS** that FBP, Vista, Viktor Baranskiy, and ICI are alter egos of one another and that ICI fraudulently transferred assets to Vista and Viktor

Baranskiy, in order to hinder, delay, and defraud its creditors. Judgment for the Plaintiffs will be entered in a separate Order.

## I.   FACTUAL FINDINGS

### A. PROCEDURAL HISTORY

On November 22, 2013, Flame brought the instant suit against ICI and co-Defendants Vista and FBP. ECF No. 1. Flame moved this Court to issue an order for the attachment of the CAPE VIEWER pursuant to its verified complaint. ECF No. 3. The Court granted the attachment in its November 22, 2013 Order, ECF No. 7, and the Vessel was attached on November 29, 2013. On December 2, 2013, FBP moved to vacate the attachment. ECF No. 11.

Glory Wealth attempted to intervene on December 17, 2013. ECF No. 31. After initially denying Glory Wealth's motion to intervene, the Court entered an order of attachment on behalf of Glory Wealth on December 19, and consolidated Glory Wealth's claim with Flame's on December 20, 2013. ECF No. 39. On December 27, 2013, FBP filed a motion to vacate Glory Wealth's attachment. ECF No. 40.

After hearing argument on FBP's motions to vacate on January 7, 2014, the Court directed Glory Wealth and Flame to file Amended Complaints by January 9, which they did. ECF Nos. 50, 55. The Court entered an Opinion and Order on January 10, 2014, determining that admiralty jurisdiction existed over Flame's claims, certifying that question for expedited appeal to the Fourth Circuit, and reserving judgment on the alter ego question until the appeals process completed. Flame S.A. v. Indus. Carriers, Inc., 2014 WL 108897 (E.D. Va. Jan. 10, 2014), ECF 57. The Fourth Circuit accelerated its briefing schedule, heard oral argument on May 14, 2014, and affirmed this Court on August 5, 2014. Flame S.A. v. Freight Bulk Pte. Ltd., 2014 WL 3828075, ____ F.3d ____ (4th Cir. Aug. 5, 2014).

FBP filed Motions to Vacate both Flame's Amended Complaint and Glory Wealth's

Amended Complaint in mid-March, ECF Nos. 103, 105, which this Court denied on May 20, 2014. Flame S.A. v. Indus. Carriers, Inc., 2014 WL 2114688, ___ F.Supp.2d ___ (E.D. Va. May 20, 2014), ECF No. 249.

On April 11, 2014, Noble and Vitol filed motions to intervene in the instant case as Intervening Plaintiffs. ECF Nos. 158, 161. Both parties requested to intervene for the purpose of preserving the right to assert *in rem* claims against the CAPE VIEWER. Id. Vitol voluntarily dismissed itself from the case on May 21, 2014. ECF No. 251.

On March 27, 2014, FBP filed counterclaims against Flame. ECF No. 121. The Court struck these counterclaims, on Flame's motion, on May 12, 2014. ECF No. 229. That same day Plaintiffs Flame and Glory Wealth adopted each other's allegations against the Defendants and the Court did so recognize and combine them.

On April 1, 2014, FBP substituted counsel from Mayer Brown LLP for its previous attorneys, Chalos & Co., P.C. On June 3, 2014, Mayer Brown LLP withdrew from its representation, and FBP continued with *pro hac vice* admitted attorney, Sergei Kachura, and with its local counsel, Patrick Brogan. That same day, FBP moved to dismiss Glory Wealth's Amended Complaint. ECF No. 266. The Court denied this motion on July 17, 2014. Flame S.A. v. Indus. Carriers, Inc., 2014 WL 3544847, ____ F.Supp.2d ____ (E.D. Va. July 17, 2014), ECF No. 330.

On June 12, 2014, the Court continued the trial date in light of the numerous discovery issues in the case. ECF No. 281. Twelve days later, the Court granted in part and denied in part Flame's Motion to Strike FBP's affirmative defenses. Flame S.A. v. Indus. Carriers, Inc., 2014 WL 2871432 (E.D. Va. June 24, 2014).

On July 25, 2014, Noble filed a Motion to Bifurcate its claims for trial, ECF No. 335. On July 30, 2014, Flame filed a motion for leave to file a Second Amended Complaint and join additional parties. ECF No. 349. At a pretrial conference on August 18, 2014, this Court granted Noble's motion for a separate trial and denied Flame's motion. ECF Nos. 406, 420; see Flame S.A. v. Indus. Carriers, Inc., 2014 WL 4202470 (E.D. Va. Aug. 22, 2014).

On April 23, 2014, the Court overruled FBP's objections to Magistrate Judge Leonard's discovery order. Flame S.A. v. Indus. Carriers, Inc., 2014 WL 1681426 (E.D. Va. Apr. 23, 2014), ECF No. 192. On April 30, 2014, Magistrate Judge Leonard sanctioned FBP for violating the Court's discovery order, ordering FBP to pay Flame reasonable fees and expenses. ECF No. 210. On August 8, 2014, Judge Leonard ordered the following sanctions against FBP for again violating the Court's ordered discovery:

1. FBP and Vista were deemed alter egos of one another;

2. The loan from Sea Traffic Shipping Co. ("Sea Traffic") to FBP for the purchase of the CAPE VIEWER was deemed a sham transaction for the sole purpose of avoiding creditors;

3. Had any ICI documents been produced by FBP in compliance with the Court's discovery orders, those documents would have been favorable to the Plaintiffs and harmful to the Defendants;

4. FBP was prohibited at trial from: offering any evidence with respect to repayments made under the loan agreement between Sea Traffic and FBP for the purchase of the CAPE VIEWER; and

5. Reasonable attorneys' fees and expenses were ordered paid jointly by FBP and its counsel.

5

*Flame S.A. v. Indus. Carriers, Inc.*, 2014 WL 3895933, at *13 (E.D. Va. Aug. 8, 2014) objections overruled, 2014 WL 4214837 (E.D. Va. Aug. 26, 2014). On August 18, 2014, FBP filed a motion objecting to the sanctions ordered by Judge Leonard. ECF No. 404. After performing both *de novo* and clearly erroneous or contrary to law review, this Court overruled FBP's objections and determined that Judge Leonard's findings and sanctions were correct. *Flame S.A. v. Indus. Carriers, Inc.*, 2014 WL 4214837, _____ F.Supp.2d _____ (E.D. Va. Aug. 26, 2014), ECF No. 430. Judge Leonard also permitted Flame and Glory Wealth to disclose their expert rebuttal reports on the eve of trial as a sanction for FBP's untimely disclosure of its own expert reports. Order, ECF No. 400.

On August 21, 2014, the Court denied FBP's motion to permit Viktor Baranskiy to testify from Odessa, Ukraine, which was in the midst of conflict. *Flame S.A. v. Indus. Carriers, Inc.*, 2014 WL 4181958 (E.D. Va. Aug. 21, 2014), ECF Nos. 406, 415. A bench trial commenced August 26, 2014.

Viktor Baranskiy appeared with his counsel and testified on direct examination.

On September 4, 2014 Viktor Baranskiy, then in the midst of cross-examination by Flame, deserted the case with his lead trial counsel, Sergei Kachura. Flame's cross examination therefore was abridged, and Glory Wealth never had any opportunity to cross Viktor Baranskiy. FBP's local counsel (This Court requires local counsel once they enter a case to remain throughout the case.) then rested its case, and the Court heard argument. The matter is ripe for decision.

### B. RELEVANT STIPULATED FACTS

The parties stipulated to the following relevant facts, and these do not include the facts found by the Court which have not been stipulated.

## 1. THE PARTIES

Plaintiff Flame is a corporation or other business entity duly organized and existing under and by virtue of the laws of Switzerland, with an office and principal place of business in Switzerland. Consolidated Plaintiff Glory Wealth is a corporation or other business entity duly organized and existing under and by virtue of the law of Singapore, with an office and principal place of business in Singapore. Intervenor Plaintiff Noble is a British Virgin Islands corporation with its principal place of business in the British Virgin Islands. Defendant ICI is a corporation or other business entity duly organized and existing under and by virtue of the laws of the Marshall Islands. Defendant Vista is a corporation or other business entity duly organized and existing under and by virtue of the laws of the British Virgin Islands. Defendant FBP is a corporation or other business entity duly organized and existing under and by virtue of the laws of Singapore. Defendant Viktor Baranskiy is a foreign citizen and resident of the Ukraine and the sole, ultimate beneficial owner of all companies in a group of companies known as the "Palmira Group," including Vista and FBP. Defendant Sergei Baranskiy is a foreign citizen and resident of a foreign country and Viktor's father. Sergei Baranskiy was Chairman of the board of directors of ICI from June through October 2008.

The Court's additional findings of fact will follow in the various analyses below. See *infra* I.C.

## 1. THE DISPUTE

### a. FLAME'S CLAIMS

Flame and ICI entered into four (4) Forward Freight (Swap) Agreements ("FFAs") dated March 12, May 19, August 14, and August 29 of 2008. Under the terms and conditions of the FFAs, ICI defaulted and breached the FFAs when ICI applied to the Piraeus Multimember Court

of First Instance, in Greece, for the granting of a petition for bankruptcy. ICI's bankruptcy application was rejected on the basis that the Center of Main Interest was not in Greece. Flame then commenced an action in London, England against ICI to recover the amounts due and owing under the FFAs. The High Court of Justice, Queen's Bench Division, Commercial Court Registry entered a judgment for Flame against ICI and ordered ICI to pay Flame a total of $19,907,118.36.

Flame commenced an action against ICI on December 22, 2010 in the United States District Court for the Southern District of New York, seeking recognition of the foreign judgment and invoking the Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. That court recognized Flame's judgment against ICI on September 14, 2011, and Flame's judgment was entered on October 4, 2011.

Flame registered its judgment in the Eastern District of Virginia on October 11, 2013. On November 22, 2013, Flame filed a Verified Complaint against ICI, Vista, and FBP and asked the Court to enter an Order of Attachment under Supplemental Admiralty Rule B, which the Court granted the same day. On December 2, 2013, FBP filed a Motion to Vacate the attachment, which the Court denied on January 10, 2014. On January 9, 2014, Flame filed an Amended Complaint.

### b. GLORY WEALTH'S CLAIMS

On or about June 5, 2008, ICI time chartered from Glory Wealth the vessel M/V MINERAL CAPEASIA for a period of twelve to thirteen (12-13) months via fixture recap pursuant to the New York Produce Exchange Form with Rider Clauses (the "Glory Wealth Charter"). Under this Charter, the daily charter hire rate required to be paid by ICI to Glory Wealth was $183,000.00 per day payable fifteen (15) days in advance. ICI failed to pay the

8

fourth installment of hire, which became due on September 17, 2008, or any further payments due under the Glory Wealth Charter.

Glory Wealth commenced arbitration against ICI in London pursuant to clause forty-five (45) of the Glory Wealth Charter. The London Arbitration Panel issued the Award, dated October 29, 2009. The United States District Court for the Southern District of New York issued a default judgment against ICI in the amount of $46,382,772.91 on May 12, 2014. On December 18, 2013, Glory Wealth filed a Verified Complaint against ICI, Vista, and FBP seeking an Order of Attachment of the CAPE VIEWER under Supplemental Admiralty Rule B. The Court issued an order of attachment the next day and consolidated Flame and Glory Wealth's attachment actions on December 20, 2013.

### c. NOBLE'S CLAIMS

On December 21, 2012, Noble entered into a contract of affreightment with Vitol to carry one cargo of coal per quarter in 2013 from Norfolk, Virginia to various potential discharge portions including Le Havre, France. On October 17, 2013, Noble entered into a trip time charter agreement to deliver cargo being loaded at Norfolk, Virginia to various discharge ports, including Le Havre, France. On November 8 and 29, 2013, Noble supplied 320.935 metric tons of LSFO, 60.058 metric tons of LSMGO, and 800.85 metric tons of HSFO bunkers to the Vessel in the total amount of $736,541.75 in connection with its trip time charter. On November 14 and 29, 2013, Noble paid hire to Vista in the total amount of $911,214.65 in connection with the trip time charter. On November 28, 2013, the CAPE VIEWER presented at the DTA terminal in Norfolk, Virginia to receive a load of coal pursuant to the trip time charter and voyage time charter. The CAPE VIEWER was loaded with 104,606.893 metric tons of coal before it was

taken off berth and moved to anchor.[1]

### C. ADDITIONAL FACTUAL FINDINGS

The Court makes these additional factual findings based on the evidence and testimony at trial.

#### a. VIKTOR BARANSKIY'S TESTIMONY WAS AT TIMES NOT CREDIBLE AND AT OTHER TIMES DEBILITATING TO HIS POSITIONS

Perhaps most important in this case is the desertion of Viktor Baranskiy in the middle of his testimony. Prior to his departure, Viktor Baranskiy's testimony had been inconsistent and poor. After the beginning of cross-examination, his story and his sworn statements began to unravel. Viktor Baranskiy's trial testimony differed substantially from his December 5, 2013 Declaration and December 12, 2013 deposition testimony, which were made under the penalty of perjury. Consequently, the Court **FINDS** that Viktor Baranskiy's testimony was at times false, inaccurate, contradictory, and untruthful.  Trial Tr. 151:22-159:6, Sept. 3, 2014, ECF No. 456; Trial Tr. 5:20-6:13, Sept. 4, 2014, ECF No. 454.

Viktor Baranskiy then abandoned the case on the second morning of his testimony by not appearing in Court. He took his in-house, and lead trial attorney, Sergei Kachura, with him. It is the first case in which the undersigned participated where a critical defense witness and representative of the main defendant abandoned his case in the middle of his cross examination at trial, leaving only local counsel to complete the trial and post-trial proceedings. Then again this case has been a first for this Court on many levels.

For these reasons, the Court **FINDS** that Viktor Baranskiy's abrupt departure prejudiced Flame and Glory Wealth. The Court also **FINDS** that, had Viktor Baranskiy stayed for the remainder of his cross-examination, his testimony would have been substantially against his own

---

[1] The CAPE VIEWER presented at the DTA terminal at 01:15 on November 29, 2013 and commenced loading coal at 02:30. The Vessel was attached later that morning and never filled to its contracted capacity.

interests in relation to Vista, Palmira, and ICI.   Trial Tr. 5:14-19, Sep. 4, 2014, ECF No. 454.

### b. THE BARANSKIYS CONTROLLED ICI

At the time of ICI filed for its rejected bankruptcy, its shareholders consisted of close family and friends of the Baranskiys. Sergei Baranskiy, Viktor's father, was President//Chairman/Director of the Board and owned thirty-three percent (33%) of ICI. Pls.'Joint Exs. 251 at 1, 252 at 2; (Test. of Jeffrey Katz); Pl. GW Ex. 414 at 4.  Viktor Baranskiy owned eighteen percent (18%) of ICI.   Pl. GW Ex. 414 at 4; Pls.' Joint Ex. 155 at 2; Trial Tr. 153:7-154:19, Sept. 3, 2014, ECF No. 456; Pl. GW Ex. 426 at 24:17-25:11.  Viktor and his father therefore controlled a majority of ICI, and Viktor completed important work ("making money") on behalf of ICI from its chartering department.   Trial Tr. 34:13-35:6, Sept. 3, 2014, ECF No. 456.   The remaining shareholders had close ties to the Baranskiys. Consequently, the Court **FINDS** that Sergei and Viktor Baranskiy controlled ICI.

### c. ICI'S INSOLVENCY

A balance book analysis performed by Jeffrey Katz shows that ICI was insolvent as early as June 30, 2008.   Pl. GW Ex. 415 at 43; (Test. of Jeffrey Katz).   A cash flow analysis was unable to be completed because ICI's documents were not produced.[2]  Pl. GW's Ex. 413 at 11; (Test. of Jeffrey Katz).  Glory Wealth's expert concluded that ICI became insolvent no later than mid-September.   Trial Tr. 54:17-18, Aug. 28-29, 2014, ECF No. 449.   Based on the evidence presented, the expert testimony, and the fact that ICI's documents were not produced, the Court **FINDS** that ICI's insolvency began in July 2008 and continued through October 2008 and thereafter.

---

[2] See *infra* II.B.1.

### d. ICI CREATED CORPORATIONS TO AVOID RULE B ATTACHMENTS AND CREDITORS

The Court **FINDS** that ICI established corporations in order to avoid creditors. In his deposition, Viktor Baranskiy admitted that companies like Weaver and others "were set up to avoid Ruby [sic Rule B] attachment[s] . . . ." Pl. GW Ex. 426 at 71:17-72:11. This exemplifies ICI's understanding of maritime attachments and its use of the corporate form to avoid creditors in the maritime industry. Viktor Baranskiy, who controlled ICI with his father, also created a whole host of companies for owning vessels, such as Hachi Holding, which owns Freight Bulk Ltd., which owns FBP, which, in turn, owns the CAPE VIEWER. Pl. GW. Ex. 426 at 24:14-16, 41:22-42-8, 81:15-17. Clearly he continuously persisted in making sure that every ship or two were titled by a different company.

The Court acknowledges that Viktor Baranksiy's deposition testimony was likely referring to Rule B attachments under the <u>Winter Storm</u> regime created by the Second Circuit, <u>Winter Storm Shipping, Ltd. v. TPI</u>, 310 F.3d 263 (2d Cir. 2002), which permitted maritime attachments of wire transfers, before the Second Circuit later overruled itself. <u>Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.</u>, 585 F.3d 58 (2d Cir. 2009). Nevertheless, the rationale for the use of separate corporate forms remains to avoid creditors, no matter Viktor Baranskiy's understanding that creditors are only those possessing the judgment of the court. Pl. GW Ex. 426 at 72:12-73:1.

The Court **FINDS** that ICI, which Viktor Baranskiy and his father controlled and established entities to avoid creditors and take advantage of the peripatetic nature of maritime assets.

### e. ICI CONVEYED THE CHARTER OF THE M/V HARMONY FALCON TO VISTA

Viktor Baranskiy worked as a chartering manager for ICI. He chartered ships on behalf of

12

ICI to transport coal to China on behalf of MetInvest, a Ukrainian company, and its shipping arm, Fayette International Holding, Ltd. The M/V HARMONY FALCON ("HARMONY FALCON") was owned by Falcon Shipping, a Vietnamese Corporation. Pls.' Joint Ex. 6; Pl. GW Ex. 426 at 133. ICI[3] chartered the ship carrying cargo owned by Fayette, International, Pls.' Joint Ex. 6, and listed the HARMONY FALCON in ICI's rejected Greek bankruptcy filing as one of ICI's vessels. Pls.' Joint Ex. 5. The charter rate for the HARMONY FALCON was $18,000 per day. Pls.' Joint Ex. 6.

Vista paid that same charter rate for the same ship and route and cargo despite the drop in shipping rates which occurred in the fall of 2008. Pl. GW Ex. 413 at 5-7; Pls.' Joint Ex. 6. The date of delivery of the vessel was September 28, 2008, Pls.' Joint Ex. 6, which is before the date Vista claimed to begin operations. Indeed, according to Viktor Baranskiy's declaration, Vista began operating in November 2008. Pl. GW Ex. 426 at 32.[4] However, a payment for ocean freight from Trend Index to Vista on October 23, 2008 for nearly $850,000.00 for a contract dated September 22, 2008 confirms that Vista began operations much earlier than Viktor Baranskiy admitted, Pls.' Joint Ex. 232, in either his declaration or on the stand. All of this took place when ICI was clearly insolvent. In addition, a Vista employee listed all Vista charters in an email sent on February 5, 2014 to a prospective client laying out Vista's bona fides to gain the client's confidence and did not include the HARMONY FALCON charter. Pls.' Joint Ex. 44; Trial Tr. 179:13-181-20, Sept. 3, 2014, ECF No. 456. The above information was hidden in one fashion or another from the creditors of ICI.

Auster Marine Co., a subsidiary of ICI, paid the bunker rates for the HARMONY

---

[3] Constantin Voinarovsky was the ICI employee who likely chartered the HARMONY FALCON. Pl. GW Ex. 422 at 62:23-63:4. He later worked for Vista. See *infra* I.C.h.

[4] Viktor Baranskiy changed the story at trial, testifying that Vista began trading in October, Trial Tr. 158:24-159:3, Sept. 3, 2014, ECF No. 456, which is after Auster paid for the bunkers on October 2, 2008. Pl. GW Ex. 431.

FALCON. Pl. GW Ex. 431. Additionally, a wire transfer of $188,000 made to Falcon Shipping for the charter was made through Trend Index, a cash conversion company, Pls.' Joint Ex. 8, from the Baltic Investment Bank of Riga Latvia without any explanation where the cash came from. Pls.' Joint Ex. 8; (Test. of Jeffrey Katz). Ultimately, Vista made about $1.7 million profit for the charter of the HARMONY FALCON, (Test. of Jeffrey Katz); Pls.' Joint Ex. 6 at 1, 7, which sum ICI would have been entitled. Vista also retained all of the other sums advanced to them by or through ICI and its agents or companies.

These facts, coupled with the negative inferences attached to both FBP's refusal to produce ICI documents and Viktor Baranskiy's abrupt departure during trial, lead the Court to **FIND** that: 1) Vista began operating while ICI was insolvent and before ICI filed for bankruptcy; 2) Vista performed ICI's charter of the HARMONY FALCON because ICI either conveyed or provided that charter to Vista at a time when ICI was insolvent; and 3) ICI and Vista purposely tried to hide the fact that Vista made substantial sums from the HARMONY FALCON transaction accomplished by and through the efforts of Viktor Baranskiy.

f. ICI FUNDED VISTA

Although Viktor Baranskiy claims he was paid bonuses as ICI was insolvent, he was not.[5] Rather, these payments from ICI were made in order to capitalize Vista's business. Viktor Baranskiy's testimony has been inconsistent throughout this matter on the value of his bonuses. At first Viktor Baranskiy said that his bonus payments from ICI were around $500,000.00, Pl. GW Ex. 426 at 33:17-34:8, but he later amended that amount, testifying that he earned three-times that much in bonuses for a total of $1.5 million. Trial Tr. 19:4-25, Sept. 3, 2014, ECF No. 456. These inconsistent and rising amounts were used to mask and explain the evidence of ICI's

---

[5] Viktor Baranskiy claims that he received roughly $1 million in cash dollars from his mother in a suitcase. Pl. GW Ex. 426 at 103:9-14, 136:17-137:10. (Manna from heaven.)

transfers to Vista, in the total amount of $1.58 million, which were made on the eve of ICI's rejected bankruptcy and used to capitalize Vista. Def. FBP Ex. 1113. Ultimately, Vista received millions of dollars from ICI or its subsidiaries into its Swiss Bank Account. Id. Vista also received over $2.75 million from Fayette to charter the HARMONY FALCON, id., which charter Vista took from ICI.

Without ICI's records to explain these payments' provenance, and with the negative inference concomitant with both this failure to produce the records and with Viktor Baranskiy's departure in the midst of trial, the Court **FINDS** that ICI's monies were not paid as bonuses and were instead used to help capitalize Vista and especially to hinder, delay, and defraud creditors. Moreover, other funds received by Vista were directly or indirectly related to ICI and also were designed to hinder, delay, and defraud creditors. The Court also **FINDS** that Vista received the payments for the charter of Harmony Falcon, which it received from ICI. These findings evidence a commingling of funds as well as a siphoning of funds into Vista. The Court therefore **FINDS** that ICI funded Vista.

### g. ICI AND ITS SUBSIDIARIES

At the time of ICI's rejected bankruptcy filing, ICI controlled the following subsidiaries: Weaver Investment, Inc. ("Weaver"), Selene Ship Management S.A., Auster Marine, Co., Treselle Navigation Ltd., Cardinia Management Co., and Tempest Service, Inc. Pls.' Joint Ex. 161 at 9. ICI routinely requested third parties to pay Weaver Investment, Inc., not ICI. Pl. GW Exs. 407, 408, 421, 428; (Test. of Alessandro Ballerini). As already found, ICI's insolvency began in July 2008 and continued through October 2008 and thereafter.

Weaver received wire transfers in the total sum of $478 million in 2008 into its HSBC account, which is the same bank ICI uses. Trial Tr. 19:14-16, 24:19-22, Aug. 28-29, 2014, ECF

No. 449. This total would not include checks. Id. at 22:12-20. Of the total, only $2.5 million left the account via wire transfer. Id. at 22:4-6. Interbank transfers from Weaver to ICI cannot be ruled out, nor can checks or bags of cash,[6] as possible gateways for at least some of the monies' destinations from the Weaver account. Id. at 24:5-10, 56:18-24. From September through October 2008 alone, Weaver received $32.6 million in wire transfers, Pl. GW Ex. 428; Trial Tr. 21:3-6, Aug. 28-29, 2014, ECF No. 449, which was not disclosed to the bankruptcy Court in Greece. Pls.' Joint Ex. 252; Trial Tr. 21:7-10, Aug. 28-29, 2014, ECF No. 449. In fact, ICI disclosed only $4.5 million in cash in its rejected bankruptcy filing and not the money paid into Weaver. Pls.' Joint Ex. 252 at 16-17.[7]

In addition, affiliated companies, including Branwyn, Syriana, Noxana, and Phaedra, having the same address as ICI were making withdrawals from ICI and designating the withdrawals as c/o ICI; in total they withdrew approximately $1.8 million from ICI the week before ICI filed for bankruptcy. Pl. GW Ex. 415 at 14-15; (Test. of Jeffrey Katz).

Without ICI's records but with the negative inferences that attach to this lack of production and to Viktor Baranskiy's abrupt departure from trial, as well as the facts above, the Court **FINDS** that: 1) ICI transferred assets to Vista while ICI was insolvent; 2) ICI did not disclose all of its assets in the rejected Greek bankruptcy, 3) ICI used Weaver to hide its assets; and 4) ICI transferred assets out of its accounts immediately preceding its rejected bankruptcy in order to hide funds from creditors.

### h.  ICI AND VISTA SHARE EMPLOYEES AND BUSINESSES

ICI and Vista shared the same employees performing substantially the same tasks. Vista

---

[6] Viktor Baranskiy claimed that as much as a $800,000 dollars of cash were carried around Odessa by him. Trial Tr. 72:8-74:11.

[7] At trial, Grant Lyon testified that this total was $3.5 million. Trial Tr. 26:11-27:1, Aug. 28-29, 2014, ECF No. 449.

employed Michael Ivanov, Vladimir Ivanov, Constantin Voinarovsky, and Vladimir Yudaev, among others. Pls.' Joint Ex. 3; Trial Tr. 100:2-7, 172:15-18, Sept. 3, 2014, ECF No. 456. Mr. Michael Ivanov, Mr. Voinarovsky, and Mr. Yudaev were among Vista's first employees. Trial Tr. 41:12-42:23, Sept. 3, 2014, ECF No. 456.

At ICI, Mr. Michael Ivanov worked in the chartering department, Pls.' Joint Ex. 4; at Vista, he was the head of chartering, Pls.' Joint Ex. 3. At ICI, Mr. Vladimir Ivanov worked in the operations department, Pls.' Joint Ex. 4; at Vista, he ran the operations department, Pls.' Joint Ex. 3. At ICI, Mr. Voinarovsky worked in the chartering department and most likely chartered the HARMONY FALCON, Pl. GW Ex. 422 at 62:25-63:4; Trial Tr. 174:12-15, Sept. 3, 2014, ECF No. 456; he quickly left Vista and joined Milestone, Trial Tr. 41:16-19 Sept. 3, 2014, ECF No. 456; Pl. Flame Ex. 385 at 2. At ICI, Mr. Yudaev worked in the operations department, Pls.' Joint Ex. 4; at Vista, he worked as a chartering manager, Pls.' Joint Ex. 3. In addition, at ICI, Viktor Baranskiy worked as a charterer as well as owning and controlling the corporation with his father; at Vista, Viktor Baranskiy worked on the HARMONY FALCON's charter and controlled the company. Trial Tr. 180:6-11, Sept. 3, 2014, ECF No. 456; Pl. GW. Ex. 426 at 81:18-19. The Court therefore **FINDS** that ICI and Vista shared the same employees performing substantially the same tasks. The Court also **FINDS** that Viktor Baranskiy was the conduit for ICI to the Vista Group and the Palmira Group.

i. CASH CONVERSION COMPANIES

Redbridge and Trend Index are both cash conversion companies. Pl. Flame Ex. 384B at 209:21-210:2; Trial Tr. 104:2-8, Aug. 28-29, 2014, ECF No. 449. They convert wire transfers to cash and vice-versa. These are red flags for fraud, (Test. of Jeffrey Katz), and can be conduits when placed between a debtor and a recipient. Trial Tr. 100:17-22, Aug. 28-29, 2014, ECF No.

449.

The cash conversion companies were used to funnel money from ICI to Vista. For example, Syriana Marine, an affiliated company of ICI's, sent money to Redbridge and shortly after Redbridge sent money to Vista. Pl. GW Ex. 415 at 15, 17; (Test. of Jeffrey Katz). Trend Index also wired Vista $1.5 million on October 24, 2008 as remittance orders, which was nine days after ICI's rejected bankruptcy filing. Def. FBP Ex. 1113 at 1; Trial Tr. 105:22-107:11, Aug. 28-29, 2014, ECF No. 449.

The Court therefore **FINDS** that ICI and Vista used cash conversion companies to mask payments from ICI to Vista and from affiliated third parties in and out of Vista.

In addition, Palmira Group funds are also routinely siphoned to cash conversion companies, which convert funds earned in various currencies to cash, in U.S. dollars. Pl. Flame Ex. 384A at 38:13-18; Trial Tr. 17:6-14, Aug. 26, 2014, ECF No. 441. The U.S. dollars are then placed into "cash boxes" at a local bank. Pl. Flame Ex. 384A at 34:6-7, 36:6-38:18. In effect, the funds of many different companies within the Palmira Group are routinely converted to cash and intermingled within a single cash box. Id. at 40:22-41:4, 187:24-188:9, 201-06; Pls.' Joint Ex. 146; Trial Tr. 4:6-12, Aug. 26, 2014, ECF No. 441; Trial Tr. 72:18-22, Sept. 3, 2014, ECF No. 456. Employee salaries are low, but cash bonuses are provided. Pl. Flame Ex. 384A at 40:20-25, 41:2-4. The money is kept in a bank box and is converted from wire transfers into cash, id. at 38:7-18.

The Court therefore **FINDS** that the Palmira and Vista entities intermingled cash and did not conduct arm's-length transactions all of which mirrored ICI's actions.

j. VISTA AND PALMIRA AND THEIR SUBSIDIARIES

As of June 2012, forty companies made up the Vista Group, which Viktor Baranskiy

controlled. Pl. Flame Ex. 384A at 14:22-24. The Palmira Group supplanted the Vista Group sometime between March and July 2013, id. at 30:2-6, Pl. Flame Ex. 384B at 175:23-179-20, and Viktor Baranskiy controls all of the sixty Palmira Group companies, which overlap with the Vista Group of companies. Pl. Flame Ex. 384A at 33:25-34:2-3; 49:16-20. Vista Shipping Ltd. is now a part of the Palmira Group. Id. at 59:18-19. The Court therefore **FINDS** that Viktor Baranskiy controls every entity that comprised and/or comprises the Vista Group and the Palmira Group.

Ekaterina Bobrenko further testified that the companies within the Palmira Group routinely transfer money to one another, without the usual corporate formalities of written loan agreements or other documentation. Pl. Flame Ex. 384B at 169, 256:9-16. Bobrenko also testified that many Palmira Group companies do not have bank accounts. Id. at 183:16-23. Moreover, as a general practice, the Palmira Group of companies often leaves a particular constituent company's bank account undercapitalized and then transfers funds from other Palmira entities on an as-needed basis in order to pay expenses or buy vessels. Id. at 125:18-25, 135:3-20, 256:5-20.

In addition, according to the sanctions leveled against FBP, the Sea Traffic "loan," whereby Vista provided Sea Traffic funds which Sea Traffic then transferred to FBP for the purchase of the CAPE VIEWER, Pl. GW Ex. 426 at 161:4-12, was a sham transaction used to avoid creditors.

The Court therefore **FINDS** that the Palmira and Vista entities commingled funds, disregarded the corporate form, and used financial transfers to avoid creditors.

### k. VISTA'S CHIEF FINANCIAL OFFICER

Vista and now Palmira's Chief Financial Officer ("CFO"), Ekaterina Bobrenko, is CFO

in name only. Ms. Bobrenko has taken no accounting courses. Pl. Flame Ex. 384A 15:21-23. She cannot make wire transfers on behalf of the Palmira Group. Id. at 30:7-13. She has made transfers on behalf of and on the instruction of Viktor Baranskiy without an invoice. Id. at 44:20-22. And she was not working on the financial audit for the Viktor Baranskiy companies but instead was preparing for this trial. Id. at 81:18-25. Viktor Baranskiy also withdrew cash payments for his personal use from Alpen Shipmanagement Co. ("Alpen"), which belongs to the Vista Group, Pl. Flame Ex. 384B at 134:7-9, including funds for a private school in Switzerland and a skiing vacation to that alpine nation. Id. at 248:20-23, 252:3-8; Trial Tr. 24:9-15, Aug. 26, 2014, ECF No. 441. A weak CFO coupled with a dominant Chief Executive Officer ("CEO") is a red flag for fraud and can allow inappropriate activities in companies like those of Viktor Baranskiy. (Test. of Jeffrey Katz).

Her testimony establishes that she exercises almost no leadership over the financial affairs of the Palmira Group companies. Instead, she follows the orders of Viktor Baranskiy, and her daily job duties involve making transfers at Viktor Baranskiy's direction and without invoices, and managing the employees of the accounting department.

The Court therefore **FINDS** that Vista's CFO was totally dominated by Viktor Baranskiy, that Viktor Baranskiy used Vista's funds as his own, and that Viktor Baranskiy disregarded the corporate forms of his companies to avoid any problems of any one entity.

## l.   VISTA'S LOAN AGREEMENTS

Sergei Baramskiy is currently a shareholder of Chaika Agency Co. Ltd. ("Chaika"), Pl. Flame Ex. 388 at 14-15, which provides chartering and operational services to Milestone Shipping S.A. ("Milestone"). Pl. Flame Ex. 385 at 5. Chaika is controlled by Sergei Baranskiy and Vladimir Tarasov, who are both shareholders and directors of Industrial Carriers. Milestone

and Chaika share an address and are located at 1 Chernomorskaya Str., Apt. 34, 65014, Odessa, Ukraine, the same address as Diamant[8] and IC Ukraine, both ICI-related entities. Pls.' Joint Ex. 251 at 1; Pl. Flame Exs. 385 at 7, 388 at 5; Pl. GW Ex. 426 at 39:10-17. Sergei Baranskiy, Viktor's father, is a shareholder of Milestone. Vladimir Tarasov, a fourteen percent (14%) shareholder of ICI, Pls.' Joint Ex. 161 at 35, is also a shareholder of Milestone Shipping S.A. Trial Tr. 45:20-46:6, Sept. 3, 2014, ECF No. 456. Milestone was founded at the end of 2008, which was on or about the time ICI had filed for bankruptcy. Trial Tr. 45:20-22, Sept. 3, 2014, ECF No. 456; Pl. Flame Ex. 385 at 1.

Milestone provided approximately $7.2 million to Vista and its related companies Palmira Enterprises and Alpen in 2009 and 2010. Pls.' Joint Exs. 124, 126-29, 133, 135, 140. One of the "loans" from Milestone to Vista is actually signed on behalf of Palmira, not Vista, by Viktor Baranskiy. Pls.' Joint Ex. 124 at 2. And transfers have continued, with $10.2 million transferred from Milestone in more ostensible, alleged loans from 2011 through 2013. Pls.' Joint Exs. 130-32, 134, 136-39. All of these "loans" are to be repaid "according to financial liquidity of the company." Pls.' Joint Exs. 124, 126-140. These funds were for business expenses and operations. Pl. Flame Ex. 384B at 125:18-25, 135:3-20. Palmira and Alpen then repaid most of these "loans," and did so without interest. Def. FBP Exs. 1075, 1096. Vista also has made a loan to Milestone in 2008; that transfer from Vista to Milestone was most likely to cover "everyday activities." Pl. Flame Ex. 384B at 117:23-118:15.

Thus Milestone continues to provide short term alleged loans to the Vista and Palmira Groups without consideration or enforceable contracts to fund everyday business expenses and operations. And the Vista and Palmira Groups then repaid them but never with interest, and Vista

---

[8] Diamant was created by Sergei Baranskiy and Viktor Baranskiy's godfather among other persons. Pl. GW Ex. 85 at 15-20.

once provided a loan to Milestone for similar y business activities. However, these so called loan agreements do not have repayment terms and are given without consideration. Given Milestone's connections with ICI, the amounts transferred to Vista, Palmira, and Alpen by Milestone and vice versa constitute continuing transfers from and to ICI shareholders and their entities. The transactions also evidence a relationship between ICI shareholders and across ostensibly "separate" business entities.

The Court therefore **FINDS** that Vista: 1) received funding from Milestone; 2) continues to enjoy funding from Milestone; 3) does not engage in arm's length transactions with Milestone; and 4) receives funds without security and with unusual terms of credit from Milestone and provides the same. It further **FINDS** that Milestone and Vista were so close as to be virtually part of each other, and that all of these actions were controlled by Viktor Baranskiy and his father.

## II.   CONCLUSIONS OF LAW

### A. JURISDICTION

The Court has jurisdiction over Flame's attachment pursuant to 28 U.S.C. § 1333. Flame S.A. v. Indus. Carriers, Inc., 2014 WL 108897 (E.D. Va. Jan. 10, 2014) aff'd, Flame S.A. v. Freight Bulk Pte. Ltd., 2014 WL 3828075, ____ F.3d ____ (4th Cir. Aug. 5, 2014).

Glory Wealth's underlying arbitration award covers a breach of charter party between it and ICI. The Court has jurisdiction over admiralty claims pursuant to 28 U.S.C. § 1333, and charter party contracts sound in admiralty. The Volunteer, 28 F. Cas. 1260 (C.C.D. Mass. 1834) (Story, J.).

### B. JUDGE LEONARD'S SANCTIONS

#### 1. ICI'S DOCUMENTS

The Court has repeatedly found that Viktor Baranskiy, and thus FBP, has control over ICI's documentation. The Court based its conclusions on E.I. DuPont de Nemours & Co. v.

Kolon Indus., Inc., 286 F.R.D. 288, 292 (E.D. Va. 2012), and Steele Software Sys., Corp. v. DataQuick Info. Sys., Inc., 237 F.R.D. 561, 564 (D. Md. 2006). The Court explained its reasoning in its April 23, 2014 Opinion and Order, Flame S.A., 2014 WL 1681426, ECF No. 192, and its August 26, 2014 Order, Flame S.A., 2014 WL 4214837, ____ F.Supp.2d ____, ECF No. 430. In addition, the Court made the following conclusion of law regarding Viktor Baranskiy's control over ICI's documents.

ICI is a Marshall Islands corporation, and The Marshall Islands adopt Delaware law, except where the Marshall Islands Business Corporations Act conflicts with Delaware law, in which case Marshall Island law controls.[9] MIBCA, Division I, § 13; see Litwin v. OceanFreight, Inc., 865 F. Supp. 2d 385, 397 (S.D.N.Y. 2011) (citing Rosenquist v. Economou et al., Supreme Court Case No. 2010–002, at 10 (Supreme Court, Republic of Marshall Islands Oct. 5, 2011)). Under Marshall Islands law:

> Any shareholder or holder of a voting trust certificate in person or by an attorney or other agent, may during the usual hours of business inspect, for a purpose reasonably related to his interests as a shareholder, or as the holder of a voting trust certificate, and make copies or extracts from the share register, books of account, and minutes of all proceedings.

MIBCA, Division 8, § 81. Delaware law makes similar provision. Del. Code title 8, subchapter VII, § 220. Under either provision, Viktor Baranskiy, an eighteen percent (18%) shareholder in ICI, had the means and authority to inspect and make copies of the ICI documents, which were not produced although they were required by discovery. The Court **FINDS** that these documents would be adverse to the Defendant's defense.

---

[9] This provision does not apply to resident domestic corporations.   MIBCA, Division 1, § 13.   ICI was based in Greece and the Ukraine.

## C. ALTER EGO

### 1. DETERMINING WHETHER ENTITIES ARE ALTER EGOS

All parties to the trial agree that federal common law applies.[10] Courts in the Fourth Circuit apply federal common law and may look to state law in situations where there is no admiralty rule on point. Ost–West–Handel Bruno Bischoff GmbH v. Project Asia Line, 160 F.3d 170, 176 (4th Cir. 1998) (citing Byrd v. Byrd, 657 F.2d 615, 617 (4th Cir. 1981); Bell v. Tug Shrike, 332 F.2d 330, 332–33 (4th Cir. 1964)). In the Fourth Circuit, the federal maritime, common law alter ego factors are set forth in Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 544 (4th Cir. 2013). These factors include:

> gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of officers, control by a dominant stockholder, and injustice or fundamental unfairness[,] . . . intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length.

Id. (citations and internal quotation marks omitted). "The conclusion to disregard the corporate entity may not, however, rest on a single factor, whether undercapitalization, disregard of [a] corporation's formalities, or what-not, but must involve a number of such factors; in addition, it

---

[10] The Second Circuit has recently held that admiralty courts must engage in Lauritzen choice of law analysis to determine the law applicable to piercing the corporate veil in admiralty actions. Blue Whale Corp. v. Grand China Shipping Dev. Co., 722 F.3d 488, 497-500 (2d Cir. 2013). Under a Lauritzen choice of law analysis, federal common law, or Vitol, would result. Lauritzen v. Larsen, 345 U.S. 571, 583-91 (1953). Specifically, the wrongful acts took place in a number of nations, including Ukraine, Greece, the British Virgin Islands, Latvia, Switzerland, Singapore, and the Marshall Islands. The CAPE VIEWER flies the Singaporean flag. Plaintiffs are Singaporean and Swiss corporate entities. Defendants are from various nations: FBP is a Singaporean entity; Vista is a British Virgin Islands entity; ICI is Marshall Islands Company operated from Ukraine and to a lesser extent, Greece, where its bankruptcy application was filed and rejected; and Sergei Baranskiy and Viktor Baranskiy are Ukrainian citizens. The places of the underlying contracts at issue may be numerous. The property at issue in this dispute, the CAPE VIEWER, is under attachment in this district. A foreign forum would not be easily accessible here because the action is based on the attachment available only where the CAPE VIEWER is located. Finally, "the basic tenet upon which Lauritzen is premised will be satisfied here by using federal common law because its application reflects an implicit 'resol[ution of] conflicts between competing laws by ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved.'" Blue Whale Corp., 722 F.3d at 499 (citing Lauritzen, 345 U.S. at 582.). The location of the CAPE VIEWER being the strongest point of contact in this dispute and for the many competing factors, federal common law will apply.

must present an element of injustice or fundamental unfairness." <u>De Witt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.</u>, 540 F.2d 681, 687 (4th Cir. 1976). An element of injustice or fundamental unfairness is the most important factor. <u>Ost–West–Handel</u>, 160 F.3d at 176. "[T]he question of whether to pierce the corporate veil is a fact-intensive inquiry . . . . and it is only in those 'extraordinary cases, such as the corporate form being used for wrongful purpose,' where 'courts will pierce the corporate veil and disregard the corporate entity.'" <u>Vitol</u>, 708 F.3d at 544. In addition, the alter ego analysis is not limited to the time a second or subsequent company forms but is more flexible and functional. <u>N.L.R.B. v. Crossroads Elec., Inc.</u>, 178 Fed. App'x 528, 534-35 (6th Cir. 2006).

2.   THE EFFECTS OF A DETERMINATION THAT ENTITIES ARE ALTER EGOS

Natural persons can be the alter ego of a corporation and vice versa. <u>See</u> e.g., <u>Walkovszky v. Carlton</u>, 18 N.Y. 2d 414, 417 (1966). Alter egos are jointly and severally liable for the debts of one another. <u>MedRehab v. Evangeline of Natchitoches, Inc.</u>, 1998 WL 671287, at *1 (E.D. La. Sept. 24, 1998); <u>see</u> 18 AM. JUR. § 51 at 698-700 (2d ed. 2013).

D.   FRAUDULENT TRANSFER

In admiralty, courts apply federal common law and may look to state law in situations where there is no admiralty rule on point. <u>Ost–West–Handel</u>, 160 F.3d at 176.[11,12] The Court has already applied Virginia law to this case with respect to fraudulent transfer when it determined that under Virginia law, no statute of limitation applies to fraudulent transfers under Va. Code §55.80, but laches instead is the test. Op. & Order at 11, ECF No. 249. Unlike the substantial precedent examining alter ego in admiralty, there is no admiralty rule on point for fraudulent

---

[11] Under the <u>Lauritzen</u> choice of law analysis, conducted above, federal common law would result. <u>See</u> supra note 10.
[12] The Plaintiffs agree that Virginia law applies, although Glory Wealth also seeks the application of Delaware law, whereas FBP did not propose any applicable law.

transfer, the Court therefore applies Virginia law to the question of fraudulent transfer.

The Virginia Code provides that:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Va. Code §55-80. The statute requires the transfer be made with the intent to hinder or delay. 9A MICHIE'S JURISPRUDENCE § 12 at 17 (2010). The intent to defraud one creditor renders the transfer void as to all creditors. Id. at 17-18. Both the grantor and grantee must have the same fraudulent purpose. Id. § 14 at 19. Intent is inferred from the circumstances surrounding a transfer; these circumstances are known as "badges of fraud." These badges include: the relationship of the parties, the grantor's insolvency, pursuit of the grantor by creditors at the time of the transfer, want of consideration, retention of the property by the grantor, and fraudulent incurrence of indebtedness after the conveyance, gross inadequacy of price, no security taken for the purchase money, unusual length of credit, and bonds taken at long period. Id. § 15 at 22. Once a prima facie case of fraud is demonstrated, the burden shifts to the party attempting to claim the transfer was fair. Id. Clearly these badges of fraud have been proven in this case.

## E. THE COURT DOES NOT HAVE PERSONAL JURISDICTION OVER THE DEFENDANTS

None of the Defendants in this case are present in the Eastern District of Virginia, with the exception of the CAPE VIEWER remaining at attachment in the Chesapeake Bay. Flame and Glory Wealth have pursued claims under Supplemental Admiralty Rule B, which permits the attachment of a vessel in a district where the defendant is not found. Supplemental Rule B(1)(a). The rule is titled "In Personam Actions: Attachment and Garnishment," but does not confer

traditional *in personam* jurisdiction over a party owning a vessel but rather Supplemental Rule B *in personam* jurisdiction. This distinction is important because the action is limited to the value of the attached vessel and is better understood as conferring *quasi in rem* jurisdiction. Woodlands Ltd. v. Nationsbank, N.A., 164 F.3d 628 (4th Cir. 1998) ("A Rule B attachment case is, therefore, a *quasi in rem* action instituted for the purpose of (1) asserting jurisdiction over the defendant *in personam* through the property and (2) to assure satisfaction of any judgment.").

Flame argues that its service of Viktor Baranskiy while he attended trial was proper; that service of one alter ego amounts to service of all alter egos; and that the service of Viktor Baranskiy therefore confers personal jurisdiction in this Court over ICI, Vista, Viktor Baranskiy, and FBP. The Court does not agree.

Service of ICI and Vista was likely proper for notice. Flame Served ICI in the Marshall Islands. ECF No. 339. Glory Wealth served ICI in New York and the Marshall Islands. ECF Nos. 264, 436. Both Flame and Glory Wealth served Vista under the terms of the Hague Convention in the British Virgin Islands. ECF Nos. 320, 362.[13] However, neither Defendant has any contacts with the Eastern District of Virginia and service must still comport with due process.[14] Therefore, in order to obtain personal jurisdiction under the theories of service via

---

[13] Flame also seems to have served Vista in the British Virgin Islands earlier in this matter but did not request default based on that apparent service. ECF No. 131.

[14] When an admiralty Court's *in personam* jurisdiction is invoked, personal jurisdiction depends upon valid service comporting with due process. 1 Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW § 3-2 at 116-17 (5th ed. 2013). Courts apply a three-prong test to determine whether minimum contacts exist to satisfy due process. Id. at 117 n.20. Here, neither Vista, ICI, nor even Viktor Baranskiy has purposely directed their activities toward the forum state or purposely availed themselves of the privileges of conducting activities here beyond the CAPE VIEWER's presence; Plaintiffs' causes of action arose years ago when ICI defaulted on its obligations and did not rise from any forum-related contacts with the exception of the attachment of the vessel; and for the reasons articulated in this section, personal jurisdiction would be unfair and unreasonable over these foreign entities. Id (citing Nuovo Pignone, SpA v. Storman Asia M/V, 310 F.3d 374, 378 (5th Cir. 2002) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). Indeed, personal jurisdiction here would "offend traditional notions of fair play and substantial justice," Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945) and erode the purposes of Supplemental Rule B. For these reasons and those articulated elsewhere in this Memorandum Opinion, the Court concludes that it cannot exercise personal jurisdiction over ICI and Vista.

alter ego advanced by Flame, Flame's service of Viktor Baranskiy must have been proper. It was not.

Suitors and witnesses are immune from service of process in federal courts. 62B AM. JUR. § 22 at 614 (2d ed. 2013).[15] The doctrine of immunity results when the individual claiming immunity came into the jurisdiction for the convenience of the court. Id. at 615. Generally nonresident litigants are "privileged from service of process while going to, attending, or returning from, court," and this rule is "especially true where parties may be examined as witnesses, or where such a party is attending a trial to testify as a witness." Id. § 27 at 617-618

Viktor Baranskiy attended the trial after the Court denied FBP's motion to permit him to testify from Odessa, Ukraine. Mem. Op., ECF No. 415. Flame S.A., 2014 WL 4181958, ECF No. 415. The Court wrote then, and it emphasizes now, the importance of observing the demeanor, comportment, and answers of important witnesses. Id. No witness was more important in this matter than Mr. Baranskiy, and his arrival and appearance at trial was for the Court's convenience as fact-finder. Viktor Baranskiy's disappearance mid-trial attests to the critical nature of his testimony, as his answers were becoming confused and contradictory and to the detriment of FBP's positions. Viktor Baranskiy's presence was based on his position as the corporate representative of FBP, which he controls, and was not a personal appearance. His attorney also objected to the service during a break in the trial. Thus Viktor Baranskiy's appearance was as a witness and litigant and based upon the convenience of the Court.

Permitting service upon Viktor Baranskiy under these circumstances would have a chilling effect on witness appearances. Witnesses will simply refuse to appear, and justice will suffer. Under such a regime, the jury and the Court will be forced to rule upon half-explanations

---

[15] Virginia law contains substantially the same immunity and is similarly based on the benefit conferred on the Court and the administration of justice. 14B MICHIE'S JURISPRUDENCE § 4 at 604-07. (2010). Thus Virginia law also bars service on Viktor Baranskiy.

and stories, not the complete record. The Court will not create such a regime, even in part.

Finally, the Court notes that permitting personal jurisdiction over ICI and Vista when neither entity has any contact with the Eastern District of Virginia with the exception of the CAPE VIEWER (as a consequence of the Court's finding below that the entities are alter egos), obviates due process and would open American corporations to similarly far-reaching attempts by foreign courts to exercise sweeping power. Global service and consequent personal jurisdiction of foreign parties with no connection to the United States District Court in question are not attributes of federal civil procedure, nor has such a scheme ever been.

## III. APPLICATION

### A. ICI, VISTA, VIKTOR BARANSKIY, AND FBP ARE ALTER EGOS OF EACH OTHER

As the Court has already concluded in its sanctions, Vista and FBP are alter egos of each other. Flame S.A., 2014 WL 3895933, at *13; Flame S.A., 2014 WL 4214837, at *12 _____ F.Supp.2d ____, ECF No. 430.

The Court has drawn adverse inferences against FBP, which was and is controlled by Viktor Baranskiy, for its failure to provide any ICI documents to Plaintiffs in violation of the Court's April 30, 2014 discovery Order. ECF No. 377 at 24. Thus, to the extent documents were not provided to the Plaintiffs, the Court **FINDS** that the contents of those documents would have been helpful to Plaintiffs and harmful to Defendants. In addition, the Court found further negative inferences from Viktor Baranskiy's disappearance mid-way through his cross examination by Flame. These inferences coupled with the facts present here support a finding that ICI, Vista, Viktor Baranskiy, and FBP are alter egos of one another under the Vitol factors.

The Vitol factors include:

gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities and maintain proper corporate records, non-functioning of

officers, control by a dominant stockholder, and injustice or fundamental unfairness[,] . . . intermingling of funds; overlap in ownership, officers, directors, and other personnel; common office space; the degrees of discretion shown by the allegedly dominated corporation; and whether the dealings of the entities are at arm's length.

Vitol, 708 F.3d at 544. No one single factor can support an alter ego finding, De Witt, 540 F.2d at 687, but the factor of injustice or fundamental unfairness is the most important in an alter ego analysis. Ost–West–Handel, 160 F.3d at 176.

The findings of fact have shown ICI was insolvent at the time of Vista's beginning. ICI's funds were siphoned through cash conversion companies to Vista and Viktor Baranskiy. Viktor Baranskiy uses Vista's funds for his personal expenses and enjoyment. Neither ICI nor Vista and its affiliated companies observe corporate formalities, with some Vista and Palmira companies having no bank account and freely transferring each other funds. Vista's CFO is not a functioning director but a tool of Viktor Baranskiy. Viktor Baranskiy controls all the Vista and Palmira companies, making all decisions for each company within the groups. He and his father control ICI through their majority interest in the corporation. ICI's money funded Vista, and the many Vista and Palmira companies continue to intermingle their funds via sham transactions whereby funds are transferred between one company or another in disregard of corporate formalities and on an as-needed basis. These transfers are disguised as "loans," but are, in reality, security- and interest-free transfers of funds. ICI and Vista have a substantial overlap in ownership, with Viktor Baranskiy controlling Vista, and he and his father controlling ICI. ICI and Vista employed the same individuals in substantially the same roles. ICI's subsidiary, Columbus Maritime, hung its sign over Vista's office space in 2009. Trial Tr. 169:4-23, ECF No. 456. No Vista or Palmira company has discretion to act without Viktor Baranskiy's word. ICI created corporations to avoid creditors, especially Rule B attachments. Finally, this entire

30

web of companies, their financial intermingling, and the many facts found here work a great injustice and fundamental unfairness against the creditors of ICI, Vista, Viktor Baranskiy, and FBP, as pursuing these entities and their related companies becomes extremely difficult and corrupts normal business dealings.

All these factors lead inevitably to the conclusion that ICI, Vista, Viktor Baranskiy, and FBP are alter egos of one another, and the Court so **FINDS.**

As a consequence of this finding, ICI, Vista, Viktor Baranskiy, and FBP are liable for each other's debts. MedRehab, 1998 WL 671287, at *1; see 18 AM. JUR. § 51 at 698-700 (2d ed. 2013). In this matter, this liability rises up to the value of the CAPE VIEWER. The same effect—that is liability up to the value of the Vessel—would result with respect to ICI and Vista, which were likely properly served, under a default judgment, as the Court has already concluded that it cannot exercise personal jurisdiction over either. See supra § II.E.

### B. ICI FRAUDULENTLY TRANSFERRED THE CHARTER OF THE M/V HARMONY FALCON AND ASSETS TO VISTA

The Court has drawn adverse inferences against FBP for its failure to provide any ICI documents to Plaintiffs in violation of the Court's April 30, 2014 discovery Order. ECF No. 377 at 24. Therefore, to the extent documents were not provided to the Plaintiffs, the Court **FINDS** that the contents of those documents would have been helpful to the Plaintiffs and harmful to Defendants. Additionally, the Court **FINDS** that Viktor Baranskiy's testimony on cross examination would have been detrimental to FBP's positions. This inference coupled with the facts present here support a finding that ICI fraudulently transferred the charter of the HARMONY FALCON and assets to Vista.

The Virginia Code provides that:

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, every suit commenced or decree, judgment or execution suffered or

31

obtained and every bond or other writing given with intent to delay, hinder or defraud creditors, purchasers or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors, purchasers or other persons, their representatives or assigns, be void. This section shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

Va. Code §55-80. The statute requires the transfer be made with the intent to hinder or delay. 9A MICHIE'S JURISPRUDENCE § 12 at 17 (2010). Both the grantor and grantee must have the same fraudulent purpose. Id. § 14 at 19. Intent is inferred from the circumstances surrounding a transfer; these circumstances are known as "badges of fraud." These badges include: the relationship of the parties, the grantor's insolvency, pursuit of the grantor by creditors at the time of the transfer, want of consideration, retention of the property by the grantor, fraudulent incurrence of indebtedness after the conveyance, gross inadequacy of price, no security taken for the purchase money, unusual length of credit, and bonds taken at long period, Id. § 15 at 22, all of which exist in this case.

As concluded above, ICI, Vista, Viktor Baranskiy, and FBP are alter egos. ICI was insolvent at the time it gave the charter of the HARMONY FALCON to Viktor Baranskiy's Vista and made money transfers to Viktor Baranskiy's Vista. Viktor Baranskiy and Vista gave no consideration for the charter of the HARMONY FALCON nor the initial funds of Vista, which were not commissions for Viktor Baranskiy's work. After providing the HARMONY FALCON charter and its assets to Vista, ICI officially filed for bankruptcy in Greece. Vista paid nothing for the charter of the HARMONY FALCON but made a substantial profit on the charter and received substantial funds from or through ICI, which it continued to retain. Finally, Milestone, an ICI offshoot, continues to provide ostensible "loans," which are in reality security- and interest-free transfers of funds to Vista for operational expenses made with indefinite repayment periods.

32

These badges of fraud coupled with the negative inferences resulting from FBP's discovery and trial abuses evidence ICI's and Vista's intent to hinder, delay, and defraud ICI's creditors and did so. Therefore, the Court **FINDS** that ICI fraudulently transferred its assets as well as the charter of the HARMONY FALCON to Vista.

IV.     **CONCLUSION**

For the reasons herein, the Court **FINDS** that: 1) ICI, Vista, FBP, and Viktor Baranskiy are alter egos of each other and 2) ICI fraudulently transferred its assets as well as the charter of the HARMONY FALCON to Vista. ICI, Vista, FBP, and Viktor Baranskiy are therefore jointly and severally liable up to the value of the CAPE VIEWER to Flame and Glory Wealth. A separate Judgment in accordance with Rule 58 of the Federal Rules of Civil Procedure will issue.

The Clerk is **DIRECTED** to forward a copy of this Memorandum Opinion to all Counsel of Record.

**IT IS SO ORDERED**.

/s/

Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
September 1?, 2014